UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

REX – REAL ESTATE EXCHANGE, INC., a Delaware corporation,

Plaintiff,

v.

ZILLOW, INC., a Washington corporation; ZILLOW GROUP, INC., a Washington corporation; ZILLOW HOMES, INC., a Delaware corporation; ZILLOW LISTING SERVICES, INC., a Washington corporation; ZILLOW GROUP MARKETPLACE, INC., a Washington corporation; TRULIA, LLC, a Delaware limited liability company; and THE NATIONAL ASSOCIATION OF REALTORS, an Illinois trade association,

Defendants.

No. 2:21-cv-00312

MOTION FOR PRELIMINARY INJUNCTION

**NOTED: April 2, 2021**

**ORAL ARGUMENT REQUESTED**

MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:21-cv-00312

54269733.7

**TABLE OF CONTENTS**

*Page*

I.    INTRODUCTION ...................................................................................................................1

II.   RELEVANT FACTS ............................................................................................................4

    A.   The Cartel Wields Arcane Anti-Consumer Rules To Entrench The Pre-Internet Way Of Doing Business. ...............................................................................4

    B.   REX Innovates A New Model That Benefits Consumers. ......................................4

    C.   Zillow Acquires Trulia And Achieves Market Dominance....................................5

    D.   Zillow Joins The Cartel And Denies REX Fair Access To Its Platform. ...............6

III.  LEGAL STANDARD............................................................................................................7

IV.   ARGUMENT.........................................................................................................................8

    A.   REX Is Likely To Succeed In Showing That Defendants' Restraint On Trade Violates Federal And State Antitrust And Unfair Competition Law. ...........8

        1.   Defendants' group boycott is illegal *per se* under the Sherman Act. ..........8

        2.   Zillow's search display is a deceptive practice that harms the public and violates Washington's Consumer Protection Act. ...................14

    B.   REX Has Been Irreparably Harmed, And That Injury Grows Worse By The Day...........................................................................................................................17

        1.   Defendants' unlawful conspiracy irreparably injures competition............18

        2.   Defendants' conduct has irreparably harmed REX's brand and goodwill. ...................................................................................................20

    C.   The Remaining Factors Favor An Injunction. ......................................................22

        1.   The balance of hardships tips strongly in favor of REX...........................22

        2.   The public interest disfavors Defendants' anti-consumer restraint on trade and favors more consumer choices and fair competition.............22

    D.   Alternatively, REX Is Entitled To An Injunction Under The "Serious Questions" Test.....................................................................................................23

V.    CONCLUSION....................................................................................................................23

MOTION FOR PRELIMINARY INJUNCTION - i
Case No. 2:21-cv-00312

**FOSTER GARVEY PC**
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

# TABLE OF AUTHORITIES

*Page*

## Cases

*Adidas Am., Inc. v. Skechers USA, Inc.*,
  890 F.3d 747 (9th Cir. 2018) ............................................................................... 20

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
  750 F.2d 1470 (9th Cir. 1985) .............................................................................. 18

*Apple Inc. v. Psystar Corp.*,
  658 F.3d 1150 (9th Cir. 2011) .............................................................................. 20

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016) ......................................................................... 22, 23

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012)............................................................................... 18

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ............................................................................... 20

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013)............................................................................. 18

*Fed. Trade Comm'n v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986)................................................................................... 8, 9, 11

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
  719 P.2d 531 (Wash. 1986)................................................................................... 16

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ......................................................................... 18, 20

*Image Tech. Servs. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) .............................................................................. 22

*Innovation Law Lab v. Wolf*,
  951 F.3d 1073 (9th Cir. 2020) ................................................................................ 7

*Jorgenson v. Cassiday*,
  320 F.3d 906 (9th Cir. 2003) ............................................................................... 23

*Keithly v. Intelius Inc.*,
  764 F. Supp. 2d 1257 (W.D. Wash. 2011)........................................................... 14, 15

*Nw. Airlines, Inc. v. Ticket Exch., Inc.*,
  793 F. Supp. 976 (W.D. Wash. 1992)..................................................................... 15

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985)................................................................................... 8, 9, 14

*Panag v. Farmers Ins. Co. of Wash.*,
  204 P.3d 885 (Wash. 2009)............................................................................. 14, 15

*Peoples v. United Servs. Auto. Ass'n*,
  452 P.3d 1218 (Wash. 2019)............................................................................ 14, 17

*Realcomp II, Ltd. v. Fed. Trade Comm'n*,
  635 F.3d 815 (6th Cir. 2011) ........................................................................... 10, 11

MOTION FOR PRELIMINARY INJUNCTION - ii
Case No. 2:21-cv-00312

**FOSTER GARVEY PC**
**1111 THIRD AVENUE, SUITE 3000**
**SEATTLE, WASHINGTON 98101-3292**
**PHONE (206) 447-4400**

54269733.7

*Regents of Univ. of California v. Am. Broad. Cos.*,
  747 F.2d 511 (9th Cir. 1984) ................................................................................................. 22

*Rush v. Blackburn*,
  361 P.3d 217 (Wash. Ct. App. 2015) ..................................................................................... 14

*Sing v. John L. Scott, Inc.*,
  948 P.2d 816 (Wash. 1997) ............................................................................................. 14, 15

*St. Paul Fire Marine Ins. Co. v. Barry*,
  438 U.S. 531 (1978) ................................................................................................................. 8

*Standard Oil Co. v. United States*,
  221 U.S. 1 (1911) ................................................................................................................... 22

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
  240 F.3d 832 (9th Cir. 2001) ........................................................................................... 18, 20

*Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*,
  840 F.2d 653 (9th Cir. 1988) ........................................................................................... 17, 18

*Thornell v. Seattle Serv. Bureau, Inc.*,
  363 P.3d 587 (Wash. 2015) .................................................................................................... 16

*Towery v. Brewer*,
  672 F.3d 650 (9th Cir. 2012) ............................................................................................. 7, 23

*Toys "R" US, Inc. v. Fed. Trade Comm'n*,
  221 F.3d 928 (7th Cir. 2000) .................................................................................... 8, 9, 10, 11

*United States v. BNS, Inc.*,
  858 F.2d 456 (9th Cir. 1988) ........................................................................................... 18, 20

*United States v. Realty Multi-List, Inc.*,
  629 F.2d 1351 (5th Cir. 1980) ......................................................................................... 11, 12

*Volga Dnepr UK Ltd. v. Boeing Co.*,
  464 F. Supp. 3d 1238 (W.D. Wash. 2020) .............................................................................. 7

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................................... 18

**Statutes**

15 U.S.C. § 1 .................................................................................................................................. 8

15 U.S.C. § 26 ................................................................................................................................ 7

RCW 19.86.010 ........................................................................................................................... 15

RCW 19.86.020 ........................................................................................................................... 14

RCW 19.86.090 ........................................................................................................................... 14

RCW 19.86.093 ........................................................................................................................... 16

**Other Authorities**

XIII P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their
  Application (4th ed. 2019) ...................................................................................................... 12

MOTION FOR PRELIMINARY INJUNCTION - iii
Case No. 2:21-cv-00312

**FOSTER GARVEY PC**
**1111 THIRD AVENUE, SUITE 3000**
**SEATTLE, WASHINGTON 98101-3292**
**PHONE (206) 447-4400**

54269733.7

## I.   INTRODUCTION

This case presents a classic antitrust violation: The legacy members of a cartel, committed to preserving their high profits and old way of doing business, have banded together to boycott a fledgling competitor that spurns the cartel in favor of a consumer-focused model that lowers prices but threatens the cartel's market stranglehold.

This particular cartel operates in the residential real estate market, and it is run by a private trade association, Defendant National Association of Realtors (NAR). Membership in NAR and affiliated regional multiple listing services (MLS) allows access to private databases of residential properties that traditionally have been the lifeblood of the residential real estate services industry. Anyone who wants to access the MLS must join the cartel and agree to its extensive rules. Those rules, of course, exist not to serve consumers, but to enrich the cartel and stifle competition from new players. As NAR's own CEO says, NAR could be called "the National Association FOR REALTORS." CEO Update – 2017 Board of Directors, *Remarks by Bob Goldberg* (Nov. 6, 2017) (https://www.nar.realtor/ceo-update-2017-board-of-directors).

Take, for example, the classic 6% real-estate agent commission, all too familiar to anyone who has bought or sold a home. For many Americans, that commission costs tens of thousands of dollars and ranks among the most expensive purchases of their lives. But through a strict set of membership rules, the cartel has kept that same commission structure in place for decades, even though the internet has revolutionized the way Americans research, tour, and purchase homes in ways that require far less effort from agents. Indeed, NAR itself acknowledges that far more Americans begin the home-buying process not with an agent, but with the internet. In many transactions nowadays, the agent barely lifts a finger—yet collects that same standard commission the cartel has promoted for decades, and one that is several times higher than that of comparable international markets. Report of Dr. Robert Majure (Majure Rpt.) ¶41.[1] NAR exists to perpetuate that arcane, yet lucrative, guild system.

---

[1] The Majure Report is attached as Exhibit A to the Declaration of Robert Majure.

MOTION FOR PRELIMINARY INJUNCTION - 1
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

Plaintiff REX—Real Estate Exchange, Inc. (REX) has found a better way—one that leverages machine learning to reduce those commissions and save each consumer thousands (if not tens of thousands) of dollars. REX's model bypasses the MLS to market homes directly to consumers using popular aggregator sites. The largest such site is Defendant Zillow. Aggregators like Zillow are an important aspect of REX's model to allow clients to sell and buy homes outside the MLS cartel and the sky-high commissions that go with it. This model resembles that of other innovative "disruptors" who transform their industries and improve consumer choice: Uber (transportation), Airbnb (lodging), Robinhood (stock trading), GrubHub (food), and so on. Since it launched in 2015, REX has saved consumers almost $29 million in commissions. Majure Rpt. ¶29. And it is just getting started: REX's goal is a new era of zero-commission home sales.

Because REX charges fees far below those of the cartel, it is no surprise that NAR is determined to drive REX from the marketplace. NAR's CEO recently explained that the way to quash competition is to cut off access to the tools and platforms that enable fair competition. He boasted that to make the cartel "more profitable," it would need to "embrac[e]" "external sources" like Zillow and bring them into the cartel. National Association of Realtors, NAR CEO Bob Goldberg Keynote, YouTube (Aug. 28, 2017) (https://www.youtube.com/watch?v=NfShMRQlx3o). By teaming up with Zillow, Zillow could enforce the cartel's self-serving rules—and erect a moat around the cartel, block disruptors like REX, and keep commissions high.

Defendants' scheme took flight on January 12, 2021, after Zillow abandoned its neutral position, joined the cartel, and implemented its rules. Relevant here are the cartel rules governing "internet data exchanges," or "IDX"—the process by which MLS members share access to home listings and display available properties on their home sites. The key feature of the IDX rules is segregation: the cartel mandates that cartel-member listings "*must be displayed separately* from"

MOTION FOR PRELIMINARY INJUNCTION - 2
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

non-cartel listings.[2] In other words, the cartel shuns REX properties as well as any other non-cartel member listing.

Zillow complied. It removed REX homes from its standard search-results display and relegated them to an obscure, difficult-to-find back page. Until January 12, 2021, a Zillow search in any market would produce a unified display of all available properties, including REX homes, alongside cartel homes. *See, e.g.*, illustration at Compl. ¶61. But now, Zillow's search results display exclusively cartel listings—described by Zillow as "Agent listings." REX homes can be found only by clicking on a "hidden" tab titled "Other listings." *See, e.g.*, illustration at Compl. ¶64. The "Other" tab includes foreclosures, construction projects, for-sale-by-owner properties (FSBOs), and REX homes. Zillow excludes REX homes from the "Agent" tab even though REX employees—like their MLS counterparts—are fully licensed agents who have passed state-mandated exams and background checks.

Since it joined the cartel a few weeks ago, Zillow has used its perch as the largest aggregator to treat REX as a second-class citizen—and denigrate REX homes as second-class products. So it is no surprise that, just as NAR intended, REX homes now receive a fraction of the exposure they once did, and some REX clients threaten to abandon REX because they cannot find their home on Zillow.

That conduct violates state and federal antitrust and consumer protection laws. Accordingly, REX brings this action for declaratory and injunctive relief and money damages. Defendants' illegal conduct causes REX and the public irreparable harm that grows worse by the day. The cartel is trying to stamp out innovative approaches that offer consumers lower prices. And Zillow's misrepresentations about REX homes damage REX's brand and goodwill in ways that money damages can never fully remedy. There is no way to know how many would-be customers REX will lose because of Defendants' illegal activity. REX therefore respectfully

---

[2] Rule 18.3.11, Internet Data Exchange, Model Rules and Regulations for an MLS Operated as a Committee of an Association of REALTORS (https://www.nar.realtor/handbook-on-multiple-listing-policy/c-model-rules-and-regulations-for-an-mls-operated-as-a-committee-of-an-association-of-realtors#idx).

MOTION FOR PRELIMINARY INJUNCTION - 3
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

requests a preliminary injunction enjoining Defendants' anticompetitive and deceptive practices to prevent further irreparable harm.

## II.    RELEVANT FACTS

### A.    The Cartel Wields Arcane Anti-Consumer Rules To Entrench The Pre-Internet Way Of Doing Business.

For decades before the internet's ascendance, homebuyers had only one practical way to learn about the full range of available homes: the MLS. And to access the MLS, consumers needed to hire an agent with MLS access. That agent, in turn, had to join the cartel and agree to be bound by its rules. Those rules are largely determined by NAR, the nation's largest trade association. NAR controls a large portion of MLSs through its local chapters. Over 70% of active licensed real-estate agents are members of NAR.

NAR's rules govern countless aspects of the real-estate industry. Take, for example, the so-called Buyer Agent Commission Rule, which has become standard across the cartel. *See* Majure Rpt. ¶¶18, 37. Under this rule, sellers are required to agree up front to pay commissions owed to the brokers on *both sides* of the deal. That is, sellers must make a predetermined offer of compensation to the agent representing the buyer's interests. *Id*. While sellers can offer any amount to buyer agents, seller agents instruct their clients that they need to induce buyer agents to bring clients who may be interested in their homes. *See id*. These commissions are in no way correlated to the buyer agent's skill or effort. In fact, buyer agents receive the same commission even if a buyer finds the home through their own effort.

### B.    REX Innovates A New Model That Benefits Consumers.

In 2015, REX was born as the brainchild of Jack Ryan. The idea for REX came to Ryan as a result of the cartel-imposed deadweight loss he experienced during his own home-buying experience. Decl. Jack Ryan ("Ryan Decl.") at ¶3. Ryan bought a home from a seller represented by an agent who happened to be on vacation. *Id*. Ryan and the seller worked out the full sale terms on their own. *Id*. Yet when the seller's agent returned from vacation, having done no work,

MOTION FOR PRELIMINARY INJUNCTION - 4
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

he happily pocketed the standard NAR-endorsed 3% commission. *Id*. Jack knew there had to be a better way—and that thought became REX.

The REX model harnesses technology to match buyers and sellers without the need for expensive commissions. Ryan Decl. ¶7. Through REX's proprietary technology, a consumer can list their home from a smartphone and have the property marketed through targeted digital ads to potential buyers using ad-based algorithms. This technology does work that agents used to do in the pre-internet era, resulting in high customer satisfaction and low costs. *Id*. at ¶15.

To be sure, REX is a full-service, licensed brokerage with licensed real-estate agents. Ryan Decl. ¶8. Computer software can do most of the work, but REX's professionals stand ready to provide the human touch that the algorithm lacks. *Id*. Unlike traditional brokers, REX licensed agents are salaried. *Id*. Instead of chasing commissions, REX agents are incentivized to satisfy their customers and work as a team to facilitate sales. *Id*. REX's agents are not bound by the cartel's rules promoting high commissions. Ryan Decl. ¶9.

REX's model has already seen extraordinary success. REX clients spend an average of only 3.3% total on commissions—far below the cartel-endorsed national average of 5.5%. Ryan Decl. ¶¶12–13. That means REX clients have saved nearly $29 million in commissions since 2015. *Id*. Unsurprisingly, REX's popularity is expanding fast, and its revenues have grown every year. *Id*. at ¶11. REX is now active in markets spanning nineteen states and jurisdictions. *Id*. at ¶10. And it is just getting started.

**C.    Zillow Acquires Trulia And Achieves Market Dominance.**

While REX was emerging as a threat to the NAR cartel, Zillow was coming to dominate the aggregator market. Zillow initially aspired to provide consumers information "independent of any real estate industry group." Zillow Group, Inc., Annual Report (Form 10-K), at 9 (Feb. 12, 2016), *(*https://investors.zillowgroup.com/investors/financials/sec-filings/sec-filings-details/default.aspx?FilingId=11172778). It took all comers; anyone could list a home on Zillow. And it swiftly became the leading aggregator site in the United States. Majure Rpt. ¶24. In 2015,

MOTION FOR PRELIMINARY INJUNCTION - 5
Case No. 2:21-cv-00312

54269733.7

Zillow acquired its primary rival, Trulia, now the fourth-most-visited aggregator site. *Id*. In 2020, Zillow received more than 9.5 billion visits and over 200 million unique users each month, with approximately 135 million homes listed. Zillow Group, Inc., Annual Report (Form 10-K), at 3 (Feb. 12, 2021) (https://investors.zillowgroup.com/investors/financials/sec-filings/sec-filings-details/default.aspx?FilingId=14701155). Today, Zillow boasts that "more people now search for 'Zillow' than 'real estate.'" *Id*.

**D.    Zillow Joins The Cartel And Denies REX Fair Access To Its Platform.**

Since its founding, REX has relied in part on aggregators like Zillow to reach consumers. Ryan Decl. ¶¶16-19. Historically, when a Zillow user searched for homes, Zillow would display REX homes on equal footing with cartel homes. Decl. of Craig Barrett ("Barrett Decl.") ¶7. The primary beneficiary was Zillow users, who could view all homes and choose their best option.

But all that changed a few weeks ago. Zillow announced in 2020 it would "no longer [be] a third party," but an active MLS participant, standing "shoulder-to-shoulder" and "locking arms" with "local and state associations, and the National Association of Realtors." ZILLOW, *A Message from Errol Samuelson*, at :30, 2:50, & 3:30, YouTube (Sep. 22, 2020) (https://www.youtube.com/watch?v=EMidklRVFMM). Zillow declared that "all Zillow-owned homes will be listed in MLSs with commissions paid to agents representing buyers." *Id*. at 1:55.

January 12 was the turning point. On that day, Zillow downgraded REX to second-class citizenship, banishing REX homes to an obscure, difficult-to-locate page with foreclosures and FSBOs. Ryan Decl. ¶¶25-29. A search on Zillow now returns only cartel homes. *Id.* Immediately, the page views for REX homes plummeted. Ryan Decl. ¶27. REX clients complained that they could not find their home on Zillow anymore. *See* Decls. of Josephine Maggio ("Maggio Decl.") ¶7; Philip Van Ham ("Van Ham Decl.") ¶8; Viktor Kruse ("Kruse Decl.") ¶7; Raphael Rio Reina ("Reina Decl.") ¶¶7-8. The damage to REX's brand and goodwill—and to competition and quality-enhancing consumer choice—are incalculable. This action followed, and now REX respectfully seeks injunctive relief.

MOTION FOR PRELIMINARY INJUNCTION - 6
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

### III.   LEGAL STANDARD

District courts in the Ninth Circuit use two tests when analyzing a request for a preliminary injunction—one based on likelihood of success on the merits, and the other based on "serious questions." *Volga Dnepr UK Ltd. v. Boeing Co.*, 464 F. Supp. 3d 1238, 1242 (W.D. Wash. 2020); *cf.* 15 U.S.C. § 26 (providing injunctive relief for violations of antitrust laws "under the same conditions" applied by courts of equity). Under the traditional test, "a district court considers whether the requesting party has shown that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1080 (9th Cir. 2020) (quotation marks omitted). "Likelihood of success on the merits is a threshold inquiry and the most important factor." *Id.*

Under the alternative "serious questions" test, "a preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (quotation marks omitted). "This approach requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset and a weaker showing of another." *Id.*

REX is entitled to a preliminary injunction under either standard. Most importantly, REX is likely to succeed on the merits of the serious questions its complaint raises. First, by cutting off REX's fair access to the Zillow platform, Defendants have implemented a horizontal restraint on trade that violates the Sherman Act. Worse still, by excluding REX homes from the "Agent" tab, and labeling REX homes "Other" alongside foreclosures, construction projects, and FSBOs, Zillow has deceived consumers in violation of the Washington Consumer Protection Act. This unlawful conduct has already caused REX and consumers irreparable harm that grows worse by the day. Moreover, the equities and public interest both favor exactly what REX seeks: a fair, competitive landscape that maximizes consumer choice and transparency. REX already has

MOTION FOR PRELIMINARY INJUNCTION - 7
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

saved consumers tens of millions of dollars in commissions, and preliminary relief will maintain REX's popular and consumer-centric model that disrupts the traditional broker-centric cartel.

**IV.     ARGUMENT**

**A.     REX Is Likely To Succeed In Showing That Defendants' Restraint On Trade Violates Federal And State Antitrust And Unfair Competition Law.**

REX is likely to establish that Defendants' conduct violates at least two distinct bodies of law. First, Defendants' group boycott of REX is precisely the sort of restraint on trade the Sherman Act outlaws. Second, Zillow's false "non-agent" characterization of REX homes impairs competition and irreparably damages REX's reputation and goodwill. Each violation is a sufficient, independent basis to order preliminary relief.

**1.     Defendants' group boycott is illegal *per se* under the Sherman Act.**

Section 1 of the Sherman Act provides that "[e]very contract . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. The Supreme Court has long interpreted that language to render certain anticompetitive business practices illegal *per se*. *See, e.g.*, *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985). One such practice is a group boycott—that is, an effort by dominant market participants to lock arms to block a competitor's access to that market. *See id.* ("'Group boycotts' are often listed among the classes of economic activity that merit *per se* invalidation under § 1."); *St. Paul Fire Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).

As the Supreme Court described in *Northwest Wholesale Stationers*, the Sherman Act renders illegal *per se* "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." 472 U.S. at 294 (quotation marks omitted); *see also Toys "R" US, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928, 936 (7th Cir. 2000) ("*TRU*") ("Horizontal agreements among competitors, including group boycotts, remain illegal per se in the sense the Court used the term in *Northwest Stationers*."); *Fed. Trade Comm'n v. Indiana*

MOTION FOR PRELIMINARY INJUNCTION - 8
Case No. 2:21-cv-00312

54269733.7

*Fed'n of Dentists*, 476 U.S. 447, 458 (1986) (confirming *per se* liability under *Northwest Stationers* where "firms with market power . . . discourage [suppliers] from doing business with a competitor"). Such "concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *Nw. Wholesale Stationers*, 472 U.S. at 290. Courts have not hesitated to declare group boycotts unlawful. *TRU*, 221 F.3d at 936 (affirming FTC's conclusion that a major retailer "trying to disadvantage the warehouse clubs, its competitors, by coercing suppliers to deny the clubs the products they needed" violated Section 1 of the Sherman Act).[3]

The Supreme Court has identified three criteria that render a group boycott illegal *per se*. *Nw. Wholesale Stationers*, 472 U.S. at 294. First, the boycott must "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete." *Id*. Second, "the boycotting firms posses[s] a dominant position in the relevant market." *Id*. Third, the boycott is "not justified by plausible arguments that [it was] intended to enhance overall efficiency and make markets more competitive." *Id.; see also TRU*, 221 F.3d at 936. Each is present here.

### a. *Defendants have cut off REX's access to dominant aggregator sites.*

The first criterion is met here because Defendants have restricted REX's access to aggregator sites through the promulgation and enforcement of special cartel rules that require cartel members to segregate cartel and non-cartel listings in internet displays. *Cf. Nw. Wholesale Stationers*, 472 U.S. at 290. One key rule, set out in the canonical NAR handbook, requires that "[l]istings obtained through IDX feeds from Realtor Association MLSs . . . *must be displayed*

---

[3] Because the Supreme Court has declared group boycotts of the kind at issue here illegal *per se*, there is no need to undertake "a full-fledged rule-of-reason inquiry," which would incur "significant costs in business certainty and litigation efficiency." *Nw. Wholesale Stationers*, 472 U.S. at 289 (quotation marks omitted). Nevertheless, REX would prevail even under a rule-of-reason analysis. There, the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Indiana Fed'n of Dentists*, 476 U.S. at 457-58. As set out below, Defendants' conspiracy to shut down REX's access to the crucial aggregator input harms consumers without any offsetting procompetitive benefit. The only beneficiaries of the cartel's misconduct are cartel members. The rule of reason cannot save their illegal boycott.

MOTION FOR PRELIMINARY INJUNCTION - 9
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

*separately* from listings obtained from other sources." National Ass'n Realtors, *Handbook on Multiple Listing Policy: Model Rules and Regulations for an MLS Operated as a Committee of an Association of REALTORS®*, § 18.3.11 (Amended 2017) (emphasis added). Zillow's enforcement of this rule deprives REX of fair access to a critical platform.

Before Zillow joined the cartel, it did not follow these rules, instead offering fair and open access to all comers regardless of cartel membership. But that all changed in January 2021, when Zillow began implementing its plans to abandon its neutral status in order to join the cartel and enforce its self-serving, anti-consumer rules. Zillow now is committed to enforcing the IDX rules by segregating REX homes from cartel homes and burying REX homes in a hidden "Other" tab. When REX requested an explanation, Zillow admitted it made these changes to comply with MLS rules. *See* Barrett Decl. ¶6. There is no clearer admission that the MLS cartel, of which Zillow now is a member, has effectively shut down REX's fair access to the aggregator market.

Today, access to aggregator sites like Zillow and Trulia is unquestionably "necessary . . . to compete." *TRU*, 221 F.3d at 936. Survey data shows that visiting home sites on the internet is now the most popular way for consumers to begin their search for a new home—not contacting an agent. National Association of Realtors, *2020 Profile of Home Buyers and Sellers*, at 56 ("Forty-three percent of home buyers looked online for properties for sale as their first step in the home buying process, while 18 percent of buyers first contacted a real estate agent.") (https://www.gaar.com/images/uploads/2020_NAR_Consumer_Profile.pdf). A *majority* of consumers now find the home they ultimately purchase on the internet. *Id*. (reporting that 51% of surveyed buyers found their home through the internet). Virtually every buyer—97%—searches for homes on the internet at some point during the process. *Id.* at 57. There thus can be no serious dispute that without access to aggregators like Zillow, REX is deprived of a level playing field.

Efforts to cut off REX's access to the aggregator market closely resemble anticompetitive MLS boycotts that have been banned in the past. As one illustrative example, consider the Sixth Circuit's decision in *Realcomp II, Ltd. v. Fed. Trade Comm'n*, 635 F.3d 815 (6th Cir. 2011).

MOTION FOR PRELIMINARY INJUNCTION - 10
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

There, a local MLS instituted a website policy keeping its own members' discounted, *a la carte*, MLS property listings from public-facing real-estate websites, including two of the top four sites. *Id*. at 822, 830. The policy was "a concerted refusal to deal with [discount listings] on substantially equal terms," thereby protecting "full-service brokers from competitive pricing pressure."[4] *Id*. at 830 (quotation marks omitted). The court highlighted the anticompetitive danger inherent in the "exclusion of nascent threats." *Id*. Ultimately, the court determined that this policy, "by restricting consumer access to discount listings," harmed competition. *Id*. at 830–31. This case merits the same conclusion: Defendants have colluded to choke off REX, a new, disruptive competitor, by denying access to a critical tool necessary to compete in this market. That is what Section 1 forbids. *See id*.; *see also TRU*, 221 F.3d at 936.

### b.    *Defendants possess a dominant market position.*

The second *Northwest Stationers* criterion also is satisfied. Zillow, NAR, and the other cartel members dominate the provision of real-estate brokerage services to sellers and buyers of residential real estate in local markets throughout the country where REX operates. *See, e.g.*, *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1372 n.39 (5th Cir. 1980). While there is no bright-line rule to assess market domination, courts have consistently held that a simple showing of "some market power" is sufficient for purposes of a Section 1 claim. *See, e.g.*, *TRU*, 221 F.3d at 936. There are at least two ways in which a plaintiff may demonstrate market dominance. The first is to show the direct effects of the anticompetitive conduct. *See Indiana Fed'n of Dentists*, 476 U.S. at 460–61. The second is to show a sufficient market share in a relevant product and geographic market as is pertinent to the case. *See TRU*, 221 F.3d at 937. "When [a] cooperating group possesses sufficient market power that a nonmember can no longer compete effectively with members, the restraint must be found to have sufficient adverse competitive impact to violate Section 1." *Realty Multi-List*, 629 F.2d at 1373.

---

[4] Much like the segregation rule here, the website policy constituted a "contract, combination, or conspiracy" among MLS members. *Id*. at 824-25.

MOTION FOR PRELIMINARY INJUNCTION - 11
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

Here, the product market consists of residential real-estate brokerage services to consumers buying or selling homes, which are provided by competing real-estate brokerage professionals. Majure Rpt. ¶30; *see, e.g., Realty Multi-List*, 629 F.2d at 1372 n.39 ("it is undisputed that the relevant product market is the market for residential real estate brokerage services"). REX competes in this market, employing licensed professionals to provide residential real-estate brokerage services. Ryan Decl. ¶10.

NAR's predecessor was founded in 1908, and, by the early 1970s, NAR was the nation's largest trade association. It now boasts 1.3 million members, 54 state and territory associations, and more than 1,130 local associations. The National Association of Realtors (https://www.nar.realtor/about-nar/history) (last visited March 8, 2021). "[I]n the case of most multiple listing services, the service will strive toward market dominance." *Realty Multi-List*, 629 F.2d at 1373 n.42. That rings true here, with NAR membership appearing to account for more than seventy percent of licensed real estate agents. Majure Rpt. ¶37. Indeed, "if all or most market participants are members and membership provides a significant advantage, then admission rules or expulsion for violating those rules can be used anticompetitively." XIII P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶2220b (4th ed. 2019).

That is precisely the situation here. NAR and related MLSs, with their dominance of local markets across the country and nationwide reach, have promulgated self-preferencing rules governing internet display. When they gained Zillow as a member, they secured significant control over the prominent internet channels needed in today's residential real-estate services market. This is a watershed event. Zillow controls the most-viewed real-estate aggregator site, which previously was equally open to non-cartel members. Zillow, together with Trulia, the fourth-most-popular aggregator site, receive 200 million unique visitors each month and more than nine billion views annually. Majure Rpt. ¶22. Prior to Zillow's changes, REX obtained more customer leads from Zillow and Trulia than any other source. Barrett Decl. ¶4 & Majure

MOTION FOR PRELIMINARY INJUNCTION - 12
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

Rpt. Ex 7. The second most viewed listing site, Realtor.com, was founded as an arm of the NAR and only permits MLS listings. Majure Rpt. ¶23. Thus, with the addition of Zillow.com and Trulia.com to the NAR/MLS ranks, Defendants enjoy dominant control of this critical input.

Defendants' market dominance is also directly established by observation of its effects. NAR and its MLS partners have, by virtue of their market power and dominance, persuaded or coerced Zillow to do their bidding and join the boycott. Dominance and market power, as to control over the critical input of access to real-estate aggregator sites, is directly established by the severe effect the boycott has had on homes wrongly tabbed as "Other." Since Zillow enforced the NAR/MLS segregation rules, REX has watched consumer views of its listings on Zillow plummet, while answering clients' questions about why their homes were no longer on Zillow. Ryan Decl. ¶27. Worse yet, some REX customers—as an expressed, direct result of Zillow's action—reversed course and were disciplined back into the NAR-MLS cartel and its inflated fee structure. *See e.g.*, Maggio Decl. ¶7 & Reina Decl. ¶8.

### c. *Zillow's segregation of listings under the boycott does not enhance competition or efficiency*.

Defendants cannot offer procompetitive justification for Zillow's segregation of listings under the boycott. By absorbing Zillow into its ranks and segregation rules, the cartel has denied REX effective access to what is now, according to NAR's own studies, the main doorway for real-estate clients. Majure Rpt. ¶24. The true victim is competition—and the consumers who stand to save millions of dollars in commissions by using REX's services. Ryan Decl. ¶13.

Indeed, it is hard to imagine what could justify treating REX as a second-class citizen selling a second-class product. For years, Zillow displayed REX homes alongside its cartel rivals, giving consumers a true choice. Now that choice is all but eliminated, with REX listings concealed to an obscure "Other" tab many never notice. That dupes consumers several times over: it misleads buyers about what's available, misrepresents the nature of REX's business, and suppresses interest in REX properties that come with low transactional costs.

MOTION FOR PRELIMINARY INJUNCTION - 13
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

*Northwest Wholesale Stationers* renders Defendants' group boycott illegal *per se*. *See* 472 U.S. at 294. Defendants have cut off REX's access to the market aggregator sites they control. Their conduct harms consumer choice and competition. An injunction should issue.

**2.      Zillow's search display is a deceptive practice that harms the public and violates Washington's Consumer Protection Act.**

In addition to the Sherman Act violation described above, Zillow's practice of categorizing REX homes as non-agent "Other listings" is an unfair and deceptive trade practice that violates Washington's Consumer Protection Act ("CPA"), RCW 19.86.020. The CPA bans "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. A violation of the CPA is an independent basis on which to grant injunctive relief. *See Peoples v. United Servs. Auto. Ass'n*, 452 P.3d 1218, 1223 (Wash. 2019); RCW 19.86.090. A private plaintiff alleging a CPA violation must establish five elements: "(1) an unfair or deceptive act or practice (2) in trade or commerce (3) which affects the public interest (4) and causes injury to the plaintiff's business or property, and (5) a causal link between the act and the injury." *Peoples*, 452 P.3d at 1221. REX satisfies each.

**a.      *Zillow's listing practice is unfair and deceptive.***

To satisfy the first element, REX need only show "a representation, omission or practice that is likely to mislead a reasonable consumer." *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 895 (Wash. 2009) (quotation marks omitted). This inquiry is one of law, not fact. *Id.* at 894; *Rush v. Blackburn*, 361 P.3d 217, 225 (Wash. Ct. App. 2015). There is no intent component; REX "need not show that defendants intended to deceive or defraud, but only that the practice had the capacity to deceive a substantial portion of the purchasing public." *Keithly v. Intelius Inc.*, 764 F. Supp. 2d 1257, 1266 (W.D. Wash. 2011), *reconsideration granted on other grounds*, No. C09–1485RSL, 2011 WL 2790471 (May 17, 2011); *see also Sing v. John L. Scott, Inc.*, 948 P.2d 816, 819 (Wash. 1997) (same). Nor need REX show falsity; a communication can be accurate and still be deceptive if the "net impression" it conveys is deceptive. *Panag*, 204 P.3d at

MOTION FOR PRELIMINARY INJUNCTION - 14
Case No. 2:21-cv-00312

**FOSTER GARVEY PC**
**1111 THIRD AVENUE, SUITE 3000**
**SEATTLE, WASHINGTON 98101-3292**
**PHONE (206) 447-4400**

54269733.7

895 (quotation marks omitted). And that standard is based not on "the most sophisticated readers but rather . . . the least." *Id.* (quotation marks omitted).

That standard is easily met here for at least two reasons. *First*, Zillow's practice of separating "agent listings" from "other listings" implies that listings in the "other" category are not represented by agents. The "net impression" a reasonable consumer would take away is that REX homes do not involve agents. *Panag*, 204 P.3d at 895. It does not matter whether Zillow intended this false impression; all that matters is that Zillow's display "ha[s] the capacity to deceive a substantial portion of the purchasing public." *Keithly*, 764 F. Supp. 2d at 1266.

*Second*, REX has provided evidence of actual deception. Because sophisticated professionals were actually deceived, it follows *a fortiori* that Zillow's search results have the capacity to deceive a reasonable consumer. Such evidence of actual deception is a sufficient basis to conclude that the first CPA element is satisfied. *See, e.g.*, *Keithly*, 764 F. Supp. 2d at 1269 (fact that plaintiff and other consumers were "actually deceived" meant that "one could reasonably find . . . the capacity to deceive"); *Nw. Airlines, Inc. v. Ticket Exch., Inc.*, 793 F. Supp. 976, 979 (W.D. Wash. 1992) (capacity to deceive substantial portion of the public because airline ticket broker failed to instruct some purchasers they were subject to forfeiture of tickets).

This Court thus should conclude that Zillow's practice is unfair and deceptive as a matter of law and enter an injunction accordingly. Indeed, "[t]he purpose of the capacity-to-deceive test is to deter deceptive conduct before injury occurs." *Sing*, 948 P.2d at 819. Unless this Court orders immediate remedial action, Zillow's 245 million unique monthly users will continue to receive false and misleading information every day. *See* Zillow Group, Inc. 2020 10-K at 3.

**b.      *Zillow's deceptive practices affect commerce with Washington residents.***

REX further satisfies the second element: Washington residents routinely rely on Zillow to acquire information in furtherance of residential real-estate transactions. The CPA broadly defines "trade" and "commerce" to "include the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2).

MOTION FOR PRELIMINARY INJUNCTION - 15
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

Zillow's misleading behavior thus affects Washington residents both directly and indirectly, as the evidence before the Court confirms. *See, e.g.*, Decls. of Todd Rosenbaum ("Rosenbaum Decl.") ¶¶8–13; Brandy Lawrence ("Lawrence Decl.") ¶¶8–11.

It does not matter that REX is headquartered outside Washington. The Washington Supreme Court has confirmed that "an out-of-state plaintiff may bring a claim against a Washington corporate defendant for allegedly deceptive acts," so long as those deceptive acts affect Washington residents. *Thornell v. Seattle Serv. Bureau, Inc.*, 363 P.3d 587, 592 (Wash. 2015). Thus, the Court should conclude that REX has satisfied the second element.[5]

### c.    *Zillow's deceptive practices continue to injure the public.*

REX satisfies the third element because Zillow's conduct has the capacity to injure other persons apart from REX. *See* RCW 19.86.093(3). The public injury inquiry is usually assessed with reference to five considerations:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 538 (Wash. 1986). "[N]ot one of these factors is dispositive, nor is it necessary that all be present." *Id*. Those factors confirm a public injury here:

- Zillow's deceptive practices were committed through its real-estate search portal used by consumers, a key part of its business.

- Zillow has admitted it will continue its deceptive practices as part of its decision to join MLSs around the country. According to Zillow's 2020 10-K report, some of its

---

[5] Applying Washington law is also appropriate because Zillow's Terms of Use require "any and all disputes, claims and actions arising from or in connection with the Services or otherwise" to be "governed by the laws of the State of Washington, *without giving effect to its conflict of laws' provisions*." *Terms of* Use, Zillow Group ¶17 (updated Jan. 12, 2021), *https://www.zillowgroup.com/terms-of-use/* (emphasis added).

MOTION FOR PRELIMINARY INJUNCTION - 16
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

subsidiaries have joined MLS organizations, and each MLS has "adopted its own rules" about "how listings data must be displayed on our websites and mobile applications." Zillow Group, Inc., 2020 10-K, at 16.

- Zillow's deceptive practices are ongoing and reaching a wide swath of the public; "According to Comscore data published in December 2018, Zillow Group brands represent nearly three quarters of market share of all mobile exclusive visitors to the real estate category." Zillow Group, Inc. 2018 10-K, at 6 (Feb. 12, 2019) (https://investors.zillowgroup.com/investors/financials/sec-filings/sec-filings-details/default.aspx?FilingId=13243830).

Consumers in Washington and at least the 19 other states where REX maintains brokerage licenses are receiving deceptive information from Zillow's search portal. *See* Ryan Decl. ¶10. That is sufficient to show the public interest is harmed. And, as set out below, the public interest favors robust competition, not the cartel's anticompetitive self-dealing. *See infra* Part IV.C.2.

> **d.**    *The remaining factors are satisfied, as discussed above.*

The final two elements—whether Zillow's misconduct causes injury to REX's business, and whether there is a causal link between Zillow's misconduct and REX's injury—are also satisfied. *See Peoples*, 452 P.3d at 1221. Zillow's false characterization of REX homes as "Other," non-agent listings has directly harmed REX's revenue, brand, and goodwill.

**B.    REX Has Been Irreparably Harmed, And That Injury Grows Worse By The Day.**

Defendants' unlawful actions have inflicted distinct injuries on REX that cannot be remedied by money damages. The Ninth Circuit has long recognized that when an antitrust plaintiff seeks injunctive relief, "[a]ll that is required is that a claimant show a threatened loss or injury cognizable in equity proximately resulting from the alleged antitrust violation, and that the injury be of the type the antitrust laws were designed to prevent." *Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 661 (9th Cir. 1988) (quotation marks and citations omitted). There are "myriad of examples of the type of evidence" that will support such a

MOTION FOR PRELIMINARY INJUNCTION - 17
Case No. 2:21-cv-00312

**FOSTER GARVEY PC**
**1111 THIRD AVENUE, SUITE 3000**
**SEATTLE, WASHINGTON 98101-3292**
**PHONE (206) 447-4400**

54269733.7

showing. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985). One is an "injury to competition" or an "anticompetitive harm." *Id*.; *see also United States v. BNS, Inc.*, 858 F.2d 456, 466 (9th Cir. 1988).

Another is intangible harm to goodwill. That is, "[i]rreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012); *accord Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm."); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001), *overruled on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

Both forms of irreparable harm are present here.

**1.      Defendants' unlawful conspiracy irreparably injures competition.**

Beyond the injury they have inflicted on REX, Defendants' anticompetitive conduct harms consumers and the marketplace in ways that can never be fully remedied. In particular, Defendants' efforts to stymie competition by excluding REX from critical aggregator sites lessens consumer choice by promoting the cartel's obsolete methods over innovation. Because "the antitrust laws were designed to prevent" this exact type of dead-weight loss, an injunction is warranted. *Sundance Land Corp*., 840 F.2d at 661. Defendants' injury to competition manifests itself in at least three distinct ways.

*First*, Defendants' boycott harms innovation by impeding the entrepreneurial, outside-the-box approach that REX offers. REX was created to give consumers an option *outside* the MLS—indeed, doing things differently is central to REX's strategy to attract clients. Rosenbaum Decl. ¶¶4, 7. One of REX's major selling points is that its listings appeared on Zillow just like all

MOTION FOR PRELIMINARY INJUNCTION - 18
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

other listings, but without the sky-high commissions. *Id.* at ¶¶6–7. But Defendants seek to end that innovative approach and force REX into the cartel.

Indeed, in just the last few weeks, REX's agents have been increasingly forced to co-list properties to the MLS in order to reach buyers on Zillow and retain clients. REX's team members report they are now offering far more clients the option to co-list to the MLS, and more quickly, to blunt repeated concerns expressed about Zillow visibility. *See e.g.*, *id.* at ¶11; Lawrence Decl. ¶9. Worse still, REX agents have fielded complaints from clients unhappy about being forced to offer commissions in order to move out of the "Other" tab on Zillow. Decl. of Randall Echevarria ("Echevarria Decl.") ¶9. The very reason many of these clients signed with REX was because they sought to avoid high commissions to buyer's agents. *See id.* ¶8. If the boycott continues, REX will face even more pressure to abandon its direct-to-consumer, data-driven approach to real estate—and innovation will suffer.

Other marketplaces and the consumers they serve have benefited enormously from "disruptors" like REX. Thanks to Uber and Airbnb, many consumers can barely remember what it is like to hail a taxi or stay in a chain hotel. The residential real-estate industry should not be exempt from that type of innovative competition. The NAR cartel may wish to protect its high profits and prevent similar disruption in the real-estate industry, but the antitrust laws favor innovation, not sclerosis. And if the cartel succeeds in stymying competition from REX, it will only embolden the cartel—and cow would-be competitors. Under that circumstance, it is hard to imagine what innovator could ever successfully break the cartel's stranglehold.

*Second*, Defendants' boycott harms consumer choice. Prior to January 12, consumers had two options: the old, high-fee cartel way, or the innovative and low-cost technology-oriented path REX has pioneered. But cutting off REX's access to Zillow impairs consumers' choice, now too often disciplining these stray consumers back into the cartel by forcing MLS co-listing. The cartel should not be able to forever lock consumers into a low-choice, high-cost regime.

MOTION FOR PRELIMINARY INJUNCTION - 19
Case No. 2:21-cv-00312

**FOSTER GARVEY PC**
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

*Third*, the cartel harms competition by forcing higher prices on consumers. The average cost difference between REX (3.3%) and the cartel (5.5%) is staggering. Ryan Decl. ¶¶12–13. REX has proudly saved consumers nearly $29 million in commissions since 2015 and is soon projected to save consumers $100 million annually. *Id.* ¶¶13–14.The cartel may prefer that $29 million had gone to cartel members, but that is no basis to permit anticompetitive conduct.

These three distinct competitive injuries are not just "threatened," *BNS, Inc.*, 858 F.2d at 466, but they have already materialized. An injunction is warranted to forestall further irreparable harm to the competitive ecosystem the antitrust laws are designed to protect.

### 2. Defendants' conduct has irreparably harmed REX's brand and goodwill.

In addition to the injury to competition discussed above, Defendants' actions have irreparably harmed REX's "business reputation" and "damage[d]" REX's "goodwill." *See Herb Reed Enters.*, 736 F.3d at 1250; *Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841. These injuries, which evade precise quantification, can be remedied only by injunctive relief. *See Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018) (affirming preliminary injunction based on "irreparable harm to [movant's] brand reputation and goodwill"); *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1154 (9th Cir. 2011) (similar); *Herb Reed Enters.*, 736 F.3d at 1250; *Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841. The fact that "damages could be calculated" does not foreclose injunctive relief where, as here, "the loss of goodwill, negotiating leverage, and non-monetary terms . . . cannot readily be remedied with damages." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (affirming preliminary injunction).

These injuries manifest themselves in several distinct ways. Defendants have already injured REX's client relationships by undermining REX's ability to effectively market its real estate listings. Since Zillow's joined the cartel, REX agents have lost customers frustrated that their properties lack visibility on Zillow. REX's employees report receiving emails from clients frustrated by the decline in the property viewings and showings after the Zillow change took effect. One client stated that the "REX marketing is not working." Van Ham Decl. ¶11 (quotation

MOTION FOR PRELIMINARY INJUNCTION - 20
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

marks omitted). Another disappointed client wrote that the new Zillow format was "a detriment to us as the sellers because our property shows up under a hidden tab." Maggio Decl. ¶7 (quotation marks omitted). This harms REX's brand in ways that evade precise quantification. By losing client listings, REX's presence in the marketplace shrinks, further reducing its ability to enhance its reputation and grow its brand at a critical time for its business. In addition, REX agents have been increasingly forced to co-list properties to the MLS to move them out of the "Other" page on Zillow. But when they do so, the listing no longer displays REX as the main listing agent, instead it shows as "Listed by" the MLS agent who is co-listing the property, and REX is demoted below them. *See* Rosenbaum Decl. ¶12. As a fledgling company expanding to new markets, brand recognition and goodwill are essential for REX's success. *Id.* at ¶11. Further, these unhappy former clients will not recommend REX to others, resulting in an unknown loss of business. Ryan Decl. ¶31.

That injury is compounded by Zillow's misrepresentation that REX listings are not represented by licensed agents. The label is so misleading that other real estate agents call REX's clients offering their services. *See, e.g.*, Van Ham Decl. ¶9. This has disrupted REX's relationships with its clients. Lawrence Decl. ¶11. In one instance, a client called a REX team member confused and agitated about directly receiving an offer for his property from a buyer's agent who was demanding a commission. *Id.* Further, Zillow's new practice misleads consumers into believing they have viewed all agent-represented listings that meet their search criteria. As a result, consumers may never see REX listings, and may miss the opportunity to purchase the best home for their needs.

Finally, Zillow's misrepresentations have prevented REX from acquiring an untold number of new clients. The placement of REX homes in the obscure "Other" tab cuts off REX's access to interested buyers and denies consumers fair access to all the listings on Zillow. To compound the injuries to REX, Zillow also groups REX's listings with foreclosures and FSBO properties. This further devalues the listing diminishes the professional real estate services REX

MOTION FOR PRELIMINARY INJUNCTION - 21
Case No. 2:21-cv-00312

**FOSTER GARVEY PC**
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

provides its clients. Ryan Decl. ¶29. The end result has been fewer viewings of REX listings, fewer showings of REX properties, and more unsatisfied clients. Some clients have left REX and cited the lack of visibility on Zillow. Reina Decl. ¶7–8; Maggio Decl. ¶7. And some homeowners never signed with REX because of concerns over visibility. Echevarria Decl. ¶8.

**C.    The Remaining Factors Favor An Injunction.**

The balance of the equities and the public interest both favor injunctive relief.

**1.    The balance of hardships tips strongly in favor of REX.**

Defendants' conduct poses distinct threats to REX and consumers. REX risks the incalculable loss of future clients. And consumers, deceived by Zillow's misleading labels, are unable to escape the cartel's high commission rates. Removing the cartel's deceitful segregation of REX listings into the "Other" tab does not harm Zillow's business. Indeed, Zillow became the most popular aggregator site while correctly categorizing REX alongside other "Agent" listings. No other Defendant suffers any cognizable injury from forced compliance with the Sherman Act and the CPA. And in any event, any such harm Defendants might cite is more than offset by the harm REX has suffered as a result of their unlawful conduct.

**2.    The public interest disfavors Defendants' anti-consumer restraint on trade and favors more consumer choices and fair competition.**

For over a century, the Supreme Court has recognized that "antitrust laws serve the public interest by encouraging effective competition." *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1218 (9th Cir. 1997) (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 58 (1911)). Indeed, "the central purpose of the antitrust laws, state and federal, is to preserve competition. It is competition . . . that these statutes recognize as vital to the public interest." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (quotation marks omitted). And the Ninth Circuit has consistently recognized that "horizontal restraints" generally countermand the public interest. *E.g.*, *Regents of Univ. of California v. Am. Broad. Cos.*, 747 F.2d 511, 521 (9th Cir. 1984). It thus follows that when a defendant's behavior could "lessen

MOTION FOR PRELIMINARY INJUNCTION - 22
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

competition," then "a preliminary injunction is in the public interest." *Boardman*, 822 F.3d at 1024.

That is the case here. As explained above, Defendants' horizontal restraint on trade stifles competition and harms both fair competition and consumer choice. Moreover, Zillow's violation of the CPA misleads consumers by misrepresenting REX's business and products. That competition-stifling deceit is especially pernicious here because REX's anti-cartel model already has saved consumers tens of millions of dollars in real-estate commissions. REX is part of a generation of innovative "disruptors" harnessing technology to eliminate old-guard dead-weight loss and offer consumers more choices and better prices. The public interest disfavors the cartel's anticompetitive efforts to entrench its outmoded ways. *See Boardman*, 822 F.3d at 1024.

**D.     Alternatively, REX Is Entitled To An Injunction Under The "Serious Questions" Test.**

As set out above, REX is likely to succeed on the merits of its claims. But even if the Court were to conclude otherwise, REX remains entitled to injunctive relief under the "serious questions" test because it has raised "serious questions going to the merits"—namely, whether Defendants' group boycott violates the Sherman Act and whether Zillow's misrepresentations violate the CPA—and "the balance of hardships tips sharply in [REX's] favor." *See Towery*, 672 F.3d at 657. The public interest favors exactly what REX offers: an alternative to the cartel based on innovation and low costs. And all REX asks is that Zillow display REX homes the same way it did before January 12, on equal footing with cartel homes. Accordingly, the Court may issue an injunction without first determining that REX is likely to succeed on the merits. *See id*.[6]

## V.     CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction. Plaintiff REX respectfully requests the Court to enjoin:

a.   Zillow, NAR and their officers, directors, partners, agents, affiliates, members, and

---

[6] Because REX seeks only to require Zillow to do what it did for years until January 12, the Court should not require a bond. *See Jorgenson v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

MOTION FOR PRELIMINARY INJUNCTION - 23
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

employees, and all persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program or device having a similar purpose or effect to the anticompetitive actions set forth above.

b. Zillow, NAR and their officers, directors, partners, agents, affiliates, members, and employees, and all persons acting or claiming to act on their behalf or in concert with them, from enforcing, implementing, or operating under any agreement, conspiracy, combination, or membership rule requiring segregation of REX's residential real estate listings from listings of NAR members and/or MLS members on any website controlled by Zillow.

c. NAR and Zillow and their officers, directors, partners, agents, affiliates, members, and employees, and all persons acting or claiming to act on their behalf or in concert with them, from enforcing, implementing, or operating under any agreement, conspiracy, combination, or membership rule requiring Zillow to in any way indicate that REX's residential real-estate listings are not represented by a licensed agent or broker on any website controlled by Zillow.

d. Zillow and its officers, directors, partners, agents, affiliates, members, and employees, and all persons acting or claiming to act on their behalf or in concert with them, from excluding REX's residential real-estate listings from the category of "Agent listings" on all websites controlled by Zillow.

e. Zillow and its officers, directors, partners, agents, affiliates, members, and employees, and all persons acting or claiming to act on their behalf or in concert with them, from categorizing REX's residential real-estate listings as "Other listings" on all websites controlled by Zillow.

MOTION FOR PRELIMINARY INJUNCTION - 24
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7

RESPECTFULLY SUBMITTED this 9th day of March, 2021.

                                FOSTER GARVEY PC

                                /s/ Michael Vaska
                                Michael Vaska, WSBA #15438
                                /s/ Rylan Weythman
                                Rylan Weythman, WSBA #45352
                                1111 Third Avenue, Suite 3000
                                Seattle, Washington 98101
                                Telephone: (206) 447-4400
                                Facsimile: (206) 447-9700
                                Email:  michael.vaska@foster.com
                                        rylan.weythman@foster.com

                                McCARTY LAW PLLC

                                /s/ Darren L. McCarty
                                Darren L. McCarty, *Pro Hac Pending*
                                /s/ Cristina M. Moreno
                                Cristina M. Moreno, *Pro Hac Pending*
                                1410B West 51st Street
                                Austin, TX 78756
                                Telephone: (512) 827-2902
                                Email:  darren@mccartylawpllc.com
                                        cristina@mccartylawpllc.com

                                *Attorneys for Plaintiff REX – Real Estate Exchange, Inc.*

Case No. 2:21-cv-00312

                                FOSTER GARVEY PC
                                1111 THIRD AVENUE, SUITE 3000
                                SEATTLE, WASHINGTON 98101-3292
                                PHONE (206) 447-4400

54269733.7

## CERTIFICATE OF SERVICE

I certify that on March 9, 2021, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF which will notify all parties in this matter who are registered with the Court's CM/ECF filing system of such filing. All other parties (if any) shall be served in accordance with the Federal Rules of Civil Procedure.

DATED this 9th day of March, 2021.

*s/Michelle Stark*
Michelle Stark

MOTION FOR PRELIMINARY INJUNCTION - 26
Case No. 2:21-cv-00312

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3292
PHONE (206) 447-4400

54269733.7