1

2

3

4                          UNITED STATES DISTRICT COURT
5                         WESTERN DISTRICT OF WASHINGTON
                                    AT SEATTLE
6
7    REX − REAL ESTATE EXCHANGE
     INC.,
8                    Plaintiff,

9         v.                                              C21-312 TSZ

10   ZILLOW INC.; ZILLOW GROUP
     INC.; ZILLOW HOMES INC.;                             ORDER
11   ZILLOW LISTING SERVICES INC.;
     TRULIA LLC; and THE NATIONAL
12   ASSOCIATION OF REALTORS,

13                   Defendants.

14         THIS MATTER comes before the Court on Plaintiff REX − Real Estate Exchange

15   Inc.'s ("REX") motion for a preliminary injunction ("Motion"), docket no. 5, against

16   Defendants Zillow Inc., Zillow Group Inc., Zillow Homes Inc., Zillow Listing Services

17   Inc., Trulia LLC ("Zillow" or "Zillow Defendants"), and the National Association of

18   REALTORS® ("NAR").  Having reviewed all papers filed in support of, and in

19   opposition to, the Motion, the Court enters the following Order.[1]

20   _____

21   [1] Also pending is Zillow Defendants' unopposed motion to seal, docket no. 58, and Plaintiff's unopposed
     motion to seal, docket no. 71.  The Court GRANTS both motions, as the parties provide compelling
22   reasons to maintain the unredacted versions of the documents under seal.  With respect to the parties'
     request for oral argument in connection with the Motion for a preliminary injunction, docket no. 5, the

23

ORDER - 1

**Background**

      **1.**      **Factual Background**

             **A.**      **National Association of Realtors**

Defendant NAR is a trade association for real estate professionals.  Galicia Decl. at ¶¶ 1–2 (docket no. 65).  NAR publishes a Handbook on Multiple Listing Policy, which serves as a guide for NAR's local associations of REALTORS® regarding the operation of multiple listing services ("MLS").  *Id.* at ¶ 3.  An MLS is a cooperative of real estate professionals that maintains a database of home listings for its geographic area, providing a single platform on which buyers and sellers, through their agents, can search or post available real estate listings.  *Id.* at ¶ 4.  Many MLSs source this listings data through Internet Data Exchange ("IDX") feeds, which compile and share listings from MLSs to their member brokerages, allowing the brokerages to publish the data on their own websites and mobile apps.  *Id.* at ¶ 8.

NAR's Handbook contains model rules and policies for NAR-affiliated MLSs, some of which are mandatory, and some of which are optional.  Galicia Decl. at ¶ 6.  One of NAR's optional rules relates to IDX feeds.  *Id.* at ¶ 9.  That rule, known as the No-Commingling Rule, provides that "[l]istings obtained through IDX feeds from [NAR-affiliated] MLSs . . . must be displayed separately from listings obtained from other sources[,] . . . e.g., from other MLSs, from non-participating brokers, etc."  Handbook at

---

Court DENIES the request because the relevant facts and legal issues are adequately presented in the briefs and supporting documents.

§ 18.3.11, Ex. A to Galicia Decl. (docket no. 65-1).  NAR first adopted the No-Commingling Rule in 2001, and the relevant language has not substantively changed since that time.  Galicia Decl. at ¶ 11; *see id.*, Exs. B & C (docket nos. 65-2, 65-3).  Most MLSs have adopted the optional No-Commingling Rule; some MLSs, however, have decided not to adopt it.  *Id.* at ¶ 16; Samuelson Decl. at ¶¶ 64–66 (docket no. 53).

## B.  Zillow Defendants

Founded in Seattle in 2004, Zillow owns and operates the most-visited network of residential real estate websites and mobile apps in the country.  Samuelson Decl. at ¶¶ 7–8.  Zillow's websites allow consumers to search a comprehensive database of homes for sale or rent, home transaction histories, home price estimates and projected appreciation, and neighborhood and tax information, among other data.  *Id.* at ¶ 9.  These websites contain listings from individual agents and brokerages, MLSs (which may or may not be affiliated with NAR), owners, builders, as well as data from properties being sold at action or in foreclosure.  *Id.* at ¶ 10.  Zillow monetizes its data aggregation business by selling advertising, which promotes real estate agents to consumers and sends the agents consumer leads.  *See id.* at ¶¶ 12–14.  In 2018, Zillow launched Zillow Offers, a business through which Zillow buys homes directly from consumers, provides any needed repairs, then resells the properties, placing them on MLSs and advertising them on Zillow's websites and other websites.  *Id.* at ¶ 16.  In January 2021, Zillow established its own licensed brokerage, Zillow Homes Inc.  *Id.* at ¶ 17.  Zillow Homes provides brokerage services in connection with the homes sold through Zillow Offers but does not provide brokerage services to third-party buyers or sellers.  *Id.*

1     To aggregate listings data on its websites, Zillow historically negotiated contracts,

2  called syndication agreements, with hundreds of MLSs and thousands of individual

3  brokers and franchise brands.  Samuelson Decl. at ¶¶ 32–34.  Over time, however, these

4  syndication agreements created problems for Zillow, as they were administratively

5  complex and did not always provide complete or accurate data.  *Id.* at ¶¶ 39–47.

6  Moreover, under the syndication agreements, the various MLSs could terminate these

7  contracts at will, cutting off Zillow's access to critical data at any time, and some MLSs

8  did in fact withdraw, or threatened to withdraw, their listings data.  *Id.* at ¶ 49.

9     At some point, Zillow started to explore alternatives to these syndication

10  agreements.  Samuelson Decl. at ¶ 5.  Zillow ultimately determined that IDX feeds

11  provide more complete and accurate data relative to what is provided through syndication

12  agreements; and, unlike what is obtained through syndication agreements, IDX feeds

13  cannot be shut off, so long as Zillow complies with its obligations under non-negotiable

14  contracts, called IDX agreements.  *Id.* at ¶¶ 53–56.  To obtain the benefits of IDX feeds,

15  Zillow joined hundreds of MLSs as a participant broker, licensed their IDX feeds, and

16  signed their IDX agreements.  *Id.* at ¶¶ 58–59.  Joining MLSs, in turn, required Zillow to

17  comply with the IDX rules adopted by each MLS, roughly two-thirds of which had

18  adopted NAR's No-Commingling Rule.  *Id.* at ¶¶ 60–61, 66.  Because Zillow's websites

19  had traditionally displayed MLS and non-MLS listings together, Zillow needed to find a

20  way to segregate the MLS listings from the non-MLS ones to comply with the No-

21  Commingling Rule, so it started experimenting with website designs.  *Id.* at ¶ 67; *see*

22  Thomas Decl. at ¶¶ 15–21 (docket no. 55).

23

1          In September 2020, Zillow publicly announced that it would start sourcing data

2    from IDX feeds beginning in January 2021.  Samuelson Decl. at ¶ 68.  Zillow also noted

3    that the change to IDX feeds would necessitate, among other things, changes to how

4    listings data would be displayed on the Zillow websites.  *Id.*[2]  From September 2020 to

5    January 2021, Zillow worked to switch over the 200 largest MLSs from syndication

6    agreements to IDX agreements.  *Id.* at ¶ 69.  This process included mandatory reviews by

7    each MLS to ensure Zillow's compliance with the MLS rules.  *Id.*  By January 2021,

8    Zillow had changed its online platforms to comply with the No-Commingling Rule,

9    utilizing a two-tab listing display, with one tab labeled "Agent Listings" and the other tab

10   labeled "Other Listings."  *Id.* at ¶ 67.  The change to a two-tab display is depicted below:

11   **Before:**                    **After:**



17   Zillow Website Screenshots, Complaint at ¶¶ 61, 64 (docket no. 1).  An enlarged view of

18   the new two-tab display is depicted below:

---

22   [2] In that same announcement, Zillow Defendants announced the launch of Zillow Homes in Phoenix, Tucson, and Atlanta.  Samuelson Decl. at ¶ 68.

ORDER - 5

NAR Response at 1 (docket no. 64).

### C.   Plaintiff REX

Founded in 2015, Plaintiff REX is a full-service real estate brokerage with licensed agents operating in 19 states and 30 cities.  Ryan Decl. at ¶¶ 2, 10 (docket no. 8).  Plaintiff competes with traditional brokers and agents, generally members of NAR and MLSs, to provide residential real estate brokerage services to consumers wishing to buy or sell homes.  Complaint ¶ 40.  Plaintiff attempts to bring efficiencies to residential real estate services, using data modeling and machine learning "to match sellers and buyers of homes as accurately and speedily as possible on Zillow, Google, Facebook, and other channels."  Ryan Decl. at ¶ 7.  Plaintiff's technology displaces much of the work that licensed agents previously did, resulting in higher customer satisfaction and lower costs.  *Id*. at ¶ 24.  "According to REX data, since inception, the company has saved consumers over $29 million in commissions."  Majure Expert Report at ¶ 29, Ex. A to Majure Decl. (docket no. 15).  Plaintiff's clients spend an average of 3.3 percent on commissions, well below the national average of 5.5 percent.  Ryan Decl. at ¶¶ 12–13.

At some point after Zillow started implementing changes to its websites in January 2021, Plaintiff's CEO realized that the changes would significantly disadvantage Plaintiff and its business model.  Ryan Decl. at ¶ 25.  Previously, Zillow's websites displayed Plaintiff's listings alongside MLS and non-MLS listings.  *Id.*  Now, when a consumer

ORDER - 6

1    searches for homes on Zillow's websites, only the MLS listings are displayed; and the

2    consumer has to click on the second tab labeled "Other Listings" to view Plaintiff's

3    listings.  *Id.*  As a result, views of Plaintiff's listings on Zillow's online platforms and

4    other listing-related activity (e.g., showings attributable to Zillow), have dramatically

5    decreased.  Ryan Decl. at ¶ 27.  Plaintiff alleges that the inclusion of Plaintiff's listings

6    on the "Other Listings" tab, juxtaposed with the "Agent Listings" tab, "seems to falsely

7    indicate that [Plaintiff's] listings are not represented by licensed agents."  *Id.* at ¶ 28.

8    Plaintiff also alleges that the inclusion of its listings with other non-MLS listings, such as

9    "for sale by owner" and foreclosure listings, implies that Plaintiff's listings are not

10   represented by licensed agents or that its listings are of inferior quality.  *Id.* at ¶ 29.

11          Some of Plaintiff's clients have recently had trouble finding their homes listed on

12   Zillow's websites; or clients have indicated that the placement of their homes on the

13   "Other Listings" tab will decrease, or has decreased, visibility of their homes.  *See*

14   Echevarria Decl. at ¶ 7 (docket no. 11); Reina Decl. at ¶¶ 7–9 (docket no. 12).  Other

15   clients have resorted to co-listing with an MLS agent to increase their properties'

16   visibility, which is more costly to Plaintiff and its clients.  *See* Echevarria Decl. at ¶ 9; *see*

17   *also* Majure Suppl. Decl. at ¶¶ 4–5 & Ex. 1, Ex. 3 to Motion to Supp. (docket no. 38).

18   Further, Plaintiff has presented evidence suggesting that when one of its clients co-lists a

19   home with an MLS-agent, which is displayed on the preferred "Agent Listings" tab,

20   Plaintiff's name is either demoted or not listed on Zillow's websites.  *See* Ex. A to

21   Rosenbaum Decl. (docket no. 13); Maggio Supp. Decl. at ¶ 6 & Ex. C, Ex. 1 to Motion to

22   Supp. (docket no. 38).  Some clients have cancelled their listings with Plaintiff.  *See*

23

Reina Decl. at ¶ 7; Maggio Decl. at ¶ 7 (docket no. 9).  According to Plaintiff, the placement of its listings on the "Other Listings" tab on the Zillow websites, and the growing dissatisfaction among its clients, will result in irreparable harm to its business. Ryan Decl. at ¶¶ 31–36.

## 2.    Plaintiff's Action Against NAR and Zillow Defendants

On March 9, 2021, Plaintiff brought this action against NAR and Zillow Defendants, asserting four claims:  (1) an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125; (3) an unfair or deceptive act or practice in violation of the Washington Consumer Protection Act ("CPA"), RCW 19.86.020; and (4) conspiracy to restrain trade in violation of the CPA, RCW 19.86.030.  Complaint at ¶¶ 114–64. Plaintiff then filed the instant Motion, docket no. 5, seeking to enjoin Defendants from implementing any rule requiring segregation of Plaintiff's listings from MLS listings, excluding its listings from the "Agent Listings" tab, and categorizing its listings as "Other Listings" on Zillow Defendants' websites.  Motion at 23–24 (docket no. 5).

## **Discussion**

## 1.    Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A party seeking a preliminary injunction must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) a balancing of equities tips in favor of an injunction, and (4) an injunction is in the public interest.  *Id.* at

20.[3]  All four elements of the *Winter* standard must be satisfied, but this circuit "use[s] a 'sliding scale' approach to these factors, according to which 'a stronger showing of one element may offset a weaker showing of another.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019) (citation omitted); *see also Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (concluding, at minimum, a moving party must show irreparable harm).[4]

## 2.    Likelihood of Success on the Merits

### A.    Section 1 Violation

Plaintiff asserts an antitrust violation under Section 1 of the Sherman Act.[5]  To demonstrate that a restraint violates Section 1, a plaintiff must show the existence of (1) a contract, combination of contracts, or conspiracy among two or more distinct business entities, (2) by which the business entities intend to harm or restrain trade or commerce

---

[3] Because, for the reasons discussed below, the Court concludes that Plaintiff has not satisfied this preliminary injunction standard, it does not decide whether a mandatory injunction is at issue in this case or whether Plaintiff has satisfied the mandatory injunction's "doubly demanding" standard.  *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

[4] Plaintiff's reliance on *Sundance Land Corp. v. Community First Federal Savings & Loan Association*, 840 F.2d 653, 661 (9th Cir. 1988), for the proposition that it need only "show a threatened loss or injury cognizable in equity proximately resulting from the alleged antitrust violation," is unavailing.  Motion at 17 (docket no. 5).  As this circuit's post-*Winter* cases make clear, a party moving for a preliminary injunction must show that it is *likely* to suffer irreparable harm absent preliminary relief.  *See e.g.*, *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1015, 1020 (9th Cir. 2016) (applying the *Winter* framework in a case involving a preliminary injunction based on antitrust claims under the Sherman Act).

[5] In its preliminary injunction briefing, Plaintiff has not addressed its claim that Defendants' conduct also violates Washington's antitrust laws, namely RCW 19.86.030.  *See* Complaint at ¶¶ 152–64.  The Court thus does not address whether Plaintiff is likely to prevail on the state antitrust claim but notes that the state and federal standards are nearly identical.  *See State v. LG Elecs., Inc.*, 186 Wn.2d 169, 186 n.3, 375 P.3d 1035 (2016) (concurring, McCloud, J.).

ORDER - 9

among several states, (3) which actually injures competition, and (4) that the injury to the

plaintiff "flowed from an 'anti-competitive aspect of the practice under scrutiny.'"  *See*

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).  Plaintiff contends

that Zillow's implementation of the No-Commingling Rule[6] amounts to either a "*per se*

violation*"* of the antitrust laws under *Northwest Wholesale Stationers, Inc. v. Pacific*

*Stationery & Printing Co.*, 472 U.S. 284 (1985), or a violation under the less demanding,

"rule of reason" standard.  *See* Motion at 8–12 & 9 n.3 (docket no. 5).  The Court

addresses each standard in turn.

### i.    *Per Se* **Antitrust Violation**

"This *per se* approach permits categorical judgments with respect to certain

business practices that have been proved to be predominately anticompetitive."  *Nw.*

*Wholesale Stationers*, 472 U.S. at 289.  Courts can thereby avoid the question of whether

there are "'significant costs' in 'business certainty and litigation efficiency' that a full-

fledged rule-of-reason inquiry entails."  *Id.* (citation omitted).  "*Per se* rules are invoked

when the surrounding circumstances make the likelihood of anticompetitive conduct so

great as to render unjustified further examination of the challenged conduct."  *Nat'l Coll.*

*Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 103–04 (1984).

---

[6] It is unclear whether Plaintiff is arguing that NAR is liable under Section 1 for *adopting* the optional No-Commingling Rule, or that it is liable as a co-conspirator, for *Zillow's implementation* of the rule.  *See* Reply at 9–11 (docket no. 69).  Nevertheless, Plaintiff does not appear to argue that it will suffer irreparable harm unless the Court enjoins NAR from adopting or promoting this optional rule, particularly as NAR has been doing so since 2001.  Accordingly, for present purposes, the Court does not address the likelihood of Plaintiff prevailing on a separate claim against NAR.

ORDER - 10

1    In this case, the parties dispute whether Defendants entered a "horizontal"

2    agreement, as Plaintiff alleges, or a "vertical" agreement, as Defendants allege.

3    "Restraints imposed by agreement between competitors have traditionally been

4    denominated as horizontal restraints, and those imposed by agreement between firms at

5    different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs.*

6    *Corp.*, 485 U.S. 717, 730 (1988); *see also Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S.

7    332, 348 n.18 (1982) (noting that "horizontal restraints are generally less defensible than

8    vertical restraints"). Plaintiff argues that Defendants have entered "a paradigmatic

9    horizontal relationship" because Zillow now offers licensed brokerage services, just as

10   Plaintiff does. *See* Reply at 4 (docket no. 69). Plaintiff further contends that Zillow's

11   decision to join MLSs as a participant broker and to change its websites to comply with

12   the No-Commingling Rule amount to a "group boycott" or a "cartel." *Id.* at 1.[7] Zillow

13   Defendants respond that they do not compete with Plaintiff (or other traditional

14   brokerages)—as Zillow joined MLSs and implemented the No-Commingling Rule to

15   obtain IDX feeds for the benefit of Zillow's *separate* data aggregation business, not to

16   harm competition with respect to its brokerage business. *See* Zillow Response at 14–16

17   (docket no. 52).

18   Regardless of whether Defendants' conduct is more akin to a horizontal restraint,

19   or a vertical one, the Supreme Court has stated that the application of the *per se* rules

20

21   _____

22   [7] The Court discourages any future use of the term "cartel" to describe Defendants' conduct, which is neither persuasive nor remotely accurate.

23

ORDER - 11

1    "must be based upon demonstrable economic effect rather than . . . upon formalistic line

2    drawing" between the different types of restraints.  *Leegin Creative Leather Prods.*, 551

3    U.S. at 887.  Plaintiff acknowledges that it has not been altogether expelled from Zillow's

4    online platforms, akin to a traditional boycott; rather Plaintiff contends that the

5    segregation of its listings amounts to a refusal to deal with its business on "substantially

6    equal terms."  Plaintiff, however, must make some showing that the restraint at issue is

7    one that "courts have had considerable experience with," permitting this Court to "predict

8    with confidence that [the restraint] would be invalidated in all or almost all instances."

9    *Leegin Creative Leather Prods.*, 551 U.S. at 886.

10          The challenged restraint is an optional, internal NAR rule that allegedly results in

11   "display bias" in favor of MLS listings—a rule with which Zillow Defendants have

12   decided to comply.  Plaintiff cites no authority that the challenged restraint is

13   "sufficiently analogous to practices already deemed by courts to be anticompetitive for it

14   to qualify as a facially anticompetitive restraint."  *Realcomp II, Ltd. v. FTC*, 635 F.3d

15   815, 827 (6th Cir. 2011) (expressly declining to decide whether an "internal rule within

16   an MLS regarding its distribution of certain types of real-estate holdings to the public"

17   was *per se* unlawful).  Plaintiff's cited authority involving analogous MLS rules or other

18   forms of "display bias" largely apply the rule of reason, not the *per se* rules.  *See, e.g.*, *id.*

19   at 827 (applying the rule of reason); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d

20   43, 55 (2d Cir. 2019) (same); *see also Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821,

21   839 (N.D. Ill. 2019) (denying a motion to dismiss plaintiff's Section 1 claim, but

22   declining to credit Defendants' alternative explanations for their parallel behavior).

23

ORDER - 12

1    In addition, the Court notes that a 2008 consent decree[8] expressly permits NAR to

2    adopt a policy that its affiliated MLSs may require that their listings "be searched

3    separately from listings obtained from other sources, including other MLSs."  Ex. A to

4    Consent Decree at § IV(3), Ex. 27 to Glass Decl. (docket no. 66-27).

5    Given the complex nature of the business relationships between the parties and the

6    challenged restraint at issue—again, an *optional*, internal NAR rule allegedly resulting in

7    "display bias"—the Court finds the *per se* rules to be inapplicable in this case.  *See*

8    *Leegin Creative Leather Prods.*, 551 U.S. at 887 ("It should come as no surprise . . . that

9    [courts] have 'expressed reluctance to adopt *per se* rules with regard to restraints imposed

10   in the context of business relationships where the economic impact of certain practices is

11   not immediately obvious.'") (citation omitted); *see also White Motor Co. v. United*

12   *States*, 372 U.S. 253, 263 (1963) (refusing to adopt *per se* rule for a vertical nonprice

13   restraint because of the uncertainty of whether this type of restraint satisfied the

14   demanding standards necessary to apply the *per se* rules).

15                    **ii.        Antitrust Violation under the Rule of Reason**

16   The Court thus turns to Plaintiff's alternative argument that it is likely to prevail

17   under the three-part, burden-shifting "rule of reason" inquiry.  Courts "generally evaluate

18   whether a practice unreasonably restrains trade in violation of Section 1 under the 'rule of

19   reason.'"  *Brantley*, 675 F.3d at 1197; *see Leegin Creative Leather Prods.*, 551 U.S. at

20

21   [8] A related NAR model policy was challenged in 2005, after the U.S. Department of Justice filed an
     antitrust complaint against NAR.  NAR settled that case with the government in 2008, which was
22   memorialized in a consent decree.  *See* 2008 Consent Decree, Ex. 27 to Glass Decl. (docket no. 66-27).

23

885 ("The rule of reason is the accepted standard for testing whether a practice restrains

trade in violation of § 1.").  The rule of reason entails a three-part burden-shifting test:

(1) the plaintiff has the initial burden to prove that the challenged restraint has a

substantial anticompetitive effect that harms consumers in the relevant market; (2) if

plaintiff carries that burden, the burden shifts to the defendant to show a "procompetitive

rationale for the restraint"; and (3) if the defendant makes this showing, the burden shifts

back to the plaintiff to demonstrate that the procompetitive efficiencies could be

reasonably achieved through less anticompetitive means.  *FTC v. Qualcomm Inc.*, 969

F.3d 974, 991 (9th Cir. 2020).  "The rule of reason requires courts to conduct a fact-

specific assessment of 'market power . . . to assess the restraint's *actual* effect' on

competition."  *Id.* at 989 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752,

768 (1984)) (emphasis in original) (alterations adopted).  "Proof that the defendant's

activities had an impact upon competition in a relevant market is an absolutely essential

element of the rule of reason case," as "[i]t is the impact upon competitive conditions . . .

which distinguishes the antitrust violation from the ordinary business tort."  *McGlinchy v.*

*Shell Chem. Co.*, 845 F.2d 802, 812–13 (1988) (citation omitted).

  With respect to the first prong, Plaintiff contends that Zillow Defendants have

demoted Plaintiff's listings, as well as other discount brokerages' listings, resulting in a

substantial anticompetitive effect that has harmed consumers in the relevant market.

Motion at 11 (docket no. 5).  Plaintiff's evidence, however, demonstrates that its listings

are still featured on the Zillow websites, either on the preferred "Agent Listings" tab or

the "Other Listings" tab, and on several other online platforms.  For example, Plaintiff

1   submitted a declaration showing that one of its agents emailed a client, explaining that

2   although "Zillow has made changes to the mapping feature . . . [w]e still have good views

3   of 565 plus 11 saves on the listing page" on the "Other Listings" tab.  Reina Decl., Ex. B

4   (docket no. 12 at 12); *see also* Maggio Decl., Ex. A (docket no. 9 at 7) (Plaintiff's agent

5   explaining to a client that "[w]e are maintaining solid activity on Zillow—your home has

6   over 3000 views").  Moreover, Plaintiff markets its clients' listings through channels

7   other than the Zillow websites, including "multiple display ads . . . across thousands of

8   sites" and "online channels."  REX Website FAQ Transcript, Ex. 38 to Glass Decl.

9   (docket no. 66-38 at 2); *see also* REX Blog, Ex. 39 to Glass Decl. (docket no. 66-39 at 3)

10  (explaining that Plaintiff markets client listings on its own site, Google, Bing, Facebook,

11  and Instagram).

12      The Court also notes that certain discount brokerages, such as Redfin, have

13  maintained their listings on the preferred "Agent Listings" tab on Zillow's websites, as

14  Redfin typically lists homes on MLSs.  Majure Expert Report at ¶ 20, Ex. A to Majure

15  Decl. (docket no. 15 at 16).  Plaintiff's expert maintains that Plaintiff can provide

16  superior savings relative to Redfin and other discount brokerages; but he also explains

17  that a majority of Plaintiff's transactions involve separate buyers' agents, resulting in a

18  total commission of 4.1 percent, which is on par with Redfin's estimated commission of 4

19  to 4.5 percent.[9]  *See id.* at ¶¶ 59, 61; *see also McGlinchy*, 845 F.2d at 812 ("The

20

21  _____

22  [9] Redfin's commission may even be lower, if a seller buys a home within a year of selling his or her home with Redfin.  Majure Expert Report at ¶ 59 n.95.

23

1   elimination of a single competitor, without more, does not prove anticompetitive

2   effect.").  Absent sufficient evidence that Defendants' actions have had a *substantial*

3   impact upon competitive conditions, as opposed to merely impacting Plaintiff's "ability

4   to save on commission fees" or its "ability to execute its innovative business model," the

5   Court concludes that Plaintiff has not demonstrated that it is likely to prevail under the

6   first prong of the rule of reason test.

7           Even assuming that Plaintiff could show that the challenged restraint has a

8   substantial anticompetitive effect, thereby harming consumers in the relevant market,

9   Zillow Defendants have demonstrated, under the second prong, that procompetitive

10  rationales likely outweigh the alleged anticompetitive aspects of the challenged restraint.

11  *See Qualcomm*, 969 F.3d at 991.  Zillow Defendants have presented evidence that IDX

12  feeds, relative to the data obtained by their prior syndication agreements, provide better

13  data quality and quantity.  *See* Hubbard Expert Report at ¶ 56, Ex. A to Hubbard Decl.

14  (docket no. 56).  From Zillow's perspective, joining MLSs as a participant broker and

15  entering into IDX agreements is more secure because such agreements cannot be

16  terminated at will; and IDX agreements are more cost-efficient as non-negotiable form

17  agreements, in contrast to individually negotiated syndication agreements.  *Id.* at ¶¶ 90–

18  92; *see Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1156–57 (9th Cir.

19  2003) (reducing or eliminating transactions costs is a procompetitive benefit).  More

20  critically, from the consumer's perspective, the evidence shows that Zillow Defendants'

21  move to IDX feeds have allowed for more listings (e.g., adding 3,000 new listings in the

22  Seattle area) on Zillow Defendants' websites, "richer content," and more "accuracy,

23

timeliness, and depth of information."  *See* Hubbard Expert Report at ¶¶ 81–83, 98; *see also id.* at ¶¶ 88 (explaining that reduced brokerage costs could reduce selling costs for clients of Zillow Offers).  The Court is satisfied that these procompetitive benefits are likely to outweigh any anticompetitive aspects of Zillow Defendants' recent actions.

Finally, appearing to ignore its burden under the third prong, Plaintiff has not addressed the procompetitive rationales provided by Zillow Defendants.  *See* Reply at 4, 7 (docket no. 69).  Although Plaintiff argues that "Zillow can gain the benefits of accessing MLS listing data without imposing the anticompetitive segregation rule," *id.* at 1, Plaintiff fails to explain how this is so or make any showing that Zillow Defendants could have reasonably obtained the same efficiencies using less anticompetitive means.  *See Qualcomm Inc.*, 969 F.3d at 991.  The Court cannot engage in a guessing game about whether Zillow Defendants could have achieved the same procompetitive benefits using less anticompetitive alternatives, or whether such alternatives would have been feasible to implement.  Because Plaintiff has not satisfied its burden under the rule of reason test, the Court concludes that Plaintiff is not likely to prevail on its federal antitrust claim.

### B.    CPA Claim

Plaintiff also asserts that Defendants have engaged in false or deceptive conduct in violation of the CPA.[10]  To prevail on this claim, Plaintiff must ultimately prove (1) an

---

[10] Plaintiff does not separately brief its Lanham Act claim in the instant Motion.  *See* Complaint at ¶¶ 125–35.  Likewise, Plaintiff appears to concede that none of the alleged unfair or deceptive acts involve NAR, as it asserts CPA and Lanham Act claims against NAR based solely on a co-conspirator theory.  *See* Reply at 9–11 (docket no. 69).  For present purposes, the Court need not resolve the merits of these issues, and thus expresses no opinion on whether Plaintiff is likely to prevail on the Lanham Act claim, or whether NAR could be held liable for Zillow Defendants' alleged deceptive practices.

1  unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the

2  public interest, (4) injury to a person's business or property, and (5) causation.  *Hangman*

3  *Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986);

4  *see* RCW 19.86.020.

5  **i.    Unfair or Deceptive Act**

6  　　　To demonstrate that a certain act is "unfair or deceptive" within the meaning of the

7  CPA, a plaintiff must show that "there is a representation, omission or practice that is

8  likely to mislead" a reasonable consumer, "by virtue of the 'net impression' it conveys."

9  *Panag v. Farmers Ins. Co. of Wash*., 166 Wn.2d 27, 50, 204 P.3d 885 (2009).  "In

10  evaluating the tendency of language to deceive, [a court] should look not to the most

11  sophisticated readers but rather to the least."  *Id.* (citation omitted).  "[A] claimant need

12  not show intent to deceive or defraud on the part of the seller, only that the practice had

13  the capacity to deceive a substantial portion of public."  *Robinson v. Avis Rent A Car*

14  *Sys., Inc.*, 106 Wn. App. 104, 115, 22 P.3d 818 (2001).

15  　　　Plaintiff contends that the listings on the "Other Listings" tab, next to the "Agent

16  Listing tab," might lead a reasonable consumer to believe that Plaintiff's listings are non-

17  agent listings, viewing the Zillow websites as a whole.  *See* Motion at 15 (docket no. 5).

18  Plaintiffs also argue that "sophisticated professionals" were actually deceived by the

19  practice.  *Id.*  Zillow Defendants argue that their websites, as a whole, demonstrate that

20  there are many other features, which on balance, reveal the true nature of the listings and

21  that consumers will not be misled.  Zillow Response at 19 (docket no. 52).  The Court

22  concludes, based on the evidence presented by this Motion, Plaintiff has not met its

23

burden to show that the "net impression" of the Zillow websites, viewed as a whole rather

than the websites' individual parts, is likely to mislead a substantial portion of the

purchasing public.  *See Panag*, 166 Wn.2d at 50; *Robinson*, 106 Wn. App. at 115.  With

respect to Plaintiff's exclusive listings, which appear on the "Other Listings" tab, the

websites indicate that the property is "Listed by . . . REX Homes" and "Rex Real Estate

Exchange," as depicted below:



Najemy Decl. at ¶ 2 (docket no. 57).  If a consumer clicks on the "View virtual tour"

button, located on the "Facts and Features" section of the listing, then the consumer will

be rerouted directly to Plaintiff's website.  *Id.* at ¶¶ 3, 6.  With respect to Plaintiff's co-

listings, which appear on the preferred "Agent Listings" tab, Plaintiff's name also appears

as "Also listed by REX Real Estate," on at least some portion of those co-listings.  *See id.*

at ¶¶ 4–5.[11]  Moreover, Zillow Defendants have attempted to explain, in a consumer-

friendly manner, the differences between the two tabs by developing pop-ups and FAQ

pages.  *See* Thomas Decl. at ¶¶ 23–25 (docket no. 55).

---

[11] Plaintiff has presented evidence that Plaintiff's co-listings do not always display "Also listed by REX Real Estate."  *See* Maggio Supp. Decl. at ¶ 5 & Ex. C, Ex. 1 to Motion to Supp. (docket no. 38); *see*

1    Plaintiff rejects this characterization of Zillow's websites, but it fails to explain

2    how a reasonable consumer could still believe that Plaintiff's properties are listed by non-

3    agents in light of the listing's references to "REX Homes," "Rex Real Estate Exchange,"

4    or "REX Real Estate," with direct links to Plaintiff's website.[12]  Although Plaintiff has

5    presented evidence that its employees have heard from unnamed clients or other agents

6    who were misled by Zillow Defendants' websites, *see, e.g.*, Van Ham Decl. at ¶ 9 (docket

7    no. 10); Lawrence Decl. at ¶ 11 (docket no. 6), the Court gives little weight to this

8    evidence, absent some indication that the unnamed consumers or agents actually clicked

9    on Plaintiff's listings.[13]  The apparent conduct of agents trolling a web page does not

10   indicate whether a reasonable consumer is likely to be confused.  The allegation about

11   unnamed clients adds little to the claim.  Plaintiff has not supported its claim that there is

12   any deception that is injuring a substantial portion of the purchasing public.  *See*

13   *Robinson*, 106 Wn. App. at 115.[14]

14   ————————————

15   Rosenbaum Supp. Decl. at ¶ 4 & Ex. B, Ex. 2 to Motion to Supp. (docket no. 38).

16   [12] Instead, Plaintiff argues that Zillow Defendants' use of pop-ups are insufficient because these pop-ups
     are only seen by new consumers and do "nothing" to suggest that "Other Listings" might include listings
17   by licensed agents.  *See* Reply at 12–13 (docket no. 69).  That might be true, but Plaintiff does not explain
     why or how Zillow's websites are likely to mislead a consumer once a consumer actually clicks on one of
     Plaintiff's listings.

18   [13] Even if Plaintiff's employees' descriptions of customer and competitor statements are hearsay, relaxed
     rules of evidence apply in the preliminary injunction context.  *See Herb Reed Enter., LLC v. Fla. Ent.*
19   *Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).  The Court merely notes that Plaintiff's evidence
     does not provide sufficient factual context to show how its customers or competitors were misled by the
20   websites at issue.

21   [14] The Court's conclusion should not be read to imply that Plaintiff's evidence is insufficient to create
     genuine issues of fact material to whether the Zillow websites are false or deceiving with respect to any
     later dispositive motion.  The Court merely holds that Plaintiff has not shown a likelihood of prevailing
22   on this record.

23

ORDER - 20

1

      **ii.**   **Development or Preservation of Business**

2    Further, Zillow Defendants have presented evidence that their employees

3 considered several different website designs to comply with the MLSs' IDX rules, the

4 No-Commingling Rule in particular, and then considered several different labeling

5 options, before settling on the present display.  *See* Thomas Decl. at ¶¶ 19–22.  The CPA

6 "shall not be construed to prohibit acts or practices which are reasonable in relation to the

7 development and preservation of business."  RCW 19.86.920; *State v. Black*, 100 Wn.2d

8 793, 803, 676 P.2d 963 (1984) (concluding the state legislature "recognized that a court

9 must weigh the public interest in prohibiting anticompetitive conduct against the

10 recognition that businesses need some latitude within which to conduct their trade").

11 Based on the current record, it is not likely that Plaintiff will prevail on the CPA claim.

12   **3.**   **Likelihood of Irreparable Harm**

13    Nor can Plaintiff show a likelihood of irreparable harm.  Plaintiff alleges that

14 Defendants' "unlawful actions have inflicted distinct injuries on REX that cannot be

15 remedied by money damages."  Motion at 17 (docket no. 5).

16    Plaintiff first asserts that it will suffer "anticompetitive harm," or "injury to

17 competition," a type of harm that could support a finding of irreparable harm.  *See Am.*

18 *Passage Media*, 750 F.2d at 1473.  To establish such harm, Plaintiff relies on its

19 employees' declarations that they are being increasingly forced to co-list properties on

20 the MLS, requiring their clients to pay higher commissions to buyer's agents.  *See*

21 Motion at 19 (docket no. 5); *see also* Rosenbaum Decl. at ¶¶ 11, 13 (docket no. 13);

22 Echevarria Decl. at ¶ 9 (docket no. 11).  According to Plaintiff, the increased trend to co-

23

1  list properties has impaired consumer choice and forced higher prices on them.  *See* Ryan

2  Decl. at ¶¶ 12–14 (docket no. 8).  Plaintiff's evidence, however, merely shows that the

3  lost consumer savings due to co-listing, or any other lost revenue, is compensable in

4  money damages.  *See Am. Passage Media*, 750 F.2d at 1473.  That evidence also shows

5  that Plaintiff can mitigate, and actually has mitigated, its claimed damages.

6         Nor does the record show a likelihood that Plaintiff is being "driven out of

7  business" or that its very "existence" is being threatened simply because Plaintiff's

8  listings are now displayed on the "Other Listings" tab on Zillow's websites.  *See id.* at

9  1473–74; *see also hiQ Labs, Inc.*, 938 F.3d at 993 (explaining that "[m]onetary injury is

10  not normally considered irreparable," but "showing a threat of 'extinction' is enough to

11  establish irreparable harm," e.g., evidence that plaintiff will be forced to "lay off most if

12  not all of its employees, and shutter its operations").  Similarly, for the reasons discussed

13  in Section 2(A)(ii) above, Plaintiff has not presented sufficient evidence of a "lessening

14  of competition" in the general market to constitute irreparable injury.  *See Boardman v.*

15  *Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016).

16         Plaintiff also asserts that it will suffer a "loss of control over its business

17  reputation and damage to goodwill," amounting to a likelihood of irreparable harm.  *See*

18  *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018) (quoting *Herb*

19  *Reed Enter., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013)).  Plaintiff

20  relies on its employees' declarations that Defendants' actions have caused Plaintiff's

21  clients to become frustrated, disappointed, or misled—which in turn, has resulted in a

22  handful of "los[t] client listings" and "reduc[ed] . . . ability to enhance its reputation and

23

1    grow its brand," as well as an "unknown loss of [future] business."  Motion at 21 (docket

2    no. 5).  From this evidence, the Court cannot infer a likelihood of irreparable harm to

3    Plaintiff's goodwill or brand recognition.  Plaintiff asserts that it is a market "disruptor"

4    within the real estate industry, but it has made no showing, for example, that it has

5    engaged in extensive marketing efforts to carefully control its brand image as unaffiliated

6    with NAR or an MLS; nor could it, as Plaintiff has historically co-listed properties with

7    MLS agents to increase the online presence of clients' listings.  *See, e.g.*, Lawrence Decl.

8    at ¶ 9 (docket no. 6); Rosenbaum Decl. at ¶ 13 (docket no. 13); *see also adidas Am.*, 890

9    F.3d at 761.[15]  The present record does not establish a likelihood that Plaintiff will suffer

10   irreparable harm absent an injunction.

11          Because the Court concludes that Plaintiff has not shown that it is likely to prevail

12   on its antitrust or CPA claims, or that it will suffer irreparable harm in the absence of an

13   injunction, the Court does not address the remaining preliminary injunction factors.  *See*

14   *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("*Winter* tells us

15   that plaintiffs may not obtain a preliminary injunction unless they can show that

16   irreparable harm is likely to result in the absence of the injunction.").  The Motion for a

17   preliminary injunction is DENIED.

18

19

20   _____

     [15] Plaintiff's expert also stated that Plaintiff "will lose its *opportunity* to establish a reputation as an
21   innovative option for sellers and the competitive discipline REX has been bringing to the real estate
     brokerage *will not develop*."  Majure Expert Decl. at ¶ 63, Ex. A to Majure Decl. (docket no. 15)
22   (emphasis added).  Speculation of future injury, however, is insufficient to show that "irreparable injury is
     *likely* in the absence of an injunction" under *Winter*.  *See Herb Reed Enters.*, 736 F.3d at 1250.

23

1 | **Conclusion**

2 |       For the foregoing reasons, the Court ORDERS:

3 |       (1)    Plaintiff's Motion for a preliminary injunction, docket no. 5, is DENIED;

4 |       (2)    Zillow Defendants' unopposed motion to seal, docket no. 58, is

5 | GRANTED.  The following documents shall remain UNDER SEAL:  (1) the unredacted

6 | versions of the Errol Samuelson Declaration, and Exhibits 1 & 2 (docket no. 61); (2) the

7 | unredacted version of the Matt Hendricks Declaration, and Exhibit 9 (docket no. 62);

8 | (3) the unredacted version of Exhibit A attached to the Glenn Hubbard Declaration, and

9 | Exhibit 3 attached to Exhibit A (docket no. 63); and (4) the unredacted version of Zillow

10 | Defendants' response to Plaintiff's Motion for a preliminary injunction (docket no. 60).

11 |       (3)    Plaintiff's unopposed motion to seal, docket no. 71, is GRANTED.  The

12 | unredacted version of Exhibit A attached to the Glenn Hubbard Declaration, and Exhibit

13 | 3 attached to Exhibit A (docket no. 63), and the Rebuttal Declaration of W. Robert

14 | Majure (docket no. 73) shall remain UNDER SEAL.

15 |       (4)    The Clerk is directed to send a copy of this Order to all counsel of record.

16 |       IT IS SO ORDERED.

17 |       Dated this 9th day of June, 2021.

18 |

19 |                                  Thomas S. Zilly
                                 United States District Judge

20 |

21 |

22 |

23 |