1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6

7  REX - REAL ESTATE EXCHANGE
   INC.,
8
                      Plaintiff,
9
          v.                                              C21-312 TSZ
10
    ZILLOW INC.; ZILLOW GROUP                             ORDER
11  INC.; ZILLOW HOMES INC.;
    ZILLOW LISTING SERVICES INC.;
12  TRULIA LLC; and THE NATIONAL
    ASSOCIATION OF REALTORS,
13
                      Defendants.
14

15      THIS MATTER comes before the Court on the motion to dismiss filed by

16  Defendants Zillow Inc., Zillow Group Inc., Zillow Homes Inc., Zillow Listing Services

17  Inc., and Trulia LLC ("Zillow"), docket no. 83, and the motion to dismiss filed by the

18  National Association of REALTORS® ("NAR"), docket no. 84.  Having reviewed all

19  papers filed in support of, and in opposition to, the motions, the Court enters the

    following Order.
20

    **Background**
21

22      NAR is the nation's largest trade association for real estate professionals,

23  consisting of multiple listings services ("MLSs"), more than a thousand local

ORDER - 1

associations, and around 1.45 million real estate agents. Compl. at ¶ 24 (docket no. 1). NAR promulgates rules governing how its members operate their businesses, which have allegedly become ubiquitous within the marketplace. *Id.* at ¶ 29. For example, NAR has adopted an optional rule, known as the Segregation Rule,[1] which requires members' listings that are obtained through MLSs' internet data exchange ("IDX") feeds to be "displayed separately from listings obtained from other sources." *Id.* at ¶¶ 83 & 85. NAR has also adopted a mandatory rule, known as the Buyer Agent Commission Rule, which requires a seller's agent to include in any MLS listing a predetermined offer of commission to a buyer's agent, thereby prohibiting any party from later modifying that commission. *Id.* at ¶¶ 31 & 33. NAR's members allegedly encourage their customers to offer high commissions for buyers' agents, resulting in historically high, static commissions throughout the United States, with total commissions averaging about 5.5 percent of a home's sale price. *See id.* at ¶¶ 34 & 42.

Established in 2015, Plaintiff REX – Real Estate Exchange Inc. is a licensed broker that employs licensed real estate agents across the nation, including in Washington. Compl. at ¶¶ 40, 44, & 47. Plaintiff is not a member of NAR or any MLS and thus has not agreed to comply with any of NAR's rules. *Id.* at ¶ 35. Home sellers who choose Plaintiff's services are able to avoid paying a predetermined buyer agent commission and can instead negotiate that fee—as a result, Plaintiff's clients pay a total average commission of 3.3 percent of a home's sale price. *Id.* at ¶ 42.

---

[1] The complaint refers to the "segregation rule" or "IDX segregation rule," *e.g.*, Compl. at ¶¶ 85 & 93, but the parties, and the Court's prior order (docket no. 80), have also referred to this rule as the No-Commingling Rule. This order will refer to the rule as the Segregation Rule.

ORDER - 2

Plaintiff has developed proprietary digital technology to market its customers' homes, allegedly saving customers more than $29 million in commissions over the past five years.  Compl. at ¶¶ 40–43.  Plaintiff lists its customers' homes on various real estate aggregator websites, including two of Zillow's websites, Zillow.com and Trulia.com, which are the first and fourth most visited real estate aggregator sites in the United States. *Id.* at ¶ 54.  Zillow's websites are alleged to be a "dominant doorway into the residential real estate market."  *Id.*  Plaintiff's listings were historically displayed on Zillow's primary search page alongside the listings of MLS participants.  *Id.* at ¶ 63.

In 2018, Zillow launched its "Zillow Offers" business, allowing Zillow to "transact[] thousands of homes annually" as an "ibuyer" of homes.  Compl. at ¶ 58. Based on Plaintiff's information and belief, "the growth and substantial inventory of Zillow-owned homes placed Zillow in a new position:  Instead of focusing on being an open access point for consumers to display and access residential real estate listings, Zillow's interests turned to its own substantial home inventory."  *Id.*  In late 2020, Zillow announced that it would join forces with NAR and several MLSs, publicly committing that "all Zillow-owned homes will be listed on the MLSs with commissions paid to agents representing buyers."  *Id.* at ¶ 59.  Plaintiff alleges that NAR's Buyer Agent Commission Rule, which is "now adopted by Zillow, is the paramount reason that real estate commissions are two to three times higher in the United States than in comparable international markets."  *Id.*  Zillow also announced that it would begin to use MLS data feeds to populate its websites.  *Id.* at ¶ 60.

In January 2021, Zillow unveiled its newly designed website display to be implemented nationwide on its websites to comply with the NAR and MLS "guidelines"

1  or "rules."  Compl. at ¶¶ 64 & 70–71.  The new display created a separate page or tab,

2  called "Other listings," that is concealed behind the primary results page or tab, called

3  "Agent listings," as depicted below:



13  *Id.* at ¶ 64.  As a result of this new display, consumers see only a portion of the homes at

14  one time, based on whether they are viewing the primary "Agents listings" tab or the

15  secondary "Other listings" tab; and they must now move back and forth between these

16  two tabs.  *Id.* at ¶ 66.  Although Plaintiff's customers' homes are all listed by licensed

17  real estate agents, its listings are now being displayed in the "Other listings" category to

18  comply with NAR and MLS rules, rather than in the "Agent listings" category.  *Id.* at

19  ¶¶ 67–68 & 71.  Zillow allegedly knows that Plaintiff is a licensed broker with licensed

20  agents, as Plaintiff pays Zillow to be a part of Zillow's Premier Agent Program.  *Id.* at

21  ¶ 69.  Plaintiff alleges that this new display and labeling system "is not only inaccurate

22  and nonsensical, it is misleading and deceptive," as it "degrades non-MLS listings" by

23  placing them on the "Other listings" tab.  *Id.* at ¶¶ 67 & 71.

ORDER - 4

After Zillow redesigned its websites, views of Plaintiff's listings "plummeted" on Zillow's websites, causing "a corresponding drop in sales and . . . lost brokerage service revenues to" Plaintiff.  Compl. at ¶¶ 73–74 & 88.  For example, views of one of Plaintiff's listings on Zillow.com dropped dramatically after January 2021, when Zillow added the "Other listings" tab to the website, as depicted below:



*Id.* at ¶ 74.  Zillow's and NAR's actions are also allegedly harming other non-MLS agents, *see id.* at ¶ 71, as well as the sellers of the homes that are listed on Zillow's "Other listings" tab, "causing them to list the home for more days on market and accept lower sales prices."  *Id.* at ¶ 73.

In March 2021, Plaintiff brought this action against Zillow and NAR, asserting four claims:  (1) an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) false advertising in violation of the Lanham Act, 15

U.S.C. § 1125; (3) an unfair or deceptive act or practice in violation of the Washington

Consumer Protection Act ("CPA"), RCW 19.86.020; and (4) conspiracy to restrain trade

in violation of the CPA, RCW 19.86.030. Compl. at ¶¶ 114–64. Plaintiff simultaneously

filed a motion for a preliminary injunction, docket no. 5, seeking to enjoin Defendants

from implementing any rule requiring the segregation of Plaintiff's listings from MLS

listings, excluding Plaintiff's listings from the "Agent listings" tab, and categorizing

Plaintiff's listings as "Other listings" on Zillow's websites. The Court denied that

motion, concluding that Plaintiff failed to satisfy its burden to show a likelihood of

prevailing on its federal and state law claims, or a likelihood of suffering irreparable

harm in the absence of an injunction. Order (docket no. 80 at 23).

Defendants now move to dismiss the claims asserted against them, *see* docket nos.

83 & 84. NAR also requests that the Court take judicial notice of certain documents,

docket no. 85. Plaintiff partially opposes the request, docket no. 91, with respect to two

of the documents, a complaint filed in a civil case, *see* Ex. C to request (docket no. 85-3),

and the final judgment entered in that case, including a 2008 consent decree between

NAR and the United States, *see* Ex. D to request (docket no. 85-4). The United States

also filed a statement of interest, docket no. 95, asking this Court to decline to draw any

inference in NAR's favor from the 2008 consent decree, which is now expired. *See id.* at

2. The Court previously noted the existence of that consent decree in ruling on the

motion for a preliminary injunction, *see* docket no. 80 at 13. Because no one disputes the

authenticity of these court records, the Court GRANTS NAR's request to take judicial

notice of them (docket nos. 85-3 & 85-4), as well as the unopposed documents (docket

nos. 85-1 & 85-2), in ruling on the instant motions.

ORDER - 6

**Discussion**

### 1.     Article III Standing

NAR argues that Plaintiff fails to plausibly allege that its injury is traceable to NAR or that such injury is redressable.  "[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Maya v. Centrex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy."  *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)).  "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' . . . ; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000)).  "For purposes of ruling on a motion to dismiss for want of standing, . . . courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party."  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  On a motion to dismiss, courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (citation omitted).

The Court first considers whether Plaintiff's allegations are sufficient to show that its alleged injuries are traceable to NAR.  In arguing that Plaintiff has failed to plead causation, NAR points to the complaint's allegations that the Segregation Rule applies only to MLSs (and not Zillow, who is merely an "MLS participant"), it is "optional" and

has not been adopted by all MLSs, and it was implemented by Zillow alone.  *See* NAR

Mot. (docket no. 84 at 9–11).  NAR also relies on allegations purportedly showing that

Zillow's selection of a new website design was done independently of NAR.  *See id*. at

10.  According to NAR, such allegations are "breaks in the chain of causation,"

demonstrating that "the specific website changes made by Zillow that allegedly harmed

REX were the product of Zillow's independent actions," and *not* NAR's actions.  *Id.*

       NAR's argument fails for the simple reason that it ignores the other allegations

that NAR is a direct participant in the challenged conduct.  The complaint challenges not

only the Segregation Rule but also the Buyer Agent Commission Rule, both of which

were "written by NAR and enforced by its member MLSs"; moreover, the Buyer Agent

Commission Rule allegedly "*mandate*[*s*] offers of commissions to buyer agents."  *See*

Compl. at ¶¶ 7 & 59.  The complaint also alleges that NAR "coopt[ed] Zillow" and that

Zillow's "[t]op sites . . . now all have restrictions based on NAR and MLS guidelines."

*Id.* at ¶¶ 61 & 71.  In addition, one Zillow representative allegedly stated that they

changed the websites as "a result of [Zillow] joining the MLS" and "to comply with MLS

rules." *Id.* at ¶ 88.  The complaint plausibly alleges that, absent NAR's actions in

drafting the rules and effectively forcing Zillow and other MLS participants to comply

with them, Zillow would not have changed its websites.  Plaintiff's alleged injuries are

thus fairly traceable to NAR's actions.

       As to whether Plaintiff's alleged injuries are redressable, Plaintiff seeks not just

injunctive relief, it also seeks statutory damages under 15 U.S.C. §§ 15 and 1117, other

"damages and statutory damages to be proven at trial," and "attorneys' fees and costs."

*See* Compl. at ¶¶ D–G.  Plaintiff has standing to bring these claims against NAR.

## 2.      Rule 12(b)(6) Standard

Although a complaint challenged by a Rule 12(b)(6) motion to dismiss need not provide detailed factual allegations, it must offer "more than labels and conclusions" and contain more than a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In ruling on a motion to dismiss, the Court must assume the truth of the plaintiff's allegations and draw all reasonable inferences in the plaintiff's favor.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). The question for the Court is whether the facts in the complaint sufficiently state a "plausible" ground for relief.  *Twombly*, 550 U.S. at 570.  If the Court dismisses the complaint or portions thereof, it must consider whether to grant leave to amend.  *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

## 3.      Antitrust Violations

Defendants argue that Plaintiff's complaint fails to state an antitrust claim, both under Section 1 of the Sherman Act and under Washington law,[2] regardless of whether the Court applies the *per se* analysis or the "rule of reason" analysis.  Plaintiff responds that "[t]he Court is not required to decide which rule applies in [ruling on] a motion to dismiss."  Resp. (docket no. 90 at 14).  The Court has already ruled that Plaintiff's challenge to a less-than-obvious restraint,[3] as well as the complicated nature of the

---

[2] The parties do not separately brief Plaintiff's state law claim for conspiracy to restrain trade under the CPA, RCW 19.86.030, and Zillow argues that this claim should be dismissed on the same basis that the Section 1 claim should be dismissed.  *See* Zillow Mot. (docket no. 83 at 20–21).  The Court recognizes that the state and federal standards are essentially the same and thus analyzes both claims under the federal standards.  *See State v. LG Elecs., Inc.*, 186 Wn.2d 169, 186 n.3, 375 P.3d 1035 (2016) (concurring, McCloud, J.).

[3] Although the complaint alleges a "group boycott," it is clear from the face of the complaint that Defendants are not alleged to be competitors who *refuse to do business* with Plaintiff—but rather, they are alleged to have "segregate[d]" Plaintiff's listings, "denying them *effective*" or "*equal*" access to

ORDER - 9

parties' business relationships, do not lend themselves to *per se* analysis.  *See* Order

(docket no. 80 at 13).  The Court therefore analyzes the complaint under the rule of

reason to determine whether Plaintiff has sufficiently pleaded antitrust claims.

To state a Section 1 claim under the rule of reason, Plaintiff "must plead facts

which, if true, will prove: (1) a contract, combination or conspiracy among [Defendants];

(2) by which the [Defendants] intended to harm or restrain trade or commerce among

several States . . . ; (3) which actually injures competition"; and "(4) [Plaintiff is] the

proper part[y] to bring the antitrust action because [it was] harmed by [Defendants']

contract, combination, or conspiracy, and the harm [it] suffered was caused by the anti-

competitive aspect of [Defendants'] conduct."[4]  *In Re Nat'l Football League's Sunday

Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019) (quoting *Brantly v. NBC

Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012)).

### A.  Anticompetitive Agreement

Defendants contend that Plaintiff has failed to plead the first two elements of a

Section 1 violation, namely that they entered an anticompetitive agreement or conspiracy.

According to Zillow, the complaint fails to allege a "conscious commitment to a common

---

Zillow's websites.  Compl. at ¶¶ 101, 109, 118 & 122.  *See Boycott*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "group boycott" as "[a] type of secondary boycott by two or more competitors who refuse to do business with one firm unless it refrains from doing business with an actual or potential competitor of the boycotters," and noting that such claims are "analyzed under either the per se rule or the rule of reason, depending on the nature of the boycott").

[4] Neither Defendant appears to challenge Plaintiff's alleged harm or so-called antitrust standing to bring this action.  Although NAR argues (unsuccessfully) that Plaintiff lacks constitutional standing, *see supra*, Section 1 of this Order, and suggests that Plaintiff also lacks standing to bring an antitrust action, NAR confines its argument to the complaint's purported failure to plead harm to *competition*—rather than any failure to plead harm to Plaintiff as a result of Defendants' anticompetitive conduct.  *See* NAR Mot. (docket no. 84 at 13–15).  The Court concludes that Plaintiff has adequately pleaded that it has suffered harm as a result of the anticompetitive aspects of Defendants' actions.  *See* Compl. at ¶¶ 73 & 111.

ORDER - 10

scheme designed to achieve an unlawful objective." Zillow Mot. (docket no. 83 at 14) (quoting *Toscano v. Prof. Golfers Assoc.*, 258 F.3d 978, 984 (9th Cir. 2001)). Although the complaint alleges that Zillow implemented the new website display as "a result of joining the MLS and changing over to IDX feeds" and to "comply with MLS rules," Compl. at ¶ 88, the complaint also alleges that it was "*Zillow's* decision to conceal non-MLS listings under the misleading and inferior 'other' category," causing "listings from non-MLS brokers such as [Plaintiff] [to] be far less competitive." *Id.* at ¶ 90; *see id.* at ¶ 108 (alleging that Zillow is "using" the MLS rules "to implement a change in" its website designs). The complaint further alleges that "Zillow signaled its dedication to . . . inflated commissions—by committing that 'all Zillow-owned homes will be listed on the MLSs with commissions paid to agents representing buyers.'" *Id.* at ¶ 59. As the Supreme Court has held, "[c]oncerted efforts to *enforce* (rather than just agree upon) private product standards face more rigorous antitrust scrutiny." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 n.6 (1988) (emphasis in original). At times, the complaint appears to allege that Zillow's mere act of entering agreements with MLSs constitutes "horizontal agreements between competitors." Compl. at ¶¶ 93 & 97; *see also* Resp. (docket no. 90 at 20). Such acts, standing alone, would be insufficient to plead an anticompetitive agreement or conspiracy. *See Toscano*, 258 F.3d at 984 (finding no evidence of concerted action to restrain trade where a third party "independently set the terms of the contracts, and [defendants] merely accepted them"). Because the complaint also alleges that Zillow went a step further—e.g., by affirmatively redesigning its websites to enforce an allegedly misleading labeling system—Plaintiff has plausibly alleged that Zillow agreed to use the MLS rules to restrain trade. *See id.*

For its part, NAR argues that Plaintiff cannot plausibly allege the existence of an unlawful agreement because NAR's challenged rules are "optional." *See* NAR Reply (docket no. 93 at 7–8). This argument is unavailing for two reasons. First, Plaintiff challenges not just the optional Segregation Rule, but also the mandatory Buyer Agent Commission Rule. *See* Compl. at ¶¶ 29, 34, & 59. Second, the Supreme Court has concluded that the interpretation and promotion of a trade association's "so-called voluntary standards" by the association's agents and members could be deemed to be "repugnant to the antitrust laws," and the association "should be encouraged to eliminate the anticompetitive practices of all its agents acting with apparent authority." *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 561–62, 570 & 574 (1982). The complaint alleges that the challenged rules were "written" by NAR and are being "promulgated" or "enforced" by its members, namely the MLSs and their members (including Zillow), and that these "combined" actions constitute illegal restraints on trade. *See* Compl. at ¶¶ 7, 86, & 120–21. The complaint further alleges that "NAR is the rare trade association that sets the rules of competition among its members," promulgating "mandates governing [IDX feeds] and the structure of compensation offers." *Id.* at ¶ 29. Allegedly, "[b]ecause of the size and scope of NAR and MLSs, these rules have become ubiquitous within the marketplace—essentially making consumers subject to them." *Id.* In other words, brokerages, agents, and even customers allegedly have *no choice* but to comply with NAR's so-called optional rules. *See Hydrolevel*, 456 U.S. at 570 (emphasizing that the trade association was "in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce"); *see also Top Agent Network, Inc. v. Nat'l Assoc. of Realtors*, No. 20-cv-3198, 2021 WL

3616480, at *6 (N.D. Cal. Aug. 16, 2021) ("That NAR exercises control over the operating rules of the market for home sales in most major markets across the country is not, in and of itself, good for competition.").   The complaint plausibly alleges NAR's involvement in an anticompetitive agreement or conspiracy.

### B.   Harm to Competition

"The rule of reason requires courts to conduct a fact-specific assessment of the 'market power and market structure . . . to assess the [restraint's] *actual* effect' on competition."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020) (citation omitted) (emphasis in original).  "[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."[5]  *Id.* (citation omitted).  "A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'"  *Id.* (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)).

### i.   Relevant Market

Plaintiff alleges that the relevant market is the "market for the provision of real estate brokerage services to sellers and buyers of residential real estate in local markets throughout the country where REX operates."  Compl. at ¶ 102; *see id.* at ¶ 44 & n.9.

---

[5] This circuit has adopted a three-part, burden-shifting test, under which a plaintiff must meet this initial burden and only "then the burden shifts to the defendant to show a procompetitive rationale for the restraint."  *Qualcomm*, 969 F.3d at 991.  "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate the procompetitive efficiencies could reasonably be achieved through less anticompetitive means."  *Id*.  In ruling on a 12(b)(6) motion, the Court exclusively focuses on whether Plaintiff has sufficiently pleaded the first element.  *See Sitzer v. Nat'l Assoc. of Realtors*, 420 F. Supp. 3d 903, 915 (W.D. Mo. 2019) (concluding that at the motion to dismiss stage, "the [c]ourt's job is not to balance the anticompetitive effects of [the challenged restraints] against procompetitive justifications," but instead to "evaluate whether [the complaint] presents facts, which . . . show the challenged conduct plausibly exerts an unreasonable restraint on trade").

1   Zillow contends that the only harm to competition that is alleged in the complaint has

2   been suffered by consumers *outside* of the relevant market.  *See Qualcomm*, 969 F.3d at

3   993 (holding that regardless of whether a defendant's "practices are interrelated, actual or

4   alleged harms to customers and consumers outside the relevant markets are beyond the

5   scope of antitrust law").  Zillow, like Qualcomm, "is no one-trick pony."  *Id.* at 983.

6   According to the complaint, Zillow has traditionally operated aggregator websites that

7   display and market homes for sale, as well as its related "Premier Agent" program,

8   through which Zillow charges a fee to promote brokers and agents on its websites.

9   Compl. at ¶¶ 47–48 & 69.  In 2018, Zillow also started "transacting thousands of homes

10  annually" as an "ibuyer" through its Zillow Offers business.  *Id.* at ¶ 58.  Zillow then

11  joined NAR as an "MLS participant."  *Id.* at ¶ 59.

12      Zillow argues that because the Segregation Rule was implemented in Zillow's

13  capacity as a *data aggregator* (and not in connection with providing *real estate*

14  *brokerage* services), Plaintiff cannot plausibly allege that the restraint occurred within the

15  relevant market.  Zillow Mot. (docket no. 83 at 20).  Even assuming that Zillow's

16  implementation of a new website design, which displays real estate listings nationwide,

17  can be deemed as occurring "outside" the market for real estate brokerage services,

18  Zillow does not address the other restraint at issue:  the Buyer Agent Commission Rule,

19  which was allegedly implemented in Zillow's capacity as a real estate broker and MLS

20  participant.  *See* Compl. at ¶¶ 34 & 59 (alleging that "all Zillow-owned homes will be

21  listed on the MLSs with commissions paid to agents representing buyers," thereby

22  "preserv[ing] sky-high real estate fees across the United States").  As other courts have

23  concluded, NAR's Buyer Agent Commission Rule, which mandates a "blanket offer of

ORDER - 14

some compensation to the buyer-broker, . . . *by itself*, raises antitrust concerns given that the offer is the same regardless of the buyer-broker's experience or the value of services provided by the buyer-broker."  *Moehrl v. Nat'l Assoc. of Realtors*, 492 F. Supp. 3d 768, 784 (N.D. Ill. 2020) (emphasis added); *see also Sitzer v. Nat'l Assoc. of Realtors*, 420 F. Supp. 3d 903, 915 (W.D. Mo. 2019).  The court in *Moehrl* also noted that the anticompetitive aspects of this NAR rule are exacerbated by the fact that "many prospective homebuyers [now] use online websites like Zillow to find homes," and that Zillow and other websites "have agreed not to compete with the MLSs by becoming licensed brokerages or offering compensation or cooperation."  492 F. Supp. 3d at 784. The Court rejects Zillow's argument that *Qualcomm* precludes relief in this case.

NAR likewise contends that the complaint fails to allege sufficiently specific geographic markets, or that NAR has market power within those markets.  The complaint identifies twenty states in which Plaintiff employs or will employ licensed real estate agents, *see* Compl. at ¶ 44 & n.9, and alleges that at least 70 percent of licensed agents are NAR members, *id.* at ¶ 26 & n.3.  Although NAR members might make up more or less than 70 percent of the active licenses in a given state or local market, the complaint sufficiently alleges that NAR enjoys substantial market power within the market for real estate brokerage services in the states that Plaintiff operates.  *See Moehrl*, 492 F. Supp. 3d at 782 (noting that NAR and the other defendants did not "deny that they have market power" in the relevant market and that "the Seventh Circuit and several other courts have recognized that MLSs have market power"); *see also Sitzer*, 420 F. Supp. 3d at 915

(concluding "[g]iven the sheer market power possessed by the . . . MLS," NAR and the other defendants have "significant influence" in the relevant market).[6]

## ii.  Substantial Anticompetitive Effect

Defendants also argue that the complaint lacks sufficient allegations to plead harm to competition, principally arguing that Plaintiff merely assumes that harm to itself is harm to competition. *See* Zillow Reply (docket no. 92 at 10); NAR Mot. (docket no. 84 at 13–14). The Court disagrees, as the complaint is replete with allegations of harm to competition. Specifically, the complaint alleges that "Zillow and NAR are . . . harming the sellers of the[] homes" that are listed on the "Other listings" tab, "causing them to maintain the home for more days on the market and accept lower sales prices" because "[i]interested buyers are likely to continue avoiding or missing 'Other listings' altogether." Compl. at ¶¶ 73 & 77. Home listings on the "Other listings" tab include, in addition to Plaintiff's listings, "For Sale by Owner (FSBO)" and "foreclosure" listings. *Id.* at ¶ 77. Plaintiff plausibly alleges that Defendants' actions have a substantial anticompetitive effect that harms consumers in the relevant market. *See id*. at ¶¶ 8, 59, 61, 65, 71, 80 & 106 (collectively, alleging that the enforcement of NAR's rules have harmed non-MLS agents and sellers, as well as buyers); *see Moehrl*, 492 F. Supp. 3d at 785 (concluding the "Buyer-Broker Commission Rules have caused an artificial inflation of commission rate"); *Sitzer*, 420 F. Supp. 3d at 915 (same).

---

[6] NAR also argues that the relevant market alleged in the complaint is "implausible" because it fails to include individuals who "provide real estate brokerage services to themselves," or other reasonable substitutes. *See* NAR Mot. (docket no. 84 at 17). The complaint alleges that "Zillow and NAR are . . . harming the sellers of the[] homes" that are listed on the "Other listings" tab, including "For Sale by Owner" listings. *Id.* at ¶¶ 73 & 77. The complaint clearly alleges harm to individuals who sell their homes *themselves*, as well as those who use non-MLS brokers like Plaintiff.

The Court therefore DENIES Defendants' motions to dismiss, docket nos. 83 & 84, the antitrust claims brought under Section 1 of the Sherman Act and under the CPA, RCW 19.86.030.

### 4.     False Advertising or Other Deceptive Acts

#### A.     Pleading Standard

Zillow argues that Plaintiff's claims for false advertisement or other deceptive acts under the Lanham Act and Washington's CPA, RCW 19.86.020, "sound in fraud" and that Plaintiff must therefore satisfy Rule 9(b)'s heightened pleading standards. Zillow further argues that Plaintiff "does not meaningfully contest that Rule 9(b) governs." Zillow Reply (docket no. 92 at 13). The Court concludes that Plaintiff sufficiently contests the rule's applicability. *See* Resp. (docket no. 90 at 30 n.9).

Rule 9(b) provides that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]he Ninth Circuit has not definitively spoken as to whether Rule 9(b) applies to Lanham Act claims," *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 634 (N.D. Cal. 2019), or to claims brought under the CPA, *see Vernon v. Quest Commc'ns Int'l, Inc.*, 643 F. Supp. 2d 1256, 1264–65 (W.D. Wash. 2009). "[T]he majority of district courts within the Ninth Circuit" have applied "Rule 9(b)'s pleading standards . . . to false advertising claims under the Lanham Act," particularly "when the claim relies on factual allegations that necessarily constitute fraud." *A.H. Lundberg Assocs., Inc. v. TSI, Inc.*, No. C14-1160, 2014 WL 5365514, at *7 (W.D. Wash. Oct. 21, 2014) (listing cases); *see also 23andMe, Inc. v. Ancestry.com DNA, LLC*, 356 F. Supp. 3d 889, 908 (N.D. Cal. 2018) (concluding that the "better reasoned authority is that, where a

Lanham Act claim is predicated on the theory that the defendant engaged in a knowing and intentional misrepresentation, then Rule 9(b) is applicable"). This District has also applied Rule 9(b)'s pleading requirements to CPA claims. *See, e.g.*, *Fidelity Mortg. Corp. v. Seattle Times Co.*, 213 F.R.D. 573, 575 (W.D. Wash. 2003); *but see Vernon*, 643 F. Supp. 2d at 1265.[7] These cases principally rely on the Ninth Circuit's application of Rule 9(b) to other types of claims involving false or misleading conduct. *See, e.g.*, *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1100 & 1106–08 (9th Cir. 2003) (applying Rule 9(b) to claims brought under California's Consumer Legal Remedies Act): *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125–27 (9th Cir. 2009) (concluding that in the event a plaintiff alleges "a unified course of fraudulent conduct," "the claim is said to be 'grounded in fraud' or to 'sound in fraud'").

In *Vess*, the Ninth Circuit held that "Rule 9(b)'s heightened pleading requirements [apply] only to 'averments' of fraud supporting a claim rather than to the claim as a whole," and clarified that "[f]raud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word 'fraud' is not used)." 317 F.3d at 1104–05. Allegations "of fraud must be accompanied by 'the who, the what, when, where and how' of the misconduct charged." *Id.* at 1106 (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

The Court acknowledges that the complaint never uses the words "fraud" or "intent" in support of Plaintiff's Lanham Act or CPA claims. Those omissions, however,

---

[7] In *Vernon*, this Court did not apply Rule 9(b) to the plaintiffs' CPA claim because the plaintiffs did "not allege[] facts that constitute fraud and the gravamen of the complaint [was] not fraud." 643 F. Supp. 2d at 1265. That case is distinguishable from the instant case for the reasons explained in this Section.

ORDER - 18

are not dispositive because the complaint also alleges facts that necessarily constitute fraud.  In support of the Lanham Act claim, for example, the complaint alleges that "Zillow and NAR *knowingly* adopted this labeling system for all [nationwide] listings on Zillow as part of a *common plan or scheme* to confuse, mislead, *and deceive* consumers" and that such actions were "*deliberately calculated* to confuse and/or *deceive*."  Compl. at ¶¶ 132 & 134 (emphasis added).  Likewise, in support of Plaintiff's CPA claim, the complaint alleges that "Zillow changed its display *so that* the first page of results is presented under a *deceptive* and misleading heading, . . . while hiding [Plaintiff's] listings" and that  "Zillow's *deceptive* search listing practice" has injured Plaintiff and others.  *See id.* at ¶¶ 141 & 145–46 (emphasis added).  In contrast, the complaint also alleges, at times, that Zillow's websites have the "tendency" or the "capacity to deceive consumers."  Compl. at ¶¶ 130–31 & 143.  Although Plaintiff has alleged some fraudulent and some non-fraudulent conduct, the Court concludes that Plaintiff has alleged "a unified fraudulent course of conduct" in support of the Lanham Act claims asserted against both Defendants and the CPA claim asserted against Zillow.  *See Vess*, 317 F.3d at 1105; *see also Vernon*, 643 F. Supp. 2d at 1265 ("Rule 9(b) can also apply where . . . [p]laintiffs allege some fraudulent and some non-fraudulent conduct.").  Because these claims are "grounded in fraud," the Court applies Rule 9(b)'s heightened pleading requirements the claims.

Plaintiff also asserts a CPA claim against NAR, but it does not implicate NAR in any of the fraud-based allegations supporting that claim.  *See* Compl. at ¶¶ 136–51.  The

Court therefore does not apply Rule 9(b) to the CPA claim asserted against NAR.[8]

### B.  Lanham Act Violation

Defendants contend that Plaintiff has failed to sufficiently plead a Lanham Act claim for false advertising.  The Lanham Act creates a private cause of action for "any person who believes that he or she is or is likely to be damaged by" a "person who" uses "false or misleading representation of fact," which, "in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities" of "another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).  "The Act itself does not define 'advertising' or 'promotion,' but [the Ninth Circuit] has adopted the following definition:  (1) commercial speech, (2) by a defendant who is in commercial competition with plaintiff, (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public."  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999)).[9]  "[T]he representations need not be made in a 'classic advertising campaign,' but may instead consist of more informal types of 'promotion.'"  *Coastal Abstract Serv.*, 173 F.3d at 735 (citation omitted).

Zillow does not dispute that the complaint plausibly alleges that Zillow's commercial speech—adopting a new labeling system for its website displays—

---

[8] The Court nevertheless concludes that Plaintiff has failed to state a Lanham Act claim against NAR under the less demanding pleading requirements.  *See infra*, Section 4(C).

[9] Although jurists debate whether the second element is still valid in light of the Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), there is no question that the third element, the only element at issue in this case, "flows from the statutory language and remains valid after *Lexmark*."  *Ariix*, 985 F.3d at 1124 (Collins, J., dissenting).

misrepresents the nature of Plaintiff's services and was sufficiently disseminated to the public.  Zillow Mot. (docket no. 83 at 21–24).  Zillow instead relies on the complaint's purported failure to allege that Zillow made the misleading statements *to influence consumers to purchase Zillow's products or services*.  *See id.* at 22–23.  The complaint alleges, however, that in late 2020, Zillow joined the NAR and MLSs to promote its "Zillow Offers" business.  Compl. at ¶¶ 58–59.  According to the complaint, the "growth and substantial inventory of Zillow-owned homes placed Zillow in a new position: Instead of focusing on being an open access point for consumers to display and access residential real estate listings, Zillow's interests turned to its own substantial home inventory."  *Id.*  The complaint further alleges that Zillow changed its websites "to comply with the new MLS rules" and that the "new web display includes several features that . . . *insulate MLS brokers from competition*."  *Id.* at ¶¶ 65 & 88 (emphasis added).

The complaint alleges that Zillow adopted the misleading labeling system for the purpose of influencing its customers to use the Zillow Offers business, as well as the services of other MLS agents, by concealing or discouraging the services of non-MLS agents like Plaintiff.  *See Ariix*, 985 F.3d at 1120 n.10 (noting that to satisfy this element, "it might be useful" to explore defendants' relationships with third parties).  The Court concludes that these allegations are sufficient to state a Lanham Act claim.  *Cf. Alfasigma USA, Inc. v. First Databank, Inc.*, 398 F. Supp. 3d 578, 591 (N.D. Cal. 2019) (concluding plaintiff's allegations that the representations influenced consumers' decisions to buy plaintiff's goods, but not defendant's own goods, were insufficient to state a claim).[10]

---

[10] Zillow also points to contradictory allegations contained in the complaint, namely that Zillow's decision to join NAR and MLSs, and requiring Zillow to change its websites, increased its own costs and

ORDER - 21

The Court further concludes that the fraud-based allegations implicating Zillow also satisfy Rule 9(b)'s heightened pleading standard, as such allegations specify "what is false or misleading" about Zillow's websites, "why it is false," and how Zillow knew it was false.  *See* Compl. at ¶¶ 128–34; *see Vess*, 317 F.3d at 1106.

Although the Court concludes that Plaintiff has plausibly stated a Lanham Act claim against Zillow in accordance with Rule 9(b)'s pleading requirements, its allegations fall short of stating such a claim against NAR.  The complaint alleges, in a conclusory fashion, that "Zillow and NAR knowingly adopted this labeling system for all [nationwide] listings on Zillow as part of a common plan or scheme to confuse, mislead, and deceive consumers."  Compl. at ¶ 132; *see id.* at ¶ 134.  There are no other allegations explaining what NAR did to design or encourage this particular labeling system on Zillow's websites, let alone when, where, and how NAR did it.  *See* Fed. R. Civ. P. 9(b), 12(b)(6); *see also A.H. Lundberg Assocs.*, 2014 WL 5365514, at *8 (dismissing a Lanham Act claim where the plaintiff failed to satisfy, "at a minimum," the "what" and the "how" aspects of Rule 9(b)).  Plaintiff has failed to plausibly state a Lanham Act claim against NAR.

Accordingly, the Court DENIES Zillow's motion to dismiss the Lanham Act claim, docket no. 83, but GRANTS NAR's motion to dismiss this claim, docket no. 84,

---

negatively impacted its data-aggregation business.  Zillow Mot. (docket no. 83 at 23) (citing Compl. at ¶¶ 54 & 65).  The Court perceives no contradiction:  Zillow could plausibly be motivated to join NAR and MLSs to boost its Zillow Offers business (and other MLS members' services) irrespective of whether that change was costly to implement or ultimately hurt Zillow's data-aggregation business.

1    and hereby DISMISSES, without prejudice, the Lanham Act claim against NAR.[11]

2                    **C.    CPA Violation – RCW 19.86.020**

3            Defendants also assert that Plaintiff fails to state a claim for unfair or deceptive

4    acts under the CPA, RCW 19.86.020.  To state a claim under RCW 19.86.020, a plaintiff

5    must plausibly allege "(1) an unfair or deceptive act or practice, (2) occurring in trade or

6    commerce, (3) affecting the public interest, (4) injury to a person's business or property,

7    and (5) causation."  *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37, 204 P.3d 885

8    (2009).

9            Zillow does not argue that the complaint fails to sufficiently plead the elements of

10   a CPA claim.  *See* Zillow Mot. (docket no. 83 at 24–25).  Instead, Zillow invokes the so-

11   called "business purposes defense," citing the complaint's allegations that Zillow

12   changed its websites merely to comply with NAR's Segregation Rule.  Zillow argues that

13   the complaint shows that Zillow's conduct was "reasonable in relation to the

14   development and preservation of [its] business."  *Id.* at 24; *see* Zillow Reply (docket

15   no. 92 at 15).  Regardless of whether Zillow may rely on the business purposes defense in

16   this case, Zillow's argument is premature at this stage in the proceedings.[12]  The

17   complaint emphasizes only the harmful effects of Zillow's actions, including that

18   "Zillow's new search listing practice has the capacity to deceive its more than 240

19   million annual unique users," e.g., "by concealing from them the opportunity to list or

20

21   _____

     [11] Leave to amend a complaint should be freely given, *see* Fed. R. Civ. P. 15(a)(2), and at this stage, it is
     not clear to the Court that an amendment would be futile.  *See Lopez*, 203 F.3d at 1130.

22

23   [12] The Court expressly does not decide whether Zillow could later prevail on a business purposes defense.
     *See* Order (docket no. 80 at 21).  That determination must await discovery and any further motion
     practice.

     ORDER - 23

buy a home from a licensed real estate agent who may charge significantly lower commissions than" an MLS agent.  *See* Compl. at ¶¶ 147–48.  The complaint says nothing about whether Zillow's allegedly deceptive practices were *reasonable* in relation to the development or preservation of its business.  Because the Court concludes that the fraud-based allegations in support of this claim also satisfy Rule 9(b)'s heightened pleading standards, Plaintiff has plausibly alleged a CPA claim against Zillow.

With respect to NAR, however, the allegations are insufficient.  The allegations made in support of the CPA claim do not once mention NAR.  *See* Compl. at ¶¶ 136–51.  Even if the Court considers the complaint's other factual allegations, including those made in support of the other claims (*see id.* at ¶¶ 132 & 134), such allegations are simply too conclusory to plausibly allege that NAR had any involvement in designing or encouraging Zillow's misleading website display.  *See supra*, Section 4(B).  In light of these deficiencies, Plaintiff has not stated a CPA claim against NAR under the less demanding pleading requirements.  *See* Fed. R. Civ. P. 8(a)(2), 12(b)(6).

The Court DENIES Zillow's motion to dismiss the CPA claim under RCW 19.86.020, docket no. 83; but the Court GRANTS NAR's motion to dismiss this claim, docket no. 84, and hereby DISMISSES, without prejudice, the CPA claim asserted against NAR.  *See supra*, n.11.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)     Zillow's motion to dismiss, docket no. 83, the claims asserted against Zillow (Counts I, II, III, & IV) is DENIED;

(2)      NAR's motion to dismiss, docket no. 84, is DENIED in part as to the antitrust claims brought under Section 1 of the Sherman Act and the CPA, RCW 19.86.030 (Counts I & IV); the motion is GRANTED in part as to the claims for false advertising or deceptive acts brought under the Lanham Act and the CPA, RCW 19.86.020 (Counts II & III), and these claims are DISMISSED without prejudice and with leave to amend.  Plaintiff may file any amended complaint on or before September 30, 2021.  Any answer or response is due on or before October 14, 2021.  *See* Fed. R. Civ. P. 15(a)(3); and

(3)      The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 2nd day of September, 2021.

Thomas S. Zilly
United States District Judge

ORDER - 25