THE HONORABLE THOMAS S. ZILLY

1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

10

11

| | |
|---|---|
| REX – REAL ESTATE EXCHANGE, INC., | Case No. 2:21-cv-00312-TSZ |
| Plaintiff, | **THE NATIONAL ASSOCIATION OF REALTORS'® MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| ZILLOW, INC., et al. | **PUBLIC VERSION – REDACTED** |
| Defendants. | NOTE ON MOTION CALENDAR: June 30, 2023 |
| | ORAL ARGUMENT REQUESTED |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS.............................................................4

    I.     NAR Promulgates Optional MLS Model Rules, Like Section 18.3.11 ....................4

    II.    Zillow Independently Decided How to Design its Website .....................................6

    III.    REX Was Not a Unique Competitor .......................................................................7

LEGAL STANDARD ................................................................................................................8

ARGUMENT .............................................................................................................................8

    I.     NAR and Zillow Did Not Agree to Change Zillow's Website ................................8

            A.    There Is No Direct Evidence of an Agreement Involving NAR ...................9

            B.    Optional Section 18.3.11 and a Handful of Communications Unrelated to Display of Non-MLS Listings Are Not Evidence of an Agreement ..................................................................................................10

                    1.    Optional Section 18.3.11 of NAR's Handbook on MLS Policy Is Not Evidence of an Agreement ........................................11

                    2.    Communications Between NAR and Zillow or the Multiple Listing Services Are Not Circumstantial Evidence of an Agreement ...........................................................................13

            C.    The Undisputed Evidence Shows that NAR, Multiple Listing Services, and Zillow Acted Independently.....................................................16

    II.    The Unilateral Changes to Zillow's Website Have Not Harmed Competition........17

    III.    REX Has Not Suffered an Antitrust Injury Caused by Changes to Zillow's Website and Therefore Lacks Antitrust Standing ..................................................19

CONCLUSION .......................................................................................................................20

NAR's Motion for Summary Judgment
Case No. 2:21-cv-00312-TSZ         i

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1

## TABLE OF AUTHORITIES

2

**Page**

3

### Cases

4

*49er Chevrolet, Inc. v. Gen. Motors Corp.*,
803 F.2d 1463 (9th Cir. 1986) .................................................................. 9, 16

5

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................... 8

6

7

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ................................................................................... 19

8

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ....................................................................... 13

9

10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................... 8

11

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
429 U.S. 477 (1977) ............................................................................... 18, 19

12

13

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ................................................................. 9, 10

14

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ...................................................................... 19

15

16

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
236 F.3d 1148 (9th Cir. 2001) ................................................................. 9, 13

17

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
832 F.3d 1 (1st Cir. 2016) .......................................................................... 13

18

19

*Fisher v. City of Berkeley*,
475 U.S. 260 (1986) ..................................................................................... 8

20

*Freeman v. San Diego Ass'n of Realtors*,
322 F.3d 1133 (9th Cir. 2003) .................................................................... 14

21

22

*Gorlick Distrib. Centers, LLC v. Car Sound Exhaust Sys., Inc.*,
723 F.3d 1019 (9th Cir. 2013) .................................................................... 18

23

*Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*,
2010 WL 4365807 (W.D. Wash. 2010) ...................................................... 16

24

*GSI Tech. v. United Memories, Inc.*,
2014 WL 1572358 (N.D. Cal. Apr. 18, 2014) ........................................... 18

25

26

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
647 F. Supp. 2d 1250 (W.D. Wash. 2009) ................................................. 14

27

*Hilton v. Children's Hosp. San Diego*,
315 F. App'x 607 (9th Cir. 2008) .......................................................... 17, 19

28

*Honey Bum, LLC v. Fashion Nova, Inc.*,
  2023 WL 2592287 (9th Cir. Mar. 22, 2023) ...................................................... 9, 13

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ......................................................................... 20

*Kaplan v. Burroughs Corp.*,
  611 F.2d 286 (9th Cir. 1979) ........................................................................... 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .......................................................................................... 10

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988) ........................................................................... 17

*Monsanto Co. v. Spray–Rite Serv. Corp.*,
  465 U.S. 752 (1984) ............................................................................................ 9

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,
  210 F.3d 1099 (9th Cir. 2000) ............................................................................ 8

*O.M. by & through Moultrie v. Nat'l Women's Soccer League, LLC*,
  541 F. Supp. 3d 1171 (D. Or. 2021) .................................................................. 13

*In re Packaged Seafood Prods. Antitrust Litig.*,
  2023 WL 3046073 (S.D. Cal. Apr. 21, 2023) .................................................... 13

*PBTM LLC v. Football Nw., LLC*,
  511 F. Supp. 3d 1158, 1178 (W.D. Wash. 2021) ................................................ 4

*PharmacyChecker.com LLC v. LegitScript LLC*,
  614 F. Supp. 3d 796 (D. Or. 2022) ..................................................................... 9

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ........................................................................... 17

*Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*,
  61 F.4th 299 (2d Cir. 2023) .............................................................................. 13

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
  2013 WL 595122 (E.D. Cal. Feb. 15, 2013) ..................................................... 10

*Todorov v. DCH Healthcare Authority*,
  921 F.2d 1438 (11th Cir. 1991) ....................................................................... 13

*USAirways Grp., Inc. v. Brit. Airways PLC*,
  989 F. Supp. 482 (S.D.N.Y. 1997) .................................................................... 20

*W. Goebel Porzellanfabrik v. Action Indus., Inc.*,
  589 F. Supp. 763 (S.D.N.Y. 1984) .................................................................... 20

## **Rules and Regulations**

Fed. R. Civ. P. 56(a) ................................................................................................ 8

NAR's Motion for Summary Judgment
Case No. 2:21-cv-00312-TSZ                    iii

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1

### PRELIMINARY STATEMENT

2      This case is about independent decisions made by multiple listing services and Zillow.  After

3 two years of discovery, the production of more than 2 million pages of documents, and 27

4 depositions, it remains undisputed that: (1) the agreement alleged in the Amended Complaint—

5 between the National Association of REALTORS®, multiple listing services, and Zillow to

6 "segregate, conceal, and demote" REX's listings on Zillow's website—never happened; (2) the

7 changes to Zillow's website did not harm competition, even if they harmed REX, because REX was

8 insignificant to consumers; and (3) the purported decline in value of REX's business was not caused

9 by harm to competition and therefore REX lacks antitrust injury and antitrust standing.  For all these

10 reasons, NAR respectfully asks the Court to enter summary judgment on the remaining claims that

11 REX has asserted against NAR (Counts I and VI in REX's Amended Complaint).

12      ***There Was No Agreement to Demote REX Listings.***  There is no direct evidence of an

13 agreement between NAR, multiple listing services, and Zillow to separately display MLS and non-

14 MLS listings on Zillow's website.  Instead, REX relies only on an ***optional*** NAR model rule and

15 evidence related to it: Section 18.3.11 of NAR's Handbook on Multiple Listing Policy.  But the

16 undisputed evidence shows that model rule is truly optional.  There is no dispute that around 30%

17 of multiple listing services affiliated with NAR have not adopted Section 18.3.11 and that those

18 multiple listing services allow their participants to commingle listings.  That means REX was simply

19 wrong when it alleged "NAR rules provide that listings from MLSs ***must be*** segregated from any

20 non-MLS listings."  NAR also does not monitor or enforce compliance with its optional rules,

21 including Section 18.3.11.  Taken together, therefore, the undisputed evidence shows that Section

22 18.3.11 is not evidence that NAR and Zillow agreed to "segregate, conceal, and demote" non-MLS

23 listings on Zillow's website.

24      Moreover, even when a local multiple listing service has adopted the optional Section

25 18.3.11, that local rule would only require that listings obtained from multiple listing services "must

26 be displayed separately from listings obtained from other sources."  Neither NAR nor the multiple

27 listing services tell participants (like Zillow) how to design their websites to comply with local rules.

28 Similarly, neither NAR nor the multiple listing services tell participants that they must display

NAR's Motion for Summary Judgment
Case No. 2:21-cv-00312-TSZ          1

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

listings obtained from the multiple listing service more prominently than those obtained from other sources.  Indeed, the undisputed evidence shows that Zillow independently decided to implement a nationwide two-tab design, independently decided to display MLS listings on the default tab, and independently decided how to label the two tabs.  That evidence disproves REX's allegation that "Zillow's moving of REX listings to 'Other Listings' was done to comply with NAR's co-mingling rules, including the segregation rule."

**_The Changes to Zillow's Website Did Not Harm Competition._**  At best, REX offers proof that REX was itself harmed by the changes to Zillow's website.  But that is not enough to prove harm to competition, which must take the form of higher prices, reduced output, or reduced quality, because REX had no meaningful impact on the market even when it was a going concern.

REX has mustered no evidence that it affected market-wide prices, output, or quality in any relevant antitrust market.  According to REX's own estimates, by 2021, after seven years in business and before Zillow changed its website, REX still accounted for ███████ of home sales, and an even smaller percentage of listings, in each market where it competed.  Moreover, while REX publicly boasted that it offered a revolutionary business model because it avoided multiple listing services and marketed properties directly to consumers—"totally eliminating" buyer agent commissions—those claims were false.  According to REX's own expert, even before Zillow's website change, REX's clients regularly paid compensation to buyer agents.  And there is no reason to believe REX's commissions were significantly lower than those that would otherwise prevail in the market.  Testimony from REX's CEO and its internal documents confirm that REX competed against all brokerage firms, including discount brokers that offered the same low fees as REX, and there is no evidence that discount brokers have not continued to offer the same low fees as REX since REX exited the market.  The undisputed facts therefore show that REX was irrelevant to competition in the market: hundreds of thousands of other real estate brokerages, with varying business models and different commission structures (including discounted commissions), remain in the market today.

REX's failure also has not reduced consumer choice or the quality of available brokerage services.  Before Zillow changed its website, REX used multiple listing services to market property

NAR's Motion for Summary Judgment
Case No. 2:21-cv-00312-TSZ                 2

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1   listings.  As REX's CEO testified, as early as 2017, REX co-listed properties with MLS participants,

2   for an average cost of $100 to $300 per listing, to market its listings through the local multiple listing

3   service and give them greater exposure than they could receive when advertised by REX alone.

4   Thus, the undisputed facts contradict REX's allegation that the changes to Zillow's website "forced

5   [REX] to co-list clients with MLS members."  REX had been co-listing properties with multiple

6   listing service participants for years prior to Zillow's changes to its website, leveraging the benefits

7   of MLS exposure at a trivial cost.  Multiple listing service participants and the benefits of marketing

8   properties through multiple listing services remain available to consumers today, giving them the

9   same (or better) marketing exposure than was available through REX.

10          At bottom, REX had no impact on competition, and it would not have had impact on

11  competition even absent the changes to Zillow's website.  Even before Zillow's website change,

12  REX had struggled to gain a toehold in the marketplace for years.  According to REX's CFO, Mike

13  Drath, REX's business was a "house of cards."  Ex. A (Drath Tr.) at 51:4.  He testified that "REX

14  built its business on "'marketing technology,' in air quotes," which "never came close to

15  compensating for the company not being on the MLS, so much so that the company was doing co-

16  listings with people that were on the MLS while not saying so," *id.* at 166:23–167:4, and it ran head-

17  long into "very aggressive competitors, underpricing commissions and coming up with similar

18  products and similar mechanics to lower the cost," *id.* at 153:14–16.  According to Mr. Drath, had

19  the changes to Zillow's website "not occurred, the company's fortunes would still have ended up in

20  the same place, maybe a little later, because everything else was still constraining the company, the

21  overspend, the lack of experience in the space, the lack of experience in running startups, the

22  competition, the pricing, the interest rates, the prices coming down, all of those are still happening,

23  and the company was burning through cash like a drunken sailor."  *Id.* at 169:10–18.

24          ***REX Has Not Suffered Antitrust Injury and Lacks Antitrust Standing.***  REX has no

25  evidence of antitrust injury because REX's claimed injury—the failure of its business—was not

26  caused by the changes to Zillow's website.  While REX now claims its business collapsed when its

27  listings were moved to the "Other Listings" tab on Zillow, it is undisputed that REX could have

28  retained its preferred position on Zillow's website—commingled with MLS listings on the default,

NAR's Motion for Summary Judgment
Case No. 2:21-cv-00312-TSZ          3

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1    "Agent Listings" tab—by continuing its practice of co-listing.  In fact, after Zillow changed its

2    website, REX initially did just that.  As REX's CEO testified, when REX co-listed a property after

3    Zillow changed its website, the property was moved to the "Agent Listing" tab, where it was

4    commingled with MLS listings.  Indeed, after the Court denied REX's preliminary injunction

5    motion, REX's co-founder, Lynley Sides, candidly told an investor that the only expected benefit

6    to REX from winning this lawsuit would be "to save about $200/home on marketing," *i.e.*, the cost

7    of a co-listing.  That is a far cry from the injury REX now claims—more than $400 million—based

8    on the purported lost enterprise value of its business.  Because these flaws in REX's case, standing

9    alone or considered together, dispose of REX's remaining claims against NAR, NAR respectfully

10   asks the Court to enter summary judgment on Counts I and VI in REX's Amended Complaint.[1]

11                      **STATEMENT OF UNDISPUTED MATERIAL FACTS**

12   **I.     NAR Promulgates Optional MLS Model Rules, Like Section 18.3.11**

13          1.      NAR is trade association of real estate professionals, and it publishes the Handbook

14   on Multiple Listing Policy, which "is intended to guide member associations of REALTORS® in

15   the operation of multiple listing services consistent with the policies established by the National

16   Association's Board of Directors."  Ex. B (NAR0001833) at -836.

17          2.      The Handbook contains different tiers of model rules: Mandatory, Recommended,

18   Optional, and Informational.  Ex. B. at -834; *see also* Ex. C (NAR0000177) at -259 ("All of the

19   following rules are optional.").

20          3.      To use the REALTOR® trademark, which is owned by NAR, and access

21   professional liability insurance procured by NAR, local REALTOR® associations must follow all

22   Mandatory NAR policies, including the Mandatory policies and rules in the Handbook.  Ex. D

23   (Gansho 30(b)(6) (Oct. 28, 2022) Tr.) at 66:11–15.

24

25   _____

26   [1] The Court should grant summary judgement on the antitrust claim REX alleged against NAR under
     state law (Count VI) for the same reasons summary judgment is warranted as to the REX's federal
27   claim (Count I).  *See PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178 (W.D. Wash.
     2021) ("The Court's analysis of [plaintiff's] federal antitrust claims extends to its state law claims
28   under the WCPA . . . ."); ECF 98 at 9 n.2 ("The Court recognizes that the state and federal standards
     are essentially the same and thus analyzes both claims under the federal standards.").

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

4.      NAR does not own or operate any multiple listing services, and state and local associations of REALTORS®, which operate multiple listing services, are independently incorporated entities (with separate by-laws).  *See* Ex. D at 15:5–19, 47:7–48:2.

5.      Multiple listing services operated by local associations of REALTORS® are not required to adopt the Recommended, Optional, or Informational model rules.  Ex. B at -834, -836.

6.      In the regular course of business, NAR does not monitor or enforce Optional model rules.  Ex. D at 78:8–15, 123:21–24.

7.      Since its inception, Section 18.3.11 of NAR's IDX Policy has been an Optional model rule for local MLSs—neither Mandatory nor Recommended for adoption by NAR.



Ex. B at -936–37 (annotations added); *id.* at -834 (annotations added); *see also* Ex. C at -259 (originally numbered Section 18.3.13); Ex. E (Gansho 30(b)(6) (Dec. 8, 2022) Tr.) at 27:7–18.

8.      Approximately 29% of multiple listing services affiliated with NAR have ***not*** adopted Section 18.3.11.  Ex. F (NAR Suppl. Resp. to REX Interrogatory No. 4); Ex. G (Evans Report) ¶ 35 (REX's economic expert acknowledging that Section 18.3.11 is optional and has been adopted by only ▮▮▮▮▮▮▮▮▮▮); Ex. H (Ryan Tr.) at 43:23–44:7 (REX's CEO has agreed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮); Ex. I (Hendricks Decl. (ECF 54)) ¶ 41; Ex. J (Zillow Resp. to REX First Set of Interrogatories) at 12–19 (No. 3) (showing that at least 75 multiple listing services did not adopt the Optional Section 18.3.11).

9.      A local NAR-affiliated MLS is not required to certify to NAR that it has adopted

NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ                    5

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

Section 18.3.11, Ex. D at 27:10–29:2, and it will not lose access to errors and omissions insurance coverage if it has not adopted Section 18.3.11.  *See id.* at 49:13–23, 66:11–15.

10.     Multiple listing services operated by local REALTOR® associations are free to adopt any rule that does not conflict with a Mandatory NAR policy and there is no Mandatory policy that requires separate displays of non-MLS and MLS listings. *Id.* at 47:7–48:20; Ex. B at -834, -836, -936.

11.     For example, the largest NAR-affiliated multiple listing service in the country—California Regional MLS ("CRMLS")—has not adopted Section 18.3.11.  Ex. F at 34; *see* Ex. K (NAR0023121) at -153–56.

12.     Multiple listing services that have adopted Section 18.3.11 are free to repeal the rule at any time without violating NAR policies.  Ex. E at 212:24–213:12.

13.     REColorado, which is a multiple listing service affiliated with NAR in Colorado, repealed Section 18.3.11 in August 2022.  Ex. L (REColorado Press Release); *see also* Ex. F at 3.

14.     For those multiple listing services that have decided to adopt Section 18.3.11, their local rule simply states that MLS listings and non-MLS listings should be displayed separately. Ex. B at -936–37.

15.     Section 18.3.11 does not mandate how MLS participants should label MLS or non-MLS listings searches or whether either should appear as the default search, and nothing in the rule requires that MLS listings be prioritized or preferred.  *Id.*

## II.     Zillow Independently Decided How to Design its Website

16.     In 2020, without consulting NAR, Zillow decided which multiple listing services it would join.  *See* Ex. M (Samuelson (Nov. 29, 2022) Tr.) at 13:19–20 ("[T]here were no communications with NAR prior to September 23, 2020."); Ex. N (Zillow Suppl. Resp. to REX Fourth Set of Interrogatories) at 6–7 (No. 21) (describing "Zillow's unilateral business decision to switch to IDX feeds," when Zillow announced its plan to switch to IDX feeds).

17.     Instead of creating a website design that only separately displayed MLS and non-MLS listings in parts of the country where separate displays are required by the local multiple listing service, Zillow unilaterally decided, without consulting NAR, to implement a uniform, nationwide

NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ                    6

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

website design, which separately displayed MLS and non-MLS listings everywhere.  Ex. O (Zillow Resp. to REX Second Set of Interrogatories) at 12–15 (No. 15); Ex. P (Samuelson Decl. (ECF 53)) ¶¶ 66–67.

18.     Without consulting NAR, Zillow changed its website on January 12, 2021 to reflect a display with two separate "tabs"—one that displayed MLS listings and another that displayed listings obtained from other sources.  Ex. O at 12–15 (No. 15); *see also* Ex. D at 179:17–181:20; Ex. M at 14:3–21.

19.     Without consulting NAR, Zillow decided how the tabs would be labeled and which tab would be displayed by default.  Ex. Q (NAR0031149); Ex. O at 12–15 (No. 15) ("Zillow alone decided how best to display listings in a manner that would comply with MLS rules."); Ex. P ¶ 62 ("[M]any of the changes that Zillow has made to its online platforms in order to comply with these rules, including the specific way listings are displayed in a two-tab format, how those tabs are labeled, and how that two-tab format has been implemented across all geographies, are business decisions made by Zillow alone and not explicitly stated in or required by any MLS rules.").

## III.     REX Was Not a Unique Competitor

20.     From 2017 through 2021 (including after Zillow's website change), REX co-listed properties with multiple listing service participants for an average fee between $100 and $300.  Ex. H at 159:13–15; *id*. at 150:1–151:15, 152:8–21, 152:22–153:2, 154:5–9, 160:5–161:11; Ex. R (REX Resp. to NAR Third Set of Interrogatories) at 8–10 (No. 10); Ex. S (REX_0035617).

21.     When REX co-listed a property, its listings were distributed both on the local multiple listing service and wherever listings were syndicated by the local multiple listing service, including Zillow, Redfin, and realtor.com.  Ex. H at 153:3–24.

22.     REX advertised that it "totally eliminat[es] the buy side agent commission."  Ex. T (Ryan Depo. Ex. 5); *see also* Ex. U (Sides 30(b)(6) Tr.) at 234:20–235:4; Ex. V (REX_0003399) ("With REX, you pay 2%.  All in!  No hidden fees, no fine print.").

23.     REX's clients paid buyer agent commissions.  Ex. G  ¶ 454 & tbl. VII-1 (showing that by March 2020, REX's seller clients paid a buyer agent commission in approximately ███ of its transactions).

NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ                    7

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1    24.    According to its own internal analysis, REX never exceeded a market share of more

2    than 0.55% in any of the local markets where it operated.  Ex. W (REX_0772791).

3    25.    In all local markets where it had operations, REX competed against every other

4    brokerage firm, including discount brokerages offering the same low fees as REX.  Ex. H at 172:18–

5    173:17; Ex. X (REX's Resp. to NAR First Set of Interrogatories) at 3–4 (No. 1).

6                                       **LEGAL STANDARD**

7         On a motion for summary judgment, "the moving party must either produce evidence

8    negating an essential element of the nonmoving party's claim" or "show that the nonmoving party

9    does not have enough evidence of an essential element to carry its ultimate burden of persuasion at

10   trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

11   "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to

12   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

13   "Only disputes over facts that might affect the outcome of the suit under the governing law will

14   properly preclude the entry of summary judgment" and a genuine dispute exists only "if the evidence

15   is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

16   *Lobby, Inc.*, 477 U.S. 242, 248 (1986).

17                                         **ARGUMENT**

18        NAR respectfully requests that the Court grant it summary judgment on both of REX's

19   claims against NAR because REX cannot establish essential elements of its antitrust claims against

20   NAR.  Specifically, REX has no evidence that shows: (1) there was an agreement involving NAR

21   to "segregate, conceal, and demote non-MLS listings" by changing the design of Zillow's website

22   and placing REX listings on a different tab than the default tab where MLS listings are displayed,

23   ECF 99 ¶ 60; (2) that competition was harmed by the changes to Zillow's website; or (3) that REX

24   suffered antitrust injury and has antitrust standing.  Absent any of these elements, summary

25   judgment on REX's two antitrust claims against NAR is warranted.

26   **I.    NAR and Zillow Did Not Agree to Change Zillow's Website**

27        "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but

28   only restraints effected by a contract, combination, or conspiracy, the crucial question is whether

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (cleaned up); *see also Fisher v. City of Berkeley*, 475 U.S. 260, 266 (1986) ("[T]here can be no liability under § 1 in the absence of agreement."). And not just *any* agreement is enough—there must be "a conscious commitment to . . . achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp*., 465 U.S. 752, 764 (1984) (quotation marks and citation omitted). The existence of an unlawful agreement can be established with direct evidence or circumstantial evidence. *In re Citric Acid Litig.*, 191 F.3d 1090, 1093 (9th Cir. 1999). This case has neither.

In its Amended Complaint, REX alleged that Zillow entered an agreement with NAR and multiple listing services to "segregate, conceal, and demote non-MLS listings" when it became a member of NAR and certain local multiple listing services. ECF 99 ¶ 60. REX further alleges that Zillow acted in furtherance of that alleged conspiracy when it changed its website to display non-MLS listings on a different tab than MLS listings, and to display MLS listings on the default tab of its website. *Id.* ¶¶ 64–65; *see also id.* ¶¶ 102–104 ("Zillow's website redesign, which demotes non-MLS listings, is driven by its voluntary membership in the NAR and MLSs and the agreed adherence to their rules."); *id.* ¶ 123 ("The NAR, MLSs, and Zillow have implemented their rules and agreement to exclude and impair non-MLS, non-NAR member competitors' access to online display in local markets nationwide.").

There is no evidence of such a conspiracy, which means summary judgment should be entered on Counts I and VI in REX's Amended Complaint. *See 49er Chevrolet, Inc. v. Gen. Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986) (affirming summary judgment where there was no evidence of an unlawful agreement).

### A.   There Is No Direct Evidence of an Agreement Involving NAR

"Direct evidence is smoking-gun evidence that establishes, without requiring any inferences the existence of a conspiracy." *Honey Bum, LLC v. Fashion Nova, Inc.*, 2023 WL 2592287, at *5 (9th Cir. Mar. 22, 2023) (cleaned up); *see also Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001) ("We have noted that direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being

1   asserted." (cleaned up)).  It includes, for example, written agreements or eyewitness testimony that

2   establishes an express agreement between the defendants.  *See*, *e.g.*, *PharmacyChecker.com LLC v.*

3   *LegitScript LLC*, 614 F. Supp. 3d 796, 809 n.13 (D. Or. 2022) ("Direct evidence may consist of

4   written documents, audio or video recordings, or eyewitness testimony about what was said.");

5   *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2013 WL 595122, at *8 (E.D. Cal. Feb. 15,

6   2013) ("[T]estimony from percipient witnesses that defendants agreed at a certain meeting to fix

7   prices or not to compete constitutes direct evidence of an agreement to restrain trade . . . ."), *aff'd*,

8   803 F.3d 1084 (9th Cir. 2015).

9        There is no direct evidence of an agreement involving NAR to "segregate, conceal, and

10  demote non-MLS listings."  There is no written evidence NAR, multiple listing services, and Zillow

11  agreed to "segregate, conceal, and demote non-MLS listings."  And there also is no eyewitness

12  testimony establishing that NAR, multiple listing services, and Zillow entered an agreement to

13  "segregate, conceal, and demote non-MLS listings."  Indeed, every NAR and Zillow witness has

14  testified that Zillow never even discussed its two-tab display with anyone at NAR before Zillow

15  changed its website in January 2021.  SUMF ¶¶ 16–19.

16   **B.    Optional Section 18.3.11 and a Handful of Communications Unrelated to**
17         **Display of Non-MLS Listings Are Not Evidence of an Agreement**

18        In the absence of direct evidence, "[t]o survive a motion for summary judgment . . . a plaintiff

19  seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility

20  that the alleged conspirators acted independently."  *Matsushita Elec. Indus. Co. v. Zenith Radio*

21  *Corp.*, 475 U.S. 574, 588 (1986) (cleaned up); *In re Citric Acid Litig.*, 191 F.3d at 1096 ("The

22  requirement that a plaintiff who relies solely on circumstantial evidence of conspiracy . . . must

23  produce evidence tending to exclude the possibility that defendants acted independently follows

24  directly from the Supreme Court's opinion in *Matsushita* and is, as we have explained, well-

25  established . . . .").  Under this standard, the Court may not infer the existence of an unlawful

26  agreement from evidence that is equally consistent with lawful, independent conduct.  *See In re*

27  *Citric Acid Litig.*, 191 F.3d at 1094.

28

NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ          10

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

REX claims the existence of an optional model rule, Section 18.3.11, is circumstantial evidence of the alleged agreement involving NAR, but that rule truly is optional and there is undisputed evidence that NAR, multiple listing services, and Zillow all acted independently.

### 1. Optional Section 18.3.11 of NAR's Handbook on MLS Policy Is Not Evidence of an Agreement

In ruling on NAR's motion to dismiss at the outset of the case, the Court recognized a line of cases in which some courts have found that rules labeled "optional" were actually mandatory in practice, *see* ECF 98 at 12–13, but the undisputed evidence shows that Section 18.3.11 is not such a rule.  Section 18.3.11 is not optional in name only.  It is undisputed that hundreds of multiple listing services owned by local REALTOR® associations (amounting to nearly 30% of all multiple listing services) have independently decided *not* to adopt Section 18.3.11.  SUMF ¶ 8.  Those multiple listing services do not require their participants to separately display MLS listings and non-MLS listings.  *Id.*  And it is undisputed that the local multiple listing services that have adopted Section 18.3.11 are free to repeal it at any time without notifying NAR and without adverse consequence.  SUMF ¶ 12.  Indeed, one major multiple listing service repealed its rule in 2022—after REX filed suit in this case.  SUMF ¶ 13.  Section 18.3.11 therefore does not require any member of NAR—including individual multiple listing services—to do anything at all.

These undisputed facts contradict REX's allegation that "brokerages, agents, and even customers allegedly have ***no choice*** but to comply with NAR's so-called optional rules."  ECF 98 at 12.  The record instead shows multiple listing services have a choice, ***and in fact choose***, not to adopt or follow Section 18.3.11.  SUMF ¶¶ 7–8.  That means REX's allegations that multiple listing services must segregate non-MLS listings because of Section 18.3.11 are false and, after two years of discovery, completely unsupported.  *Compare* ECF 99 ¶ 47 ("Notably, the NAR rules provide that listings from MLSs ***must*** be segregated from any non-MLS listings") (emphasis added); *id.* ¶ 73 ("NAR requires its affiliated Multiple Listing Services to comply with NAR Rules, including . . . the mandatory co-mingling rules.").  That alone is enough for summary judgment.

Moreover, the undisputed evidence shows that Zillow acted independently when deciding how to design its website, including how it would comply with the rules of local multiple listing

services.  Zillow independently decided, for its own reasons, to become a participant in certain multiple listing services to obtain access to their IDX feeds.  SUMF ¶ 16.  Zillow then independently decided which multiple listing services it would join, without consulting NAR.  *Id.*  Some of the multiple listing services that Zillow decided to join allow commingling of MLS listings and non-MLS listings, and some do not.  *Id.* ¶ 17; Ex. G ¶ 235 n.226 (REX's expert reporting that ████████

████████████████████████████████████████████████████

████████████████████████).  Zillow independently decided to implement a nationwide, two-tab design to comply with the rules of the individual multiple listing services it joined.  SUMF ¶ 17.  It could have pursued other options, including a website design that varied between localities, a design with more tabs and labels, or a different default tab, but it chose not to, for its own reasons.  *Id.* ¶¶ 17–18.  In other words, yet again, REX's allegations are not supported by the undisputed facts.  *See* ECF 99 ¶ 88 ("Zillow's moving of REX listings to 'Other Listings' was done to comply with NAR's co-mingling rules, including the segregation rule.").

The undisputed evidence also contradict REX's allegation that "absent NAR's actions in drafting the rules ***and effectively forcing*** Zillow and other MLS participants to comply with them, Zillow would not have changed its websites."  ECF 98, at 8 (emphasis added).  NAR did not force Zillow to change its website design.  Nor did NAR dictate how many separate "tabs" Zillow would have on its website, how they would be labeled, or which tab would be the default tab.  *See* ECF 99 ¶ 89 ("Because the default option is the 'Agent listing' tab, many consumers will never click on the tab that includes REX homes.").  In fact, there is nothing in the text of Section 18.3.11 that dictates to MLS participants how to display non-MLS listings, including what labels to use or which listings to display as the default.  SUMF ¶¶ 7, 15.  And there is no record evidence that suggests otherwise.

The reality is that Section 18.3.11 does not compel multiple listing services—or anyone else—to do anything.  To illustrate the point:  If NAR repealed Section 18.3.11 today, the rules of local multiple listing services would not change.  Multiple listing services operated by local REALTOR® associations are free to adopt any rule that does not conflict with a mandatory NAR policy and there is no mandatory policy that requires separate displays of non-MLS and MLS listings.  SUMF ¶ 10.  That means multiple listing services that currently allow commingling non-

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

MLS and MLS listings would be free to continue with that practice after Section 18.3.11 was repealed.  And those that prohibit commingling would continue to prohibit commingling without Section 18.3.11.

Section 18.3.11 does nothing to compel multiple listing services, brokers, agents, or Zillow to do anything, which means it cannot be evidence of an unlawful agreement.  *See, e.g., Cnty. of Tuolumne*, 236 F.3d at 1156 (recommendation of medical staff regarding a credentialing decision, even if followed, does not establish a conspiracy between the hospital and staff); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 9 (1st Cir. 2016) ("We note that the antitrust laws allow trade associations to make nonbinding recommendations about businesses and products."); *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1459 n.34 (11th Cir. 1991) (a decision-maker's acting consistently with a recommendation does not result in conspiracy between the decision-maker and those providing the recommendation); *cf. Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 307–09 (2d Cir. 2023) (finding concerted action only where "a ***binding*** association rule designed to prevent competition" is promulgated "in conjunction with the members' ***surrender to the control of the association***" (emphasis added)); *O.M. by & through Moultrie v. Nat'l Women's Soccer League, LLC*, 541 F. Supp. 3d 1171, 1180 (D. Or. 2021) (finding plaintiff alleged concerted action only where a soccer league created a ***mandatory*** rule and required member teams to comply).

### 2. Communications Between NAR and Zillow or the Multiple Listing Services Are Not Circumstantial Evidence of an Agreement

Beyond contending that an Optional model rule that is not followed by 30% of multiple listing services is actually mandatory, REX cites a handful of communications between NAR, MLSs, and Zillow as purported circumstantial evidence of the alleged agreement to demote non-MLS listings on Zillow's website.  *See* Ex. Y (REX Resp. to Zillow Fourth Set of Interrogatories) at 8–10 (No. 11) (citing NAR0003757, NAR0003784, NAR0150760, NAR0003861, NAR0090947, NAR0103417, ZG_00352026).   But mere communications between members of an alleged conspiracy do not permit an inference of an unlawful agreement "unless those communications rise to the level of an agreement, tacit or otherwise." *In re Packaged Seafood Prods. Antitrust Litig.*,

NAR's Motion for Summary Judgment
Case No. 2:21-cv-00312-TSZ                13

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

2023 WL 3046073, at *12 (S.D. Cal. Apr. 21, 2023) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999)); *see also Fashion Nova, Inc*., 63 F.4th at 823–24 (observing that "to qualify as a plus factor, . . . communications must go beyond the 'standard fare' of business and trade-association practice," otherwise, courts "would have to allow an inference of conspiracy whenever a trade association exists in a given industry." (cleaned up)).   And here, the communications cited by REX show only that (1) NAR employees addressed questions about issues that were wholly unrelated to the alleged agreement to separate MLS and non-MLS listings; and (2) communications relating to Zillow's decisions about how to display of MLS and non-MLS listings occurred **after** Zillow had already unilaterally changed its website.

For a conspiracy to implement a two-tab display on Zillow's website to be plausible, REX must come forward with evidence that **before** Zillow changed its website design on January 12, 2021, NAR, multiple listing services, and Zillow agreed to demote non-MLS listings on Zillow's website. *See In re Hawaiian & Guamanian Cabotage Antitrust Litig*., 647 F. Supp. 2d 1250, 1257 (W.D. Wash. 2009) (finding that allegations about purportedly conspiratorial communications, temporally untethered from the conduct complained of, are plainly inadequate for inferring agreement).   The communications REX cites, however, fail even to establish that NAR knew about the contemplated changes to Zillow's website before they were implemented.

Only two communications cited by REX pre-date the website change.   *See* Ex. Z (NAR0090947) (Dec. 18-29, 2020 emails between Zillow and NAR); Ex. AA (ZG_00352026) (Jan. 5-11, 2021 emails between Metro MLS and Zillow).   One ███████████████████████████ ██████████████████████████████████████████████████████ ).   Ex. AA.   The other shows that NAR responded to a question about Zillow's ability to display information concerning sold properties (such as the sales price) that it acquired from outside the MLS in locations where home sale prices are not publicly disclosed.   Ex. Z.   Neither shows that NAR knew about Zillow's two-tab display, that NAR and Zillow agreed to demote non-MLS listings, or that NAR forced Zillow to demote non-MLS listings.   As confirmed in later communications, "Zillow came up with the current display format," and did not "seek[] [NAR's] approval or feedback [on the two-tab display] . . . prior to rolling out [its] new IDX site." Ex. Q.   That is the opposite of NAR

NAR's Motion for Summary Judgment
Case No. 2:21-cv-00312-TSZ                14

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

directing or recommending to Zillow that it "segregate" non-MLS listings.  *Compare Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1156 (9th Cir. 2003) (noting that the California Association of Realtors did not commit any antitrust violation by opining on the legality of a certain fee arrangement, as CAR did not "encourage[]" or "recommend[]" the particular arrangement).

Nor do the communications that post-date Zillow's website change constitute evidence that Zillow and NAR reached any agreement regarding Zillow's two-tab display.  For example, three communications—Ex. BB (NAR0003757), Ex. CC (NAR0003784), and Ex. DD (NAR0150760)— are from the same email chain between Zillow, NAR, and MLS of Greater Cincinnati ("Cincy MLS").  They show that NAR and Cincy MLS discussed whether Zillow's two-tab display complies with IDX rules **after** the website change had already occurred.  NAR concluded that "this display does not appear to violate IDX policy . . . ."  Ex. DD at -767.  But the fact that NAR felt that the already-implemented website change did not violate national IDX rules—which allow local multiple listing services to decide on their own whether to prohibit or allow commingling of MLS and non-MLS listings—is meaningless.  At best, it shows that NAR did not consider whether Zillow's two-tab display complied with IDX rules proves until after it was implemented, further confirming Zillow neither sought nor obtained NAR's approval prior to its implementation.  The same reasoning applies to the remaining communications cited by REX.  *See* Ex. EE (NAR0003861) (emails from Apr. 2-7, 2021, months after Zillow changed its display, asking a question that related to ███████████████████████████████████████████████████████████████████ ███████████████████████████████████); Ex. FF (NAR0103417) (emails from Apr. 26–July 23, 2021, months after Zillow changed its display, ████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████ (emphasis added)).

Put simply, REX has failed to identify a single communication—or communications in combination—that could be properly construed as circumstantial evidence of agreement.

**C.    The Undisputed Evidence Shows that NAR, Multiple Listing Services, and Zillow Acted Independently**

Multiple listing services independently decide whether to prohibit or allow commingling of non-MLS listings and MLS listings in a single display, SUMF ¶¶ 7–9, and they do so based on local market conditions.  *See* Ex. D at 104:13–106:12 (prior to promulgation of Section 18.3.11, MLSs had expressed concern that the reputation of MLS data and listings would be tarnished if lower-quality non-MLS listings were commingled in searches alongside MLS listings); Ex. GG (Niersbach Tr.) at 64:19–65:3 ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████).  Some allow commingling, some do not, and others, after initially deciding to prohibit commingling, later changed their minds.  SUMF ¶¶ 8, 13.

It also is undisputed that Zillow acted independently when it chose to access listings through IDX feeds rather than syndication and to redesign its website.  Zillow independently chose which multiple listing services to join and how to design its website to comply with their rules.  SUMF ¶ 16.  Zillow could have decided to join only multiple listing services that allow commingling, or it could have designed its website to commingle non-MLS and MLS listings for the regions served by the approximately 75 multiple listing services it joined that allow commingling.  *Id.* ¶¶ 8, 17.  Zillow instead chose, for its own reasons and without any input from NAR, to join some multiple listing services that prohibited commingling and to implement a single, nationwide website design. *Id.* ¶ 17.

All of this evidence is precisely the sort of unilateral conduct that does not give rise to liability under the Sherman Act and from which a plaintiff cannot infer the existence of an unlawful agreement as a matter of law.  *See 49er Chevrolet*, 803 F.2d at 1467 (affirming summary judgment for defendants because the plaintiff failed to present evidence to prove there was an agreement between the dealers); *Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 2010 WL 4365807 at *5 (W.D. Wash. 2010) (holding that a Sherman Act claim failed as a matter of law

NAR's Motion for Summary Judgment
Case No. 2:21-cv-00312-TSZ                    16

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1    because the plaintiff failed to present evidence that the defendants agreed not to ship automotive

2    parts to certain regions of the country rather than unilaterally deciding not to do so).

3    **II.     The Unilateral Changes to Zillow's Website Have Not Harmed Competition**

4          As the Court recognized in its motion to dismiss decision, REX's antitrust claims must be

5    evaluated under the rule of reason.  ECF 98 at 9–10.  To prevail in a rule of reason case, the plaintiff

6    must prove that the defendants' actions harmed competition.  *Kaplan v. Burroughs Corp.*, 611 F.2d

7    286, 291 (9th Cir. 1979) (a rule of reason plaintiff must prove "significant anticompetitive effects").

8          To meet this burden, REX alleges the changes to Zillow's website harmed competition

9    because sellers "may feel forced to do business" with NAR and multiple listing services "to have

10   superior placement on Zillow's dominant website, while buyers may never see their best options

11   because REX's listings (and all others in the 'Other listings' category) are demoted."  ECF 99 ¶ 96.

12   According to REX, this harms competition because "[c]ompetition from REX, which allows buyers

13   and sellers to lower commissions to get more home for their money, is suppressed, and REX loses

14   customers."  *Id*.  REX further alleges that the changes to Zillow's website have anticompetitive

15   effects because REX "has lost clients, has been forced to co-list clients with MLS members, and has

16   been repeatedly questioned about the lack of visibility of REX listings on Zillow's websites."

17   *Id*.  ¶ 140.

18          None of these claims, however, amount to harm to competition, even if the effects of the

19   website change ultimately drove REX out of business.  "The elimination of a single competitor,

20   without more, does not prove anticompetitive effect."  *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802,

21   812 (9th Cir. 1988).  That means to show harm to competition, REX must do more than simply

22   prove that it exited the market as a result of the changes to Zillow's website.  *See Hilton v. Children's

23   Hosp. San Diego*, 315 F. App'x 607, 609 (9th Cir. 2008) ("Any loss of Hilton's services is

24   insufficient by itself to raise a genuine issue of material fact regarding a decline in marketwide

25   quality."); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).  REX must prove

26   that its presence in the market had a meaningful impact on competition before it failed, which it

27   cannot do.  Indeed, REX's own expert implicitly concedes that REX had no impact on competition

28   prior to Zillow's website change by opining ███████████

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1   ████████████████████████████████████████████████████ Ex. G

2   ¶ 438 (emphasis added).  In other words, at the time of its failure—after seven years in business—

3   REX still was not "a competitive constraint" in the marketplace, which is confirmed by the

4   discovery record.

5          The undisputed facts show that REX had no impact on the prices consumers pay for

6   brokerage services.  REX admits that it competed with all licensed real estate agents in the parts of

7   the country where it had operations, Ex. X at 3 (No. 1), which amounts to ████████████████

8   ████████, Ex. H at 172:6–8, 172:18–21.  REX admits that ████████████████████████

9   ████████████████████████████████████.  *Id.* at 172:24–173:17.  And REX never

10  attained a market share of more than 0.6% in any individual market.  Ex. W.  That means there is

11  no reason to believe REX's exit from the market had any impact on prices whatsoever.  *See Gorlick*

12  *Distrib. Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th Cir. 2013)

13  ("[T]he antitrust laws 'were enacted for the protection of competition, not competitors.'  [Plaintiff]

14  must demonstrate injury to competition in the market as a whole, not merely injury to itself as a

15  competitor." (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488 (1977));

16  *GSI Tech. v. United Memories, Inc.*, 2014 WL 1572358, *3 (N.D. Cal. Apr. 18, 2014) ("While

17  eliminating one player from a market will certainly cause injury to the eliminated party, that injury

18  is not 'of the type the antitrust laws were intended to prevent,' so long as other participants are not

19  harmed and competition remains in the market." (quoting *Gorlick*, 723 F.3d at 1025)).

20         The undisputed evidence also shows that REX had no impact on quality or consumer choice.

21  While REX publicly claimed that it offered a unique service that leveraged technology to market

22  homes directly to buyers, "totally eliminating" buyer agent commissions, Ex. T at 2, buyer agents

23  were actually involved in many of REX's transactions, and REX's clients often paid buyer agent

24  commissions.  SUMF ¶ 23.  Moreover, it also is undisputed that REX, like MLS participants, used

25  multiple listing services to market its listings before Zillow changed its website.  SUMF ¶ 20 (Ex. H

26  at 152:8–21).  It did so through co-listing, which refers to practice in which two real estate

27  brokerages or agents jointly list a property for sale.  SUMF ¶ 20 (Ex. H at 150:2–151:18).  It is

28  undisputed that REX co-listed properties with MLS participants ***before*** Zillow changed its

website—as early as 2017—for a nominal fee that was typically between $100–300 per listing. SUMF ¶ 20.  Indeed, REX's use of co-listings had already been ***increasing*** in the year prior to the changes to Zillow's website.  *See* SUMF ¶ 20.  REX used co-listings for the same reason that any agent chooses to use a multiple listing service—to expose their clients' homes to the broadest possible audience.  SUMF ¶ 20 (Ex. H at 152:22–153:2).

In sum, there was nothing particularly unique or novel of REX's approach, or its impact on the market, that would suggest REX's exit from the market caused an increase in prices or a market-wide reduction in the quality of brokerage services or consumer choice.  And REX has not identified any other competitively significant firm that was impacted by Zillow's website changes in any way. That means it has not mustered any evidence of harm to competition.

## III.    REX Has Not Suffered an Antitrust Injury Caused by Changes to Zillow's Website and Therefore Lacks Antitrust Standing

Antitrust injury is a required element for a plaintiff to establish antitrust standing and maintain a private antitrust case.  *See Brunswick*, 429 U.S. at 489; *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021) (antitrust injury is "mandatory").  Specifically, to create a triable issue on antitrust injury, the plaintiff must produce evidence that (1) the defendants' actions harmed competition; ***and*** (2) that the plaintiff's injury was caused by the reduction in competition. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) ("Antitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct . . . .");  *Hilton*, 315 F. App'x at 609 (granting defendants' motion for summary judgment where plaintiff failed to show there was a genuine issue of material fact on the question of antitrust injury). The undisputed evidence shows that REX's claimed injury was not caused by a reduction in competition arising from the changes to Zillow's website—instead, its injury was caused by its own stubborn refusal to continue its preexisting business practice of co-listing.

REX insists that "Zillow's decision to adopt a two-tab display and label the default tab as 'Agent Listings' and place REX's listings . . . under 'Other Listings' had a devastating impact on REX's listings and its business as a whole." Ex. Y (REX Resp. to Zillow Fourth Set of Interrogatories) at 14 (No. 12).  But it is undisputed that the changes to Zillow's website prevented

NAR's Motion for Summary Judgment
Case No. 2:21-cv-00312-TSZ                    19

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

REX from advertising its listings on Zillow "alongside homes listed by competing brokers who were members" of multiple listing services.  ECF 99 ¶ 55.  REX could have continued to advertise its listings on Zillow "alongside" MLS listings by continuing to use its pre-existing business practices, specifically co-listing.  After Zillow's website change, REX continued to co-list properties with MLS participants to ensure they appeared on the default tab of Zillow's website, commingled with the listings of other brokers.  SUMF ¶ 20.  REX could have co-listed its properties with MLS participants for a nominal fee to ensure its properties were commingled with MLS listings on Zillow's website, and it could have done so without altering its preexisting business practices.  Indeed, as Lynley Sides, the co-founder of REX, candidly told an investor in 2021 that the expected benefit to REX of winning this lawsuit was only saving the "$200/home" that REX spent on co-listing fees.  Ex. HH (REX_0061218) at -219.

Because the alleged conspiracy did not deprive REX of the ability to advertise its listings in a way that were commingled with MLS listings on Zillow's website, and the sole reason its listings were not commingled with MLS listings was that REX discontinued its existing practice of co-listing, REX's claimed injury (the loss of its business) was not caused by the alleged conspiracy.  That means it has not suffered antitrust injury as a result of the changes to Zillow's website.  Absent evidence of causal antitrust injury, REX's case should not proceed to trial because it lacks antitrust standing.  *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997) (no antitrust injury where the plaintiff's "losses resulted from [plaintiff's] inability to adapt to [defendant's] conduct"); *W. Goebel Porzellanfabrik v. Action Indus., Inc.*, 589 F. Supp. 763, 766 (S.D.N.Y. 1984) (no antitrust injury based on a "unilateral decision" by antitrust claimant to "cease imports" in response to a copyright lawsuit); *USAirways Grp., Inc. v. Brit. Airways PLC*, 989 F. Supp. 482, 489 (S.D.N.Y. 1997) (no antitrust injury based on failure to assist a rival to obtain regulatory approval when the rival "could have sought and obtained the authority on its own").

### CONCLUSION

For the reasons stated herein, NAR respectfully requests summary judgment.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1   DATED: June 8, 2023

2                                                   /s/ Ethan Glass_____

3                                          Christopher B. Durbin (WSBA No. 41159)
                                           COOLEY LLP
4                                          1700 Seventh Avenue
                                           Suite 1900
5                                          Seattle, WA 98101-1355
                                           Phone: (206) 452-8700
6                                          Fax: (206) 452-8800
                                           Email: cdurbin@cooley.com

7                                          Ethan Glass (pro hac vice)
8                                          Samantha A. Strauss (pro hac vice)
                                           COOLEY LLP
9                                          1299 Pennsylvania Avenue, NW
                                           Suite 700
10                                         Washington, DC  20004-2400
                                           Phone: (202) 776-2244
11                                         Fax: (202) 842-7899
                                           eglass@cooley.com
12                                         sastrauss@cooley.com

13                                         Sarah M. Topol (pro hac vice)
                                           COOLEY LLP
14                                         55 Hudson Yards
                                           New York, NY 10001
15                                         Tel: (212) 479-6000
                                           stopol@cooley.com

16                                         Michael D. Bonanno (pro hac vice)
17                                         Kathleen Lanigan (pro hac vice)
                                           Peter Benson (pro hac vice)
18                                         Michael Sebring (pro hac vice)
                                           QUINN EMANUEL URQUHART & SULLIVAN,
19                                         LLP
                                           1300 I Street, Suite 900
20                                         Washington, D.C. 20005
                                           Phone: (202)538-8000
21                                         Fax: (202) 538-8100
                                           mikebonanno@quinnemanuel.com
22                                         katlanigan@quinnemanuel.com
                                           peterbenson@quinnemanuel.com
23                                         michaelsebring@quinnemanuel.com

24                                         *Attorneys for Defendant National
                                           Association of REALTORS®*

25

26

27

28

NAR's Motion for Summary Judgment
Case No. 2:21-cv-00312-TSZ          21

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1

## **CERTIFICATION OF WORD COUNT**

2

I certify that this memorandum contains 7,851 words, in compliance with the Local Civil Rules.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ          22

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1

## <u>CERTIFICATE OF SERVICE</u>

2
        I hereby certify that on June 8, 2023, I caused a true and correct copy of the foregoing to be

3
filed in this Court's CM/ECF system, which will send notification of such filing to counsel of record.

4
        DATED: June 8, 2023

5

6
                                                        */s/ Ethan Glass*

7
                                                        Ethan Glass

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NAR's Motion for Summary Judgment
Case No. 2:21-cv-00312-TSZ          23

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000