THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| REX - REAL ESTATE EXCHANGE, INC., | Case No. 2:21-CV-00312-TSZ |
| Plaintiff, | ZILLOW DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | NOTE ON MOTION CALENDAR: June 30, 2023 |
| ZILLOW, INC., et al., | *ORAL ARGUMENT REQUESTED* |
| Defendants. | *REDACTED FOR PUBLIC FILING* |

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1

**TABLE OF CONTENTS**

2

**Page**

3   I.     INTRODUCTION...................................................................................... 1

4   II.    BACKGROUND....................................................................................... 3

        A.     Zillow provides innovative real estate services that turn the lights on. ............ 3

5       B.     In 2021, Zillow seeks to improve the quality of its listings data. ..................... 4

6       C.     REX is unhappy with changes to Zillow's website and brings this suit. .......... 6

7   III.   SUMMARY JUDGMENT STANDARD ................................................ 8

    IV.    ARGUMENT ........................................................................................... 9

8       A.     REX lacks evidence to establish its Sherman Act claim (Count I). ................. 9

9              1.     There is no evidence that Zillow entered an agreement to
                      exclude non-MLS discount brokers. ..................................................... 9

10                    a.     REX has no direct evidence that Zillow joined a
                             conspiracy to use the No-Commingling Rules to exclude

11                           non-MLS discount brokers.......................................................... 9

12                    b.     REX cannot survive summary judgment based on
                             circumstantial evidence. .......................................................... 10

13                           (1)     Zillow acted independently and consistent with
                                     proper business practice. ............................................... 11

14                           (2)     REX has no evidence to exclude the possibility

15                                   that Zillow acted independently or with proper
                                     business practice........................................................... 12

16             2.     REX has failed to establish harm to competition. ............................... 14

17                    a.     REX's claim of harm fails where REX always remained
                             on Zillow and could otherwise access potential buyers. .......... 14

18                    b.     REX has no evidence that complying with the No-

19                           Commingling Rules imposed by various MLSs harms
                             competition beyond REX. ......................................................... 15

20      B.     REX lacks evidence to establish its Lanham Act claim (Count II). ................. 16

21             1.     The challenged statement is not in commercial advertising or
                      promotion. ....................................................................................... 16

22             2.     REX has not presented evidence of any concrete injury
                      proximately caused by Zillow's use of the label "Other listings.".......... 18

23             3.     REX has no evidence from which a jury could award damages

24                    under the Lanham Act. ..................................................................... 20

        C.     REX lacks evidence to establish its WCPA claims (Counts IV & VI). ........... 21

25             1.     REX's false advertising claim under Count IV fails for the same
                      reasons as its Lanham Act claim and because REX has failed to

26                    establish trade or commerce. ............................................................. 21

27             2.     REX's antitrust claim under Count VI fails for the same reasons
                      as its federal antitrust claim.............................................................. 22

28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - i -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1

## TABLE OF CONTENTS
(continued)

2                                                                                           **Page**

3          D.       REX lacks evidence to establish its Defamation claim (Count VII). ............... 23

4   V.     CONCLUSION ......................................................................................................... 23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - ii -
2:21-CV-00312-TSZ

Orrick, Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A White & Yellow Cab, Inc. v. Uber Techs.*,
    No. 15-cv-05163, 2017 WL 1208384 (N.D. Cal. Mar. 31, 2017)........................................21

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010)...........................................................................................14

*Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*,
    114 Wn. App. 371, 57 P.3d 1178 (2002) ..........................................................................23

*Ariix, LLC v. NutriSearch Corp.*,
    985 F.3d 1107 (9th Cir. 2021)...........................................................................................17

*Browne v. Avvo Inc.*,
    525 F. Supp. 2d 1249 (W.D. Wash. 2007) ........................................................................22

*Cascade Yarns, Inc. v. Knitting Fever, Inc.*,
    905 F. Supp. 2d 1235 (W.D. Wash. 2012) ........................................................................22

*Cascade Yarns, Inc. v. Knitting Fever, Inc.*,
    No. C10-861, 2015 WL 3407882 (W.D. Wash. May 27, 2015) ...................................20, 21

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999)...........................................................................................13

*Davidson v. Kimberly-Clark Corp.*,
    889 F.3d 956 (9th Cir. 2018).............................................................................................21

*Eastman v. Quest Diagnostics Inc.*,
    No. 15-cv-00415, 2015 WL 7566805 (N.D. Cal. Nov. 25, 2015) .....................................14

*Feitelson v. Google, Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ..............................................................................14

*FTC v. Qualcomm*,
    969 F.3d 974 (9th Cir. 2020).............................................................................................14

*Harper House, Inc. v. Thomas Nelson, Inc.*,
    889 F.2d 197 (9th Cir. 1989).............................................................................................18

*Honey Bum, LLC v. Fashion Nova, Inc.*,
    63 F.4th 813 (9th Cir. 2023)..........................................................................................9, 13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .........................................................................................................20

*Maffick LLC v. Facebook*,
    No. 20-cv-05222, 2021 WL 1893074 (N.D. Cal. May 11, 2021) ......................................17

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                     - iii -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

*McGlinchy v. Shell Chem. Co.,*
  845 F.2d 802 (9th Cir. 1988) .................................................................................15

*MM Steel, L.P. v. JSW Steel (USA) Inc.,*
  806 F.3d 835 (5th Cir. 2015) .................................................................................13

*In re Musical Instruments & Equip. Antitrust Litig.,*
  798 F.3d 1186 (9th Cir. 2015) ...............................................................................13

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.,*
  795 F.3d 1124 (9th Cir. 2015) .................................................................................9

*Newman v. Google LLC,*
  No. 20-cv-04011, 2021 WL 2633423 (N.D. Cal. June 25, 2021) ...........................17, 19, 21

*Panag v. Farmers Ins. Co. of Wash.,*
  166 Wn.2d 27, 204 P.3d 885 (2009) ......................................................................22

*PBTM LLC v. Football Nw., LLC,*
  511 F. Supp. 3d 1158 (W.D. Wash. 2021) .............................................................22

*Prager Univ. v. Google LLC,*
  951 F.3d 991 (9th Cir. 2020) .....................................................................16, 17, 18

*Reykdal v. Espinoza,*
  196 Wn.2d 458, 473 P.3d 1221 (2020) ..................................................................23

*Roufa v. Constantine,*
  No. C15-01379, 2017 WL 120601 (W.D. Wash. Jan. 11, 2017) ...........................9

*Sambreel Holdings LLC v. Facebook, Inc.,*
  906 F. Supp. 2d 1070 (S.D. Cal. 2012) .................................................................15

*Schmidt v. Tacoma Police Dep't,*
  No. C09-5135, 2010 WL 5071309 (W.D. Wash. Dec. 6, 2010) ...........................23

*Smith v. Markgraf,*
  No. 78948-1, 2019 WL 6699972 (Wash. Ct. App. Dec. 9, 2019)...........................23

*Southland Sod Farms v. Stover Seed Co.,*
  108 F.3d 1134 (9th Cir. 1997) ......................................................................16, 18

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.,*
  803 F.3d 1084 (9th Cir. 2015)...................................................................8, 9, 11, 12, 13

*ThermoLife Int'l LLC v. BPI Sports, LLC,*
  No. 21-15339, 2022 WL 612669 (9th Cir. Mar. 2, 2022) ......................................20

*Toscano v. Pro. Golfers Ass'n,*
  258 F.3d 978 (9th Cir. 2001).................................................................................11

*TrafficSchool.com, Inc. v. Edriver, Inc.,*
  653 F.3d 820 (9th Cir. 2011)................................................................................21

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - iv -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

*Universal Life Church Monastery Storehouse v. King*,
    No. 19-cv-00301, 2023 WL 1928169 (W.D. Wash. Feb. 10, 2023) .................................19

*VBS Distrib., Inc. v. Nutrivita Laby's, Inc.*,
    811 F. App'x 1005 (9th Cir. 2020).......................................................................................19

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
    435 F.3d 989 (9th Cir. 2006)...................................................................................................9

**Statutes**

15 U.S.C. § 1117(a) ........................................................................................................................20

15 U.S.C. § 1125(a)(1)(B).............................................................................................................17

**Other Authorities**

Fed. R. Civ. Procedure 12(b)(6) ....................................................................................................17

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2023) .................................................14

*McCarthy on Trademarks and Unfair Competition* (5th ed.) .......................................................20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - v -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
+1 206 839 4300

1    **I.    INTRODUCTION[1]**

2        Over two years of litigation confirms that Zillow's decision to join Multiple Listings

3    Services ("MLSs") around the country—and comply with their rules governing the access to

4    and display of their home listings data—was an independent business decision motivated by

5    Zillow's desire to improve the customer experience on its platforms.  There is no evidence

6    supporting any alleged conspiracy by Zillow to exclude discount brokers, engage in false

7    advertising, or defame Plaintiff REX – Real Estate Exchange ("REX").  To the contrary, what

8    the extensive discovery in this case has revealed is that REX seized upon Zillow's website

9    design change to hide its own business failings.  The time has come to end this baseless

10   lawsuit.

11       Zillow's popularity comes from making the process of buying a home more

12   transparent.  Before Zillow, consumers could not easily discover all available homes.  Zillow

13   changed that dynamic by aggregating available listings, of all kinds, and placing them on a

14   single website for anyone to access, free-of-charge.  In the nearly two decades Zillow has been

15   in business, it has been guided by this principle of turning the lights on for its consumers,

16   ensuring they can see all their options on a single online platform.

17       It was this core principle that motivated Zillow, in 2021, to switch to the gold standard

18   source of listings data—the Internet Data Exchange ("IDX") feeds that MLSs themselves use.

19   This source provides more complete, accurate, detailed, and timely listings data than the feeds

20   previously relied upon by Zillow.  Moreover, by joining MLSs and guaranteeing it access to

21   IDX feeds, Zillow could ensure its ability to innovate with new offerings.  Switching to IDX

22   feeds thus was vital to Zillow's core mission of turning on the lights for its consumers.

23       To access this listings information, Zillow had to comply with licensing rules imposed

24   by each local MLS on how that data could be used.  As relevant here, the majority of MLSs

25   have adopted rules that preclude placing MLS listings in the same display as listings obtained

26

27   ───────────────

28   [1] All exhibits cited herein are attached to the concurrently filed Declaration of Laura Najemy.

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 1 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1  from other sources.  To comply with those local MLSs' "No-Commingling Rules,"[2] Zillow

2  could have simply displayed MLS listings only, choosing to leave off listings from any other

3  source, including For-Sale-By-Owner ("FSBOs"), auctions, and non-MLS agents like REX.

4  Instead, Zillow spent well over a year, ███████████████, re-engineering its website to

5  create a two-tab display that both complied with the individually imposed MLS rules and

6  provided its consumers with *all* listings, including those of REX.

7       REX nonetheless sued Zillow and Defendant National Association of Realtors

8  ("NAR").  Although Zillow never excluded REX's listings from its online platform (even after

9  REX brought suit), REX's complaint manufactures an antitrust conspiracy between Zillow,

10  NAR, and various non-party MLSs to exclude REX, and claims Zillow had engaged in false

11  advertising and defamation.  REX's claims bear little relation to reality:  It was just one of

12  many discount brokers, operated only in a small number of geographic markets, and its

13  business was in substantial decline before Zillow's website design change.  Unsurprisingly,

14  REX's claims all fail as a matter of law.

15       REX's federal and state antitrust claims fail because REX cannot establish either an

16  agreement to exclude REX or harm to competition.  There is zero direct evidence of *any*

17  agreement involving both Zillow and NAR, let alone evidence of an agreement between them

18  to exclude discount brokers like REX.  Nor can REX point to sufficient circumstantial

19  evidence that could tend to disprove that Zillow acted independently in complying with the

20  various local No-Commingling Rules that are at the center of REX's claim.  Further, REX

21  cannot show harm to competition because it was never precluded from accessing buyers

22  through Zillow's website, or the other marketing channels REX used, nor is it disputed that

23  many other discount brokers remain available to consumers.

24

25
26
27
28

---

[2] Just as REX has used over-the-top language by describing the entire real estate industry as a "cartel," *see* Dkt. No. 80 ("PI Order") 11 n.7, REX has instead taken to calling this kind of rule a "Segregation Rule" and has used similar inflammatory language in describing Zillow's website.  *See* Ex. 1, 400:24-401:14 ("So being separate, it is not being equal"); Ex. 2, 142:14-144:24 (REX's attorney comparing Zillow's use of the word "Other" to segregation in the United States and phrases "used by Nazis").  Such terminology is not remotely accurate.

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                      - 2 -
2:21-CV-00312-TSZ

REX's non-antitrust claims are equally flawed. REX's Lanham Act claim fails because Zillow's use of the phrase "Other listings" to describe a user tool is neither commercial advertising nor promotion. Additionally, REX's state and federal false advertising claims and its defamation claim fail where REX has not established that Zillow's use of "Other listings" caused it any injury, let alone quantifiable damages.

In short, even with over two years to build its case, REX has come up short. Despite the 580 discovery requests served, nearly 580,000 documents exchanged, and 26 individuals deposed, REX simply has no evidence to support its claims.

## II.     BACKGROUND

### A.     Zillow provides innovative real estate services that turn the lights on.

Founded in 2004, Zillow has created multiple innovative platforms to help millions of consumers buy and sell homes every month. Dkt. No. 61 ("Samuelson Decl.") ¶¶ 7-9. One of Zillow's "core values" is to "turn on the lights" for consumers, its "North Star," by bringing "transparency" to the homebuying process, Ex. 3, 23:3-12, and "getting information available" into "the hands of consumers." Ex. 4, 204:15-18; Ex. 5, 103:3-22, 110:2-9. Zillow wanted to make "it easy for consumers to see all of their home shopping options in one place." Ex. 3, 23:3-9. In doing so, Zillow provided "users with information and data related to real estate that was previously available to only a select few." Samuelson Decl. ¶ 9. Zillow made this information available on its online and mobile platforms, where Zillow has search tools that let anyone look for specific homes in which they might be interested. Samuelson Decl. ¶ 9; Dkt. No. 55 ("Thomas Decl.") ¶ 7. For example, users can filter by geographic location, price, number of bedrooms or bathrooms, or size of the home to easily find what they are interested in seeing. Samuelson Decl. ¶ 9; Thomas Decl. ¶ 7; Ex. 1, 76:24-77:9, 265:16-266:14.

The core input into Zillow's listings aggregation business is property listings data. Samuelson Decl. ¶ 4; Ex. 6, 46:16-25; Ex. 7, ZG_00268586. Listings are created by real estate agents to help sellers provide information of interest to potential buyers. *See* Samuelson Decl. ¶ 19. To facilitate that process, agents join brokerages, which, in turn, join local MLSs to

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 3 -
2:21-CV-00312-TSZ

"contribute to a common database of listings" and share listings amongst one another. Samuelson Decl. ¶¶ 24-25.  There are approximately 600 MLSs in the United States, spread across distinct geographic regions.  Samuelson Decl. ¶ 24.

Zillow "want[s] all the listings," having adopted a "[c]ome one, come all, no matter what approach."  Ex. 8, 234:23-235:8, 236:6-9; Ex. 6, 38:23-39:6.  Historically, Zillow was able to access listings data only by negotiating hundreds of individualized and complex "syndication agreements" with local MLSs, individual brokerages, and franchisors across the country.  Samuelson Decl. ¶¶ 32-34, 37.  Zillow also obtained—and displayed—listings from other sources, including FSBOs, foreclosures, auctions, and new construction.  Samuelson Decl. ¶ 36.

**B.    In 2021, Zillow seeks to improve the quality of its listings data.**

Over time, this constellation of syndication agreements created multiple problems for Zillow.  Samuelson Decl. ¶ 39; Ex. 4, 150:19-152:24.  Zillow was unable to obtain complete listings information in certain geographies.  Samuelson Decl. ¶¶ 40-43.  For some of the listings it did obtain, key information, like lot size, open house information, or photos, was missing.  Samuelson Decl. ¶¶ 44-46; Ex. 4, 84:20-85:23, 150:19-151:14, 179:19-180:7.  Worse still, Zillow often received these listings on a delay, in some instances up to "20-24 hours" after the listing was available on other data aggregators, including some of its competitors.  Samuelson Decl. ¶ 47; Ex. 4, 84:20-85:23, 150:19-151:14.  Finally, syndication agreements left Zillow vulnerable because they could be terminated at will, cutting off the most critical input to Zillow's business at any time.  Samuelson Decl. ¶ 49; Ex. 4, 169:12-170:6; Ex. 9, 219:19-220:11.

These problems were not academic.  Although Zillow was among the most popular platforms potential homebuyers consulted, they consulted other sources, too.  Ex. 3, 86:4-87:3.  Consumers used Zillow's real-estate competitors, like Realtor.com, Redfin, Homes.com, and Apartments.com, but also Google and social media sites like Facebook and Instagram, as well as offline advertisers.  *See* Ex. 3, 71:25-72:19.

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                        - 4 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1    Zillow had hoped to solve these listings challenges "within the syndication

2    framework," but Zillow wasn't "making progress, and … in some cases" was "going

3    backwards." Ex. 4, 179:16-180:7. Thus, Zillow proceeded with a plan it called "Bookshelf,"

4    in which Zillow would switch to the IDX feeds that came directly from the MLSs. Samuelson

5    Decl. ¶¶ 30-31, 53; Ex. 10, ZG_00715905; Ex. 7, ZG_00268579, 8585-8586. This data, which

6    is considered the gold standard, is a compilation created by local MLSs. Samuelson Decl. ¶ 5.

7    Switching to the IDX feeds would improve listings coverage, quality, completeness, and

8    timeliness, all while offering Zillow greater listings security and the potential for cost savings.

9    Samuelson Decl. ¶¶ 54-57; Ex. 3, 78:13-80:10.

10    In exchange for this data, Zillow had to comply with the terms of the IDX agreements

11    each local MLS had in place. Dkt. No. 62 ("Hendricks Decl.") ¶ 17. These agreements come

12    with a standard set of rules governing access and display of IDX data, unique to each MLS,

13    and there is no room to negotiate these terms. Hendricks Decl. ¶¶ 17-19; Ex. 4, 150:24-

14    152:24. Roughly two-thirds of these local MLSs incorporate into their individual form

15    agreements a version of a rule that generally provides that "[l]istings obtained through IDX

16    feeds … must be displayed separately from listings obtained from other sources." Samuelson

17    Decl. ¶¶ 64, 66.

18    Even those MLSs that have adopted these No-Commingling Rules do not "dictate how

19    to implement" them. Ex. 4, 62:4-15; Ex. 11, 238:6-239:1; Thomas Decl. ¶¶ 6, 14; Samuelson

20    Decl. ¶ 67. Thus, it was "up to" Zillow to "figure out" how to comply. Ex. 4, 62:4-15; *see* Ex.

21    12, 28:10-20. In doing so, it remained important to Zillow to continue to display listings from

22    *all* sources. Samuelson Decl. ¶ 64. As a result, Zillow spent considerable time and money to

23    redesign its website to accomplish that goal. Ex. 4, 153:6-21.

24    Zillow considered redesigning its search results display only for those geographies

25    where the local MLSs prohibited commingling, but ultimately decided on a uniform

26    nationwide design to avoid user experience complexities. Thomas Decl. ¶¶ 15-17. Zillow

27    considered multiple search-tool designs to accomplish this result, but ultimately decided that a

28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 5 -
2:21-CV-00312-TSZ

two-tab display was the best approach. Thomas Decl. ¶¶ 6, 15-18; Ex. 6, 73:10-74:23. In one tab, labeled "Agent listings," Zillow placed listings sourced from MLSs. Thomas Decl. ¶¶ 22-25. In the second tab, labeled "Other listings," Zillow included all remaining listings received from other sources. Thomas Decl. ¶¶ 22-25. In this way, **all listings, including those from REX, remained on Zillow's website**, with the "Other listings" tab being located "not even an inch" and just "one click" away from the "Agent listings" tab. Ex. 1, 73:24-75:4, 83:6-19. Zillow also included special FAQ pages explaining what each tab's labels meant. Thomas Decl. ¶¶ 24-25; Ex. 6, 64:20-66:18.[3]

In September 2020, Zillow announced that it would switch to the IDX feeds, and, in January 2021, Zillow implemented the change. Samuelson Decl. ¶ 68. Importantly, although Zillow had to "go through a process to review the design changes with MLSs," there were no changes made to Zillow's two-tab design or labeling based on any of the "MLS feedback." Ex. 6, 20:5-21:16, 25:9-18.

It is no secret that Zillow did not like the local MLSs' No Commingling Rules. Complying with them was costly for Zillow and prevented it from fully optimizing the consumer experience. *See* Ex. 4, 53:18-55:14. ████████████████████████████ ████████████████████████████ Ex. 4, 44:4-21, 53:18-23, 60:3-22. Thus, Zillow has advanced multiple proposals to NAR to adopt a mandatory rule that would require all MLSs to permit commingling of listings from all sources. Ex. 4, 264:15-266:15; Ex. 13, ZG_00203827.

**C.     REX is unhappy with changes to Zillow's website and brings this suit.**

One discount broker, REX, was unhappy with this change to Zillow's website. REX was founded in 2014, based on the "████████████" REX "████████████████████ ████████████████████████████████████████████████████."

---

[3] Zillow recognized there was reduced exposure to listings on the "Other listings" tab, particularly among less "serious buyers." Ex. 4, 106:1-17; *see* Ex. 5, 78:7-79:25. But the "listings data quality benefits" Zillow "got from a business perspective from IDX far outweighed" those costs. Ex. 5, 78:7-79:25, 94:19-95:5.

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 6 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1    Ex. 14, 31:16-17, 33:8-34:12.  REX was not the only, nor the first, "discount broker," Ex. 14,

2    38:23-25; Ex. 1, 172:24-173:17, and many others exist today, including, for example, Redfin.

3    Ex. 15, ¶¶ 34-35.  At its height, REX operated in just 39 locations across the United States, and

4    ███████████████████████████████████████████████████.  Ex. 15, ¶ 33, exhibits 10, 19.

5          To make its clients' properties visible to buyers, REX used its own website, ████████

6    ███████████████████████████████████████████████████████████████████████████

7    ████████████████████.  Ex. 14, 57:17-21, 74:3-20, 79:20-80:12, 88:4-22; Ex. 16, ¶¶ 48-50 &

8    n.109.  ██████████████████████████████████████████████████████████████████

9    ███████████████████████████.  Ex. 14, 74:3-20.  █████████████████████████████

10   ██████████████████████████████████████████████████.  Ex. 1, 393:15-20;

11   Ex. 17, 73:2-11.  Even so, Zillow did not promise REX the specific location its listings would

12   be displayed on Zillow's website, *see* Ex. 1, 311:4-13, nor did Zillow have an obligation to

13   include REX listings on its website at all.  Ex. 11, 243:19-22.

14         Because REX made the deliberate business decision to forgo joining MLSs, REX's

15   listings initially appeared on the "Other listings" tab after Zillow switched over to IDX feeds,

16   together with all other listings that were not sourced from MLSs.  Samuelson Decl. ¶ 71; Ex. 1,

17   145:18-22, 159:21-24.  Within months, however, REX listings could be displayed on the

18   "Agent listings" tab as a result of REX (1) ████████████████████████████████████

19   ███████████████████████████, Ex. 14, 139:21-140:3, 295:3-14; Ex. 1, 161:8-11, or

20   (2) ██████████████████████████████████████████████████████████████████████,

21   Ex. 14, 170:2-5; Ex. 1, 33:15-19, 236:22-237:7.  In short, REX always was able to have its

22   listings appear on Zillow's website and other online platforms.  Ex. 1, 392:7-12.

23         Nonetheless, REX sued Zillow and NAR in March 2021, alleging that Zillow had

24   entered into an anticompetitive conspiracy (with NAR and non-party MLSs) to deny non-

25   MLS, non-NAR members, including REX, effective access to Zillow.  Dkt. No. 99 ("FAC")

26   ¶¶ 131-141 (Sherman Act), ¶¶ 189-201 (WCPA).  REX also claimed that Zillow's labeling of

27   the tabs on its redesigned website constituted false advertising under state and federal law.

28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:              - 7 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1    FAC ¶¶ 142-152 (Lanham Act), ¶¶ 163-178 (WCPA).  REX went so far to claim that the

2    labeling defamed REX.  FAC ¶¶ 202-216.  REX sought damages and injunctive relief.  FAC

3    p.44-46.

4         This Court denied REX's motion for a preliminary injunction because, among other

5    reasons, REX had not offered evidence sufficient to establish any harm to competition or that

6    Zillow's website is deceptive.  PI Order 14-20.  Following this Court's resolution of two

7    motions to dismiss, Dkt. No. 98 ("MTD Order"), Dkt. No. 108, only Counts I, II, IV, VI, and

8    VII remain in the case.

9         In May 2022, REX ceased its brokerage operations, ███████████████████

10   ███████████████████.  Ex. 14, 252:13-253:5; Ex.18, ¶ 485 n.474.  In 2020, well prior to

11   Zillow's website design change, REX reported to its Board of Directors that it would run out

12   of funds in 2021 as a result of the slowdown in the U.S. housing market caused by the global

13   pandemic.  Ex. 19, REX_0007667.  Nonetheless, REX's management embarked on an

14   aggressive expansion of operations in late 2020 in the hopes of improving its valuation for a

15   planned Special-Purpose Acquisition ("SPAC") Initial Public Offering in mid-2021.  Ex. 20,

16   REX_0055602.  That IPO was abandoned following the widely reported bust of the SPAC

17   investment bubble in April 2021.  *See, e.g.*, Ex. 21, REX_0638040.  ███████████████

18   ███████████████████████████████████████████████████

19   ███████████████████████████████████████████████████

20   ███████████████████████████.

21   **III.    SUMMARY JUDGMENT STANDARD**

22        Summary judgment "is appropriate" if "there is no genuine dispute as to any material

23   fact and the movant is entitled to judgment as a matter of law."  *Stanislaus Food Prods. Co. v.*

24   *USS-POSCO Indus.*, 803 F.3d 1084, 1088 (9th Cir. 2015) (citation omitted).  Although this

25   Court must "view the facts and draw factual inferences in favor of … the non-moving party,"

26   "to survive summary judgment," REX must, "establish a 'genuine' factual dispute, which

27

28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                      - 8 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

involves 'more than … some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## IV.    ARGUMENT

### A.    REX lacks evidence to establish its Sherman Act claim (Count I).

To prevail on its Section 1 claim, REX must establish (1) a "contract, combination or conspiracy among two or more … distinct business entities"; (2) "which is intended to restrain or harm trade"; (3) "which actually injures competition"; and (4) "harm to the plaintiff from the anticompetitive conduct." *Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*, 795 F.3d 1124, 1129 (9th Cir. 2015) (citation omitted).  REX has alleged a single conspiracy here:  "Defendants NAR and Zillow, with non-party MLSs, entered into" an "agreement … to boycott and deprive non-MLS, non-NAR members, including REX, effective access to Zillow['s]" websites "pursuant to the NAR clear-segregation rule."  FAC ¶¶ 135-136.[4]

#### 1.    There is no evidence that Zillow entered an agreement to exclude non-MLS discount brokers.

The threshold requirement of any Section 1 claim is the existence of an agreement. Plaintiffs can "establish" agreement "through direct evidence, circumstantial evidence, or both."  *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th Cir. 2023).  REX has neither direct nor circumstantial evidence that Zillow entered into the claimed agreement to restrain trade.

##### a.    REX has no direct evidence that Zillow joined a conspiracy to use the No-Commingling Rules to exclude non-MLS discount brokers.

"Direct evidence is smoking-gun evidence that 'establishes, without requiring any inferences' the existence of a conspiracy."  *Honey Bum*, 63 F.3d at 822.  REX has no direct

---

[4] REX has attempted to stray beyond the alleged conspiracy relating to the No-Commingling Rules alleged in its complaint to sweep in a separate unpled conspiracy concerning "the buyer broker commission rule."  Ex. 23, 16:18-22, 17:13-18:6, 24:18-25:20.  In this motion, Zillow does not address any theory, or any purportedly related evidence not rooted in REX's complaint, because "evidence … untethered from the factual allegations made in the complaint" need not be considered on summary judgment.  *Roufa v. Constantine*, No. C15-01379, 2017 WL 120601, at *9 (W.D. Wash. Jan. 11, 2017); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006).

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 9 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1    evidence of any agreement between Zillow, NAR, and the non-party MLSs.  It is undisputed

2    that Zillow made no agreement with NAR.  Rather, Zillow's redesign of its website resulted

3    from Zillow's independent business decision to enter into non-negotiated, form IDX

4    agreements with local MLSs.  Samuelson Decl. ¶¶ 59-66; Ex. 4, 150:19-151:18.  In this way,

5    there are multiple, independent agreements between Zillow and individuals MLSs, none of

6    which include NAR as a party.  Ex. 4, 52:9-25, 273:16-19; Ex. 8, 125:16-127:3, 327:24-

7    328:9.[5]

8         Moreover, as this Court previously recognized, Zillow's "mere act of entering

9    agreements with MLSs" to access their respective IDX feeds does not "standing alone"

10   establish "an anticompetitive agreement or conspiracy."  MTD Order 11; Ex. 11, 287:22-

11   288:16.  And now, REX must come forward with evidence, and not just allegations, that

12   Zillow "agreed to use the MLS rules to restrain trade."  MTD Order 11.  The IDX agreements

13   do not supply that evidence, as they at most require that, for some MLSs, the "[l]istings

14   obtained through IDX feeds … be displayed separately from listings obtained from other

15   sources."  Samuelson Decl. ¶ 64.  They say nothing about excluding non-MLS brokers, instead

16   merely specifying that "you can't put IDX listings in the same search results as non-IDX

17   listings," and leaving it "up to [Zillow] to figure out how [to] do that."  Ex. 4, 62:4-15; Ex. 11,

18   232:19-233:3.[6]

19                    **b.    REX cannot survive summary judgment based on**
                              **circumstantial evidence.**
20
21        REX's showing of a purported agreement thus hinges entirely on circumstantial

22   evidence.  To "survive summary judgment on the basis of circumstantial evidence," REX

23   [5] There is no requirement from NAR that MLSs adopt No-Commingling Rules; to the
     contrary, NAR's Model Rule (18.3.11) relating to commingling of listings is an optional rule
24   that MLSs can and do choose not to adopt.  *See* NAR Mot. for Summ. J. 11-13.

25   [6] Where Zillow made agreements only with individual MLSs, REX cannot claim agreement
     between Zillow and NAR based on the general relationships among Zillow, NAR, and MLSs
26   or by asserting that NAR and the MLSs are one and the same.  Ex. 24, 8-10.  Indeed, although
     REX's liability expert has advanced this theory of agreement, Ex. 18, ¶¶ 40-41, 227; Ex. 11,
27   210:19-213:5, whether there is an agreement is a legal question about which Evans has no
     expertise, Ex. 11, 213:6-17.
28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 10 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

"must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Stanislaus*, 803 F.3d at 1088 (citation omitted). To that end, if Zillow shows there is "a plausible and justifiable reason for its conduct that is consistent with proper business practice," then REX must "provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *Id.* at 1089 (citation omitted). The hundreds of thousands of pages of documents produced, over two dozen depositions taken, and hundreds of discovery responses served in this case confirm that Zillow acted independently and consistent with proper business justification. Nor has REX come forward with sufficient specific evidence that could require the contrary inference of conspiracy.

### (1) Zillow acted independently and consistent with proper business practice.

Zillow's conduct in this case—complying with the Rules imposed upon it by individual MLSs regarding the commingling of listings—was independent and consistent with proper business practice. There is no "conscious commitment to a common scheme designed to achieve an unlawful objective" where a party "merely agree[s] to purchase products or provide a service under conditions set by the other party." *Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 984 (9th Cir. 2001) (citation omitted). In those circumstances, the purchaser merely contracts to obtain "a product," and it still "act[s] independently" even if it "accept[s] the fact that" use of the product will be governed by the "rules and regulations" provided by the supplier. *Id.* The "acceptance of that part of the package provides ***no evidence*** of concerted action to restrain trade." *Id.* (emphasis added).

There can be no dispute that Zillow acted independently here. To the extent Zillow "accept[ed] the fact" that it had to comply with the various MLS rules prohibiting the commingling of data, it is undisputed that Zillow did so merely to comply with the "rules and regulations" imposed upon it by local MLSs on how to use their product, *i.e.*, listings data. *See* Samuelson Decl. ¶¶ 63-66; Ex. 5, 103:3-22. To that end, there is overwhelming evidence that Zillow's decision to switch to IDX feeds was driven by its desire to improve its listings

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:
2:21-CV-00312-TSZ

- 11 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
+1 206 839 4300

aggregation business, in terms of listings coverage, quality, timeliness, and security. *E.g.*, Ex. 3, 78:3-80:10; Ex. 25, ZG_00715918 ("We are doing Bookshelf for three reasons: improved customer experience through more listings coverage, long term ZOB cost savings and further business model iteration flexibility."); Ex. 5, 91:7-92:6 (stating that Bookshelf "was motivated by listings data quality"). Prior to the switch, Zillow "did not have 100 percent coverage," lacked "key fields which consumers were interested in," experienced "delayed" listings, and faced the concern that MLSs could pull their listings entirely. Ex. 3, 78:3-80:10. There is no evidence that Zillow agreed to comply with the individual MLSs' No-Commingling Rules out of a desire to exclude REX, or any other non-MLS discount brokers.

The evidence further reflects that Zillow independently determined how to comply with the individual MLS rules. Zillow unilaterally adopted a two-tab website design that Zillow could use throughout the country. Thomas Decl. ¶¶ 14-17; Samuelson Decl. ¶ 67. There is no evidence that NAR provided any input whatsoever on Zillow's website design change. *See* Ex. 26, NAR0031149. It also is undisputed that "[t]here were no changes made to the design of the two-tab display based on … MLS feedback." Ex. 6, 25:3-18; Ex. 12, 28:10-29:5. In direct contrast to any claim of a conspiracy to exclude REX, Zillow—unlike other MLS-affiliated data aggregators like Redfin and Realtor.com—spent over a year and ███████████ redesigning its website in a manner that *continued to include non-MLS listings*, *including those of REX*. Samuelson Decl. ¶¶ 64, 67; Ex. 1, 384:7-385:13. Far from desiring to exclude non-MLS listings, Zillow repeatedly has asked NAR to adopt a mandatory rule requiring MLSs to permit commingling of listings from all sources. Ex. 4, 264:15-266:15.

**(2)     REX has no evidence to exclude the possibility that Zillow acted independently or with proper business practice.**

Because Zillow has established that its conduct was independent and consistent with proper business practice, REX is obligated to come forward with "specific evidence tending to show that [Zillow] was not engaging in permissible competitive behavior." *Stanislaus*, 803 F.3d at 1089. REX cannot show merely that Zillow's "decision … was consistent with the

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 12 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1    purpose of the [alleged] group boycott," as that "does not tend to exclude the possibility that it

2    was made independent of the group boycott." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806

3    F.3d 835, 846 (5th Cir. 2015).  Instead, for "an inference of conspiracy" to "be reasonable,"

4    REX must point to "sufficient other 'plus' factors," *In re Citric Acid Litig.*, 191 F.3d 1090,

5    1102 (9th Cir. 1999), which are "economic actions and outcomes that are largely inconsistent

6    with unilateral conduct but largely consistent with explicitly coordinated action."  *In re*

7    *Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015).  REX

8    cannot establish any of the usual plus factors here.

9         ***Interfirm Communications***.  REX has no evidence of "[i]nterfirm communications,

10    particularly among high-level executives … that [could] bolster the inference of conspiracy."

11    *Stanislaus*, 803 F.3d at 1092-93.  There was no communication between Zillow and NAR

12    about Zillow's decision to join individual MLSs and redesign its website until the same day it

13    was announced to the rest of the world. Ex. 3, 14:3-14; Ex. 26, NAR0031149 (███████

14    ████████████████████████████████████████████████████); Ex.

15    9, 275:1-16.  None of the communications between Zillow and the local MLSs ***after*** Zillow's

16    public announcement, to certify with those local MLSs that Zillow's redesigned website

17    complied with their individually imposed rules, can support any inference of an agreement to

18    exclude non-MLS brokers because Zillow did not make any changes to its two-tab design

19    structure, or its labeling, in response to such communications. Ex. 6, 25:3-18.  Thus, these

20    "communications" do not "go beyond the 'standard fare' of business and trade-association

21    practice."  *Honey Bum*, 63 F.4th at 823.

22         ***Economic Motivation***.  Nor can REX demonstrate that "the alleged conspirators would

23    have had a rational motivation to conspire." *Stanislaus*, 803 F.3d 1090.  To the contrary, the

24    conspiracy REX alleges would "make little economic sense" for Zillow to join, *id.*, because, as

25    a data aggregator, Zillow would want as many listings as possible, as REX's economic expert

26    concedes.  Ex. 18, ¶ 253; *see* Ex. 8, 234:23-235:8 ("We want all the listings.  Come one, come

27    all, no matter what.").  That's why Zillow, unlike other listings aggregators who comply with

28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                         - 13 -
2:21-CV-00312-TSZ

1  individual MLS No-Commingling Rules by *excluding* non-MLS listings entirely, remained

2  committed to keeping as many listings on Zillow's websites as possible, spending considerable

3  sums to achieve that result.  Samuelson Decl. ¶¶ 64, 67; Ex. 4, 153:6-21; Ex. 1, 384:7-385:13.

4  Having made every effort to avoid excluding listings from its website, it would make no sense

5  for Zillow to enter an anticompetitive agreement to exclude those listings.

### 2.     REX has failed to establish harm to competition.

7         REX must also establish that the purported "agreement was in unreasonable restraint of

8  trade."  *FTC v. Qualcomm*, 969 F.3d 974, 989 (9th Cir. 2020).  REX's claim must be analyzed

9  under the rule of reason, MTD Order 9-10, where REX must "prove that the challenged

10  restraint has a substantial anticompetitive effect that harms consumers in the relevant market."

11  *Qualcomm*, 969 F.3d at 991 (citation omitted).  REX cannot make that showing here.

### a.     REX's claim of harm fails where REX always remained on Zillow and could otherwise access potential buyers.

13         REX claims that it has been harmed because it, and other non-MLS entities, have been

14  denied "effective access to internet residential real estate aggregator sites, which are a

15  critically important input to effectively compete in the provision of residential real estate

16  brokerage services."  FAC ¶¶ 126-128, 139-140.  In other Section 1 contexts, an

17  "arrangement" is unlawful under the "rule of reason … only if its effect is to 'foreclose

18  competition in a substantial share' of the 'relevant market.'"  *Allied Orthopedic Appliances*

19  *Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).  A "'Substantial Share'

20  has been quantified as foreclosure of 40% to 50% of the relevant market," *Feitelson v. Google,*

21  *Inc.*, 80 F. Supp. 3d 1019, 1030 (N.D. Cal. 2015), where "foreclosure levels are unlikely to be

22  of concern where they are less than 30 or 40 (or 40 to 50) percent of the relevant market."

23  *Eastman v. Quest Diagnostics Inc.*, No. 15-cv-00415, 2015 WL 7566805, at *11 (N.D. Cal.

24  Nov. 25, 2015); *accord* Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 1821b-c

25  (2023).

26         Here, REX cannot claim that it was excluded by Zillow's redesigned website.  First, it

27  is undisputed that ***REX's listings always remained on Zillow's website***, even after Zillow

28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 14 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

switched to IDX feeds.  At a minimum, REX listings were placed on the "Other listings" tab,
which was "less than an inch" and only "one click" away from the default tab for consumers to
access.  Ex. 1, 73:24-75:4, 84:11-13.  Indeed, "serious buyers" would visit the "Other listings"
tab. Ex. 4, 106:1-17; *see* Ex. 17, 193:3-196:4.  REX's listings were also displayed on the
"Agent listings" tab by (1) ████████████████████████████████████████████
████████████, Ex. 14, 139:21-140:3, 295:3-14; Ex. 1, 161:8-11, or by (2) ████
████████████████████████████████████████████████████████, Ex. 14,
170:2-5; Ex. 1, 236:22-237:7.  REX simply cannot plausibly claim that consumers could not
access its listings on Zillow.

Second, REX cannot show it has been "prohibited from advertising … outside" of
Zillow, or that Zillow "users are prohibited from viewing" REX "advertisements … on other
websites."  *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1079 (S.D. Cal.
2012).  Even "if 67% of U.S. home buyers use Zillow today," that does not mean that 67% of
buyers use **only** Zillow:  Rather, "there's considerable audience overlap between people who
use Zillow and people who also use … other sites." Ex. 3, 86:4-87:3.  It is undisputed that
REX marketed homes on its own website, and "████████████████████████████████"
including "████████████████████████████████████" Ex. 16, ¶¶ 48-50 & n.109
(collecting REX sources); Ex. 14, 57:17-21, 74:3-20, 79:20-80:12, 88:4-22; Ex. 17, 57:19-
59:13.  Indeed, ████████████████████████████████████████████████████
████████████████  Ex. 14, 74:10-20, 85:1-12.  For this reason, ████████████████
████████████████████████████████████████████████████████████
████████████  *See* Ex. 27, 141:11-143:15.

        **b.**     **REX has no evidence that complying with the No-Commingling Rules imposed by various MLSs harms competition beyond REX.**

In any event, REX could not possibly show the requisite harm to competition by
pointing only to its own exclusion because "[t]he elimination of a single competitor, without
more, does not prove anticompetitive effect."  *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802,

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                           - 15 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1  812 (9th Cir. 1988).  REX's liability expert never even attempts to determine whether REX

2  had an impact on the market at any point.  Ex. 11, 84:6-85:19, 90:9-16.  And there is nothing

3  to suggest that REX's broader claim—that the No-Commingling Rules effectively keeps

4  discount brokers, in general, out of the relevant market, Ex. 18, ¶¶ 442-445—is true.  There is

5  nothing about the No-Commingling Rules that operate to exclude discount brokers, as

6  demonstrated by the presence of the many other discount brokers—like Redfin and Homie—

7  remaining in the market.  Ex. 15, ¶ 151.  In fact, REX has acknowledged that there are

8  discount brokerages in every part of the country where REX operated.  Ex. 1, 172:18-173:18.[7]

9  **B.    REX lacks evidence to establish its Lanham Act claim (Count II).**

10  For there to be liability under the Lanham Act, there must be a false statement of fact

11  that, among other things, is "in a commercial advertisement about [defendant's] own or

12  another's product" and causes injury to the plaintiff "as a result."  *Southland Sod Farms v.*

13  *Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

14  REX cannot make that showing here.  REX's false advertising claim challenges the

15  labels Zillow gave to the tabs on its redesigned website—with REX alleging that "Other

16  listings" (which describes a category of listings that contains, among other things, REX's

17  listings) is misleading or deceptive when juxtaposed to the label "Agent listings" (which

18  describes a separate category of listings sourced from MLSs).  FAC ¶ 145; MTD Order 20-21.

19  But those labels were not used by Zillow in any commercial advertisement or promotion.

20  Moreover, REX also cannot show that it was injured *as a result of* those labels, let alone

21  establish damages tabulating any such harm.

22  **1.    The challenged statement is not in commercial advertising or**
      **promotion.**

23  For a statement to be actionable under the Lanham Act, the statement must "constitute

24  'commercial advertising or promotion.'"  *Prager Univ. v. Google LLC*, 951 F.3d 991, 999 (9th

25

26  ───────────────────

[7] There is yet another reason why REX has failed to show harm to competition.  As explained

27  in Zillow's separate *Daubert* motion seeking to exclude a portion of Dr. Evans' analysis (at
   § IV.A), Dr. Evans' report depends on a theory of harm that is not the liability claim at issue in

28  this case.

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                        - 16 -
2:21-CV-00312-TSZ

1    Cir. 2020); *see* 15 U.S.C. § 1125(a)(1)(B).  REX must establish, among other things, that

2    Zillow's labeling is "commercial speech" made "for the purpose of influencing consumers to

3    buy defendant's goods or services."  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115

4    (9th Cir. 2021).

5           REX has failed to satisfy this requirement.  REX has been unable to develop evidence

6    substantiating its allegations, which this Court had to accept as true at the Rule 12(b)(6) stage,

7    that "Zillow adopted the misleading labeling system for the purpose of influencing its

8    customers to use the Zillow Offers business, as well as the services of other MLS agents."

9    MTD Order 21.  REX has no evidence that Zillow Offers, which has since ceased operations,

10   Ex. 3, 58:18-59:5, played any role in the selection of the labels.  Nor has REX even attempted

11   to show that Zillow, in selecting these labels, was "acting as agents of [other MLS agents] and

12   therefore had a vested interest in the goods that [they] sold."  *Ariix*, 985 F.3d at 1120 n.10.

13   The undisputed evidence reflects that, when it came to the design of the two-tab labeling

14   system, the MLS agents had no input.  *See supra* at 12-13.

15          More fundamentally, REX cannot show that labels like these are designed to influence

16   consumers because they merely describe a user tool.  The Ninth Circuit has made clear that

17   statements "made to explain a user tool" are "not for a promotional purpose to 'penetrate the

18   relevant market' of the viewing public," and therefore do not "constitute 'commercial

19   advertising or promotion' as the Lanham Act requires."  *Prager*, 951 F.3d at 999-1000

20   (citation omitted); *see also Newman v. Google LLC*, No. 20-cv-04011, 2021 WL 2633423, at

21   *11-12 (N.D. Cal. June 25, 2021) (statement that a "video is unavailable with Restricted Mode

22   enabled" was not actionable because it "simply explain[ed] … the nature of the Restricted

23   Mode tool"); *Maffick LLC v. Facebook*, Inc. No. 20-cv-05222, 2021 WL 1893074, at *4 (N.D.

24   Cal. May 11, 2021) (same with respect to "Russia state-controlled media" label).

25          *Prager* resolves this case.  In *Prager*, a plaintiff challenged YouTube's decision to

26   designate and label several dozen of its videos as "appropriate" only for "Restricted Mode,"

27   which "makes unavailable certain age-inappropriate content."  951 F.3d at 996.  As in this

28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                            - 17 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

case, the plaintiff contended that the designation of its videos for that mode, as signaled by labeling as "unavailable with Restricted Mode enabled," amounted to false advertising under the Lanham Act, on the theory that the public would be deceived about "the nature of [its] videos." *Id.* at 999-1000. The Ninth Circuit rejected that theory of liability because "the designation of certain … videos for Restricted Mode" and the label that the "video is 'unavailable with Restricted mode enabled'" were not "part of an advertising or promotion." *Id.* at 996, 999-1000. Rather, any "representations related to Restricted Mode were made to explain a user tool," and were "not for a promotional purpose." *Id.* at 1000.

So too here. REX's challenge to the allegedly "deceptive labeling system" on Zillow's website, FAC ¶ 152, is nothing more than a challenge to language explaining a tool that helps users navigate its website. Tabs are one of many available "Zillow search tools" that allow "users [to] identify property listings in which they may be interested." Thomas Decl. ¶¶ 7-9. Just as Zillow had "search tools" that would allow users to "search by other criteria, such as lot size, square footage, and more," Thomas Decl. ¶ 7; Ex. 1, 76:14-77:9, 265:22-266:11, the "toggle, or two-tab approach, to transition between MLS and non-MLS listings" is just another tool used to move around Zillow's platforms, Thomas Decl. ¶¶ 6 & n.3, 18. Indeed, "tabs are a navigation element used in web design that allow users to easily access different areas of a website," Thomas Decl. ¶ 6 n.3, and were chosen by Zillow over other tools, like radio buttons or filters, to ensure that, from a users' perspective, the "second tab" would be just "one click away," Ex. 6, 73:15-24. Zillow provided labels for these navigational tools and created an FAQ page designed to explain what those navigational labels meant. Thomas Decl. ¶¶ 19, 24-25.

### 2.    REX has not presented evidence of any concrete injury proximately caused by Zillow's use of the label "Other listings."

Even if REX could show that Zillow's labels are a false statement made in commercial advertising or promotion, which it cannot, REX must then show that it "has been or is likely to be injured *as a result of the false statement*" it challenges. *Southland Sod.*, 108 F.3d at 1139 (emphasis added); *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir.

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 18 -
  2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1989) ("[A]ctual evidence of some injury *resulting from the deception* is an essential element of the plaintiff's case.").  Summary judgment is proper where, as here, "the plaintiff 'fail[s] to present any evidence of injury *resulting from* defendants' deception."  *VBS Distrib., Inc. v. Nutrivita Lab'ys, Inc.*, 811 F. App'x 1005, 1007 (9th Cir. 2020) (emphasis added) (citation omitted); *see Universal Life Church Monastery Storehouse v. King*, No. 19-cv-00301, 2023 WL 1928169, at *1-2 (W.D. Wash. Feb. 10, 2023).

The undisputed record establishes that REX has not, and cannot, show that any harm resulted from Zillow's use of the label "Other listing."  REX has no concrete way to identify whether it was harmed by the labels used on Zillow's display.  Ex. 14, 218:24-220:24.  Rather, there could be no basis for such a claim because, as REX's witnesses explained, it would be "complete conjecture" to determine whether, and to what extent, the labels—as opposed to the existence of the tabs—caused REX's alleged harm.  Ex. 28, 68:17-69:9; Ex. 14, 219:5-220:24.  In fact, REX's own consumer behavior expert testified that the alleged harm was more likely to be a result of REX's placement on a non-default tab, not the naming of Zillow's labels.  Ex. 29, 18-19 ("Zillow's decision *not* to place REX listings on the default tab had a far greater prejudicial impact on REX than Zillow's decision of how to label the second tab."); Ex. 28, 71:3-22.

Simply put, there is no evidence that REX's alleged injuries resulted specifically from Zillow's labeling, as opposed to the alleged harm more generally caused by Zillow's two-tab website design.  *Newman*, 2021 WL 2633423, at *12 (harms that "flow from … the unavailability" of plaintiff's product are not injuries resulting from the "allegedly false statements").  REX's failure to provide non-speculative evidence that, but for Zillow's allegedly deceptive statements it would not have suffered any harm, is fatal to its claim.  *See VBS Distrib.*, 811 F. App'x at 1007 (evidence claiming harm is insufficient where it is "not specific to the … statement" at issue in the case and instead "refers collectively to various allegedly false statements, most of which are no longer at issue in this case"); *ThermoLife Int'l*

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:
2:21-CV-00312-TSZ

- 19 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

*LLC v. BPI Sports, LLC*, No. 21-15339, 2022 WL 612669, at *2 (9th Cir. Mar. 2, 2022) (rejecting claim where "allegations" were "too speculative to establish proximate causation").

### 3. REX has no evidence from which a jury could award damages under the Lanham Act.

REX also has no evidence to support its request for monetary relief on its Lanham Act claim. Under § 1117(a), REX may recover "(1) defendant's profits" or "(2) any damages sustained by the plaintiff," 15 U.S.C. § 1117(a), so long as the injury plaintiff claims is "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014).

REX has failed to offer any evidence of damages that could support its claim for relief. As this Court has already recognized, Ex. 23, 75:13-18, REX's expert economist opted not to calculate a traditional lost profits metric.[8]  Nor could he, as Dr. Evans admitted that "████ ██████████████████████████████████████████████████████████████████." Ex. 18, ¶ 485 n.474. Instead, he claimed REX's "████████████████████████████████ ███████████████████████████████," where the calculated figure estimates "████████████████." Ex. 18, ¶ 485 & n.475 (emphasis added). But future profits do not represent actual lost profits, and it is not clear that Dr. Evans' esoteric measure of damages represents an "injury to a commercial interest in sales or business reputation." *Lexmark*, 572 U.S. at 140.

In any event, Dr. Evans' assessment further fails because he has not offered any basis from which a jury could find these "damages were attributable to" Zillow's use of the label "Other listings," and not "any number of economic or other causes" for which REX cannot recover. *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. C10-861, 2015 WL 3407882, at *6-7 (W.D. Wash. May 27, 2015). To the contrary, Dr. Evans at most accounts for REX's claim

---

[8] REX's chosen measure of damages is not among those normally recovered under the Lanham Act. *McCarthy on Trademarks and Unfair Competition* § 27:43 (5th ed.) (referencing (1) damage to good will; (2) profits lost by plaintiff; (3) defendant's profits; and (4) corrective advertising).

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:
2:21-CV-00312-TSZ

- 20 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
+1 206 839 4300

that "Zillow's two-tab display violated the Lanham Act," without zeroing in on the challenged labels. Ex. 18, ¶ 485 n.473. Indeed, Dr. Evans wrongly focuses on the combined effect of the two-tab display—and not just the harms attributable to the labeling of the tabs—precisely because he failed to distinguish between the harms relevant to REX's false advertising claim and those relevant to its antitrust claim. Ex. 18, ¶ 485 & n.473. That flaw was fatal because at least some of the claimed anticompetitive harm—reduced visibility of REX listings from the existence of two tabs, FAC ¶ 140; Ex. 18, ¶¶ 261-265, 410-412—is categorically irrelevant under the Lanham Act. *See Newman*, 2021 WL 2633423, at *12.

Accordingly, on this record, "[t]he jury would have no way to find that [REX's] damages were attributable" to Zillow's allegedly misleading statements, and thus "would be forced to award wholly speculative relief, which … the finder of fact is not permitted to do." *Cascade Yarns*, 2015 WL 3407882, at *7. Because there is no "way to determine with any degree of certainty what award would be compensatory," *TrafficSchool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820, 831 (9th Cir. 2011), "any award would constitute an impermissible penalty rather than compensation," and it is therefore "appropriate to preclude [REX]'s Lanham Act claim from going to the jury." *Cascade Yarns*, 2015 WL 3407882, at *7.[9]

**C.    REX lacks evidence to establish its WCPA claims (Counts IV & VI).**

REX brings two claims against Zillow under the WCPA. FAC ¶¶ 163-178 (Count IV); FAC ¶¶ 189-201 (Count VI). REX has failed to offer evidence establishing essential elements of each.

**1.    REX's false advertising claim under Count IV fails for the same reasons as its Lanham Act claim and because REX has failed to establish trade or commerce.**

REX's Count IV WCPA claim, like its Lanham Act claim, challenges Zillow's use of the label "Other listings." FAC ¶ 170. REX's claim fails because it cannot show the label is

---

[9] REX's request for injunctive relief also must fail because it is undisputed that REX is no longer listing properties, and thus lacks Article III standing to seek prospective relief. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018); *A White & Yellow Cab, Inc. v. Uber Techs.*, No. 15-cv-05163, 2017 WL 1208384, at *5 (N.D. Cal. Mar. 31, 2017) (company "no longer in business" lacks standing to pursue injunctive relief).

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 21 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

"an unfair or deceptive practice" that caused "injury to" REX's "business or property" or "occur[red] in trade or commerce." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009).

For the same reasons REX failed to establish causation and damages with respect to its Lanham Act claim, REX has failed to make that showing under the WCPA. A "failure to support a Lanham Act claim should lead to the ***automatic failure*** of the state law claims of unfair competition … under the CPA." *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, 905 F. Supp. 2d 1235, 1251 (W.D. Wash. 2012) (emphasis added).

The challenged labels also do not occur "in trade or commerce." Because Zillow's labels tell users how to navigate its listings, they are not part of the "sale of assets or services." *Browne v. Avvo Inc.*, 525 F. Supp. 2d 1249, 1254 (W.D. Wash. 2007). Rather, these aspects of Zillow's website are akin to the features of other "information clearinghouse[s]" that courts have found not to constitute "trade or commerce" under the WCPA. *Id.* (attorney listings website not considered commerce). As in *Browne*, Zillow operates a service that "collects data" on a product—houses—and "provides both the underlying data" and the listings to "consumers free of charge." *Id.* And Zillow "do[es] not accept payment for the inclusion of [listings] on [its] website." *Id.* Accordingly, labels relating to Zillow's "publication of information … based on available data" are "not 'trade or commerce' and cannot form the basis of a CPA claim." *Id.*

## 2. REX's antitrust claim under Count VI fails for the same reasons as its federal antitrust claim.

REX has affirmatively conceded that there is no difference between its federal and state antitrust claims and that they are governed by the same standards. Ex. 23, 7:11-8:4; *see* FAC ¶¶ 198-199. Accordingly, for the same reasons that REX's federal antitrust claim fails, this Court should also reject REX's state law antitrust claim. *See PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178 (W.D. Wash. 2021) ("The Court's analysis of [plaintiff's] federal antitrust claims extends to its state law claims under the WCPA, which are patterned after Sections 1 and 2 of the Sherman Antitrust Act.").

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 22 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
+1 206 839 4300

1

**D.    REX lacks evidence to establish its Defamation claim (Count VII).**

2     REX's defamation claim is that the "description of REX-listed homes as 'Other

3  Listings' … harms REX's reputation."  FAC ¶ 214.  To prevail on that claim, REX must show,

4  among other things, that Zillow's "statement proximately caused damages."  *Alpine Indus.*

5  *Computers, Inc. v. Cowles Publ'g Co.*, 114 Wn. App. 371, 378, 57 P.3d 1178 (2002).

6     As with REX's Lanham Act claim, REX's "inability to prove damages" means that

7  "the defamation claim fails as a whole."  *Smith v. Markgraf*, No. 78948-1, 2019 WL 6699972,

8  at *4-5 (Wash. Ct. App. Dec. 9, 2019); *Reykdal v. Espinoza*, 196 Wn.2d 458, 466, 473 P.3d

9  1221 (2020).  REX has not even attempted to calculate damages for its defamation claim.

10  Although Dr. Evans offered a calculation of damages for REX's "antitrust claim" and "the

11  Lanham Act and the analogous state consumer protection act," his report is entirely devoid of

12  any mention of the defamation claim or the calculation of reputational damages.  Ex. 18, ¶ 485

13  & n.473; *contra* Ex. 30, 8 (indicating REX's experts would calculate reputational damages for

14  defamation).  Accordingly, REX's defamation claim "fails as a matter of law."  *Schmidt v.*

15  *Tacoma Police Dep't*, No. C09-5135, 2010 WL 5071309, at *6 (W.D. Wash. Dec. 6, 2010)

16  (granting summary judgment where plaintiff "has not established that the alleged statement …

17  caused damages").

18  **V.    CONCLUSION**

19     Zillow respectfully requests that this Court grant Zillow's motion for summary

20  judgment on all of REX's claims.

21

22

23

24

25

26

27

28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:                    - 23 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATION**:

   I certify that this memorandum contains 8,351 words, in compliance with the Local Civil Rules.

   Respectfully submitted this 8th day of June 2023.

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:   - 24 -
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1    Dated: June 8, 2023              By:    */s/ Aravind Swaminathan*

2

ORRICK, HERRINGTON & SUTCLIFFE LLP
3                           Aravind Swaminathan (WSBA No. 33883)
aswaminathan@orrick.com
Nicole Tadano (WSBA No. 40531)
4                           ntadano@orrick.com
401 Union Street, Suite 3300
5                           Seattle, WA  98101
Telephone:  206-839-4300
6                           Facsimile:  206-839-4301

7

Laura Najemy (Admitted *Pro Hac Vice*)
8                           lnajemy@orrick.com
222 Berkeley Street
Suite 2000
9                           Boston, MA 02116
Telephone: 617-880-1800
10

Paul Stancil (Admitted *Pro Hac Vice*)
11                         pstancil@orrick.com
609 Main Street
12                         40th Floor
Houston, TX 77002
13                         Telephone:  713-658-6446

14

DECHERT LLP
15                         John "Jay" Jurata, Jr. (Admitted *Pro Hac Vice*)
jay.jurata@dechert.com
16                         Erica Fruiterman (*Pro Hac Vice* Forthcoming)
erica.fruiterman@dechert.com
17                         1900 K Street, N.W.
Washington, DC  20006
18                         Telephone:  202-261-3440

19

Russell P. Cohen (Admitted *Pro Hac Vice*)
20                         russ.cohen@dechert.com
One Bush Street, Suite 1600
21                         San Francisco, CA 94104
Telephone:  415-262-4506

22

***Attorneys for Defendants Zillow, Inc., Zillow***
23                         ***Group, Inc., Zillow Homes, Inc., Zillow Listing***
***Services, Inc., and Trulia, LLC***

24

25

26

27

28

ZILLOW DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT:          - 25 -
2:21-CV-00312-TSZ