THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| REX – REAL ESTATE EXCHANGE, INC., | Case No. 2:21-cv-00312-TSZ |
| Plaintiff, | **OPPOSITION TO NAR'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| ZILLOW, INC., et al. | NOTE ON MOTION CALENDAR: June 30, 2023 |
| Defendants. | ORAL ARGUMENT REQUESTED |

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1

2

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION.............................................................................................. 1

FACTS ................................................................................................................. 2

    I.     NAR Regulates the MLSs ............................................................ 2

    II.    Zillow Did Not Independently Decide How to Design Its Search Results Page ................................................................................ 5

    III.   REX Was a Unique Competitor ................................................ 6

    IV.   But For Zillow and NAR's Agreement REX Would Have Thrived ........... 8

ARGUMENT ...................................................................................................... 8

    I.     REX has Direct Evidence of an Agreement in Violation of the Sherman Act .................................................................................... 8

        A.    NAR's Members Promulgated An Anticompetitive Agreement Through NAR........................................................... 9

        B.    The Segregation Rule is An Anticompetitive Agreement............. 10

        C.    Zillow Publicly Announced It was Joining NAR and so Joining the Anticompetitive Agreement ....................................... 11

        D.    Zillow's Actions, Both Before and After the Display Change, Confirm the Agreement.................................................... 14

    II.    The Fact that the Segregation Rule is Optional Does Not Immunize Defendants' Conduct ................................................................... 15

        A.    DOJ's case against NAR's VOW policy..................................... 16

        B.    This Court's Ruling on Defendants' Motion to Dismiss............... 18

    III.   The Segregation Rule Has a Significant Adverse Impact on Competition ................................................................................ 19

    IV.   REX Suffered Antitrust Injury and Has Antitrust Standing..................... 23

CONCLUSION ................................................................................................... 23

CERTIFICATE OF SERVICE.............................................................................. 25

OPPOSITION TO NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ

i

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1

## TABLE OF AUTHORITIES

2

Page(s)

<u>**Cases**</u>

3

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
  486 U.S. at 501 (1988) ................................................................. 19

4

5

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,*
  456 U.S. 556 (1982) ..................................................................... 19

6

7

*Associated Press v. United States,*
  326 U.S. 1 (1945) ..................................................................... 9, 18

8

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.,*
  485 U.S. 717 (1988) ................................................................ 16, 17

9

10

*Cnty of Toulumne v. Sonora Community Hospital,*
  236 F.3d 1148 (9th Cir. 2001) ...................................................... 10

11

12

*ECOS Elecs. Corp. v. Underwriters Labs.,*
  743 F.2d 498 (7th Cir. 1984) ........................................................ 19

13

*Epic Games, Inc. v. Apple, Inc.,*
  67 F.4th 946 (9th Cir. 2023) .............................................. 20, 21, 22

14

15

*Evergreen Partnering v. Pactiv Corp.,*
  832 F.3d 1 (1st Cir. 2016) ............................................................ 10

16

17

*Fla v. Hollywood Foreign Press Association,*
  55 F.4th 680 (9th Cir 2022) .......................................................... 23

18

*Hollywood Foreign Press Association,*
  55 F.4th 680 (9th Cir 2022) .......................................................... 23

19

20

*In re Citric Acid Litigation,*
  191 F.3d 1090 (9th Cir. 1999) ...................................................... 14

21

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.,*
  647 F.Supp.2d 1250 (W.D. Wash. 2009) ...................................... 13

22

23

*Indian Head Inc. v. Allied Tube & Conduit Corp.,*
  816 F.2d  (2d Cir. 1987) .............................................................. 19

24

25

*Interstate Circuit v. U.S.,*
  306 U.S. 208 (1939) ................................................................ 12, 13

26

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
  465 U.S. 752 (1984) ..................................................................... 13

27

28

*Moore v. James H. Matthews & Co.,*
  473 F.2d 328 (9th Cir. 1972) ........................................................ 12

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ                    ii

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

*National Soc'y of Prof'lEng'rs v. United States*,
    435 U.S. 679 (1978) .................................................................. 9, 16, 17

*O.M by and through Moultrie v. National Women's Soccer, LLC*,
    541 F.Supp. 3d 1171 (D.Or. 2021) ........................................................ 10

*Ohio v. Am. Ex*press Co. ("Amex"),
    138 S. Ct. 2274 (2018) .................................................................. 20, 21

*Paladin Associates, Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ............................................................. 13

*PLS.Com, LLC v. National Association of Realtors*,
    32 F.4th 824, (9th Cir. 2022) ..................................................... 12, 13, 20

*Radiant Burners Inc. v. Peoples Gas Light & Coke Co.*,
    364 U.S. 656 (1961) ....................................................................... 19

*Realcomp II, Ltd. v. F.T.C.*,
    635 F.3d 815 (2011) ........................................................................ 23

*Richards v. Neilsen Freight Lines*,
    810 F.2d 898 (9th Cir.1987) ............................................................... 14

*Todorov v. DCH HealthCare Authority*,
    921 F.2d 1438 (11th Cir. 1991) ............................................................ 10

*Toscano v. Professional Golfers Association*,
    258 F.3d 978 (9th Cir. 2001) ............................................................... 9

*United States v. American Tobacco Co.*,
    221 U.S. 106 (1911) ................................................................... 16, 17

*United States v. NAR*,
    2006 WL 3434263 (Nov. 27, 2006) .................................................. 16, 17, 18

*United States v. Realty Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir.1980) .............................................................. 18

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ          iii

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1

## INTRODUCTION

2    In 2021, when Zillow decided to join NAR and implemented its two-tab display in

3 order to comply with and enforce NAR's Model Rule, 18.3.11 (the "Segregation Rule"),

4 REX was in its seventh year.  Its market was the residential real estate brokerage industry.

5 Its business model was that of a disruptor – a low-cost, internet-based brokerage that was

6 successfully offering consumers an alternative means of buying and selling houses, which

7 reduced and often eliminated "buy-side" commissions by operating outside of the NAR

8 MLSs.[1]

9    REX's approach was unique – no other broker was attacking the problem of supra-

10 competitive commissions by seeking to eliminate "buyer-broker" commissions. REX was

11 doing so from outside the NAR MLS system as that was the only way to escape NAR rules,

12 including the Buyer Broker Commission Rule ("BBCR").[2]  REX's business model offered

13 consumers meaningful savings: a 5.0% commission on a $500,000 house is $25,000 but a

14 REX customer who paid the same seller agent fee could reasonably expect to save at least

15 $12,500 if no buyer-agent participated in the transaction. REX's success would have

16 encouraged existing discount brokers to reconfigure their business models and spurred new

17 low-cost commission entrants to copy REX's business model.  Consumers, the housing

18 market, and even the national economy would have benefitted had REX not been forced out

19 of business by Defendants' wrongful conduct.

20    Contrary to NAR's contention, REX has direct and circumstantial evidence of an

21 agreement between NAR and Zillow to exclude competition from non-MLS entrants by

22 enforcing the Segregation Rule. Unlike the usual conspiracy case, Zillow and NAR did

23 nothing to hide their agreement. Zillow announced it publicly on September 20, 2020,

24 trumpeting to NAR agents and brokers that it would proceed  "while locking our arms with

25

26

27

28

[1] Ex.26, '849; Ex.27 '623; Ex.28. Numbered exhibit citations refer to exhibits previously filed in support of REX's Motion for Partial Summary Judgment (Dkt. 332)
[2] Ex.A '831.  Lettered exhibits refer to new exhibits filed in support of this Opposition.

OPPOSITION TO NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ          1

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1  like-minded partners such as you" and also telling them that "[n]ow, as MLS participants,
2  no longer a third party, we'll be shoulder to shoulder with you."[3]

3          Between September 2020 and January 2021, Zillow honed its plans to take its new
4  website live. Among the steps, it had its employees join NAR and the NAR MLSs and
5  consulted with NAR and its MLSs to ensure that Zillow's new website conformed to the
6  Segregation rule. Zillow also allowed NAR to referee disputes between Zillow and various
7  MLSs concerning its compliance with the Segregation Rule.

8          Zillow knew that separating listings in accordance with the Segregation Rule would
9  produce a poor user experience and that low-cost digital brokers, such as REX likely would
10  fail due to the display change. Its own employees labelled the Segregation Rule anti-
11  consumer and anti-competitive. Therefore, after Zillow went live with its new display,
12  Zillow, now a NAR member, sought to free itself of the constraints of the Segregation Rule
13  by petitioning NAR at least twice to eliminate it. By doing so, Zillow underscored that it was
14  against Zillow's independent interest, as an aggregator, to agree to the Segregation Rule in
15  the first place.

16          As demonstrated below, the facts and law do not support NAR's motion. At a bare
17  minimum, NAR's arguments rest on disputed issues of material fact and its motion should
18  be denied.

19                                      **FACTS**

20          Numerous critical material facts are in dispute, or have been mischaracterized or
21  omitted by NAR.

22  **I.      NAR Regulates the MLSs**

23          NAR notes that it is a trade association that publishes the Handbook on Multiple
24  Listing Policy, which "is intended to guide member associations of REALTORS® in the
25  operation of multiple listing services consistent with the policies established by the National
26
27
28  ───────────────
[3]https://www.youtube.com/watch?v=EMidklRVFMM          at          00:20          ("Zillow's
Announcement").

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ                    2

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1  Association's Board of Directors."[4] The Handbook, though, is not a mere "guide."[5] NAR

2  associations and the NAR MLSs agree to be bound by NAR's policies and rules.[6] This

3  includes adopting all mandatory NAR rules and policies and refraining from adopting any

4  contradictory rule or policy.[7]  NAR's members are authorized to use NAR's REALTOR®

5  trademark and the MLSs are authorized to use NAR's service mark.[8]  But their use must

6  comply with NAR policies and rules.[9]  NAR MLSs that fail to conform to NAR's

7  requirements are subject to charter revocation and loss of NAR's insurance coverage.[10]

8  NAR members who fail to adhere to NAR's MLS policy and rules are subject to expulsion

9  from the MLS and, importantly, loss of access to IDX feeds.[11]  For all intents and purposes,

10  NAR, its member associations and the NAR MLSs are functionally aligned in pursuit of

11  common economic interests.[12]

12       NAR relies heavily on the fact that NAR labels the Segregation Rule "Optional."

13  But the "optional" rule has been adopted by 71% of NAR MLSs.[13] But for Zillow's

14  agreement to enforce the Segregation Rule, Zillow could not reliably obtain IDX listings

15  data from the NAR MLSs.[14] Accordingly, it is immaterial here that neither CRMLS nor

16  REColorado currently enforce the Segregation Rule – Zillow had to adhere to the rule

---

[4] Mot. 4 (quoting Ex.B to Mot. at '836).

[5]                                                                    Ex.8.

[6] Ex.B '856

[7] Ex.B, '856.

[8] Ex.C, '411.

[9] Ex.B, '895

[10] https://www.nar.realtor/about-nar/policies/charter-revocation-procedure ("NAR's Bylaws prohibit state and local associations from adopting any rule, regulation, practice or policy inconsistent with, or contrary to, any policy adopted by the NAR Board of Directors."); Ex.1 (NAR requiring certification of compliance in order to maintain insurance coverage).

[11] Ex.B, '856; Ex.14, 122:8-23; Ex.D

[12] Ex.C, '411.

[13] Ex.12; Ex.E, '918

[14] See Ex.2, ¶29 & 74; Ex.F, '555; Ex.G

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ                    3

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1    because the vast majority of NAR MLSs had adopted and enforce it.[15]  Nor is there any

2    evidence that the MLSs would have adopted the Segregation Rule if it were not a NAR

3    optional rule.

4          NAR also fails to acknowledge that the Segregation Rule here is inextricably

5    intertwined with the BBCR, which requires that MLS Participants that list a property "make

6    or accept offers of cooperation and compensation with respect to properties of the type that

7    are listed on the MLS in which participation is sought."[16]  This is a euphemism for NAR's

8    requirement that listing brokers make offers to split commissions with buyer-brokers when

9    submitting listings to MLSs.[17]  Under the Segregation Rule, the listings that "must be

10   displayed separately" are listings not bound by the BBCR because those listings are *not* on

11   the MLS.[18]  As an outlier, REX did not comply with the BBCR, and so, under the

12   Segregation Rule, REX's listings were excluded from the NAR MLSs and later from the

13   Agent Listings tab on Zillow.[19]

14         Because REX's business model was predicated on operating independently of NAR

15   and NAR MLSs, it was dependent on aggregator platforms to publish its listings.[20]  Of those

16   platforms, by far the most important was Zillow.[21]  Zillow's platforms were used by about

17   two-thirds of home buyers to search for homes,[22] trailed by Realtor.com, which is currently

18   operating under a NAR license, with a 20.2% share of views and Redfin (a NAR member)

19   with a 13.4% market share.[23]  Neither allowed REX to list its homes on those platforms at

20   all or without significant restrictions. Beginning in 2015, REX listed all its homes for sale

21   _____

22   [15] *Id.*
     [16] Ex.1, '701-702.

23   [17] Ex.2 ¶25.
     [18] Ex.14, 161:1-21.

24   [19] Ex.H ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26   [20] Ex.ZZ, Sides Dep. 83:20-21 ("It was absolutely critical that we have a presence on
     Zillow.")

27   [21] Ex.14, 52:2–5.
     [22] Ex.J, '279 & 281. Zillow also operates Trulia, which is also one of the top 4 real estate

28   search platforms.
     [23] Evans Rpt. ¶249, Table IV-1.

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ                    4                    BOIES SCHILLER FLEXNER LLP
                                                                   401 E LAS OLAS BLVD., SUITE 1200
                                                                   FORT LAUDERDALE, FL 33301
                                                                   (954) 356-0011

1   on Zillow. Dr. Evans, calculated that prior to Zillow's enforcement of the Segregation Rule,

2   Zillow accounted for 47.8% of REX buyer leads that resulted in closings.[24]

3        On January 12, 20221, after joining NAR and NAR MLSs, Zillow implemented its

4   two-tab display to enforce NAR's Segregation Rule.[25] ████████████████████████

5   ████████████████████████████████████████████████████████████████████

6   ████████████.[26] Dr. Evans's analysis of Zillow's data found the display change was

7   accompanied by a 64.6% reduction in page views of REX's listings, and caused 60.2% drop

8   in REX closings in 2021 and 75.5% drop in 2022, as a result of fewer buyer leads and fewer

9   sellers being willing to list given the loss of visibility of their homes, leading to REX's

10  demise.[27]

11  **II.    Zillow Did Not Independently Decide How to Design Its Search Results Page**

12       NAR cites the absence of evidence demonstrating that Zillow communicated directly

13  with NAR's leadership *before* implementing its two-tab display. But even if no such direct

14  communications occurred, there was an open invitation to join NAR's existing

15  anticompetitive agreement among its members to enforce the Segregation Rule. And Zillow

16  accepted.[28] All Zillow had to do to obtain IDX feeds was consult NAR's Handbook, which

17  showed it had to join NAR to qualify as an MLS participant and comply with all NAR

18  mandatory rules.[29] And because 71% of NAR MLSs had already adopted the Segregation

19  Rule, which protects the BBCR from non-NAR entrants, Zillow had to enforce that rule on

20  its platform.[30]

21  _____

22  [24] *Id.* 194 Table VI-4.
    [25] Ex.K

23  [26] Ex.L, '615; Ex.YYY 439-40 ████████████████████████
    ███████████████████████████████████████

24  [27] Evans Rpt. ¶¶416, 423. Zillow's own data also observed a similar precipitous decline
    across all listings relegated to the "other" tab. Ex.38, '1167 ██████████████████

25  ████████████████████████████████████████████████████████████

26  ██████ [28] Ex.M, 280:12-282:13.

27  [29] Ex.E '924 ████████████████████████████████████████
    ████████████████████████████████████████████████████

28  [30] Ex.4, ¶ 66

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1    While there is evidence that NAR and Zillow communicated before Zillow

2    announced it was joining NAR, as important are the communications that occurred between

3    Zillow's announcement and its implementation.[31]    After Zillow submitted its two-tab

4    designs to the MLSs for approval as required, ████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████████████

6    ████████████████████.[32]    Later, Zillow, whose executives served on several NAR

7    committees[33], twice went to NAR—thus confirming the agreement with NAR—to get the

8    Segregation Rule reversed, because Zillow thought it was ████████████████████████████

9    ████████."[34]

10   **III.    REX Was a Unique Competitor**

11   NAR lumps REX together with every other "discount broker" inaccurately described

12   as offering the "same low fees" as REX.  However, the other so-called discount brokerages,

13   like Redfin, joined NAR and so must comply with the BBCR and their clients pay buyer

14   broker commissions.[35]    REX's clients often did not.[36]    REX was unique in its goal to

15   completely eliminate buyer-broker commissions. *Id.*  Almost half – 44% – of REX's home

16   sales in established markets were made without a buyer-agent.  For these transactions, the

17   ────────────────────

18   [31] Ex.N

19   ████████████████ ; *see also* Ex.O

20   ████████████████████

21   ████ Ex.P

22   ████████████████████████████████████████████████████████ Ex.Q; Ex.R; Ex.S; Ex.T; Ex.U.

23   [32] Ex.V; Ex.W; Ex.X; Ex.Y; Ex Z; Ex.AA; Ex.BB; Ex.CC; Ex.DD ████████████

24   ████████████████████████████████████████████████████████████████████████████

25   (emphasis added); Ex.EE.

26   [33] https://www.zillowgroup.com/news/nar-appointees/.
     [34]    Ex.34;    Ex.35;    Ex.36;    Ex.40;    Ex.41;    Ex.14,    151:16-152.    Ex.FF;
27   https://www.inman.com/2022/11/23/nar-shuts-down-bid-to-end-no-commingling-rule-
     zillow-reveals/.
28   [35] https://www.redfin.com/services/listing-fee.
     [36] Ex.A, '831.

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ                    6

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1    total commission was about 2%.[37]  When REX was not able to avoid the involvement of

2    buyer-agents, REX could often negotiate a reduced commission because it had not made an

3    offer of compensation.  In all, the average total commission REX's clients paid was about

4    3.1% compared to average NAR commissions of about 5.5%.[38]

5           NAR argues (at 7) that "[f]rom 2017 through 2021 (including after Zillow's website

6    change), REX co-listed properties with MLS participants for an average fee between $100

7    and $300."  But this is, at best, misleading in the extreme. REX did not co-list in 2017 and

8    2018. [39]  In 2019, REX tried co-listing on a very limited basis in an attempt to get visibility

9    for properties that were not selling.[40] From June 2019 to March 2020, when the effects of

10   the pandemic were becoming apparent, REX co-listed 54 homes or 2.5% of REX's new

11   listings.[41]  In the last three quarters of 2020, when the pandemic deterred buyers from

12   attending open houses, REX increased its co-listings to 14% of total new listings.[42]

13          Zillow's decision "to lock arms" with NAR caused an increase in REX's co-listings

14   in 2021, as REX sought to mitigate the calamitous impact of NAR and Zillow's joining

15   forces.[43]  About three quarters of all the co-listings that REX ever made were after the

16   Segregation Event.[44]  After that event, REX lost a massive number of views of its listings

17   on Zillow, which dried up its buyer leads, and so had trouble winning new listings.[45] To

18   make matters worse, increased advertising on other channels to compensate for being

19   blocked by Zillow were expensive and ineffectual.[46] REX was in survival mode. So, REX

20   decided to try co-listing. But to co-list on the NAR MLSs, REX had to comply with the

21   BBCR, which limited REX's ability to offer its customers the value proposition on which

22

23   [37] Evans Rpt. 218, Table VII-2.
     [38] *Id.* 219, Table VII-3.
24   [39] Evans Reply Rpt. ¶66.
     [40] *Id.*
25   [41] *Id.*
     [42] *Id.*
26
     [43] Ex.GG, 319:15-321:18.
27   [44] Evans Reply Rpt. ¶67.
     [45] Evans Rpt. ¶¶330-31, 409-425.
28
     [46] Ex.GG, 319:3-14.

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1  its business model was based – significantly lower commissions. Co-listing failed to mitigate

2  the harm to REX from being blocked on Zillow, and, ultimately, REX's business failed.

3  **IV.     But For Zillow and NAR's Agreement REX Would Have Thrived**

4          NAR claims that REX would have failed regardless.  NAR fails to acknowledge that

5  REX experienced rapid growth between 2016 and 2020.[47]  Between 2016 and 2019, its

6  average annual growth measured in number of closings was 227% and its average annual

7  revenue growth during that time period was 293%.[48]  The revenue REX earned from closings

8  in 2019 was nearly 31 times larger than in 2016.[49]  REX also performed at or above its

9  growth forecasts in the first quarter of 2020.[50]  While the pandemic slowed REX's growth

10  during 2020, even then REX's revenue increased by 60%, more than many of its

11  competitors.[51]  Until NAR and Zillow buried REX's listings behind its "Other Listings" tab,

12  REX was on track to cash-positive on a net income basis by 2024.[52]

13          In August 2020, REX closed an arm's-length market transaction that valued REX at

14  $325 million.[53]  It also was invited by Bank of America and Wells Fargo [54] to enter

15  discussions about a public offering. Those banks conducted initial valuations of REX based

16  on REX's experience through October 2020. Using a standard investment banking approach

17  for start-ups, Bank of America and Wells Fargo – just 4 months before the segregation event

18  – valued REX's enterprise value between $751 million and $1.255 billion.[55]  And all of these

19  valuations took place in a pandemic year.

20                                        **ARGUMENT**

21  **I.     REX has Direct Evidence of an Agreement in Violation of the Sherman Act[56]**

22

23  [47] Evans Rpt. ¶¶332, 363, 380-388, 539.

    [48] Evans Rpt. ¶¶382-83.

24  [49] *Id.* ¶383.

    [50] *Id.* ¶395-400.

25  [51] *Id.*

    [52] *Id.* ¶¶401-403.

26  [53] *Id*. ¶541 and Table VIII-9; Ex.TT, Evans Dep, at 43, 118, 135, 197, 250.

27  [54] Ex.HH; Ex.II.

    [55] Evans Rpt. ¶¶364, 403, 425.

28          [56] The Court has ruled that this case should be analyzed under the Rule of Reason.
    *See* ECF 80 at 13.  For purposes of the present discussion – proof of an agreement – it is

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ                    8

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1    "Direct evidence is that which can defeat a request for summary judgment if 'taken

2    as true,' whereas circumstantial evidence can defeat a summary judgment motion only if

3    inferences are drawn in the nonmovant's favor." *Toscano v. Professional Golfers*

4    *Association*, 258 F.3d 978, 983 (9th Cir. 2001). REX has direct evidence that NAR and

5    Zillow entered into an agreement in violation of the Sherman Act. The evidence could not

6    be more direct or more public. In fact, neither NAR nor REX tried to hide the agreement.

7        **A.    NAR's Members Promulgated An Anticompetitive Agreement Through**
          **NAR**

8

9          The fact that the Segregation Rule was promulgated by the members of NAR acting

10    through their trade association does not put the rule beyond the reach of the Sherman Act.

11    In *National Soc'y of Prof'l Eng'rs v. United States*, the Supreme Court held that agreements

12    among members of a professional association governing the way in which members compete

13    with one another are horizontal restraints of trade. 435 U.S. 679, 692 (1978) (striking down

14    the National Society of Professional Engineers' canon of ethics prohibiting competitive

15    bidding); *see also*, *Associated Press v. United States*, 326 U.S. 1, 19 (1945). (a group of

16    market participants cannot immunize "arrangements or combinations designed to stifle

17    competition ... by adopting a [group] membership device accomplishing that purpose").

18          The key issue for determining the legality under the Sherman Act of a policy adopted

19    by a trade or professional association is its effect on competition. Here, the record

20    establishes that the Segregation Rule, which was promulgated by NAR members through

21    their trade association and enforced on members by NAR and NAR MLS, is itself direct

22    evidence of an anticompetitive agreement, just as the Court found that the By-Laws of the

23    Associated Press "on their face . . .  constitute restraints of trade." *Associated Press*, 326

24    U.S. at 12.

25          There the By-Laws allowed a member of the Associated Press to effectively block

26    the admission of a competing newspaper's application for membership in the Associated

27    _____

28    immaterial whether the *per se* rule or the rule of reason is applied.

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

Press, which was virtually a prerequisite for competing with an established paper. *Id*. at 13-14.  Here, the Segregation Rule enables NAR members through the rules of NAR MLSs to block their competitors—non-NAR brokers such as REX and FSBOs—from having their listings displayed together with MLS listings on Zillow, by far the most important aggregator site and a prerequisite for effective competition by any brokerage company or direct home seller, which operates outside of NAR.[57]

### B.    The Segregation Rule is An Anticompetitive Agreement

Through its members, NAR promulgates rules that are then enforced on its members by NAR and NAR MLSs.[58]  "NAR is therefore a bottoms-up and top-down organization which coordinates its members' conduct and facilitates cooperation between them."[59]  Although the Segregation Rule is optional, it has been adopted by more than 70% of NAR MLSs.  It is binding on participants in those MLSs.  Model Rule 18.3.11 states, "Listings obtained through IDX feeds from Realtor® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources."  By its express terms, the Segregation Rule permits a NAR MLS to require that its listings be displayed separately from non-MLS listings while prohibiting any MLS from requiring its listings to be displayed separately from other IDX listings.[60]  It is no coincidence

---

[57] The cases NAR cites (Mot. 13) are not to the contrary.  *Cnty of Toulumne v. Sonora Community Hospital*, 236 F.3d 1148 (9th Cir. 2001) and *Todorov. v. DCH HealthCare Authority*, 921 F.2d 1438 (11th Cir. 1991), both involve medical credentialing decisions, a scenario vastly different than a trade association promulgating rules governing cooperation among competitors.  *O.M by and through Moultrie v. National Women's Soccer, LLC*, 541 F. Supp. 3d 1171 (D.Or. 2021), turned not on whether the Rule barring underage players was mandatory, but rather whether clubs had entered into an agreement to enforce the rule.  *Evergreen Partnering v. Pactiv Corp.*, 832 F.3d 1 (1st Cir. 2016), is also not on point.  There, the court found the plaintiff had failed to establish a trade group favored a rival of the plaintiff.

[58] ECF 98 at 11; ECF 99 ¶98.

[59] Evans Rpt. ¶18.

[60] A note to the rule states: "An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS participant (or MLS subscriber) holds participatory rights in those MLSs."  By authorizing participants to commingle IDX feeds, the rule prohibits an MLS from barring commingling of those listings.

OPPOSITION TO NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ          10

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1   that the listings that cannot be segregated are those that include a mandatory offer of

2   compensation for the buyer's broker.

3       The Segregation Rule is anticompetitive because it enables NAR MLSs to protect

4   their members by blocking competitors—non-MLS brokers such as REX and also FSBOs—

5   from having their listings published alongside the MLS listings on any MLS's website or on

6   Zillow.  NAR argues that the Segregation Rule did not dictate the precise details of Zillow's

7   display (at 12-14) and thus NAR did not agree to "demote" non-MLS listings. But that

8   contention is divorced from reality. Although the Segregation Rule does not specify the exact

9   details of how that segregation is to be effectuated, the MLS listings had to "be displayed

10  separately" from non-MLS listings, and Zillow's only choice was how it would accomplish

11  that anticompetitive goal.  Because NAR members dominate the market for residential real

12  estate brokerage services, MLS listings are far more numerous than non-MLS listings.

13  Common sense and economic reality dictate that any website display that separates MLS

14  from non-MLS listings and that must be endorsed by NAR MLSs before going live, is going

15  to prioritize MLS listings, which generate the most revenue for its members.  Given Zillow's

16  overwhelming market share and its importance as an aggregator, a rule that effectively hides

17  the listings of competitors like REX is bound to be anticompetitive.[61]  NAR argues that non-

18  NAR brokers should just stop fighting and join NAR and make a mandatory offer of

19  compensation, which, of course, is antithetical to a non-NAR business model.

20      It is that pre-existing anticompetitive agreement among NAR members to enforce

21  the Segregation Rule that REX alleges Zillow chose to join[62].  In fact, it did so by written

22  contract.[63]

23      **C.    Zillow Publicly Announced It was Joining NAR and so Joining the
            Anticompetitive Agreement**

24

25

26  [61] Ex.14, 52:2–5.

    [62] ECF 99, ¶60 ("When Zillow entered the cartel, it agreed to segregate, conceal, and demote
27  non-MLS listings."); ¶113.

    [63] Ex.F, '555 ▓▓▓▓▓
28  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ                    11

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

As the U.S. Supreme Court said: "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."  *Interstate Circuit v. U.S.*, 306 U.S. 208, 227 (1939); *see also PLS.Com, LLC v. National Association of Realtors*, 32 F.4th 824, 843, (9th Cir. 2022) (quoting same language from *Interstate Circuit* and stating whether MLS entered into agreement with NAR "after NAR required it or by voluntarily adopting a substantially equivalent policy beforehand makes no difference") *cert. denied sub nom. The National Association of Realtors v. The PLS.com, LLC.* (2023); *Moore v. James H. Matthews & Co.,* 473 F.2d 328, 330 (9th Cir. 1972) (same).

NAR's handbook, setting forth the requirements for becoming a member of NAR, constitutes an outstanding invitation to anyone who qualifies to join NAR and if they meet the requisite requirements to obtain access to IDX feeds, an offer reinforced by NAR's public statements.[64]  Bob Goldberg, NAR's CEO since 2017, regularly spoke and wrote about wanting a big tent and bringing people and groups into the tent.[65]  In one trade publication, Goldberg is described as saying "those thought of as 'disruptors' should be invited into the 'tent' of organized real estate in the hopes of turning them into Realtor advocates."[66]

On September 20, 2020, Errol Samuelson publicly announced to brokers and agents with great fanfare that Zillow would accept the invitation to join NAR "*while locking our arms with like-minded partners such as you*."[67]  He also said: "*Now, as MLS participants, no longer a third party, we'll be shoulder to shoulder with you*[.]"[68]  He explained that henceforth Zillow would obtain listings through IDX feeds, which required joining NAR, becoming an MLS participant and enforcing the Segregation Rule.  His announcement is direct evidence of Zillow's agreement to join a pre-existing anticompetitive agreement.

---

[64] *Id.*
[65] Ex.M, 280:12-282:13.
[66] Ex.JJ.
[67] https://www.youtube.com/watch?v=EMidklRVFMM at 00:20 (emphasis added).
[68] *Id.* (emphasis added).

OPPOSITION TO NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ                    12

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1    Accordingly, NAR's contention (at 14) that REX must show communications between NAR

2    and Zillow before announced the change to its web site, is wrong as a matter of law.[69]  *See*

3    *Interstate Circuit*, 306 U.S. at 227; *PLS.Com, LLC* , 32 F.4th at 843.  Nor was there any need

4    to confer.  NAR's MLS Handbook told Zillow everything it needed to agree to gain access

5    to IDX feeds. Moreover, Zillow entered into "written" agreements to enforce the Segregation

6    Rule with NAR MLS, which are functionally aligned with NAR.[70]

7            The record shows that Zillow knew the agreement it was joining was anti-consumer

8    and anticompetitive.[71]  But Zillow chose to join the collusive agreement with NAR and its

9    members anyway because it wanted access to the IDX feeds.[72]  Zillow's deliberate choice

10   to join NAR and enforce the Segregation Rule, even though it knew the rule is

11   anticompetitive, is "a conscious commitment to . . . achieve an unlawful objective."

12   *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).[73]

13           In any event, were this Court to find that REX does not have direct evidence of an

14   agreement, the record shows that Zillow's decision to join the anticompetitive agreement

15   was against Zillow's unilateral interest, at least insofar as Zillow was operating as a national

16   aggregator.  Zillow disliked the Segregation Rule because it knew it that enforcing it caused

17

18

19   [69] *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F.Supp.2d 1250, 1259 (W.D.
     Wash. 2009), cited by NAR (at 14) is not on point because there was no direct evidence of
20   an agreement and because plaintiffs did not even address issues of timing.
     [70] Ex.F, '555.
21   [71] *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1153–1154 (9th Cir. 2003)
     ("Our antitrust law is clear that [plaintiff] need not prove intent to control prices or destroy
22   competition to demonstrate the element of an agreement ... among two or more entities. . .
     Although a defendant's predatory intent may be relevant in determining whether a particular
23   agreement is unreasonable, it is not required to prove the existence of an agreement.")
     (internal citations and quotations omitted); Ex.40, ████████████████████████
24   ████████████████████████████████████████████████████████████████  Ex.41,
     ████████████████████████████████████████████████████████████
25   [72] Ex.G ████████████████████████████████████
26   [73] NAR contends Rule 18.3.11 does not compel MLSs, brokers, agents, or Zillow "to do
     anything."  That is wrong.  It compels participants in NAR MLSs that have adopted the Rule,
27   such as Zillow, to enforce it.  As Rich Barton, CEO of Zillow, shortly after Zillow joined
     NAR and implemented its two-tab display, ████████████████████████████████████
28   ███████████████████████████  Ex.KK.

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ          13

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

confusion, frustration, and problems for its users .[74]  Accordingly, Zillow sought repeatedly to convince NAR to repeal the Segregation Rule and replace it with a rule allowing commingling of all listings, again showing that the rule was against Zillow's unilateral self-interest as an aggregator.[75]

As to NAR, NAR cannot show "a plausible and justifiable reason for its conduct that is consistent with proper business practice." *In re Citric Acid Litigation*, 191 F.3d 1090, 1094 (9th Cir. 1999) (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987)).  NAR's only proffered justification for the Segregation Rule is that it *might* have been adopted out of a concern about the integrity of non-MLS data (at 16) That assertion is clearly pretextual, in light of NAR's refusal to repeal the Rule and given the paucity of evidence supporting that contention,[76] and given the rule's obvious anticompetitive effects. Thus, REX has carried its burden to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *In re Citric Acid Litigation*, 191 F.3d at 1094.

### D. Zillow's Actions, Both Before and After the Display Change, Confirm the Agreement

Zillow's extensive efforts to enforce the Segregation Rule is additional direct evidence of an agreement under controlling case law.  *See Allied* efforts to enforce (rather than just agree upon) private product standards face more rigorous antitrust scrutiny"); *see also* Dkt. No. 362 at 15-16 (citing cases).  The record demonstrates how extensive that effort was.

After Samuelson' s announcement but before the display change occurred, Zillow showed its two-tab display to the MLSs that had adopted the rule to confirm it conformed

---

[74] Ex.38, '1168.

[75] Ex.34; Ex.35.

[76] NAR claims that the Segregation Rule "might" have been adopted in 2001 because of a concern that listings provided by a source other than an MLS might not be accurate. Mot. 16.  NAR's expert who parroted that assertion admitted that he had seen no study or analysis to support that theory, either when the rule was first adopted or later then it was amended. Ex.UU, Prince Dep. 130:24-132:1; 136:5-17.  *See also* Ex.VV, 122:10-123:19.

OPPOSITION TO NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ          14

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

with the Segregation Rule.[77] NAR umpired disputes between Zillow and the MLSs regarding the NAR rules. And once the two-tab display went live, Zillow moved listings from the Agent Listings tab to the Other Listings tab and in response to complaints from MLSs.[78]

In 2021 and again in 2022, Zillow, which was now a member of NAR, petitioned NAR to replace the Segregation Rule with a rule that would permit MLS participants to commingle listings regardless of their source.[79] By permitting such commingling, that rule would repeal the Segregation Rule and also prohibit segregation. The very fact that Zillow sought—twice—to repeal the Segregation Rule because it believed it was anti-consumer and anticompetitive,[80] and had one of its executives write an op-ed against the rule confirms its prior agreement to enforce the rule. After all, if Zillow had not agreed to enforce the Segregation Rule and was not bound by it, Zillow would not have been so anxious to repeal it, thereby terminating its anticompetitive agreement with NAR.

## II.    The Fact that the Segregation Rule is Optional Does Not Immunize Defendants' Conduct

NAR contends that the fact that the Segregation Rule was promulgated as an optional rule means it cannot be liable for violating the Sherman Act. The language of the Sherman Act, the case law, and common sense are to the contrary. The key issue, legally and factually, is not whether the Segregation Rule is voluntary or mandatory, but rather its effect on competition. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 731 (1988);

---

[77] Ex.LL ███████████████████████████████████████
████████████████████████████████████████████ Ex.MM.

[78] Ex.NN; Ex.OO; Ex.PP; Ex.QQ; Ex.RR. For more than a year before Samuelson's public announcement, Zillow had been working in secret, at significant effort and expense, to convert its web sites from where all listings were shown on a single display to a two-tab display.

[79] NAR argues (at 12-13) that if the Segregation Rule were simply repealed so that it was no longer an optional NAR rule, that would not require MLS, which had adopted the Segregation Rule, to eliminate it. NAR therefore contends it cannot be held liable for the conduct of the NAR MLSs, which adopted the Segregation Rule. That argument seeks to invert causation. The NAR MLSs adopted the rule precisely because it was a NAR rule. There is no evidence that NAR MLSs would have adopted a rule that was not promulgated by NAR. Evans Reply Rpt. ¶28 n.60.

[80] Ex.34 (" ███████████████████████████████████
████████████████████████ ).

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ          15

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1    *National Soc'y of Prof'l Eng'rs*, 435 U.S. at 694-95 (1978); *United States v. American*

2    *Tobacco Co.*, 221 U.S. 106, 179 (1911).

3    **A.    DOJ's case against NAR's VOW policy**

4    NAR's contention is virtually identical to the unsuccessful argument it made in 2005

5    when the U.S. Department of Justice challenged NAR's Virtual Office Website ("VOW")

6    policy as violative of the Sherman Act.    VOW sites were Internet sites operated by

7    innovative brokers, which allowed customers to investigate homes for sale online.    *United*

8    *States v. NAR*, 2006 WL 3434263, *2 (Nov. 27, 2006). As a result, VOW operators could

9    operate more efficiently than their brick-and-mortar competitors, and some VOW brokers

10    offered rebates or reduced commissions.    *Id.*    ("In this regard, the United States avers,

11    "[m]any traditional brick-and-mortar brokers fear the ability of VOW operators to use

12    Internet technology to attract more customers and provide better service at a lower cost.")

13    (citing complaint).

14    Both VOW policy and the Segregation Rule protect the NAR MLS members from

15    competition. The VOW policy protected brick and mortar brokers from competition by

16    virtual office web sites by allowing brokers to block VOW sites from displaying their

17    listings.    The Segregation Rule similarly protects brokers from competition by non-MLS

18    members.    In both cases, NAR's policy or rules functioned to keep commissions high by

19    shielding NAR members from competition.

20    As the DOJ asserted in its opposition to NAR's unsuccessful motion to dismiss

21    DOJ's antitrust complaint, "[t]hreatened by the broker-members who operate VOWs, NAR's

22    traditional brokers, through NAR, devised a tool to thwart this new mode of competition."[81]

23    That tool was a new NAR policy, which *allowed* traditional brick and mortar brokers to

24    block a VOW from posting their listings.    2006 WL 3434263, *3.    That policy included an

25    "optout" provision that allowed a broker to forbid VOW operators – either some of them

26

27

---

28    [81]    DOJ    Br.    Mot.    to    Dismiss,    available    at:    https://www.justice.gov/atr/case-document/memorandum-united-states-opposition-defendants-motion-dismiss-0.

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1  (through a "selective" opt out) or all of them (through a "blanket" opt out) – from providing

2  that broker's listings to customers through a VOW.  *Id.*

3       As DOJ was filing suit, NAR announced changes to its VOW policy.  *Id.* at *4.

4  Under the amended policy, brick and mortar brokers, had the option to engage in a blanket

5  but not selective optout. *Id.*  NAR's argument there was a near replica of an argument NAR

6  makes here—the Segregation Rule cannot violate the Sherman Act because it is an optional

7  rule.  DOJ's response to NAR's motion to dismiss the amended complaint is equally

8  applicable here.  There, DOJ explained NAR's position depended on a fundamental

9  misunderstanding of the terms in the Sherman Act, stating:

10      Restraints actionable under the Sherman Act are – like the opt-
11      out provisions – those that result in harm to competition. As the
       Supreme Court has explained:

12      [t]he term "restraint of trade" in the statute, like the term at
13      common law, refers not to a particular list of agreements, but to
       a particular *economic consequence*, which may be produced by
14      quite different sorts of agreements in varying times and
       circumstances.  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485
15      U.S. 717, 731 (1988) (emphasis added); *see also National Soc'y
       of Prof'l Eng'rs*, 435 U.S. at 694-95 (1978) (the Sherman Act
16      "prohibits unreasonable restraints on competition") (emphasis
17      added); *United States v. American Tobacco Co.*, 221 U.S. 106,
       179 (1911) (actionable restraints of trade are those that "unduly
18      restrict[] competition . . . either because of their inherent nature
       or effect, or because of the evident purpose of the acts").[82]
19

20      The DOJ rejected NAR's optionality argument, stating:

21      Delegating the exercise of the opt-out right to individual
22      members does not absolve NAR of liability for creating the
       restraint and the mechanism for its enforcement.  In *Associated
23      Press v. United States*, 326 U.S. 1 (1945), the Supreme Court
       found that a rule similar to NAR's optout provisions constituted
24      a restraint of trade.  The by-laws at issue in Associated Press
       provided that any member could veto a local competitor from
25      joining the association.  *Id.* at 10-11. Exercise of the veto right
       was – like a broker's exercise of opt-out rights – left to the sole
26      discretion of an individual member.  *Id.*[83]

27  ————————————————

28  [82] *Id.*
   [83] *Id.* (emphasis added)

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ    17

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1  After discussing the *Associated Press* case, the DOJ said:

2          It is equally fallacious for NAR to assert that, because its opt-
3          out provisions provide some brokers additional "freedom of
           action," those policies do not restrain trade.  Like the members
4          of the AP, NAR's members pool their listings, and exert their
           combined power, through adoption of the opt-out rights, to
5          curtail competition from VOW operating brokers.[84]

6          The court denied the motion to dismiss.[85]  Subsequently, DOJ and NAR settled the

7  case,[86] and NAR was required to eliminate its practice of discriminating against VOW

8  brokers.

9          **B.     This Court's Ruling on Defendants' Motion to Dismiss**

10         Here, too, NAR's contention is unavailing.  As DOJ explained in the VOW case the

11 key issue is not whether an agreement is voluntary –after all, all participation in a conspiracy

12 is always voluntary—but rather, the "economic consequence" of an agreement and whether

13 it results in "harm to competition."[87]  DOJ Br. U.S. v. NAR 2008 at 17 (quoting *Bus. Elecs.*

14 *Corp.*, 485 U.S. at 731.

15         In its motion to dismiss the complaint in this action, NAR argued "Plaintiff cannot

16 plausibly allege the existence of an unlawful agreement because NAR's challenged rules are

17 'optional.'"  ECF 98, at 12 citing (NAR Reply (ECF 93 at 7–8)).  This Court rejected that

18 argument, stating:

19         [T[he Supreme Court has concluded that the interpretation and
20         promotion of a trade association's "so-called voluntary
           standards" by the association's agents and members could be
21         deemed to be "repugnant to the antitrust laws," and the
           association "should be encouraged to eliminate the

22 _____

23 [84] *Id.*

[85] *See United States v. NAR*, 2006 WL 3434263.  In its ruling (at *12), the district court cited
24 the court's opinion in *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th
   Cir.1980) where the court said: "[T]here exists the potential for significant competitive
25 harms when the group, having assumed significant power in the market, also assumes the
   power to exclude other competitors from access to its pooled resources." That is precisely
26 what NAR and the NAR MLSs have done here through the Segregation Rule.

27 [86] *See* Judgment, https://www.justice.gov/archive/opa/pr/2008/May/nar-final-judgment.pdf
   and  DOJ's  Competitive  Impact  Statement,  https://www.justice.gov/atr/case-
28 document/competitive-impact-statement-160.

[87] DOJ Br. Mot. to Dismiss.

anticompetitive practices of all its agents acting with apparent authority." *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 561–62, 570 & 574 (1982).

ECF 98, at 12. As this Court concluded:

> Allegedly, "[b]ecause of the size and scope of NAR and MLSs, these rules have become ubiquitous within the marketplace— essentially making consumers subject to them." *Id.* In other words, brokerages, agents, and even customers allegedly have no choice but to comply with NAR's so-called optional rules. *See Hydrolevel*, 456 U.S. at 570 (emphasizing that the trade association was "in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce").

*Id.*

The Court's ruling was well grounded . Under *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, a voluntary rule, with significant adverse impact on competition, can violate the Sherman Act. *See*, *e.g.*, *Radiant Burners Inc. v. Peoples Gas Light & Coke Co*., 364 U.S. 656 (1961) ("The alleged conspiratorial refusal to provide gas for use in plaintiff's Radiant Burners 'interferes with the natural flow of interstate commerce (and) clearly has, by its 'nature' and 'character', a 'monopolistic tendency.'"); *Indian Head Inc. v. Allied Tube & Conduit Corp.*, 816 F.2d 938 (2d Cir. 1987) ("We refuse to permit a defendant to use its literal compliance with a standard-setting organization's rules as a shield to protect such conduct from antitrust liability."); *ECOS Elecs. Corp. v. Underwriters Labs.*, 743 F.2d 498, 502 (7th Cir. 1984) ("the power of a standard-making organization can be abused when it is used to exclude competitors from a market by denying them the needed stamp of approval") (emphasis in original).

## III. The Segregation Rule Has a Significant Adverse Impact on Competition

NAR argues (at 17-19) that REX's Section 1 claim fails because REX must show Defendants' actions harmed competition, not just REX, and REX cannot do so. The record and the law refute NAR's contention.

"To prove a substantial anticompetitive effect directly, the plaintiff must provide 'proof of actual detrimental effects [on competition],' such as reduced output, increased

OPPOSITION TO NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ                    19

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1    prices, or decreased quality in the relevant market." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4[th]

2    946, 983 (9th Cir. 2023) (quoting *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4[th] 824, 834

3    (9th Cir. 2022) and *Ohio v. Am. Express Co.* ("Amex"), 138 S. Ct. 2274, 2284 (2018)). "To

4    prove substantial anticompetitive effects indirectly, the plaintiff must prove that the

5    defendant has market power and present "some evidence that the challenged restraint harms

6    competition." *Epic Games, Inc.*, 67 F.4[th] at 983 (*quoting Amex*, 138 S. Ct. at 2284).

7         Here, REX has provided both direct" and "indirect evidence of a substantial

8    anticompetitive effect.  The direct evidence is the *persistence* of inflated U.S. real estate

9    commission rates, far in excess of the rates in most developed countries and which are

10   insulated from competition by the Segregation Rule.[88]  As Dr. Evans explained in Section

11   IV of his report, the Segregation Rule prevents entry and forecloses competition that could

12   rode those rates.  Defendants virtually ignore the evidence of inflated commission rates and

13   do not seriously dispute the persistence of excessively high commission rates in the United

14   States.   Nor do they address why those rates have persisted.

15        REX also has indirect evidence of anticompetitive impact. Dr. Evans analyzed the

16   relevant geographic markets in this case. He found the NAR MLSs and their participating

17   realtors have monopoly power in their local markets over real estate brokerage services.[89]

18   He also found that NAR has monopoly power over the national market for real estate

19   brokerage services.[90]

20        Because NAR and the NAR MLSs have monopolies, REX must only present "some

21   evidence that the challenged restraint harms competition" to prove anticompetitive effect.

22   *Epic Games, Inc.*, 67 F.4th at 983 (*quoting Amex*, 138 S. Ct. at 2284). REX has far exceeded

23   that requirement. The record demonstrates Zillow's implementation of its two-tab display

24   had a severe adverse impact not just on REX, but also on FSBO homes and any other listings

25

26

27   [88] Evans Rpt. ¶¶82-223.

28   [89] *Id.* ¶297.
     [90] *Id.* ¶¶298 to 325.

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ          20

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

moved to the "Other Listings" tab.[91]  Contemporaneous evidence from REX shows that page views on its listings plummeted by 80% and requests for showings fell by 60% following Zillow's display change.[92] ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████  Because FSBO homes represent about 7% of all home sales,[94] the impact on FSBO homes alone demonstrates significant impact on competition.

Any argument that the display change did not harm REX is also demonstrably wrong. Dr. Evans found that as a result of Zillow's two-tab display, the number of transactions REX closed nose-dived by 60.2% in 2021 and 75.5% in 2022.  Evans Report.at ¶ 423.  Dr. Evans' analysis thus demonstrates that REX was foreclosed from at least 60% of the market, more than enough to demonstrate impact.

Ignoring the impact of the Segregation Rule on FSBO listings, which NAR agrees are in the relevant markets, NAR argues that REX was not a unique competitor and that REX's demise thus had no impact on competition.[95] But REX was unique because it was the only competitor seeking to eliminate buy-side commissions, and when it could not do so, at least reduce them. Dr. Evans' analysis shows that REX was successful in eliminating the buy-side commission between July 19, 2019 and March 31, 2020 in 44% of the homes it sold in established markets,[96] and the average, total commission rate on those sales, was 2%.[97] That 2% total fee was significantly lower than the fees incurred by customers of the so-called discount brokers, all of whom offered mandatory buyer broker fees and whose customers typically paid about 2.5% to buyer brokers on top of the 1.5% or so "discount fee" charged by the discount broker.[98]

---

[91] Ex.14, 179:24-180:12

[92] Evans Report 50 & C-3 at ¶5 n.1.

[93] Ex.38, '1167-68

[94] Evans Rpt. ¶304

[95] Mot. 7-8, 17-19.

[96] Evans Rpt ¶454; Table VII-1,

[97] *Id.* ¶¶455-56; Table VII-2

[98] Redfin, a prominent discount broker and NAR MLS member, describes the typical buyer agent commission as ranging from 2.5 percent to 3.0 percent and uses a 3.0 buyer agent

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ                21

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1    NAR's contention that REX's market share was too small to affect competition is

2    also wrong. Based on what has happened in other industries with successful entry by a

3    market disruptor, Dr. Evans provided economic evidence that once other companies saw

4    REX's success, imitators and tag-along companies would mimic REX's business model, and

5    collectively would gain enough market share to force traditional brokers to lower

6    commission rates.[99]    NAR contends (at 17) that REX must demonstrate it had "a meaningful

7    impact on competition *before* it failed, which it cannot do." (emphasis added). Under NAR's

8    view, established companies can kill would-be competitors in their infancy with impunity,

9    ensuring they never face serious competition.  That is not and cannot be the law.

10    Rather, the law holds evidence of anticompetitive impact can be based on economic

11    theory and include the deterrent effect on would-be entrants.  *See Epic Games, Inc.*, 67 F.4th

12    at 983-84 ("It is sufficient that the plaintiff prove the defendant's conduct, *as matter of*

13    *economic theory*, harms competition—for example that it increases barriers to entry or

14    reduces consumer choice *by excluding would-be competitors* that would offer differentiated

15    products.") (emphasis added); *id.* at 985 (rejecting Apple's claim that showing of

16    anticompetitive harm was speculative and stating: "But, *supported by basic economic*

17    *presumptions*, the district court reasonably found that, without Apple's restrictions, *would-*

18    *be competitors* could offer iOS users alternatives that would differentiate themselves from

19    the App Store on price as well as consumer-appeal features like searchability, security,

20    privacy, and payment processing");  (emphasis added); *see also Fla v. Hollywood Foreign*

21    *Press Association*, 55 F.4th 680, 688-89 (9th Cir 2022) ("[A] group boycott (also known as a

22    concerted refusal to deal)" includes exclusionary conduct toward not only actual

23    competitors, but also "*would-be competitors* of a trade relationship" and "*potential*

24    *competitors*.") (emphasis added).[100]

25    _____

26    commission to illustrate pricing when using Redfin to sell a home.
      https://www.redfin.com/sell-a-home/home-sale-proceeds-calculator.

27    [99] Evans Rpt. ¶¶438-441.

28    [100] *See also Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 832 (2011) (affirming FTC finding
      that MLS's "website policy restricted the public dissemination of [MLS's] real-estate
      listings tending to offer consumers limited-brokerage services at reduced costs", coupled

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ                    22

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

## IV.    REX Suffered Antitrust Injury and Has Antitrust Standing

NAR's flawed argument (at 19) that REX cannot show antitrust injury or standing rests on NAR's erroneous contention that REX injury was caused by REX's refusal to co-list its homes.

The record demonstrates otherwise. REX engaged in only very limited co-listing prior to the COVID pandemic.  The vast majority of the instances in which REX co-listed a home came after Zillow changed its display, when REX was fighting for survival.[101]  As REX explained in an interrogatory response,[102] and as Phil Felice, REX's head of sales and chief revenue officer, testified, co-listings led to numerous problems and did not enable REX to mitigate the impact of Zillow's display change.  "The experience of your customers is horrific."[103]  "It's a suboptimal strategy for a direct-to-customer business to say our success metric is we're going to use some third party that we can't control to deliver service for our customers.  Nobody would agree that that's a sensible strategy.  That's a horrific strategy."[104]

Some MLSs would not allow REX to be listed as a co-listing agent so REX would not always get credit for the listing.[105] Other brokers often thought REX's client did not have a sell side broker and would inundate the seller with calls trying to sign him or her up as a client.[106]  And of course, REX had to make a mandatory offer of compensation to the buyer's broker, which led to more buyers with brokers, and so to more transactions with a buyer broker commission, increasing REX's total aggregate commission as a result, and undercutting REX's business model and a key component of its pitch to prospective customers.[107]

## CONCLUSION

---

with finding of market power, constituted "indirect evidence that those policies have or likely will have anticompetitive effects."
[101] Evans Reply Rpt. ¶67.
[102] Ex.SS, Response to Zillow Interrogatory No. 2.
[103] Ex.GG, 319:24-25.
[104] *Id.* 321:12-18.
[105] *Id.* 320:2-6; 321:22-25.
[106] *Id.* 325:22-326:21.
[107] *Id.* 327:19-328:11; 330:19-332:14; 332:24-333:18; 334:13-335:12.

OPPOSITION TO NAR'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:21-cv-00312-TSZ                    23

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1    For the reasons stated above, NAR's motion for summary judgment should be

2    denied.[108]

3

4    **Certification:**

5    I certify that this memorandum contains 8,325 words, in compliance with the Local Civil

6    Rules.

7

8    Dated:  June 27, 2023                              **BOIES SCHILLER FLEXNER LLP**

9

10                                                      By:*/s/ Carl Goldfarb, Esq.*
                                                        Carl E. Goldfarb (Admitted Pro Hac Vice)

11                                                      401 East Las Olas Blvd., Suite 1200
                                                        Fort Lauderdale, FL 33301

12                                                      Telephone: (954) 356-0011
                                                        Facsimile:  (954) 356-0022

13                                                      cgoldfarb@bsfllp.com

14                                                      Ursula Ungaro, Esq.
                                                        Stephen N. Zack, Esq.

15                                                      BOIES SCHILLER FLEXNER LLP

16                                                      100 SE 2nd Street, Suite 2800
                                                        Miami, FL  33131

17                                                      Telephone:  (305) 539-8400

18                                                      Facsimile:   (305) 539-1307
                                                        uungaro@bsfllp.com

19                                                      szack@bsfllp.com

20

21                                                      James Denvir, Esq.
                                                        BOIES SCHILLER FLEXNER LLP

22                                                      1401 New York Ave, NW
                                                        Washington, D.C, 20005

23                                                      Telephone: (202) 237-2727
                                                        Facsimile:  (202) 237-6131

24                                                      jdenvir@bsfllp.com

25    _____

26    [108] REX's antitrust claim, Count VI, pursuant to RCW 19.86.030 also should proceed to
      trial for the same reasons stated above regarding its federal antitrust claims, given their

27    similarities.  *See Murray Pub. Co. v. Malmquist*, 66 Wash. App. 318, 324, 832 P.2d 493,
      497 (1992) ("RCW 19.86.030 is essentially identical to section 1 of the Sherman Antitrust

28    Act, 15 U.S.C. § 1.  In construing RCW 19.86.030, courts are to be guided by federal
      decisions interpreting comparable federal provisions.") (internal citation omitted).

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ          24

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

David Boies, Esq.
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY  10504
Telephone:  (914) 749-8200
Facsimile:  (914) 749-8300
dboies@bsfllp.com

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that on June 27, 2023, I served foregoing document to be filed in this Court's CM/ECF system, which will send notification of such filing to the counsel of record.

By: */s/ Carl E. Goldfarb*
    Carl E. Goldfarb, Esq.

OPPOSITION TO NAR'S MOTION FOR SUMMARY
JUDGMENT
Case No. 2:21-cv-00312-TSZ          25

BOIES SCHILLER FLEXNER LLP
401 E LAS OLAS BLVD., SUITE 1200
FORT LAUDERDALE, FL 33301
(954) 356-0011