THE HONORABLE THOMAS S. ZILLY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| REX – REAL ESTATE EXCHANGE, INC., <br><br>　　　　Plaintiff, <br><br>　　v. <br><br>ZILLOW, INC., et al. <br><br>　　　　Defendants. | Case No. 2:21-cv-00312-TSZ <br><br>**NAR'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br>NOTE ON MOTION CALENDAR: June 30, 2023 |

NAR's Reply ISO NAR Mot. Summ. J.
Case No. 2:21-cv-00312-TSZ

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

RESPONSE TO REX'S STATEMENT OF FACTS AND ARGUMENT ................................ 2

ARGUMENT .............................................................................................................................. 3

I.    Section 18.3.11 Is Not an Agreement ............................................................................ 3

    A.    Proof of an Agreement Is a Threshold Element of Every Section 1 Claim ............... 3

    B.    Section 18.3.11 Is Not an Agreement to "Segregate, Conceal, and Demote" REX Listings ............................................................................................................ 4

    C.    The DOJ Brief Cited by REX Does Not Show Section 18.3.11 Is an Agreement .................................................................................................................. 6

    D.    This Court's Motion to Dismiss Decision Does Not Show Section 18.3.11 Is an Agreement .............................................................................................................. 7

II.    Section 18.3.11 Does Not Harm Competition ............................................................... 7

    A.    The So-Called "Buyer-Broker Commission Rule" Does Not Show that Section 18.3.11 Harms Competition .......................................................................... 7

    B.    REX Did Not Offer a Differentiated Product and Was Not Excluded from Competing .................................................................................................................. 9

III.    Section 18.3.11 Did Not Cause Antitrust Injury to REX ........................................... 10

CONCLUSION ........................................................................................................................ 11

CERTIFICATION OF WORD COUNT ................................................................................. 13

CERTIFICATE OF SERVICE ................................................................................................. 14

NAR's Reply ISO NAR Mot. Summ. J.
Case No. 2:21-cv-00312-TSZ    i

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

# TABLE OF AUTHORITIES

**Page**

### Cases

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
   181 F.3d 216 (2d Cir. 1999) .................................................................................................. 4

*Andros, Inc. v. United States*,
   2010 WL 4983566 (W.D. Wash. Dec. 2, 2010) ...................................................................... 7

*Associated Press v. United States*,
   326 U.S. 1 (1945) .................................................................................................................... 5

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) ................................................................................................................ 9

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
   846 F.2d 284 (5th Cir. 1988) .................................................................................................. 4

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ........................................................................................... 1, 3, 9

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
   832 F.3d 1 (1st Cir. 2016) ....................................................................................................... 4

*Falstaff Brewing Co. v. Stroh Brewery Co.*,
   628 F. Supp. 822 (N.D. Cal. 1986) ....................................................................................... 10

*Heinemann v. Satterberg*,
   731 F.3d 914 (9th Cir. 2013) .................................................................................................. 2

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ................................................................................................... 4

*Interstate Cir. v. United States*,
   306 U.S. 208 (1939) ................................................................................................................ 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................................................ 9

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ................................................................................................ 10

*Monsanto Co. v. Spray-Rite Service Corp.*,
   465 US 752 (1984) .................................................................................................................. 3

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ................................................................................................ 4

NAR'S REPLY ISO NAR MOT. SUMM. J.
Case No. 2:21-cv-00312-TSZ     ii

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

*Nat'l Collegiate Athletic Ass'n v. Alston*,
　141 S. Ct. 2141 (2021) .................................................................................................. 8

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
　435 U.S. 679 (1978) .................................................................................................... 5

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
　32 F.4th 824 (9th Cir. 2022) ....................................................................................... 5

*Read v. Med. X-Ray Ctr., P.C.*,
　110 F.3d 543 (8th Cir. 1997) ..................................................................................... 11

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
　875 F.2d 1369 (9th Cir. 1989) ..................................................................................... 8

*Todorov v. DCH Healthcare Auth.*,
　921 F.2d 1438 (11th Cir. 1991) ................................................................................... 4

*United States v. Nat'l Ass'n of Realtors*,
　2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) ........................................................... 6, 7

*Verisign, Inc. v. Internet Corp.*,
　2004 WL 1945561 (C.D. Cal. May 18, 2004) ........................................................... 10

*W. Goebel Porzellanfabrik v. Action Industries, Inc.*,
　589 F. Supp. 763 (S.D.N.Y. 1984) ............................................................................ 11

**Statutes**

15 U.S.C. § 1 ............................................................................................................. 1, 3, 4, 7, 8

RCW 19.86.030 ..................................................................................................................... 3

NAR'S REPLY ISO NAR MOT. SUMM. J.
Case No. 2:21-cv-00312-TSZ　　iii

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

**PRELIMINARY STATEMENT**

REX's Opposition confirms: (1) the agreement between NAR and Zillow alleged in the Amended Complaint—to "segregate, conceal, and demote" REX's listings—did not exist; (2) Section 18.3.11 did not harm competition; and (3) any injury REX allegedly suffered was caused by REX's own actions and choices, and not the alleged conspiracy. NAR therefore respectfully maintains summary judgment should be granted in favor of NAR.

***No Contract, Combination, or Conspiracy.*** REX claims the "key issue, legally and factually, is not whether the Segregation Rule is voluntary or mandatory, but rather its effect on competition." ECF 407 at 15. That is wrong as a matter of law. A plaintiff bringing the case REX has brought must, as a threshold matter, provide evidence of a "contract, combination in the form of trust or otherwise, or conspiracy." Absent evidence of such an agreement, the case fails.

REX skips this threshold element because the undisputed evidence shows the agreement alleged by REX does not exist. REX admits that multiple listing services can, and do, independently decide whether to allow MLS listings to be commingled with non-MLS listings and that at least 29% of multiple listing services have decided to allow commingling. ECF 407 at 3–4. In other words, multiple listing services individually determine whether their participants can commingle MLS listings with non-MLS listings. And even in the parts of the country where the local multiple listing service adopted Section 18.3.11, REX agrees that Section 18.3.11 "does not specify the exact details of how that segregation is to be effectuated." ECF 407 at 11. That is the exact opposite of an agreement to "demote" and "conceal" non-MLS listings on Zillow's website that was alleged by REX; it is a concession that Zillow alone decided how to display non-MLS listings by placing them on the "Other Listings" tab that is not displayed by default on Zillow's website.

***No Harm to Competition.*** The cases cited by REX require it to show harm to competition with evidence the alleged conspiracy "exclude[d] would-be competitors that would offer differentiated products." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023). REX has no such evidence. REX admits its listings continued to be published on Zillow after the website change, ECF 407 at 20, and there is no dispute REX could have retained its preferred position on the "Agent Listings" tab by continuing its longstanding practice of co-listing properties with MLS

NAR'S REPLY ISO NAR MOT. SUMM. J.
Case No. 2:21-cv-00312-TSZ   1

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

agents. And the undisputed evidence shows REX tried for seven years before Zillow's website change to gain share while competing against thousands of other brokerages that were offering substantially the same services REX—including at the same commission levels—and that REX never had any impact on competition, price, output, or quality. All of this means REX was not "excluded" from Zillow's website and competition was not harmed.

*No Causal Antitrust Injury (Antitrust Standing).* Again, there is no dispute that REX co-listed properties with MLS agents before and after the Zillow website change, and that after the Zillow website change, co-listed REX properties were commingled with MLS listings on the "Agent Listings" tab of Zillow's website. That means REX could have completely avoided the claimed impact of Zillow's website change on REX's business by continuing to use co-listings. Because REX chose to close its doors and rely on this litigation, instead of competing, REX alone is responsible for its claimed injury. Thus, REX has not proffered *evidence* of causal antitrust injury and lacks antitrust standing.

## RESPONSE TO REX'S STATEMENT OF FACTS AND ARGUMENT

REX has not provided any evidence that creates a genuine dispute concerning the material facts set forth in NAR's Motion. Those facts should therefore be deemed undisputed for purposes of NAR's Motion. *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) ("[T]he opposing party's failure to respond to a fact asserted in the motion permits a court to consider the fact undisputed for purposes of the motion." (cleaned up)).

While REX makes some factual claims in its Opposition, they are either immaterial to NAR's Motion or unsupported by evidence. For example, REX claims there is no evidence "that the MLSs would have adopted the Segregation Rule if it were not a NAR optional rule." ECF 407 at 4. But several multiple listing services prohibited commingling before NAR adopted Section 18.3.11. ECF 383 at 3–4. REX also claims that "REX did not co-list in 2017 and 2018." ECF 407 at 7. But its own CEO's testimony and its own documents show that REX did co-list properties as early as 2017. ECF 331 at SUMF ¶ 20; Ex. H at 159:13–15; Ex. S (Mr. Ryan in May 2017 email: "can we now be the lead agent on Zillow when we co-list with someone from the mls?"). Next, REX insists that "NAR refereed disputes between Zillow and the MLSs as to compliance with the

NAR's Reply ISO NAR Mot. Summ. J.
Case No. 2:21-cv-00312-TSZ              2

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

Segregation Rule." ECF 400 at 6, 15. But there is no evidence of that. Most of the documents cited by REX do not even reference Section 18.3.11. *See* REX Exs. V, W, X, Y, Z, AA, BB, CC. And in the two documents that discuss commingling or Section 18.3.11, NAR makes clear that adoption and enforcement of Section 18.3.11 is up to the local multiple listing service. *See* REX Ex. DD at -893 ("As stated in IDX Policy, at the MLSs local *option*"); REX Ex. EE ("[T]he MLS rules do not prohibit brokers from including FSBO properties on a brokerage website. . . . the MLS can require that those listings be displayed separately . . . .").

## ARGUMENT

### I. Section 18.3.11 Is Not an Agreement

#### A. Proof of an Agreement Is a Threshold Element of Every Section 1 Claim

The crux of REX's Opposition is that "[t]he key issue, legally and factually, is not whether the Segregation Rule is voluntary or mandatory, but rather its effect on competition." ECF 407 at 15. But that ignores black letter law—and the text of the statutes—which require a plaintiff to prove a "contract, combination in the form of trust or otherwise, or conspiracy." *See* 15 U.S.C. § 1; RCW 19.86.030. Indeed, the Supreme Court has unambiguously held that an agreement is an essential element of every Section 1 claim: "Section 1 of the Sherman Act requires that there be a 'contract, combination . . . or conspiracy' . . . in order to establish a violation" because "[i]ndependent action is not proscribed." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 US 752, 761 (1984); *see also id*. at 761 ("The requirement that a plaintiff show an agreement is independent of the additional element that the agreement must unreasonably restrain trade."). That is why, under Ninth Circuit precedent, proof of an unlawful agreement is the "threshold" requirement for maintaining a Section 1 claim. *See Epic Games*, 67 F.4th at 981 ("[A] Section 1 inquiry has both a threshold component (whether there is a contract, combination, or conspiracy) and a merits component (whether it is unreasonable)."). REX therefore cannot avoid summary judgment by simply ignoring the requirement that it must proffer some evidence of the alleged agreement to "segregate, conceal, and demote" non-MLS listings.

NAR's Reply ISO NAR Mot. Summ. J.
Case No. 2:21-cv-00312-TSZ                    3

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

### B. Section 18.3.11 Is Not an Agreement to "Segregate, Conceal, and Demote" REX Listings

REX argues that all NAR rules or policies are agreements under Section 1, but that is wrong because "every action by a trade association is ***not*** concerted action by the association's members." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (emphasis added); *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 292 (5th Cir. 1988) (there was no valid Section 1 claim against a trade association when it acted "without constraining others to follow its recommendations"). Instead, "an antitrust plaintiff must present evidence tending to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT*, 181 F.3d at 234. Thus, contrary to what REX suggests in its citations to generalized statements about "big tents" and "like-minded partners," ECF 407 at 12, "mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010) (accord).

In fact, contrary to REX's arguments, "antitrust laws allow trade associations to make nonbinding recommendations." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 9 (1st Cir. 2016). And optional "recommendations"—even if they are likely to be followed—do "not establish, or even reasonably suggest, the existence of a conspiracy." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1459 n.34 (11th Cir. 1991) (cleaned up). To find otherwise would "eviscerate[] the agreement requirement of section 1." *Id.* As the Ninth Circuit has held, even evidence that a defendant always follows the recommendations of an alleged co-conspirator is not sufficient to survive summary judgment when there is evidence the defendant "made a valid, independent decision." *Id.* at 1156–57. Thus, it is well-established that independent decisions to follow recommendations or optional guidance are not circumstantial evidence of "a conscious commitment to a common scheme." *Id.* at 1157.

None of the cases cited by REX suggest otherwise. Most are predicated on mandatory rules adopted by trade associations or joint ventures, which their members had no choice but to follow.

NAR'S REPLY ISO NAR MOT. SUMM. J.
Case No. 2:21-cv-00312-TSZ    4

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1  *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 830 (9th Cir. 2022) ("NAR adopted the Clear Cooperation Policy," a mandatory rule that "require[d] agents posting listings on competing services to also post those listings on the appropriate MLS."); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978) (striking down professional association's binding canon of ethics that prohibited competitive bidding); *Associated Press v. United States*, 326 U.S. 1, 4 (1945) (all joint venture members agreed to follow the restraints challenged by the government). Others do not involve optional trade association guidance or recommendations and instead relate to traditional conspiracies involving "demands" for concerted action among competitors that were accepted "in substantially unanimous action." *See Interstate Cir. v. United States*, 306 U.S. 208, 222 (1939). The circumstances presented in those cases are categorically different than those here because Section 18.3.11—the sole NAR rule challenged by REX—is optional.

Importantly, there is no dispute that Section 18.3.11 is truly optional (and not mandatory in practice) and that multiple listing services have a choice about whether to adopt Section 18.3.11. REX agrees that, under Section 18.3.11, multiple listing services can and do choose whether to allow MLS listings to be commingled with non-MLS listings. ECF 407 at 10 ("By its express terms, [Section 18.3.11] **permits** a NAR MLS to require that its listings be displayed separately from non-MLS listings . . . ." (emphasis added)). Indeed, according to REX, at least 29% of multiple listing services—including 6 of the top 25—do not require separation of listings. ECF 407 at 3; *id.* at 3 n.13 ("19 of the top 25 MLSs forbid co-mingling").

REX also concedes that critical components of its alleged conspiracy—the purported "demotion and concealment" of REX listings on Zillow's website—would not be compelled by Section 18.3.11 even if it were mandatory. REX states that, even if Section 18.3.11 were an agreement between NAR and Zillow, it "does not specify the exact details of how that segregation is to be effectuated." ECF 407 at 11. In other words, REX admits that Zillow was free to decide how to design its website consistent with the rules of the multiple listing services it joined, including by deciding which listings to promote and display by default. That is the exact opposite of what REX alleged. REX therefore resorts to saying that the Court should deny NAR's Motion for Summary Judgment because "[c]ommon sense and economic reality dictate that any website display

NAR'S REPLY ISO NAR MOT. SUMM. J.
Case No. 2:21-cv-00312-TSZ                    5

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

that separates MLS from non-MLS listings and that must be endorsed by NAR MLSs before going live, is going to prioritize MLS listings." *Id.* But alleged "common sense and economic reality" are no substitute for ***evidence***; in fact, those claims confirm REX has no evidence whatsoever to support its antitrust claims against NAR.

### C. The DOJ Brief Cited by REX Does Not Show Section 18.3.11 Is an Agreement

In 2006, the United States brought an antitrust case to enjoin a mandatory NAR policy concerning virtual office websites. *See United States v. Nat'l Ass'n of Realtors*, 2006 WL 3434263, at *14 (N.D. Ill. Nov. 27, 2006). Virtual office websites are "password-protected websites that enabled potential home buyers, once they had registered as customers of the broker, to search the MLS database themselves and to obtain responsive MLS listings over the Internet." *Id.* at *2. On May 17, 2003, NAR adopted an "Initial VOW Policy." *Id.* at *3. Prior to the Initial VOW Policy, "no broker was permitted to withhold his or her listings from a rival broker, seemingly under virtually any circumstances." *Id.* The Initial VOW Policy, however, contained a provision that "allowed brokers to direct that their clients' listings not be displayed on any" virtual office website or "to direct that their clients' listing not be listed on a particular subset of targeted competing broker's or brokers'" virtual office websites. *Id.*

Contrary to what REX claims, the DOJ's 2006 case is simply not relevant here.

***First***, the DOJ case did not challenge Section 18.3.11 or any other Optional NAR rule; the DOJ challenged a different, ***Mandatory*** NAR policy. REX fails to recognize in its Opposition that the Court there said in its motion to dismiss decision: "The Initial VOW Policy was ***obligatory and enforceable***. Under the terms of the policy, member boards were prohibited from adopting rules 'more or less restrictive than, or otherwise inconsistent with' the policy." *Id.* at *4 (emphasis added); *see also id.* at *3 ("NAR ***mandated*** that all 1,600 of its member boards implement the Initial VOW Policy by January 1, 2006." (emphasis added)). The fact that the Mandatory NAR VOW Policy allowed brokers to withhold their listings from other brokers (the so-called "opt-out") did not make it an Optional policy. Multiple listing services had no choice but to adopt the VOW Policy. That means all of REX's cites to, and block quotes from, the DOJ's opposition to NAR's motion to

NAR'S REPLY ISO NAR MOT. SUMM. J.
Case No. 2:21-cv-00312-TSZ    6

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

dismiss are irrelevant to whether Section 18.3.11 and other Optional NAR rules are sufficient to satisfy the threshold agreement element of its antitrust claim.

*Second*, REX is wrong when it claims that "NAR's contention," *i.e.*, Section 18.3.11 is optional and therefore not evidence of a conspiracy, "is virtually identical to the unsuccessful argument it made in 2005 when the U.S. Department of Justice challenged NAR's Virtual Office Website ('VOW') policy." ECF 407 at 16. In the motion to dismiss decision there, the Court expressly acknowledged that the agreement element was not at issue (at the time of the motion to dismiss). *Nat'l Ass'n of Realtors*, 2006 WL 3434263, at *13 ("Defendant concedes, for present purposes at least, that the challenged VOW Policies and rules are the product of a 'combination among NAR's members,' which is a prerequisite for the practices to be actionable under Section 1 of the Sherman Act."). And the DOJ did not argue, and the Court did not find, that any Optional NAR policy was an agreement.

### D. This Court's Motion to Dismiss Decision Does Not Show Section 18.3.11 Is an Agreement

REX also tries to substitute this Court's motion to dismiss decision for evidence. But, as we all know, at the pleading stage, the Court had to assume REX's allegations were true, including its claim that brokers and multiple listing services had "no choice" but to follow Section 18.3.11. ECF 98 at 9–10. At summary judgment, however, it is REX's burden to provide evidence to support it allegations. *See Andros, Inc. v. United States*, 2010 WL 4983566, at *2 (W.D. Wash. Dec. 2, 2010). In its motion to dismiss decision, the Court described what REX had to do to meet that burden: come forward with proof that industry participants "have no choice but to comply with NAR's so-called optional rules," specifically Section 18.3.11. ECF 98 at 12. REX has failed to do that.

## II. Section 18.3.11 Does Not Harm Competition

### A. The So-Called "Buyer-Broker Commission Rule" Does Not Show that Section 18.3.11 Harms Competition

REX's Opposition incorrectly attempts to substitute alleged harm to competition from another NAR rule—one that is not the alleged restraint in this case—for proof that Section 18.3.11

NAR'S REPLY ISO NAR MOT. SUMM. J.
Case No. 2:21-cv-00312-TSZ                    7

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

harms competition.  In a Section 1 case, provided there is evidence of an agreement, the Court must go on to assess whether there is evidence of anticompetitive effects caused by that agreement.  *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2155 (2021) ("Most restraints challenged under the Sherman Act . . . are subject to the rule of reason," which is "aimed at assessing ***the challenged restraint's*** actual effect on competition—especially its capacity to reduce output and increase price." (emphasis added) (cleaned up)); *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989) ("Proving injury to competition ordinarily requires the claimant to . . . demonstrate the effects ***of the restraint*** within those markets." (emphasis added)).  Simply stated, alleged effects attributable to restraints or actions that are different from those challenged by the plaintiff as an anticompetitive agreement are not relevant to that inquiry.

REX attempts to evade this requirement through obfuscation.  In its Opposition, as purported evidence of harm to competition, REX points to "the persistence of inflated U.S. real estate commission rates, far in excess of the rates in most developed countries . . . ."  ECF 407 at 20 (cleaned up).  And as support for this assertion, REX cites more than 100 paragraphs in the report submitted by its expert, Dr. Evans.  *Id.* at 20 n.88.  Dr. Evans' report, however, unambiguously attributes those allegedly high commissions to "the effect of the Buyer Broker Commission Rule" and not Section 18.3.11. ECF 382-4 (Evans Report) ¶ 108.  Contrary to the suggestions REX makes in its Opposition, Dr. Evans did not compare commission rates in the United States to those in countries that do not have **Section 18.3.11**.  *See id*.  REX cannot rely on the purported effects of the Buyer-Broker Commission Rule to establish the purported harm to competition caused by Section 18.3.11.

Moreover, as a real estate brokerage, REX lacks standing to claim it suffered an antitrust injury caused by a NAR rule that allegedly inflates commissions.  Assuming, solely for the sake of argument, the Buyer-Broker Commission Rule inflates commissions, REX would have benefitted from that Rule because it would have allowed REX to raise commission levels or attract more customers by offering lower commissions.  And that is exactly what REX claims it did.  Ex. II (Ryan Tr.) at 13:17–14:2, 15:8–23 (REX increased commission levels because of high commissions charged by allegedly conspiring brokers).  Accordingly, REX does not have antitrust standing to

NAR's Reply ISO NAR Mot. Summ. J.
Case No. 2:21-cv-00312-TSZ                          8

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

challenge the Buyer-Broker Commission Rule. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337 (1990) (plaintiff lacked standing to sue over elevated prices because, as a competitor in the market, "higher . . . prices would have worked to [its] advantage"); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (competitor lacks standing to challenge a conspiracy to charge higher prices because such restrictions "actually *benefit* competitors by making supracompetitive pricing more attractive" (emphasis in original)).

### B. REX Did Not Offer a Differentiated Product and Was Not Excluded from Competing

Contrary to REX's suggestion, "some evidence" of a "deterrent effect" is not enough to show harm to competition. Instead, a showing of competitive effects based on indirect evidence must be based on **"exclusion"** of competitors that "would offer differentiated products." *Epic Games*, 67 F.4th at 984 (emphasis added). There is no such evidence.

REX was not excluded from Zillow's website or even its preferred position on Zillow's website. Even after Zillow's website change, REX admits that REX listings (and those of for-sale-by-owner properties) were still advertised on Zillow, where they were viewed by consumers, some of whom ultimately purchased a home listed by REX. ECF 407 at 20–21. And REX does not dispute that it could have continued to advertise properties on Zillow's website on the "Agent Listings" tab, i.e. commingled with MLS listings, by merely continuing its existing practice of co-listing. *See* ECF 328 at SUMF ¶ 21. Thus, it is undisputed that REX was able to access Zillow's website before and after the Zillow website change, including in its preferred position, which means REX was not "excluded" from anything.

Moreover, there is no evidence that REX offered a product that consumers wanted. There is no evidence—other than REX's say-so—that "REX was unique because it was the only competitor seeking to eliminate buy-side commissions, and when it could not do so, at least reduce them." ECF 407 at 21. To the contrary, the undisputed evidence shows that REX competed for seven years prior to Zillow's website change, against thousands of other brokerages—including those offering the same low fees as REX, Ex. H at 172:18–173:17 (Q. Fair to say REX competed against all brokerages in the local regions where it had operations? A. Yes. . . . Q. Some offered fees

NAR's Reply ISO NAR Mot. Summ. J.  
Case No. 2:21-cv-00312-TSZ — 9

QUINN EMANUEL URQUHART & SULLIVAN, LLP  
1109 First Avenue, Suite 210  
Seattle, WA 98101  
(206) 905-7000

that were just as low as REX's fees, correct? A. Yes.")—and REX had no meaningful impact on competition. *See* ECF 328 at SUMF ¶ 24. Thus, there is no reason to think REX's failure deprived consumers of a "differentiated" product that benefitted consumers in any way, even relying solely on "economic reality and common sense." *Id.* at 11. Simply put, the failure of a small firm that is one of many competing firms offering similar services does not establish harm to competition. *See, e.g.*, *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 (9th Cir. 1988) ("The elimination of a single competitor, without more, does not prove anticompetitive effect."); *Falstaff Brewing Co. v. Stroh Brewery Co.*, 628 F. Supp. 822, 828 (N.D. Cal. 1986) ("To injure, even to cripple or destroy, one or two competitors in a market will not, if there are many competitors in that market, have much, if any, effect on consumers. . . ."); *Verisign, Inc. v. Internet Corp.*, 2004 WL 1945561, at *6 (C.D. Cal. May 18, 2004) (no harm to competition where there are 250 competitors, many of which "already offer (or plan to offer) similar or competitive services" to those offered by the plaintiff).

To compensate for these problems with its case, REX argues the decline in page views for REX listings on Zillow, which it attributes to Zillow's website change, is evidence of harm to competition. ECF 407 at 20–21. But REX also admits that Zillow's website design choices—not Section 18.3.11—are the reason that MLS listings appeared by default on Zillow's website. *Id*. at 5–6, 11, 20 ("[T]he Segregation Rule does not specify the exact details of how that segregation is to be effectuated, the MLS listings had to 'be displayed separately' from non-MLS listings, and Zillow's only choice was how it would accomplish that anticompetitive goal."). That means Section 18.3.11 did not cause a decline in page views or the purported harm to competition. Moreover, REX's Opposition and contemporaneous business documents show it had myriad other ways to advertise properties to consumers outside of Zillow, *see* ECF 407 at 7; Ex. II (Ryan Tr.) at 300:2–303:23, which means there is no reason to believe a decline in page views is harm to competition.

### III. Section 18.3.11 Did Not Cause Antitrust Injury to REX

While REX may believe co-listing is "suboptimal," REX co-listed homes before Zillow changed its website and that it continued to co-list properties after Zillow changed its website. ECF 400 at 23. After Zillow changed its website, those co-listed properties appeared on the Agent Listings tab, commingled with the MLS listings, just as they did before Zillow changed its website.

NAR'S REPLY ISO NAR MOT. SUMM. J.
Case No. 2:21-cv-00312-TSZ         10

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1  ECF 328 at 19–20. That means REX could have stayed in business and commingled its listings
2  with MLS listings on Zillow by simply continuing its existing practice of co-listing. *Id.* at 20.
3  Because REX has not established its claimed injury (the collapse of its business) was caused by
4  Section 18.3.11, instead of its choice to discontinue its practice of co-listing, REX cannot establish
5  antitrust injury caused by Section 18.3.11. *See Read v. Med. X-Ray Ctr., P.C.*, 110 F.3d 543, 546
6  (8th Cir. 1997) (no antitrust injury when plaintiff "did not take reasonable steps to compete . . . in
7  the [relevant] market"); *W. Goebel Porzellanfabrik v. Action Industries, Inc.*, 589 F. Supp. 763, 766
8  (S.D.N.Y. 1984) ("self-inflicted" injury does not support an antitrust claim).

## CONCLUSION

NAR respectfully requests that the Court grant NAR's Motion for Summary Judgment.

NAR'S REPLY ISO NAR MOT. SUMM. J.
Case No. 2:21-cv-00312-TSZ    11

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

| | |
|---|---|
| 1   DATED: June 30, 2023 | /s/ Ethan Glass |
| | |
| | Christopher B. Durbin (WSBA No. 41159) |
| | COOLEY LLP |
| | 1700 Seventh Avenue |
| | Suite 1900 |
| | Seattle, WA 98101-1355 |
| | Phone: (206) 452-8700 |
| | Fax: (206) 452-8800 |
| | Email: cdurbin@cooley.com |
| | |
| | Ethan Glass (pro hac vice) |
| | Samantha A. Strauss (pro hac vice) |
| | COOLEY LLP |
| | 1299 Pennsylvania Avenue, NW |
| | Suite 700 |
| | Washington, DC  20004-2400 |
| | Phone: (202p) 776-2244 |
| | Fax: (202) 842-7899 |
| | eglass@cooley.com |
| | sastrauss@cooley.com |
| | |
| | Sarah M. Topol (pro hac vice) |
| | COOLEY LLP |
| | 55 Hudson Yards |
| | New York, NY 10001 |
| | Tel: (212) 479-6000 |
| | stopol@cooley.com |
| | |
| | Michael D. Bonanno (pro hac vice) |
| | Kathleen Lanigan (pro hac vice) |
| | Peter Benson (pro hac vice) |
| | Michael Sebring (pro hac vice) |
| | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| | 1300 I Street, Suite 900 |
| | Washington, D.C. 20005 |
| | Phone: (202)538-8000 |
| | Fax: (202) 538-8100 |
| | mikebonanno@quinnemanuel.com |
| | katlanigan@quinnemanuel.com |
| | peterbenson@quinnemanuel.com |
| | michaelsebring@quinnemanuel.com |
| | |
| | *Attorneys for Defendant National Association of REALTORS®* |

NAR's Reply ISO NAR Mot. Summ. J.
Case No. 2:21-cv-00312-TSZ                    12

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

**CERTIFICATION OF WORD COUNT**

I certify that this memorandum contains 4,164 words, in compliance with the Local Civil Rules.

NAR's Reply ISO NAR Mot. Summ. J.
Case No. 2:21-cv-00312-TSZ    13

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

**CERTIFICATE OF SERVICE**

I certify that on June 30, 2023, I caused a true and correct copy of the foregoing to be filed in this Court's CM/ECF system, which will send notification of such filing to counsel of record.

DATED: June 30, 2023

/s/ Ethan Glass
Ethan Glass

NAR's Reply ISO NAR Mot. Summ. J.
Case No. 2:21-cv-00312-TSZ    14

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000