THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

REX – REAL ESTATE EXCHANGE, INC.,

     Plaintiff,

  v.

ZILLOW, INC., et al.

     Defendants.

Case No. 2:21-cv-00312-TSZ

**PLAINTIFF REX'S REPLY IN SUPPORT OF ITS PARTIAL SUMMARY JUDGMENT MOTION**

*ORAL ARGUMENT REQUESTED*

**NOTED ON THE MOTION CALENDAR: June 30, 2023**

**FILED UNDER SEAL**

PLAINTIFF REX'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No. 2:21-cv-00312-TSZ

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................................ii

INTRODUCTION .......................................................................................................................... 1

    I.       Introduction................................................................................................... 1

    II.      Argument ...................................................................................................... 4

         A.     Because 71% of NAR MLSs Have Adopted the Segregation Rule
              It Is an Actionable Restraint Under Section 1 ...................................... 5

         B.     The Fact That the Segregation is Optional to the MLSs Does Not
              Confer Immunity From the Antitrust Laws ......................................... 6

         C.     Zillow's Website Redesign Was a Product of the Segregation Rule. 10

CONCLUSION............................................................................................................................. 12

CERTIFICATE OF SERVICE .................................................................................................... 14

Plaintiff REX's Reply In Support Of Its
Motion for Partial Summary Judgment

Case No. 2:21-cv-00312-TSZ

i

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Associated Press v. United States*,
   326 U.S. 1 (1945).................................................................................6, 9, 10, 11

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988).................................................................................5

*Consolidated Metal Prods., Inc. v. American Petroleum Inst.*,
   846 F.2d  (5th Cir. 1988) .......................................................................7

*Cty of Tuolumne v. Sonora Cmty. Hospital*,
   236 F.3d 1148 (9th Cir. 2001) ..............................................................7, 8

*Esco Corp. v. United States*,
   340 F.2d 1000 (9th Cir. 1965) ..............................................................9

*Hahn v. Or. Physicians' Serv.*,
   868 F.2d 1022 (9th Cir. 1988) ..............................................................5, 8

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)..................................................................7

*Interstate Circuit v. United States*,
   306 U.S. 208 (1939)..............................................................................7, 9

*Mayor & City Council of Balt. Md. v. Citigroup*,
   709 F.3d 129 (2d Cir. 2013)..................................................................9

*N. Tex. Specialty Physicians v. F.T.C.*,
   528 F.3d 346 (5th Cir. 2008) ................................................................5, 8

*Nat'l Soc'y of Prof'l Eng'rs*,
   435 U.S. 679 (1978)..............................................................................6

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) .................................................................7

*Todorov v. DCH Healthcare Auth.*,
   921 F.2d 1438 (11th Cir. 1991) ............................................................7, 8

*United States v. American Tobacco Co.*,
   221 U.S. 106 (1911)..............................................................................6

*United States v. Nat'l Ass'n of Realtors*,
   2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) ...............................5, 6, 10, 11

PLAINTIFF REX'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No. 2:21-cv-00312-TSZ

ii

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

*United States v. Sealy, Inc.,*
  388 U.S. 350 (1967)...........................................................................................5

PLAINTIFF REX'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No. 2:21-cv-00312-TSZ

iii

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

# INTRODUCTION

**I.    Introduction**

NAR's opposition leaves no question that NAR and its members (including Zillow) authored, adopted, and enforced the Segregation Rule, and accordingly REX is entitled to partial summary judgment on the limited issue of whether NAR and Zillow entered into an agreement for purposes of Section 1 of the Sherman Act.  NAR effectively admits as much:

1) Prior to NAR's adoption of the model Segregation Rule, only two of all the nation's MLSs prohibited the display of MLS listings with non-MLS listings. NAR's Opposition to REX's Motion for Partial Summary Judgment ("NAR Opp.") at 3.

2) NAR MLSs choose whether to allow their participants to co-mingle MLS and non-MLS listings.  NAR Opp. at 1.

3) Only 30% of multiple listing services operated by local associations of NAR members (REALTORS®) have not adopted the Segregation Rule. NAR Opp. at 2.

4) NAR publishes an "informational" "Schedule Of Fines For Administrative Sanctions" and encourages MLSs "to use the MLS Schedule of Fines Table provided . . . to establish administrative sanctions for violations of the MLS Rules."  NAR Opp. at 4.

Taken together, these admitted facts show that NAR provided its members (and potential members such as Zillow) the guidebook to enforce the exclusion of non-MLS listings from their own listings.  Since NAR's publication of this model exclusion agreement, or the Segregation Rule, its adoption has grown from 2 MLSs[1] to 373 NAR MLSs.  Once Zillow announced it would join NAR and enforce the Segregation Rule, and

---

[1] That NAR did not create the anticompetitive Segregation Rule, but apparently copied it and successfully propagated it to 70% of its members' MLSs, hardly indicates a lack of Section 1 agreement.  It is an irrelevant point.

PLAINTIFF REX'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No. 2:21-cv-00312-TSZ

1

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

certainly by the time it began enforcing the rule, it had entered into an agreement with NAR, the author of and prime mover behind Segregation Rule.

NAR's primary argument against REX's motion is that NAR MLSs do not have to adopt the Segregation Rule —it is optional, and so it could not have entered an agreement with Zillow.  The record, however, indicates that the overwhelming majority of MLS adopted the Segregation Rule only **after** NAR proposed it as a rule.  Optionality is not the relevant issue; the effect of the rule is what matters. A key question in this case is what effect the rule has had on competition once it is adopted, and Zillow agreed to join in enforcing it.

Logic dictates that once a rule such as the Segregation Rule is widely adopted and enforced by competitors, it will have a binding impact.  NAR's legal authority does not counsel to the contrary, as explained below.  When Zillow joined NAR and its MLSs, in order to get access to the IDX feeds and despite Zillow's dominance of the aggregator market, it submitted to the pervasive Segregation Rule and, as a result, changed its websites to exclude non-MLS listings from its default display.  That is evidence of the rule's impact.  As conceded publicly, internally, and before this Court, Zillow's display change was prompted solely by the Segregation Rule.

NAR's effort to distance itself from the widespread adoption of the Segregation Rule is dramatically at odds with the record. Beginning with NAR's Handbook on Multiple Listing Service Policy's ("Handbook"), NAR's stated purpose is to "guide member associations of REALTORS® in the operation of multiple listing services consistent with the policies established by the National Association's Board of Directors."  Nat'l Ass'n of Realtors, 2023 Handbook on Multiple Listing Service Policy, at Preface, available at: https://www.nar.realtor/handbook-on-multiple-listing-policy. NAR's Handbook evidences NAR's extensive control of its MLSs rules and policies—even the requirements  a broker satisfy to qualify as a "MLS Participant."  *Id.* § 2.  Thus, it is hardly surprising or coincidental that so many MLSs adopted the Segregation Rule after NAR promulgated it.

PLAINTIFF REX'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No. 2:21-cv-00312-TSZ

2

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

1    NAR also was deeply involved in the details of integrating Zillow's websites into

2  the NAR regime. For example, NAR mediated disputes between Zillow and MLSs

3  regarding the application of MLS rules to Zillow's websites display.  *See, e.g.*, Ex. A (███

4  ████████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████████

6  ████).  And NAR was the definitive voice on how MLS rules should be enforced by MLS

7  and abided by Zillow. *See* Ex. B ("███████████████████████████████████████████

8  ████████);  Ex. C (█████████████████████████).

9    Counter to what NAR argues, these were not isolated instances about issues

10  unrelated to the website display. Rather the record shows that NAR, for over a year, was

11  involved in almost every aspect of Zillow's website redesign.  This extended directly to

12  the enforcement of the Segregation Rule: Ex. D ("██████████████████████████████

13  ████████████████████████████████████████████████████████████████████████

14  ████████████████████████");  Ex. E ("████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████

17  ████");  Ex. F ("████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████");  Ex. G; Ex. H.

22  NAR was also involved in the nuances of other aspects of Zillow's display:  ████████

23  ████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████

26

27

28

1  ███████████████████████████████████████████████████████

2  █████████████████████████████████████████████ [2]

3      Soon after Zillow launched its new display NAR's Director of MLS went on a

4  podcast to inform NAR's MLSs and its membership that Zillow two-tab display was in

5  compliance with NAR rules. *See* Ex. Y.[3] This wasn't a new role for NAR, years before

6  Zillow's decision to join NAR, █████████████████████████████████████████

7  █████████████████████████. *See* Ex. Z.

8      Whatever control Zillow retained over the nuances of its displays, Zillow had no

9  control over whether to segregate and thereby demote REX's and other non-MLS listings.

10  That is the essence of the Section 1 agreement and the heart of the issue. Whether Zillow

11  could have handled the details of the implementation differently is irrelevant to whether

12  there was an agreement concerning segregation for purposes of Section 1.

13  **II.    Argument**

14      Facing a wealth of Supreme Court and other federal precedent confirming the low

15  threshold that must be met to establish that the promulgation, adoption and enforcement of

16  NAR's Segregation Rule is an agreement, combination, or conspiracy under Section 1,

17  NAR responds only that (1) an "optional" rule can never serve as the basis for the Section

18  _____

19  [2] NAR's adjudications began before Zillow launched its new display in mid-January 2021
20  and continued for well over a year after. *See* Ex. U (pre new website launch in January
    2021); Ex. V (same); Ex. S (same); Dkt. No. 405-26; Ex. AA (same); Ex. T (same); Dkt.
21  No. 405-30 Ex. EE (September 2021); Ex. W (March 2022); Ex. C (October 2022). MLSs
    and Zillow repeatedly sent NAR "screenshots" of Zillow's tentative display and █████
22  █████████████████████████████████████ *See* Ex. X ( ███████████████████████
    ████████████████████████████████████████████████████████████████████ Ex.
23  L; Ex. R.

24
25  [3] Available at https://www.brightmls.com/article/zillow-group-update-for-january-2021 at
    24:20 ("I know the question came up because of Zillow's what they are wanting to do this
26  applies to any member right, **we don't have a policy that would prohibit any member
    from operating a website where on the one hand they display IDX data** *and then they*
27  *have a separate page* or even an entirely different website where they want to themselves
    act as a local syndicator of sorts or publisher of **other information**") (emphasis added).

28

1 agreement and (2) Zillow's website design was not the product of concerted action because it was entirely of Zillow's own choosing.  The facts and law support neither proposition, and accordingly, REX is entitled to partial summary judgment on its Sherman Act claim and its corresponding state law claim.

### A.    Because 71% of NAR MLSs Have Adopted the Segregation Rule It Is an Actionable Restraint Under Section 1

Once the Segregation Rule was adopted by NAR MLSs, as it currently has been by 71%, or 373 of them, it was an operative and enforceable agreement among NAR members to suppress competition from non-members, and is actionable under Section 1 if it meets the required elements, including having an adverse impact on competition.  Any claim of optionality is illusory because the Rule has a binding impact on all affected competitors. Such was the case with Zillow, which in its dual capacities as both brokerage and as an aggregator, surrendered its autonomy and even the fundamentals of its industry-leading website when, in order to obtain access to IDX feeds, it agreed to segregate and divert listings such as REX's away from NAR MLS member listings.

When NAR promulgates model rules—mandatory or otherwise—it engages in concerted activity by a group of competitors and its rules are subject to the Sherman Act. Of course, not all joint or concerted action by members of a trade or professional organization violate the Sherman Act, though such action constitutes concerned action for purposes of the Act. "When an organization is controlled by a group of competitors, it is considered to be a conspiracy of its members." *N. Tex. Specialty Physicians v. F.T.C.*, 528 F.3d 346, 356 (5th Cir. 2008) (*citing United States v. Sealy, Inc.*, 388 U.S. 350, 352 (1967)). Even if concerted activity is not among direct competitors, "shared similar economic interests" can be the foundation for an unlawful horizontal agreement.  *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1030 (9th Cir. 1988).  "NAR's member boards control a

PLAINTIFF REX'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No. 2:21-cv-00312-TSZ

5

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

majority of the MLSs in the United States. NAR promulgates rules governing the conduct of MLSs and requires its member boards to adopt these rules." *United States v. Nat'l Ass'n of Realtors*, 2006 WL 3434263, at *2 (N.D. Ill. Nov. 27, 2006) (cleaned up) (citation omitted). NAR's membership not only shares economic interests, but are in fact direct competitors.

**B.    The Fact That the Segregation is Optional to the MLSs Does Not Confer Immunity From the Antitrust Laws**

NAR cannot immunize its rules from scrutiny under the Sherman Act merely by peddling them as "optional." *See N. Tex. Specialty Physicians v. F.T.C.*, 528 F.3d 346, 356 (5th Cir. 2008) ("[A]ntitrust liability does not depend upon a particular form or business structure . . . ."). The question is whether the promulgation, adoption and enforcement of the Segregation Rule, however labeled, acts in restraint of trade. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 731 (1988); *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. 679, 694–95 (1978); *United States v. American Tobacco Co.*, 221 U.S. 106, 179 (1911).

In the past, NAR has tried unsuccessfully to hide other anticompetitive, exclusionary rules behind a veneer of optionality. Virtual Office Websites (VOWs) competed with brick-and-mortar brokerages and often offered lower commissions while providing greater transparency to consumers. *United States v. Nat'l Ass'n of Realtors*, 2006 WL 3434263, at *2 (Nov. 27, 2006). NAR authored a rule that ultimately delegated, even to individual brokerages, the ability to block a VOWs' listings. *Id.* at *4. The United States Department of Justice (DOJ) challenged the "optional" VOW rule as anticompetitive. *Id.* In defeating NAR's motion to dismiss, the DOJ countered NAR's defense of the rule as being merely optional, explaining:

> Delegating the exercise of the opt-out right to individual members does not absolve NAR of liability for creating the restraint and the mechanism for its enforcement. In *Associated Press v. United States*, 326 U.S. 1 (1945), the Supreme Court found that a rule similar to NAR's optout provisions constituted a restraint of trade. The by-laws at issue in

PLAINTIFF REX'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

6

Case No. 2:21-cv-00312-TSZ

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

> Associated Press provided that any member could veto a local competitor from joining the association. *Id.* at 10-11. Exercise of the veto right was – like a broker's exercise of opt-out rights – left to the sole discretion of an individual member. *Id.*
>
> . . .
>
> It is equally fallacious for NAR to assert that, because its opt-out provisions provide some brokers additional "freedom of action," those policies do not restrain trade. Like the members of the AP, NAR's members pool their listings, and exert their combined power, through adoption of the opt-out rights, to curtail competition from VOW operating brokers.

DOJ Mot. to Dismiss, available at: https://www.justice.gov/atr/case-document/memorandum-united-states-opposition-defendants-motion-dismiss-0. By comparison, the Segregation Rule is more restrictive, offering no individual brokerage freedom of action. It thus provides NAR a powerful vehicle for asserting its members' combined power to curtail competition from outsiders. The exclusionary agreement is dictated by the competitor group. As a broker, Zillow is also a competitor and so part of that competitor group, and as noted in REX's opposition to Zillow's motion for summary judgment, benefits from elevated commission rates. Opp'n. at 4, 13, 17–18.

NAR relies upon *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010), for the proposition that independent decisions by trade association members to implement recommendations, or optional guidance, do not evidence a common scheme. But the allegations and proof in this case are starkly different. REX alleges, not that the individual members of NAR violated Section 1 of the Sherman Act, but that Zillow accepted an invitation to join with countless competitors in enforcing the extant Segregation Rule, which is anticompetitive on its face and produces anticompetitive effects by restricting non-NAR entry into the residential real estate brokerage market. *See Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939); *see also PLS.Com, LLC v. Nat'l Ass'n of Realtors,* 32 F.4th 824, 843 (9th Cir. 2022). Individual real estate brokers,

PLAINTIFF REX'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No. 2:21-cv-00312-TSZ

7

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

1    regardless of their individual motivations,[4] had no choice but to honor the Segregation Rule

2    once adopted, as Zillow itself has shown.

3         *Consolidated Metal Products, Inc. v. American Petroleum Institute,* 846 F.2d 294

4    (5th Cir. 1988), also cited by NAR, has no bearing here.  A manufacturer sued a standard

5    setting body that did not initially approve the manufacturer's product, a decision which had

6    no consequence other than the manufacturer could not place the defendant's "monogram"

7    on its products.  *Id.* at 294.  The court found no evidence of anticompetitive collusion and

8    concluded that a single error in evaluation "does not amount to a conspiracy."  *Id.*  NAR's

9    Segregation Rule requires no qualitative review—it is merely a naked exclusion of any

10   brokers who are not MLS members from having their listings appear alongside those of

11   MLS members.

12        NAR suggests that in *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438 (11th

13   Cir. 1991), and *County of Tuolumne v. Sonora Community Hospital*, 236 F.3d 1148 (9th

14   Cir. 2001), the "recommendations" of medical committees to the ultimate deciders

15   (hospital boards in both cases) to exclude doctors from certain practicing privileges, were

16   insulated from antitrust scrutiny because the medical committees' recommendations were

17   not binding, but again, optional.  NAR's interpretation misreads the courts' holdings.  The

18   key to both cases was that the final decision was made by boards controlled by persons

19   unmotivated by anticompetitive economic incentives—they were not the applicant doctors'

20   competitors.  *Tuolumne*, 236 F.3d at 1153 ("The Board is the final decision-maker on

21   hospital privileging criteria. None of defendant [obstetricians] was a member of the Board.

22   Many Board members were non-physician community representatives or had backgrounds

23   in health-care administration."); *Todorov*, 921 F.2d at 1457, 1459 (noting that the hospital's

24   governing board was incentivized to foster competition and "there is no additional evidence

---

[4] It is hardly implausible that even a local brokerage would want to maintain a listing
website that was fully inclusive including FSBOs, builders' homes, non-MLS agent
listings, etc., to drive traffic to their particular website.  Under the Segregation Rule, that
opportunity was foreclosed.

PLAINTIFF REX'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No. 2:21-cv-00312-TSZ

8

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

that reasonably suggests that [the hospital's] board of directors and the radiologists conspired to deny [plaintiff doctor's] application for privileges").  Contrary to NAR's portrayal, these holdings relied upon the fact that the ultimate decisionmakers were not competitors who shared economic incentive to exclude other competitors.  NAR and its member MLSs are made up of competitors who share the same economic interests.

Two other healthcare cases highlight the distinction.  In *North Texas Specialty Physicians v. F.T.C.*, 528 F.3d 346, 356–57 (5th Cir. 2008), the court stated the determination of "conspiracy" or "concerted activity" by physicians did not depend on the form of the entity, but "whether the organization is controlled by members with substantially similar economic interests."  Similarly, in reversing summary judgment in favor of a defendant prepaid healthcare plan that excluded non-physician podiatrists, the Ninth Circuit in *Hahn v. Oregon Physicians' Service*, 868 F.2d 1022, 1029 (9th Cir. 1988), noted:

> The proper inquiry is not whether individual board members *themselves* were in actual competition with the complaining nonmembers.  Rather, the proper inquiry is whether practitioners sharing substantially similar economic interests collectively exercised control of a plan under whose auspices they have reached agreements which work to the detriment of competitors.

The Segregation Rule was a product of collective action by NAR membership, who are industry competitors.  Much like the optional VOW rule, it works directly to suppress unwanted competitors like REX through the power of the NAR collective.

The Supreme Court's decision in *Associated Press* emphasizes the point.  326 U.S. 1 (1945).  At issue were by-laws of the Associated Press (AP), a cooperative association of then over 1200 newspaper publishers.  *Id.* at 3.  The by-laws, as they eventually evolved, granted easy entry into the association for any newspaper publisher who did not compete with a current AP member.  *Id.* at 9.  But for applicant-publishers who competed with current AP members, the by-laws gave the current AP member an *optional* right to object.

1    *Id.* at 10.  Upon an objection being lodged, several obstacles followed including additional

2    fees, loss of an applicant-publisher's exclusivity over other news resources, and a required

3    vote of the AP membership.  *Id.* at 10–11.  The fact that exclusionary decisions were

4    delegated to an individual competitor neither eviscerated the essential agreement embodied

5    in the by-laws nor dissuaded the Court from holding that the AP's scheme "hindered and

6    restrained the sale of interstate news to non-members who competed with members." *Id.*

7    at 13.

8         Optionality does not annul an anticompetitive agreement, conspiracy, or

9    combination when competitors are acting concertedly in accordance with it.

10   **C.    Zillow's Website Redesign Was a Product of the Segregation Rule**

11        NAR provides no legal support for the novel proposition that an anticompetitive

12   agreement or conspiracy must contemplate every detail of its implementation for it to be

13   subject to Section 1.  Such a requirement would be incompatible with the broad definition

14   of agreement supported by decades of Section 1 precedent.  *See, e.g.*, *Interstate Circuit v.*

15   *United States*, 306 U.S. 208 (1939) (noting a formal or explicit agreement is not necessary);

16   *Mayor & City Council of Balt. Md. v. Citigroup*, 709 F.3d 129, 136 (2d Cir. 2013) (noting

17   an agreement may be tacit and without even verbal communication); *Esco Corp. v. United*

18   *States*, 340 F.2d 1000, 1007 (9th Cir. 1965) (noting a "knowing wink" can be sufficient).

19        NAR offers (1) that Zillow did not have to join NAR MLSs enforcing NAR's

20   Segregation Rule and (2) that Zillow might have implemented NAR's Segregation Rule

21   with a different format or in a different manner.  Both arguments miss the point.  The first

22   is dealt with easily:  Zillow did join, thereby agreeing to enforce all NAR rules, and

23   accordingly surrendered its autonomy to the anticompetitive collective.  *Associated Press*

24   *v. United States,* 326 U.S. 1, 8, 19 (1945).  And whether Zillow could have designed its

25   website somehow differently to comply with the Segregation Rule also misses the point—

26   it is segregation in and of itself that produces the pernicious effect.

27

28

1        1.   NAR Itself Regulated Zillow's Websites

2        NAR's assertion that it was not involved in the details of Zillow's website

3    integration, while utterly irrelevant, is false as the lengthy citation of facts above make

4    plain.  As other courts have determined, as the communications in this matter have shown,

5    and as Dr. Evans has opined, NAR is a trade organization that operates through its

6    membership, which empowers it to make the rules and then enforce them upon its

7    members.  The extensive consultations and adjudications concerning Zillow's website

8    redesign to comply with the Segregation Rule highlights the power of NAR.  It is the master

9    of its rules, optional or mandatory, including anticompetitive schemes such as the

10   Segregation Rule.  The absence of a signature line cannot protect NAR from its central role

11   in the agreement, combination, and conspiracy to promulgate and enforce the Segregation

12   Rule.

13       2.   The Segregation Rule Is Anti-Competitive On Its Face

14       Both *Associated Press v. United States*, 326 U.S. 1 (1945), and the VOW case,

15   *United States v. Nat'l Ass'n of Realtor* , 2006 WL 3434263 (Nov. 27, 2006), are instructive

16   on the issue of anticompetitive segregation.  In *Associated Press*, the Supreme Court

17   observed that:  "AP is a vast, intricately reticulated organization, the largest of its kind,

18   gathering news from all over the world, the chief single source of news for the American

19   press, universally agreed to be of great consequence."  *Associated Press*, 326 U.S. at 18

20   (citation omitted).  The Court also noted that "morning newspapers, which control 96% of

21   the total circulation in the United States, have AP news service."  *Id.* at 18.  The upshot of

22   the Court's analysis was:

23           It is apparent that the exclusive right to publish news in a given field,
24           furnished by AP and all of its members gives many newspapers a
             competitive advantage over their rivals.  Conversely, a newspaper without
25           AP service is more than likely to be at a competitive disadvantage.

*Id.* at 17–18 (note omitted).  Likewise, segregation from NAR members' MLS listings (the nation's largest trade group), on the nation's leading internet aggregator site provider, is an extreme competitive disadvantage, regardless of the precise form that segregation takes.

As the DOJ asserted in *United States v. NAR*, 2006 WL 3434263, in opposition to NAR's motion to dismiss the DOJ's complaint against NAR's amended VOW rule: "NAR's members pool their listings, and exert their combined power, through adoption of the opt-out rights, to curtail competition from VOW operating brokers."[5]  In other words, the segregation itself imposed harm.

NAR's argument to the contrary ignores the irrefutable evidence of concerted action, agreement, or combination to enforce NAR's Segregation Rule to exclude non-members' listings, including REX's, from appearing alongside members' listings.  Nothing about Zillow's execution of the rule on its own websites could change that.

<u>**CONCLUSION**</u>

For the reason set forth above and in its opening brief, REX respectfully requests the Court to grant its motion for partial summary judgment on its federal and state law antitrust claims as set for in its Consolidated Motion for Partial Summary Judgment.

**Word Count:** I certify that this memorandum contains 3,926 words, in compliance with the Local Civil Rules

Dated: June 30, 2023               **BOIES SCHILLER FLEXNER LLP**

By:*/s/ Carl E. Goldfarb*
   Carl E. Goldfarb (Admitted *Pro Hac Vice*)
   Boies Schiller Flexner LLP
   401 East Las Olas Blvd., Suite 1200
   Fort Lauderdale, FL 33301
   Telephone: (954) 356-0011
   Facsimile:  (954) 356-0022
   cgoldfarb@bsfllp.com

---

[5]  DOJ Br. Mot. to Dismiss, available at: https://www.justice.gov/atr/case-document/memorandum-united-states-opposition-defendants-motion-dismiss-0.

Plaintiff REX's Reply In Support Of Its
Motion for Partial Summary Judgment

Case No. 2:21-cv-00312-TSZ

12

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

Ursula Ungaro
Stephen N. Zack
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, FL 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307
uungaro@bsfllp.com
szack@bsfllp.com

James Denvir
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, D.C, 20005
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
jdenvir@bsfllp.com

David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300
dboies@bsfllp.com

Darren L. McCarty
McCARTY LAW PLLC
1410B West 51st Street Austin, TX 78756
Telephone: (512) 827-2902
darren@mccartylawpllc.com

*Attorneys for Plaintiff*

PLAINTIFF REX'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No. 2:21-cv-00312-TSZ

13

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

1

## CERTIFICATE OF SERVICE

2

**I HEREBY CERTIFY** that on June 30, 2023 , I served foregoing document to be

3

filed in this Court's CM/ECF system, which will send notification of such filing to the

4

counsel of record.

5

6

By: */s/ Carl E. Goldfarb*

7

Carl E. Goldfarb, Esq.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28