1

2

3

4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

5

6

7

8

9

10

| | |
|---|---|
| REX – REAL ESTATE EXCHANGE, INC.,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>ZILLOW, INC., et al.,<br><br>　　　　　　Defendants. | C21-0312 TSZ<br><br>ORDER |

11

12

13

14

15

16

17

18

19

20

21

22

　　THIS MATTER comes before the Court on (i) the motion for summary judgment, docket no. 331, brought by defendant the National Association of REALTORS® ("NAR") relating to antitrust claims under federal and state law asserted by plaintiff REX – Real Estate Exchange, Inc. ("REX"), (ii) the deferred portion of the motion for summary judgment, docket no. 339, brought by defendants Zillow, Inc., Zillow Group, Inc., Zillow Homes, Inc., Zillow Listing Services, Inc., and Trulia, LLC (collectively, "Zillow") relating to REX's antitrust claims, and (iii) the portion of REX's motion for partial summary judgment, docket no. 332, seeking to establish the existence of an "agreement" for purposes of its antitrust claims.  Having reviewed all papers filed in support of, and in opposition to, the motions, and having considered the oral arguments of counsel, the Court enters the following Order, and dismisses REX's antitrust claims against all defendants.

23

**Background**

**A.    Zillow**

This action arises from Zillow's implementation of a two-tab display on its websites and mobile platforms ("apps").  Founded in 2004 in Seattle, Washington, Zillow operates "the most-visited network of residential real estate websites and mobile apps in the United States."  Samuelson Decl. at ¶ 7 (docket no. 61)[1]; *see also* Ex. J to Goldfarb Decl. (docket no. 405-9 at 5) (showing that the total number of Zillow's daily active app users is three times higher than its nearest competitor).

Before January 2021, Zillow obtained access to the millions of property "listings"[2] that it displayed on its websites and mobile platforms through individually negotiated, third-party "syndication agreements" with hundreds of multiple listing services across the United States and many of their participants.[3]  Samuelson Decl. at ¶¶ 32, 34.  A multiple listing service ("MLS") is an "organization and a system" through which real estate professionals "agree on the basic terms of their cooperation and compensation to help one another sell homes and contribute to a common database of listings."  *Id.* at ¶ 24.

---

[1] All parties rely on the Declaration of Errol Samuelson, Zillow's Chief Industry Development Officer, docket no. 61, in support of their respective motions and briefs.

[2] A listing is a "compilation of data" about a specific property, including its size, price, and sale status, as well as any photos, videos, or virtual tours of the property.  Samuelson Decl. at ¶ 19.

[3] The parties repeatedly refer to various types of real estate professionals throughout their motions and briefs.  According to NAR's antitrust rebuttal expert, Jeffrey Prince, Ph.D., a real estate "agent" has a professional license to assist in the buying, selling, or rental of real estate, while a "broker" typically has more experience than an agent, as well as an additional license, and might oversee one or more agents.  Prince Report at ¶¶ 19–20, Ex. 10 to Goldfarb Decl. (docket no. 344-2).

ORDER - 2

1   Approximately 585 MLSs exist within the United States, "each of which generally covers

2   a discrete geographic region and facilitates broad access to all listings within that area."

3   *Id.*

4        Although Zillow's syndication agreements with MLSs allowed it to "compile a

5   vast quantity" of listings nationwide, Zillow observed that its coverage was not complete.

6   Samuelson Decl. at ¶¶ 35, 40.  Although Zillow was, on average, displaying

7   approximately 98% of listings in the United States, its coverage in certain markets was

8   substantially lower.  *Id.* at ¶¶ 40–41.  For example, Zillow found that it was missing

9   approximately 30–35% of MLS listings in the Seattle real estate market despite its

10  syndication agreement with the local MLS.  *See id.*  These gaps in coverage caused

11  Zillow to consider whether to use a different method of obtaining listings data.  *Id.* at

12  ¶ 30.  Additionally, Zillow was concerned about losing access to listings because most

13  MLSs could terminate the syndication agreements "without cause and with very limited

14  notice."  *Id.* at ¶ 49.

15       In 2019, Zillow began to shift away from syndication agreements to contracts

16  permitting it to obtain "more reliable, comprehensive, and higher-quality" Internet Data

17  Exchange ("IDX") feeds directly from the MLSs.  Samuelson Decl. at ¶ 31.  To gain

18  access to an MLS's IDX feed, Zillow was required to become a participant of the MLS.[4]

19  _____

20  [4] Zillow's decision to join local MLSs coincided with the expansion of its iBuying business, Zillow
    Offers.  Since 2018, Zillow had been purchasing homes directly from consumers in 25 major markets
21  across the United States.  *See* Samuelson Decl. at ¶ 16.  Zillow would buy a home, flip it, and then place
    the property in a local MLS and on Zillow's websites for resale.  *Id.*  Zillow typically worked with local
22  brokers to represent it when buying and selling properties through its Zillow Offers service.  *Id.*  In

23

*Id.* at ¶¶ 18, 31; *see also* Samuelson Dep. (Nov. 29, 2022) at 13:9–13, Ex. M to Bonanno

Decl. (docket no. 329-13) ("[T]hat meant that [Zillow] would be joining MLSs in order to

qualify for those [IDX] feeds.").  Unlike Zillow's third-party syndication agreements,

which sometimes "imposed restrictions on how often Zillow would obtain updated

listings information," access to IDX feeds would provide Zillow with complete listings

delivered directly from the MLSs without delay.  Samuelson Decl. at ¶¶ 5, 47.

      The record reflects that Zillow's transition to IDX feeds was not a simple task.

Zillow first "had to become a licensed brokerage and hire and/or license designated

brokers" in all 50 states and the District of Columbia.  *Id.* at ¶ 53.  These brokers "then

applied for membership with hundreds of local MLSs" and requested access to their IDX

feeds.  *Id.*  By joining local MLSs, Zillow was required to "adhere to various rules and

policies enacted by the local MLSs regarding the display of IDX data[.]"  *Id.*  Many of

these policies and rules had been promulgated by defendant the National Association of

REALTORS®.

**B.   NAR**

      NAR is a trade association of real estate professionals.  Samuelson Decl. at ¶ 26.

Its approximately 1.4 million members include real estate brokers, agents, and others

---

January 2021, Zillow launched Zillow Homes.  *See id.* at ¶ 17.  Through its Zillow Homes business,
Zillow became a licensed brokerage in certain markets and represented itself when buying and selling
homes in those areas.  *Id.*  Zillow hoped to expand Zillow Homes to all of the markets in which Zillow
Offers operated.  *Id.*  Becoming a licensed broker, however, required Zillow "to change the way it
obtained listings data [from the MLSs] to conform to the typical way brokers receive listing data" (i.e.,
through IDX feeds licensed to an MLS's participants).  *Id.* at ¶ 52.

involved in the real estate industry.  *Id.*  The term "REALTOR®" refers to a broker or agent who is member of NAR.  Galicia Decl. at ¶ 2 (docket no. 65).  A broker or agent can become a REALTOR® by joining a local association of REALTORS®, which "automatically extends" the broker's or agent's membership to the state association and to NAR.  Prince Report at ¶ 21, Ex. 10 to Goldfarb Decl. (docket no. 344-2).  As a trade association, NAR publishes the Handbook on Multiple Listing Policy (the "Handbook"), which "is intended to guide member associations of REALTORS® in the operation of [their MLSs] consistent with the policies established by [NAR's] Board of Directors."  *See* Ex. B to Bonanno Decl. (docket no. 329-2 at 5).  Pursuant to the Handbook, NAR-affiliated MLSs[5] "must conform their governing documents to the mandatory MLS policies established by [NAR's] Board of Directors to ensure continued status as member boards and to ensure coverage under [NAR's] master professional liability insurance program."  *Id.*

## C.      The No-Commingling Rule

In addition to providing mandatory provisions, the Handbook contains a number of NAR's "recommended," "optional," or "informational" model rules.  *See* Handbook (docket no. 329-2 at 3).  At issue in this action is "Section 18.3.11," which the Handbook

---

[5] NAR-affiliated MLSs are "independent entities owned by or operated by [REALTOR®] associations."  Gansho Dep. (Oct. 28, 2022) at 47:16–20, Ex. D to Bonanno Decl. (docket no. 335).  Some MLSs in the United States are not affiliated with NAR.  For example, the Northwest Multiple Listing Service (which covers the Seattle housing market) is not affiliated with NAR.  *See* Samuelson Decl. at ¶ 27.  Only MLSs owned by one or more associations of REALTORS® are considered NAR-affiliated.  *Id.*  If affiliated with NAR, an MLS must "enact and follow" NAR's mandatory policies and rules.  *See id.* at ¶ 29.

labels as an optional model rule.  *Id.* (docket no. 329-2 at 105).  Section 18.3.11

(hereafter referred to as the "no-commingling rule")[6] provides that:

> Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources.  Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.

*Id.*  The parties do not dispute that approximately 29% of NAR-affiliated MLSs have not

adopted the no-commingling rule.  NAR Suppl. Resp. to REX Interrog. No. 4, Ex. F to

Bonanno Decl. (docket no. 335-2 at 4); Gansho Dep. (Dec. 8, 2022) at 27:10–18, Ex. E to

Bonanno Decl. (docket no. 335-1).  For example, the California Regional Multiple

Listing Service, the largest NAR-affiliated MLS in the United States, has not adopted the

rule.  *See* NAR Suppl. Resp. to REX Interrog. No. 4 (docket no. 335-2 at 35).[7]

The no-commingling rule originated in 2001 when Triangle MLS (which operates

in North Carolina) adopted a no-commingling provision due to concern regarding the

quality and reliability of listings data obtained from sources outside the MLS.  Gansho

Dep. (Dec. 8, 2022) at 127:1–129:17, Ex. C to Bonanno Decl. (docket no. 386-3).  NAR

promulgated the optional no-commingling rule sometime thereafter and most recently

---

[6] REX refers to Section 18.3.11 as the "segregation rule," Zillow refers to Section 18.3.11 as the "no-commingling rule," and NAR refers to the provision as "Section 18.3.11."  The Court will refer to Section 18.3.11 as the "no-commingling rule."

[7] Some unaffiliated MLSs, such as the Northwest Multiple Listing Service, have also "enacted or otherwise agreed to abide by many of" NAR's policies and rules.  *See* Samuelson Decl. at ¶ 65.  Although the Northwest Multiple Listing Service is not affiliated with NAR, it has adopted a rule that prohibits the commingling of MLS and non-MLS listings.  Zillow Resp. to REX Interrog. No. 3, Ex. J to Bonanno Decl. (docket no. 329-10 at 9).

1    amended the rule in May 2017.  *See id.*; Handbook (docket no. 329-2 at 105).  Zillow was

2    not involved in NAR's promulgation or amendment of the model rule.

3             Unlike with mandatory rules, NAR does not require its affiliated MLSs to certify

4    to NAR that they have adopted optional rules, such as the no-commingling rule, *see*

5    Gansho Dep. (Oct. 28, 2022) at 27:10–29:2 (docket no. 335), and MLSs that choose not

6    to adopt the no-commingling rule will not lose access to NAR's errors and omissions

7    insurance policy, *see id.* at 49:13–23, 66:11–15.  In other words, NAR does not mandate

8    compliance with its optional rules, *see id.* at 78:8–19, and an MLS that decides to adopt

9    an optional model rule, such as the no-commingling rule, can repeal the rule at any time,

10   *see* Gansho Dep. (Dec. 8, 2022) at 212:24–213:12 (docket no. 335-1).  For example, in

11   August 2022, REColorado, a NAR-affiliated MLS, decided to repeal the no-commingling

12   rule, with no negative consequences from NAR.  Ex. L to Bonanno Decl. (docket

13   no. 329-12).

14   **D.    Zillow's "Two-Tab Display"**

15           Zillow's syndication agreements did not impose restrictions on the commingling

16   of search results, meaning that "listings from all sources could be, and were, displayed

17   together on Zillow's online platforms," and prior to January 2021, Zillow's search results

18   contained a mix of listings from various sources, including MLS feeds and for-sale-by-

19   owner listings.  Samuelson Decl. at ¶ 38.  On September 23, 2020, Zillow made a

20   public announcement that it would obtain listings data from IDX feeds beginning in

21   January 2021.  *Id.* at ¶ 68.  Because Zillow was joining many MLSs that had adopted the

22   no-commingling rule, Zillow was required to change the way it displayed its search

23

1   results in certain geographic areas.  *Id.* at ¶ 68.  For example, as of April 2021, Zillow

2   had executed approximately 218 agreements with local MLSs to obtain access to their

3   IDX feeds.  Hendricks Decl. at ¶ 25 (docket no. 62)[8]; Hendricks Dep. at 125:16–126:17,

4   Ex. 8 to Najemy Decl. (docket no. 352-8).  Of those 218 IDX agreements, 204 were with

5   NAR-affiliated MLSs, Hendricks Decl. at ¶ 26, and approximately two-thirds of the

6   MLSs Zillow joined had adopted a no-commingling rule, Samuelson Decl. at ¶ 66.

7   Before obtaining access to the MLSs' IDX feeds, Zillow was required to execute IDX

8   agreements with each MLS and submit to a "mandatory review process" with the MLSs

9   to ensure compliance with their local rules.  *See* Samuelson Decl. at ¶ 69.

10       How Zillow chose to comply with the no-commingling rule was decided solely by

11   Zillow.  Samuelson Decl. at ¶ 67 ("The no-commingling rule is not prescriptive and

12   Zillow alone decided how it would display its search results to comply, including for

13   MLSs that did not prohibit comingling at all.").  Although Zillow could have

14   implemented a different website display in regions where local MLSs had adopted the

15   no-commingling rule, it decided to implement a uniform, two-tab display, with the

16   default tab labeled "Agent listings" and the second tab labeled "Other listings."  *See id.* at

17   ¶ 68.  Because Zillow set the "Agent listings" tab as the default tab, listings associated

18   with that tab would be seen by Zillow's users immediately (without clicking the tab).  A

19   user who clicked on the "Other listings" tab would see only non-MLS listings.  Thus, the

20

21   ───────────────

22   [8] The parties also rely on the Declaration of Matt Hendricks, docket no. 62, a Senior Director of Brokerage Operations at Zillow.

23

Court and the parties refer to the "Agent listings" tab as the "default" tab.  *See* Am.

Compl. at ¶ 63 (arrow added, showing Zillow's two-tab display).



On January 12, 2021, Zillow implemented its new two-tab display.  Zillow Resp.

to REX Interrog. No. 15, Ex. O to Bonanno Decl. (docket no. 329-15 at 15).  Many

Zillow users disliked the change and Zillow recorded "a 32% increase in inbound

complaints to Customer Care in the weeks following [its] transition to IDX [feeds]."

Ex. NNN to Goldfarb Decl. (docket no. 405-61 at 2); *see also* Ex. 38 to Goldfarb Decl.

(docket no. 332-37 at 8) (explaining that Zillow received "overwhelmingly negative

feedback [regarding] the 'two-tab experience.'").  Some users expressed their belief that

the two-tab display favored agent listings over listings obtained from other sources.  *See*

Ex. NNN to Goldfarb Decl. (docket no. 405-61 at 2).

Additionally, Zillow observed that pageviews of for-sale-by-owner listings

dropped approximately 80–85% after Zillow moved those listings to the "Other listings"

1   tab.  *See id.*  By February 2021, Zillow found that usage of the "Other listings" tab was

2   low (used in only four to seven percent of sessions) despite "minimal change in overall

3   onsite customer engagement."  Ex. 38 to Goldfarb Decl. (docket no. 332-37 at 8); *see*

4   *also* Ex. YYY to Goldfarb Decl. (docket no. 405-72) (characterizing the "Other listings"

5   tab's performance as "terrible").  Zillow also recognized that various listing types such as

6   agent, new construction, and coming soon could appear in either tab depending on the

7   source of the data.  *See* Ex. 38 to Goldfarb Decl. (docket no. 332-37 at 10).  Zillow

8   described the categorization of listings by data source (i.e., MLS v. non-MLS listings) as

9   "arbitrary."  *Id.* (docket no. 332-37 at 9).

10      The record reflects that Zillow disliked the no-commingling rule, and some of its

11   employees even referred to the requirement as "anti-competitive."  Samuelson Dep.

12   (Apr. 27, 2023) at 44:4–21, 53:18–23, Ex. 4 to Najemy Decl. (docket no. 345-2).  From

13   Zillow's perspective, the commingling of all listings greatly benefits consumers,

14   Samuelson Decl. at ¶ 72, and, beginning in October 2021, Zillow advanced multiple

15   proposals to NAR to adopt a mandatory rule that would require all MLSs to permit the

16   commingling of listings regardless of source, *id.*; Samuelson Dep. (Apr. 27, 2023) at

17   264:15–266:15 (docket no. 345-2); Ex. 34 to Goldfarb Decl. (docket no. 332-34).

18   **E.   REX**

19      Founded in 2014, REX was a licensed real estate broker that adopted a business

20   model aimed at reducing commissions in the real estate industry.  Sides Dep. at 31:16–

21   17, 33:8–34:12, Ex. 14 to Najemy Decl. (docket no. 345-9).  As a broker, REX employed

22   licensed real estate agents to handle its clients' listings.  *See* Hendricks Dep. at 157:19–

23

158:5, Ex. 14 to Goldfarb Decl. (docket no. 332-14).  Unlike some other discount

brokers, such as Redfin, REX attempted to bypass MLSs entirely, *see* Ryan Dep. at 33:7–

11, 385:5–11, Ex. 1 to Najemy Decl. (docket no. 345), and advertised to consumers that it

charged "a low fee" for its services by "totally eliminating" certain commissions

customary in the real estate industry, Ex. T to Bonanno Decl. (docket no. 329-20 at 4).

Specifically, by operating outside of the MLSs, REX sought to eliminate mandatory,

predetermined buyer broker or agent commissions.[9]

   To promote its clients' properties, REX relied on websites such as Zillow, Google,

Facebook, Instagram, and Bing.  Sides Dep. at 57:17–21, 74:3–20, 79:20–80:12 (docket

no. 345-9); *see also* Ex. T to Bonanno Decl. (docket no. 329-20).  Prior to January 12,

2021, REX's listings were displayed alongside all other listings on Zillow's platforms.

Following implementation of its two-tab display, Zillow moved REX's listings to the

non-default "Other listings" tab.  Ryan Dep. at 159:17–24 (docket no. 345).  As a result

of this transition, a number of REX's clients were unable to find their listings on Zillow.

*See*, *e.g.*, Ex. 39 to Goldfarb Decl. (docket no. 332-38) ("Seller reported that they can't

find listing on Zillow. . . . Seller is upset and considering cancelling.").  REX also

observed that some prospective clients were hesitant to use its services in light of

Zillow's two-tab display.  *See*, *e.g.*, *id.* ("Seller is hesitant to sign listing agreement due to

---

[9] Mandatory offers of buyer broker or agent compensation are required under NAR's "Buyer Broker Commission Rule," which provides that an MLS participant, when listing a property with an MLS, must disclose the compensation offered to a buyer broker or agent whose client purchases the listed home.  *See* Handbook (docket no. 329-2 at 55).  REX contends that the Buyer Broker Commission Rule preserves "sky-high" real estate commissions in the United States.  Am. Compl. at ¶ 33.

1  the change in the [Z]illow platform.").  REX estimates that, like for-sale-by-owner

2  listings, pageviews of its listings on Zillow's platforms dropped by as much as 80%

3  following Zillow's implementation of the two-tab display.  *See* Ex. 38 to Goldfarb Decl.

4  (docket no. 332-37 at 9).  Approximately 18 months after Zillow adopted the two-tab

5  display, REX wound down its residential real estate brokerage business.  REX Resp. to

6  Zillow Interrog. No. 12., Ex. Y to Bonanno Decl. (docket no. 335-6 at 9).

7       REX attributes its total business failure to Zillow's two-tab display, and brings

8  antitrust claims against Zillow and NAR under the Sherman Act, 15 U.S.C. § 1, and an

9  antitrust provision of the Washington Consumer Protection Act ("CPA"),

10  RCW 19.86.030.  Am. Compl. at ¶¶ 131–41, 189–201.  REX alleges that NAR and

11  Zillow, along with non-party MLSs, "entered into a horizontal combination, agreement,

12  and/or conspiracy" to enforce the no-commingling rule, thereby denying non-MLS

13  members like REX "effective access to prominent Zillow residential real estate

14  aggregator websites[.]"  Am. Compl. at ¶¶ 110, 135.  NAR and Zillow now move for

15  summary judgment on REX's antitrust claims, and REX moves for partial summary

16  judgment on two discrete issues:  (i) the existence of an agreement for purposes of its

17  antitrust claims; and (ii) the falsity of Zillow's tab labels for purposes of its false

18  advertising claim against Zillow under Section 43 of the Lanham Act.[10]  For the reasons

19  discussed below, the Court concludes that REX has failed to present evidence of the

---

[10] The Court will address the portion of REX's motion regarding its false advertising claim in a separate order.

conspiracy alleged in its Amended Complaint, namely, a purported agreement between NAR, Zillow, and non-party MLSs to segregate, conceal, and demote non-MLS listings on Zillow's websites and mobile platforms.

**Discussion**

**A.     Summary Judgment Standard**

The Court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive a motion for summary judgment, the adverse party must present affirmative evidence, which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn.  *Id.* at 255, 257.  When the record, however, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted.  *See Beard v. Banks*, 548 U.S. 521, 529 (2006) ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

**B.     Contract, Combination, or Conspiracy**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade[.]"  15 U.S.C. § 1.  Like Section

1 of the Sherman Act, RCW 19.86.030 provides that "[e]very contract, combination, in

the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby

declared unlawful."  Because the federal and state standards are practically the same, the

Court will analyze both of REX's antitrust claims using the federal standards.[11]  *See State*

*v. LG Elecs., Inc.*, 186 Wn.2d 169, 186 n.3, 375 P.3d 1035 (2016) (McCloud, J.,

concurring) (explaining that Washington courts are guided by the interpretation of

corresponding federal statutes).

To prevail on a Section 1 claim, a plaintiff must establish:  (i) a "contract,

combination or conspiracy among two or more persons or distinct business entities";

(ii) "which is intended to restrain trade"; (iii) "which actually injures competition"; and

(iv) "harm to the plaintiff from the anticompetitive conduct."  *Name.Space, Inc. v.*

*Internet Corp. for Assigned Names & Nos.*, 795 F.3d 1124, 1129 (9th Cir. 2015) (citation

omitted).  The contract, combination, or conspiracy element of a Section 1 claim is not

particularly demanding; a formal agreement is not required, *see Interstate Cir., Inc. v.*

*United States*, 306 U.S. 208, 227 (1939), and a "knowing wink" among competitors

might be sufficient to create a triable issue of fact, *see Esco Corp. v. United States*, 340

F.2d 1000, 1007 (9th Cir. 1965).  The existence of a contract, combination, or conspiracy,

however, is a "threshold component" of every Section 1 claim, *see Epic Games, Inc. v.*

*Apple, Inc.*, 67 F.4th 946, 981 (9th Cir. 2023), and must reflect a "conscious commitment

---

[11] The Court notes that the parties rely only on the federal standards in their respective motions and briefs.

ORDER - 14

to a common scheme designed to achieve an unlawful objective," *Toscano v. Pro.*

*Golfers Ass'n*, 258 F.3d 978, 984 (9th Cir. 2001) (quoting *Monsanto Co. v. Spray–Rite*

*Serv. Corp.*, 465 U.S. 752, 764 (1984)).  "Mere independent action is insufficient to

trigger" a violation of Section 1 of the Sherman Act.  *Gold Medal LLC v. USA Track &*

*Field*, 187 F. Supp. 3d 1219, 1224 (D. Or. 2016).

   The existence of a contract, combination, or conspiracy may be established by

either direct or circumstantial evidence.  "Direct evidence is smoking-gun evidence that

'establishes, without requiring any inferences' the existence of" such an agreement.

*Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th Cir. 2023) (quoting *In re*

*Citric Acid Litig.*, 191 F.3d 1090, 1093 (9th Cir. 1999)).  Direct evidence "may consist of

written documents, audio or video recordings, or eyewitness testimony about what was

said." *PharmacyChecker.com LLC v. LegitScript LLC*, 614 F. Supp. 3d 796, 809 n.13

(D. Or. 2022).  In contrast, to survive a motion for summary judgment, a plaintiff who

relies on circumstantial evidence "must present evidence 'that tends to exclude the

possibility' that the alleged conspirators acted independently." *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quoting *Monsanto*, 465 U.S. at

764).

   In its Amended Complaint, REX alleges that NAR and Zillow, with non-party

MLSs, "entered into a horizontal combination, agreement, and/or conspiracy" to

"segregate, conceal, and demote non-MLS listings" on Zillow's websites and mobile

platforms.[12]  Am. Compl. at ¶¶ 60, 135.  The gist of REX's antitrust claims is that NAR, Zillow, and certain non-party MLSs conspired to organize Zillow's websites and mobile platforms in a manner that disadvantages non-MLS listings.  *See id.* at ¶ 125 ("In particular, [NAR, Zillow, and affiliated MLSs] are using their commonly agreed [no-commingling rule] to implement a change in Zillow.com's and Trulia.com's display of home inventory to demote and obscure listings by non-member competitors.").  NAR and Zillow contend that REX has failed to present any evidence of a common scheme between them to redesign Zillow's platforms and relegate REX's listings to a secondary, non-default tab.  On the other hand, REX argues that the undisputed facts establish the existence of an agreement for antitrust purposes, and asserts that it has presented direct evidence of the challenged conspiracy or, at the very least, "overwhelming circumstantial evidence of an agreement."  Tr. (July 27, 2023) at 37:3–7 (docket no. 456).  Specifically, REX contends that (1) Zillow's enforcement of the no-commingling rule and (2) certain communications between Zillow, NAR, and the MLSs support the existence of an agreement between the defendants.

### 1.    The No-Commingling Rule

The no-commingling rule, standing alone, does not constitute direct or circumstantial evidence of an anticompetitive agreement between NAR and Zillow to

---

[12] REX alleges that the defendants entered into a horizontal agreement.  Horizontal agreements are those between actual or potential competitors.  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).  In contrast, vertical agreements are defined as agreements between firms at different levels in a chain of production or distribution.  *Id.*; *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).

segregate, demote, and conceal non-MLS listings on Zillow's websites and mobile

platforms.  Although "arrangements or combinations designed to stifle competition

cannot be immunized by adopting a membership device accomplishing that purpose,"

*Associated Press v. United States*, 326 U.S. 1, 19 (1945), "every action by a trade

association is not concerted action by the association's members," *AD/SAT, Div. of*

*Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (internal citation

omitted).  To establish the existence of an agreement for antitrust purposes, a plaintiff

must present evidence tending to show a "conscious commitment to a common scheme

designed to achieve an unlawful objective."  *See Toscano*, 258 F.3d at 984 (quoting

*Monsanto*, 465 U.S. at 764).

The undisputed evidence in this action shows that neither NAR nor its affiliated

MLSs were involved in Zillow's decision to implement the challenged two-tab display

that allegedly drove REX out of business.  *See* Samuelson Decl. at ¶ 67 ("Zillow alone

decided how it would display its search results to comply [with the no-commingling

rule].").  When deciding how to comply with the no-commingling rule, Zillow

"experimented with a number of different options," including "displaying MLS and non-

MLS listings on separate search results pages," "adding a filter option to switch between

MLS and non-MLS listings," and "displaying search results differently based on [a

user's] specific location and whether the local MLS had enacted the no-commingling

rule."  *Id.*  Zillow ultimately chose, without input from NAR or any MLS, to implement

the two-tab display on its platforms.

Although REX has presented no evidence to refute that Zillow acted independently when it decided how to design its platforms to comply with the no-commingling rule, REX argues that Zillow's enforcement of the no-commingling rule alone is evidence of an anticompetitive agreement between the defendants to segregate, demote, and conceal non-MLS listings. This argument, however, ignores the optional nature of the no-commingling rule and does not support the existence of an alleged agreement between NAR and Zillow.

The authorities cited by REX deal with mandatory, not optional, rules or policies. For example, in *Gold Medal*, a case on which REX relies, a manufacturer of chewing gum brought suit against the United States Olympic Committee ("USOC") and USA Track & Field ("USATF") to challenge USOC's mandatory policy prohibiting athletes from competing at the 2016 Olympic Trials in apparel bearing individual sponsorship. 187 F. Supp. 3d at 1221–23. Athletes who violated the policy were subject to disqualification from the trials. *Id.* at 1223. When ruling on USOC's and USATF's motions to dismiss, the district court concluded that plaintiff had plausibly alleged the existence of an agreement between the defendants to enforce the advertising policy. *Id.* at 1224–25. Although USATF did not conspire to craft the challenged policy, plaintiff alleged that the organization would play a significant role in enforcing the mandatory

1    policy by identifying and potentially disqualifying athletes whose apparel violated its

2    terms.[13]  *Id.*

3         Similarly, in *Associated Press*, another case on which REX relies, the United

4    States Supreme Court explained that an association's mandatory by-laws constituted an

5    actionable restraint of trade in the newspaper publishing field.  326 U.S. at 12.  There, the

6    Associated Press ("AP"), a cooperative association of more than 1200 newspaper

7    publishers, required all of its members to "consent" to the organization's bylaws, which it

8    enforced through "severe disciplinary action," including monetary fines, suspension, or

9    expulsion from the organization.  *Id.* at 3, 8.  Among other restrictions, the bylaws "tied

10   the hands" of all members by prohibiting them "from selling or furnishing their

11   spontaneous news to any agency or publisher except to AP," which made "it difficult, if

12   not impossible" for non-members "to buy news from AP or any of its publisher

13   members."  *Id.* at 9, 13.

14        Unlike the mandatory advertising policy at issue in *Gold Medal* or the mandatory

15   bylaws challenged in *Associated Press*, the undisputed evidence in this action shows that

16   the no-commingling rule is entirely optional and has not been adopted by approximately

17   29% of NAR-affiliated MLSs.  *See* NAR Suppl. Resp. to REX Interrog. No. 4 (docket

18   no. 335-2 at 4).  REX does not dispute that (i) an affiliated MLS will suffer no

19

20

21   [13] REX also relies on *O.M. by and through Moultrie v. National Women's Soccer League, LLC*, 541 F.
     Supp. 3d 1171 (D. Or. 2021), to support its argument that Zillow's enforcement of the no-commingling
     rule is evidence of an anticompetitive agreement between the defendants.  Like *Gold Medal*, *Moultrie*

22   involves allegations of a concerted effort to enforce a mandatory rule.  *See id.* at 1176.

23

ORDER - 19

consequence if it chooses not to adopt the no-commingling rule, *see* Gansho Dep. (Oct. 28, 2022) at 27:10–29:2 (docket no. 335), or (ii) NAR takes no disciplinary action against MLSs that permit the commingling of listings, *see id.* at 49:13–23, 66:11–15.  Instead, REX argues that the optional nature of the no-commingling rule cannot immunize the defendants from antitrust liability.

Specifically, REX contends that the Northern District of Illinois previously rejected a "virtually identical" argument made by NAR when the United States Department of Justice challenged NAR's Virtual Office Website ("VOW") policies in the early 2000s.  *See United States v. Nat'l Ass'n of Realtors*, No. 05 C 5140, 2006 WL 3434263, at *2 (N.D. Ill. Nov. 27, 2006).  At issue in that action were mandatory policies created by NAR in response to the increased use of VOWs (broker-created websites that enabled potential home-buyers to personally search MLS databases after registering as customers of the broker).  *See id* at *2–3.  At the time, VOWS "presented a competitive challenge to brokers" who relied on "traditional, non-Internet methods" to provide listings to their clients.  *Id* at *2.  NAR's initial VOW policy contained a blanket "opt-out" provision which prohibited participating brokers in an MLS "from conveying a listing to his or her customers via the Internet without the permission of the listing broker."  *Id.* at *3.  Phrased differently, brick-and-mortar brokers could prevent their clients' listings from being displayed on VOWs altogether.  *Id.*  The initial policy also contained a selective opt-out provision that "allowed brokers to direct that their clients' listings not be displayed" on "a particular subset" of competing VOWs.  *Id.*

After the Department of Justice informed NAR of its intent to challenge the policy, NAR rescinded its initial policy and adopted a modified version. *Id.* at *4. Although the modified policy differed from its predecessor in some respects, including the removal of the selective opt-out provision, it still contained a blanket opt-out provision forbidding "any broker participating in an MLS from conveying a listing to his or her customers via the Internet without the permission of the listing broker." *Id.* The policy, however, specifically exempted NAR's official website, Realtor.com, from the blanket opt-out provision. *Id.* Unlike the optional no-commingling rule at issue in this case, adoption of the VOW policies was mandatory, even though the exercise of the opt-out provisions was left to the discretion of individual brokers. *See id.* Significantly, unlike the present matter, the existence of an agreement was not at issue because NAR conceded, for the purposes of its motion to dismiss, that the challenged policies were "the product of a 'combination among NAR's members.'" *Id.* at *13.

REX similarly relies on *PLS.Com, LLC v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022), to support its contention that the no-commingling rule itself is evidence of an anticompetitive agreement. There, NAR moved to dismiss a lawsuit challenging its "Clear Cooperation Policy," which allegedly sought to stifle competition from pocket listings (listings that are not shared on an MLS). *Id.* at 830. The Clear Cooperation Policy requires a broker to submit a listing "to the MLS for cooperation with other MLS participants" within one business day "of marketing a property to the public." *Id.* Unlike the no-commingling rule, the Clear Cooperation Policy is mandatory, *see* Handbook (docket no. 329-2 at 49), and agents who fail to comply with the policy face

1   "severe penalties, including in some cases several-thousand dollar fines, or suspension

2   from, or termination of, their access to the MLS," *PLS.com*, 32 F.4th at 830.

3          NAR's promulgation of an optional model rule years before Zillow designed and

4   implemented its two-tab display does not, standing alone, constitute evidence of "a

5   common scheme" or concerted effort among its members to enforce the rule.  *See*

6   *Toscano*, 258 F.3d at 984.  Unlike the mandatory rules discussed above, roughly 29% of

7   NAR-affiliated MLSs have not adopted the no-commingling rule.  Although REX

8   contends that the no-commingling rule is nothing more than a "so-called voluntary" or

9   mandatory rule, the record demonstrates that affiliated MLSs have independently decided

10  whether to allow their participants to comingle listings without any input from NAR.[14]

11         Despite REX's argument to the contrary, NAR-affiliated MLSs have not, with

12  respect to the no-commingling rule, "surrendered [themselves] completely to the control

13  of the association."  *See Associated Press*, 326 U.S. at 19 (quoting *Anderson v.*

14  *Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 362 (1926)).  Moreover, the no-

15  commingling rule requires only the separation of MLS and non-MLS listings, and REX

16

17  [14] REX's reliance on *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corporation*

18  ("*Hydrolevel*"), 456 U.S. 556 (1982), is similarly misplaced.  Although this Court previously cited
    *Hydrolevel* for the proposition that a trade association's "so-called voluntary standards" could be deemed
    to be "repugnant to the antitrust laws," Order at 12 (docket no. 98) (quoting *Hydrolevel*, 456 U.S. at 570,

19  574), discovery in this action has shown that the no-commingling rule is in fact optional.  Moreover,
    *Hydrolevel* is factually dissimilar from the present matter.  In *Hydrolevel*, the Supreme Court held that an

20  organization could be found liable for the antitrust violations of its agents acting with apparent authority.
    456 U.S. at 570–74.  There, a subcommittee vice chairman for the American Society of Mechanical
    Engineers, Inc. ("ASME") was also employed as the vice president of a company that manufactured

21  certain safety devices for water boilers.  *Id.* at 559–64.  The dispute in *Hydrolevel* arose when the
    individual used his position in ASME to harm a competing manufacturer by interpreting a widely-adopted

22  code provision in a manner that declared the competitor's product unsafe.  *Id.*

23

ORDER - 22

1  has presented no evidence to support that Zillow redesigned its website in an allegedly

2  misleading manner at NAR's or any MLS's direction.  Zillow's independent decision to

3  implement a uniform two-tab display because approximately 71% of NAR-affiliated

4  MLSs have adopted the optional no-commingling rule does not demonstrate a common

5  scheme between NAR and Zillow to conceal non-MLS listings behind a secondary tab on

6  Zillow's platforms.

7         **2.      Certain Communications Between NAR, Zillow, and the MLSs**

8         REX argues that certain communications between NAR, Zillow, and some MLSs

9  constitute direct evidence of an alleged agreement to segregate, conceal, and demote non-

10  MLS listings on Zillow's websites and mobile platforms.  Direct evidence of an

11  agreement, however, "is explicit and requires no inferences to establish the proposition or

12  conclusion being asserted."  *In re Citric Acid Litig.*, 191 F.3d at 1094 (quoting *In re Baby*

13  *Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)).  The communications on which

14  REX relies are not so explicit as to qualify as direct evidence of the requisite agreement.

15  Likewise, these communications do not constitute circumstantial evidence because the

16  communications do not tend "to exclude the possibility" that the defendants acted

17  independently.  *See Monsanto*, 465 U.S. at 764.

18         REX cites multiple emails between NAR and Zillow to support the existence of an

19  agreement between the defendants to segregate, conceal, and demote non-MLS listings

20

21

22

23

ORDER - 23

on Zillow's platforms.[15]  *See*, *e.g.*, Ex. H to Goldfarb Decl. (docket no. 451-5) (Oct. 16, 2020, email from NAR to Zillow inviting Errol Samuelson to join NAR's Industry Relations Group); Ex. N to Goldfarb Decl. (docket no. 405-13) (June 26, 2017, email from Samuelson to Bob Goldberg congratulating Goldberg on his new role as NAR's CEO).  Notably, these emails between NAR and Zillow do not discuss the no-commingling rule and do not suggest the existence of an agreement between the defendants to redesign Zillow's website in a manner that concealed REX's listings behind a purportedly misleading, non-default tab.

REX also contends that NAR "refereed" disputes between Zillow and certain MLSs regarding the no-commingling rule (Section 18.3.11).  The majority of these emails, however, do not discuss the commingling of listings.  *See*, *e.g.*, Ex. V to Goldfarb Decl. (docket no. 405-21) (Jan. 2021 email chain requesting NAR's interpretation of Sections 18.3.13 and .14); Ex. X to Goldfarb Decl. (docket no. 405-23) (Dec. 2020 email chain discussing Section 20.3.12); Ex. Y to Goldfarb Decl. (docket no. 405-24) (Dec. 2020 email chain discussing the display of expired or cancelled listings); Ex. AA to Goldfarb Decl. (docket no. 405-26) (Dec. 2020 email chain discussing the display of sold listings); Ex. CC to Goldfarb Decl. (docket no. 405-28) (Jan. 2021 email chain discussing an unrelated requirement).  When the no-commingling rule was discussed, NAR noted its

---

[15] REX presents an email dated August 1, 2014, from then-NAR President Steve Brown concerning the commingling of listings, *see* Ex. B to Goldfarb Decl. (docket no. 451-2), but that email does not appear to have been sent to Zillow.  Moreover, the email does not evidence any agreement between NAR and Zillow regarding Zillow's unilateral decision almost seven years later to adopt its two-tab display.

optional nature.  *See, e.g.*, Ex. DD to Goldfarb Decl. (docket no. 405-29) (Feb. 4, 2021, email explaining that an MLS may prohibit the commingling of listings at its "local *option*" (emphasis in original)); *see also* Gansho Dep. (Dec. 8, 2022) at 213:14–22 (docket no. 335-1) (agreeing that MLSs "were free to make whatever decision they wanted on how an optional rule would be adopted and implemented").

REX cites a multitude of emails between NAR, Zillow, and certain MLSs, but none support an inference that Zillow acted at NAR's direction when designing its websites and implementing the two-tab display which allegedly caused REX's demise. Moreover, the fact that some MLSs sought assistance from NAR when interpreting certain model rules does not reasonably suggest the existence of a conspiracy.  *See County of Tuolumme v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1156–57 (9th Cir. 2001) (finding in the context of medical credentialing that independent decisions to follow nonbinding recommendations did not constitute circumstantial evidence of an alleged conspiracy); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1459 n.34 (11th Cir. 1991) (explaining in the context of medical credentialing that a hospital board's likely decision "to follow the recommendations of the medical staff does not establish, or even reasonably suggest, the existence of a conspiracy"); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 9 (1st Cir. 2016) ("We note that antitrust laws allow trade associations to make nonbinding recommendations about businesses and products."). REX has presented no evidence of an agreement or conspiracy which tends to exclude the

1   possibility that Zillow acted independently when redesigning its websites and assigning

2   REX's listings to the "Other listings" tab.[16]

3       Moreover, Zillow has presented evidence showing that its switch to IDX feeds

4   was consistent with a proper business practice.  *See Stanislaus Food Prods. Co. v. USS-*

5   *POSCO Indus.*, 803 F.3d 1084, 1089 (9th Cir. 2015) (quoting *In re Citric Acid Litig.*, 191

6   F.3d at 1094).[17]  Specifically, Zillow's independent decision to switch to IDX feeds was

7   consistent with its desire to improve listings coverage, timeliness, and access, and to

8   increase business model flexibility.  *See*, *e.g.*, Barton Dep. at 91:7–92:6, Ex. 5 to Najemy

9   Decl. (docket no. 345-3); Ex. 25 to Najemy Decl. (docket no. 345-16); Samuelson Decl.

10  at ¶ 49 (explaining that syndication agreements were a "a significant vulnerability" for

11  Zillow because MLSs could terminate the agreements without cause and with little

12  notice); *see also id.* at ¶ 47 ("[C]ertain MLSs and brokers imposed restrictions on how

13  often Zillow would obtain updated listings information [under the syndication

14

---

15  [16] REX argues that Zillow did not act independently when it enforced the no-commingling rule because
16  approximately 71% of NAR-affiliated MLS had already adopted the rule.  Essentially, REX contends that
    Zillow had no choice but to enforce the no-commingling rule given the rule's prevalence in the real estate
    market and Zillow's status as a national aggregator of listings data.  This argument ignores important
17  components of the alleged anticompetitive agreement that REX challenges in this action.  Although
    Zillow's IDX agreements with certain MLSs required it to display MLS and non-MLS listings separately,
    the conspiracy REX alleges in this action involves more than the mere segregation of listings data.
18  REX's antitrust claims are based on an alleged agreement to also conceal and demote non-MLS listings
    on Zillow's platforms, *see* Am. Compl. at ¶¶ 60, 110, 135, and the Court cannot ignore these crucial
19  components of the challenged restraint.

20  [17] When an action "hinges" on circumstantial evidence, a court's inquiry into whether a plaintiff's
    "showing is sufficient to establish an agreement proceeds in two steps:"  (i) "the defendant can rebut an
21  allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent
    with proper business practice; and if so (ii) "[t]he burden then shifts back to the plaintiff to provide
    specific evidence tending to show that the defendant was not engaging in permissible competitive
22  behavior."  *See Stanislaus*, 803 F.3d at 1089 (quoting *In re Citric Acid Litig.*, 191 F.3d at 1094).

23

ORDER - 26

agreements]"); Ex. JJJ to Goldfarb Decl. (docket no. 405-57) (recognizing that the user experience following Zillow's switch to IDX feeds would be "a wash, at best," but would provide Zillow "business model flexibility.").  REX has provided no evidence, such as relevant communications between Zillow and any MLS, tending to show that Zillow was not engaging in permissible competitive behavior.  The evidence demonstrates that instead of precluding REX's listings entirely, like websites such as Redfin did, *see* Ryan Dep. at 385:5–11 (docket no. 345), Zillow expended significant time and resources to ensure that REX's and other non-MLS listings would remain on its platforms, albeit under a separate tab, *see* Samuelson Decl. at ¶¶ 64, 67.  REX contends that Zillow has "a financial interest in maintaining excessive" buyer agent or broker commission rates because Zillow "exacts a percentage" of buyer agent or broker "commissions earned on closed transactions by favored buyer agents or brokers" through its Premier Agent Flex program.[18]  REX Resp. to Zillow Mot. for Summ. J. at 4, 13 (docket no. 402).  But a "common motive for increased profits always exists," and does not, standing alone, provide circumstantial evidence of an agreement to demote and conceal listings on Zillow's platforms.  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1194–95 & n.8 (discussing circumstantial evidence in the context of an alleged price-fixing conspiracy).

---

[18] Zillow's Premier Agent program offers "advertising services, as well as marketing and technology products and services, to help real estate agents grow and manage their businesses."  *See* Samuelson Decl. at ¶ 13.  Under Zillow's Flex program, Zillow provides leads to select brokers or agents in exchange for a specified portion of a broker's or agent's commission if a transaction successfully closes.  *See generally* Ex. UUU to Goldfarb Decl. (docket no. 405-68).

ORDER - 27

**C.    Zillow's IDX Agreements with Individual MLSs**

Typically, a plaintiff is not required to "name all of the coconspirators in its complaint" or "sue all of the alleged conspirators inasmuch as antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1053 (9th Cir. 1981).  REX could have, in theory, pursued an antitrust claim against Zillow for entering into allegedly anticompetitive IDX agreements with certain MLSs, even though those MLSs are not parties to this action.  Thus, at oral argument, the Court inquired as to whether REX would have an antitrust claim against Zillow in the event the Court dismissed REX's claims against NAR.  Tr. (July 27, 2023) at 24:14–17.  REX did not address the Court's inquiry, and REX's Amended Complaint, its discovery in this action, its motions and briefs, and the oral arguments of its counsel all suggest that REX views NAR as an indispensable member of the conspiracy it alleged in the operative pleading.  For example, REX refers repeatedly to Zillow joining an alleged "NAR/MLS cartel" throughout its Amended Complaint.  *See*, *e.g.*, Am. Compl. at ¶ 60 ("When Zillow entered the cartel, it agreed to segregate, conceal, and demote non-MLS listings.").

Regardless, REX has failed to adduce evidence of alleged conspiracies between Zillow and individual MLSs.  Although REX alleged that NAR, Zillow, and unnamed MLSs conspired to deny brokers such as REX effective access to Zillow's website, *see* Am. Compl. at ¶ 135, REX has presented no direct or circumstantial evidence of such conspiracies, let alone any conspiracies involving only Zillow and individuals MLSs.  For the reasons discussed above, the existence of written IDX agreements which require the

segregation of listings does not support alleged conspiracies to also conceal and demote non-MLS listings on Zillow's platforms.  Zillow independently designed and implemented the challenged two-tab display which allegedly caused REX's business failure, *see* Samuelson Decl. at ¶ 67, and Zillow did not make any changes to its websites or mobile platforms as a result of its review processes with individual MLSs, *see* Thomas Dep. at 25:12–18, Ex. 6 to Najemy Decl. (docket no. 345-4).

Moreover, REX has presented the Court with no legal analysis of an antitrust claim involving only Zillow and individual MLSs, and has failed to identify which specific MLSs are involved in the alleged conspiracies.  As the Court previously noted, approximately 71% of NAR-affiliated MLSs have adopted the no-commingling rule. NAR Suppl. Resp. to REX Interrog. No. 4 (docket no. 335-2 at 4).  Other MLSs that are not affiliated with NAR have nevertheless adopted a no-commingling policy.  Samuelson Decl. at ¶¶ 24, 27, 65.  For example, the Northwest Multiple Listing Service (which covers the Seattle market) is not affiliated with NAR, *see id.* at ¶ 27, but has adopted a no-commingling rule, *see* Zillow Resp. to REX Interrog. No. 3 (docket no. 329-10). Despite adopting a no-commingling rule, the Northwest Multiple Listing Service is presumably not a member of the alleged NAR/MLS cartel conspiracy because it is not a NAR-affiliated MLS.  *See* Am. Compl. at ¶ 8 ("Zillow recently joined NAR-affiliated MLSs and adopted their associational rules to conceal all non-MLS listings on Zillow's heavily trafficked websites.").  Throughout the course of this dispute, REX has focused at all times on Zillow's decision to join an alleged nationwide conspiracy with NAR and its

1   members (the alleged "NAR/MLS cartel").  REX has not premised its antitrust

2   allegations on any agreements between Zillow and individual MLSs.

3        For the reasons discussed above, the Court concludes that NAR and Zillow have

4   met their burden of demonstrating the absence of a genuine issue of material fact

5   concerning the existence of an alleged agreement between the defendants to segregate,

6   conceal, and demote non-MLS listings on Zillow's websites and mobile platforms.

7   Because NAR and Zillow have established that REX cannot prove the threshold

8   component of its antitrust claims, the Court GRANTS NAR's motion for summary

9   judgment, docket no. 331, and the deferred portion of Zillow's motion for summary

10  judgment, docket no. 339, and DISMISSES with prejudice REX's antitrust claims against

11  the defendants under federal and state law.[19]  Having dismissed the antitrust claims, the

12  Court DENIES the portion of REX's motion for partial summary judgment, docket

13  no. 332, as it relates to the existence of an agreement for antitrust purposes.  REX has

14  failed to establish as a matter of law that Zillow adopted the two-tab display that gives

15  rise to REX's antitrust claims pursuant to an agreement between the defendants.

16  _____

17  [19] Because the Court concludes that REX has not made a factual showing sufficient to establish the
    threshold requirement of its antitrust claims, the Court need not address whether the alleged agreement

18  was an unreasonable restraint of trade.  *Epic Games*, 67 F.4th at 981 (explaining that "a Section 1 inquiry
    has both a threshold component (whether there is a contract, combination, or conspiracy) and a merits

19  component (whether it is unreasonable)").  Importantly, "[e]conomic injury to a competitor does not equal
    injury to competition, *Cascade Cabinet Co. v. W. Cabinet & Millwork Inc.*, 710 F.2d 1366, 1373 (9th Cir.

20  1983), and the "elimination of a single competitor, without more, does not prove anticompetitive effect,"
    *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 (9th Cir. 1988); *see also Gorlick Dist. Ctrs., LLC v.

21  Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th Cir. 2013) ("[A plaintiff] must demonstrate
    injury to competition in the market as a whole, not merely injury to itself as a competitor.").  The present

22  record does not demonstrate harm to competition resulting from the challenged restraint and shows only
    harm to REX itself.

23

ORDER - 30

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)     NAR's motion for summary judgment, docket no. 331, and the deferred portion of Zillow's motion for summary judgment, docket no. 339, are GRANTED, and REX's antitrust claims under the Sherman Act, 15 U.S.C. § 1 (COUNT I), and the analogous antitrust provision of the CPA, RCW 19.86.030 (COUNT VI), are DISMISSED with prejudice.

(2)     REX's motion for partial summary judgment, docket no. 332, is DENIED in part as to the existence of an agreement for purposes of REX's antitrust claims, and is otherwise DEFERRED in part as to the falsity of Zillow's tab labels for purposes of its false advertising claim against Zillow under Section 43 of the Lanham Act (COUNT II).

(3)     The Court having dismissed all claims against NAR in this action, the Clerk is DIRECTED to terminate NAR as a party.

(4)     The Clerk is further DIRECTED to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 16th day of August, 2023.

Thomas S. Zilly
United States District Judge

ORDER - 31