1

2

3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

4

5

REX – REAL ESTATE EXCHANGE,
INC.,

6

                    Plaintiff,                          C21-0312 TSZ

7

          v.                                            ORDER

8

ZILLOW, INC., et al.,

9

                    Defendants.

10          THIS MATTER comes before the Court on the deferred portion of a motion for

11   partial summary judgment, docket no. 332, brought by plaintiff REX – Real Estate

12   Exchange, Inc. ("REX").  The part of REX's motion now at issue concerns REX's claim

13   against defendants Zillow, Inc., Zillow Group, Inc., Zillow Homes, Inc., Zillow Listing

14   Services, Inc., and Trulia, LLC ("Zillow") for false advertising pursuant to Section 43 of

15   the Lanham Act, which reads in relevant part:

16          Any person who, on or in connection with any goods or services . . . uses in
            commerce any . . . false or misleading description of fact, or false or
17          misleading representation of fact, which . . . in commercial advertising or
            promotion, misrepresents the nature, characteristics, [or] qualities . . . of his
18          or her or another person's goods, services, or commercial activities, shall be
            liable in a civil action by any person who believes that he or she is or is likely
19          to be damaged by such act.

20   15 U.S.C. § 1125(a)(1)(B).  REX seeks a ruling that it has proven "falsity" as a matter of

21   law.  Having reviewed all papers filed in support of, and in opposition to, REX's motion,

22   the Court enters the following Order.

23

ORDER - 1

**<u>Background</u>**

In a previous Order dismissing REX's antitrust claims, the Court summarized the history of this litigation.  <u>See</u> Order (docket no. 461).  This Order incorporates by reference the earlier Order's recitation of facts and supplements it by describing allegations and evidence of particular relevance to REX's Lanham Act claim for false advertising.[1]  REX's false advertising claim relates to Zillow's websites (Zillow.com and Trulia.com) and related mobile-device applications ("Apps").  Most home buyers use the Internet (93% in 2020) or Apps (71% in 2020) to conduct their searches for properties; people who are moving look online more frequently than they contact real estate agents. <u>See</u> Ex. NNN to Goldfarb Decl. (docket no. 405-61 at 2).  On its websites and Apps, Zillow aggregates listings of real properties that are for sale or for rent.  <u>See</u> Am. Compl. at ¶ 53 (docket no. 99) ("Zillow and Trulia are the first- and fourth-most-visited aggregator sites in the United States."); Samuelson Decl. at ¶¶ 7 & 10 (docket no. 61). Prior to January 2021, Zillow's websites displayed on one page (or in one tab) all homes

---

[1] REX also asserts a claim under Washington's Consumer Protection Act ("CPA").  In other cases, courts have suggested or decided that a Lanham Act claim and a CPA claim have identical elements.  <u>See</u> <u>Cascade Yarns, Inc. v. Knitting Fever, Inc.</u>, 905 F. Supp. 2d 1235, 1251 (W.D. Wash. 2012) (inferring that "failure to support a Lanham Act claim should lead to automatic failure of the state law claims of unfair competition, both statutory under the CPA and at common law"); <u>Campagnolo S.r.l. v. Full Speed Ahead, Inc.</u>, No. C08-1372, 2010 WL 1903431, at *11 (W.D. Wash. May 11, 2010) (ruling without explanation that the CPA and common law unfair competition claims at issue were identical to a Lanham Act claim).  The Court cannot, however, treat REX's CPA claim as co-extensive with its Lanham Act claim because REX has pleaded both the "unfair" and "deceptive" prongs of a CPA violation.  A trade practice may be considered "unfair" without being "deceptive" or involving "false" advertising.  <u>See</u> <u>Rush v. Blackburn</u>, 190 Wn. App. 945, 963, 361 P.3d 217 (2015).  To be deceptive, an act must be "'likely to mislead' a reasonable consumer" or have the "capacity to deceive a substantial portion of the public."  <u>Id.</u>  The Court makes no ruling concerning the merits of REX's CPA claim.

for sale in a certain region regardless of how they were listed, *i.e.*, by a real estate agent, a real estate broker, a realtor,[2] or an unrepresented owner.  A screenshot of how the Zillow.com website appeared prior to January 2021 is reproduced below:



Am. Compl. at ¶ 60 (docket no. 99).

---

[2] The National Association of REALTORS® ("NAR") defines a "realtor" or REALTOR® as an agent or broker who is a member of a local association of REALTORS® and thereby of the state association and of NAR.  Prince Report at ¶ 21 (docket no. 344-2); *see also* Galicia Decl. at ¶ 2 (docket no. 65) ("Only members of NAR are permitted to call themselves REALTORS®."). According to NAR's expert, an "agent" has a professional license to assist in the buying, selling, or rental of real estate, while a "broker" typically has more training and experience than an agent, as well as an additional license, and might manage or supervise one or more agents.  Prince Report at ¶¶ 19–20 (docket no. 344-2).  In Washington, however, a "broker" is a person who performs certain services for which a real estate license is required, and who does so under the supervision of a managing broker or a designated broker/owner of a real estate firm.  *See* RCW 18.85.011(2), (10), & (15); *see also* RCW 18.85.011(17) (defining real estate brokerage services).  Under Washington law, an "agent" is a designated broker, managing broker, or broker "who has entered into an agency relationship with a buyer or seller" in an actual or prospective real estate transaction.  *See* RCW 18.86.010(2), (3), (5), & (14).

1    In mid-January 2021, Zillow unveiled a two-tab design, which segregated content

2  between tabs (or webpages) labeled as "Agent listings" and "Other listings."  In the

3  figure below, the Court has circled the tabs in red:



13  *Id.* at ¶ 63 (modified); *see also* Thomas Decl. at ¶¶ 17–18 (docket no. 55).

14    The two-tab design has three essential features, namely (i) the tab labels ("Agent

15  listings" and "Other listings"), (ii) the tab contents (*i.e.*, the listings associated with each

16  tab), and (iii) the tab "default" status.[3]  The first two features must be considered together

17  because the tab labels have meaning only with regard to the tab contents.  The tab default

18  ───────────────

19  [3] Zillow set the "Agent listings" tab as the default, meaning that the content associated with
20  "Agent listings" would be seen by users unless they clicked on the "Other listings" tab, also
    referred to (by Zillow) as "Tab 2."  Zillow could have chosen instead to designate the "Other
21  listings" tab as the default, but it had economic reasons for not doing so.  *See* Thomas Dep. at
    75:8–14, Ex. G to Goldfarb Decl. (docket no. 451-4) (indicating that the default tab is "where the
    most valuable listings are" and that Zillow's "customers want to see [those] more than the
22  listings we have in Tab 2").

23

ORDER - 4

status is a separate aspect of the design, and it is not relevant to the issue of "falsity." Thus, the Court focuses on the tab labels and the tab contents.

Prior to implementing the two-tab design, Zillow began entering into contracts with multiple-listing services ("MLSs") to receive listings via Internet Data Exchange ("IDX") feeds.  *See* Samuelson Decl. at ¶ 69 (docket no. 61) ("From September 2020 to January 2021 we worked tirelessly to switch over the 200 largest MLSs from syndication agreements to IDX agreements . . . .").  According to Zillow, the two-tab display resulted from Zillow's efforts to comply with the National Association of REALTORS® model "no-commingling" (or segregation) rule, also known as NAR Model IDX Rule 18.3.11, which had been adopted by roughly two-thirds of the MLSs that had agreed to provide Zillow with IDX feeds.  *See id.* at ¶¶ 65–67; *see also* Thomas Decl. at ¶¶ 5–6 & 11–15 (docket no. 55) (describing the two-tab design development process); Krishna Report, Ex. 29 to Najemy Decl. (docket no. 345-20 at 7) (indicating that 71% of NAR-affiliated MLSs have adopted the "no-commingling" rule, citing NAR's Supp. Resp. to REX's Interrog. No. 4).  NAR's optional[4] model "no-commingling" rule provides that "[l]istings obtained through IDX feeds from Realtor® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources."  Samuelson Decl. at ¶ 64 (docket no. 61); Thomas Decl. at ¶ 15 (docket no. 55).

When the two-tab system was activated in January 2021, REX employed in various states, including Washington, licensed brokers and agents.  *See* Am. Compl. at

---

[4] NAR-affiliated MLSs are not required to adopt the "no-commingling" rule.

1    ¶¶ 39 & 43 (docket no. 99).  Thus, REX's listings qualified as "agent listings," as

2    opposed to for-sale-by-owner ("FSBO") or non-agent listings.  Nevertheless, REX's for-

3    sale listings were relegated, along with FSBO and non-MLS listings, to the "Other

4    listings" page because REX's brokers and agents were not members of the MLSs from

5    which Zillow was receiving IDX feeds.  _See id._ at ¶ 64; _see also_ Samuelson Decl. at

6    ¶¶ 65–67 (docket no. 61).  REX contends that Zillow's tab labels were false and that it

7    suffered injury as a result.

8         Before Zillow launched the two-tab system, it evaluated the associated risks.  _See_

9    ZXR: Rolling Research | Two-Tab SRP Evaluation at 1, Ex. 37 to Goldfarb Decl. (docket

10   no. 332-36 at 2).  In 2019, Zillow's investigation regarding tabs labeled "Agent listings"

11   and "Other listings" revealed "critical comprehension concerns warranting further

12   iteration."  _Id._  In November 2020, Zillow's research indicated that eight (8) of the

13   twelve (12) participants in a study (described as "buyers," meaning individuals trying to

14   purchase a home who had previously used one of Zillow's platforms) "assumed" that

15   "other" meant "non-agent" listings, while the other four (4) buyers thought "other" meant

16   non-Zillow-agent or agent "not approved by Zillow."  _Id._ at 4 (docket no. 332-36 at 5);

17   _see id._ at 2 (docket no. 332-36 at 3) (defining "buyer").  Meanwhile, Zillow's own

18   understanding of "Tab 2" (the "Other listings" tab) was that, if a listing is under Tab 2,

19   then "the listing isn't in the MLS."  Ex. CCC to Goldfarb Decl. (docket no. 405-50 at 2).[5]

20   _____

21   [5] Zillow considered labeling the tabs "MLS Listings" and "Non-MLS Listings," but opted not to
     do so because it had "historically found" that MLS has "little meaning for most users."  Thomas

22   Decl. at ¶ 20 (docket no. 55).  In addition, Zillow wished to avoid infringing the Canadian Real
     Estate Association's registered trademark "MLS."  _See id._

23   ORDER - 6

In anticipation of consumer curiosity and/or confusion about the new "search toggle" display, Zillow prepared and published a frequently asked question ("FAQ") page, which users could access via a link.  *See* Thomas Decl. at ¶ 24 (docket no. 55).  The FAQ page articulated the following differences between the tabs:

> "Agent Listings" are properties listed by real estate agents in the MLS. "Agent Listings" do not include homes for sale by owner, non-MLS auctions or foreclosures.  "Other Listings" are for sale by owner, non-MLS auctions, foreclosures and other properties.  "Other Listings" do not include properties listed by agents in the MLS.

*Id.* at ¶¶ 24–25.  The FAQ page further explained:

> If an agent lists your home on the MLS (even through a limited-service brokerage), it will appear under "Agent Listings."  If you advertise your home on Zillow as for sale by owner, it will appear under "Other Listings."

*Id.* at ¶ 25.  The FAQ page did not indicate that the "Other listings" tab might include homes for sale by agents or brokers who were not MLS members.  *See id.* at ¶¶ 24–25.  It also failed to define MLS or to clarify that some licensed real estate agents and brokers do not belong to an MLS.

The two-tab design was met with hostility by the users of Zillow's websites and Apps.  Zillow recorded a thirty-two percent (32%) increase in complaints during the weeks after the transition, which included the following comments:

> *Why separate listings for realtor and for sale by owners?  Why?*
>
> *I do not like the separate tabs for "agent listings" and "other listings." I think you should just show all results.  Why prop up agents when the whole point of your app is to circumvent the need for a high commission agent?"*
>
> *I do not like that you have divided the agent and by owner listings making us toggle.  I use your app daily – you have just complicated things instead of simplifying things.  Why do companies do this stuff?  Seems to me this was done for the relators.  They are the ones that have everything to gain by this change!*

> *If you list your property and it's "for sale by owner" buyers will not see it unless they happen to click on the very small "other" button.  The properties that automatically appear are the "listed by agents."  Which defeats the whole purpose of using Zillow or Trulia.  Agents have the MLS and many apps to use.  Go back like it was when all properties came up in a search area.*

Ex. NNN to Goldfarb Decl. (docket no. 405-61 at 2–3) (italicized in original).  Zillow also received the following feedback:

> The average person looking for a new house won't see your FSBO listing unless they toggle to the "other listing" section.  This is ridiculous and makes listing FSBO much more challenging for people to see your house.  One more way to push people to list with agent.  This was purely a money decision for Zillow and everyone should rate it 1 star because of it.  (AppStore review)

> Really hate the "Agent/Other" segregation when browsing houses.  As a prospective homebuyer I don't see the need for it.  I understand why Zillow would get pressured by realtor association to include this, so when people are browsing they prioritize realtor listed properties unless I remember to constantly click back and forth between the two. So annoying!  From a buyer standpoint, why should I care who's selling it?  I guess they know where their bread is buttered.  (AppStore review)

> Totally dislike the new changes on Zillow with having to toggle back-and-forth between the real estate agents and other properties.  THUMBS DOWN!  (AppStore review)

> Oh . . . oh no . . . I wouldn't even think to click on a separate list.  I just assumed all the homes would be in this list.  (User test comment)

> Other listings . . . so I don't know exactly what that would mean . . . at first I thought homes that are being sold by owners that don't have an agent, but I see in this one, it says contact agent.  (User test comment)

Ex. 38 to Goldfarb Decl. (docket no. 332-37 at 61).  Zillow also observed very low usage of the "Other listings" tab; the tab was clicked during only 4–7% of sessions, and 80% of the FSBO page views were lost.  *Id.* (docket 332-37 at 8–9).

Zillow perceived REX to be "an industry disruptor" that had not been well received by other agents and brokers because it did not share its listings with MLSs (in

ORDER - 8

1    other words, it did not "syndicate"), and it did not "pay a buy side commission."  *See*

2    Ex. AAA to Goldfarb Decl. (docket no. 405-48).  In contrast, NAR-affiliated MLSs are

3    bound by the "buyer broker commission" rule, also known as Policy Statement 7.23,

4    which requires that MLS participants, when listing homes for sale, make "blanket

5    unilateral offers of compensation" to other MLS members serving as buyers' agents.  *See*

6    Evans Report at ¶ 10(i) & n.15 (docket no. 345-13 at 15).  In emails exchanged on

7    January 4, 2021, shortly before Zillow began segregating MLS listings from non-MLS

8    listings, Zillow's Senior Director of Brokerage Operations Matt Hendricks and its Senior

9    Director of Broker Relations TG Gallaudet acknowledged that REX was "poised to be a

10   casualty" of the change.  Exs. I & CCC to Goldfarb Decl. (docket nos. 405-8 & 405-50);

11   *see also* Hendricks Decl. at ¶ 1 (docket no. 54).  Consistent with Zillow's predictions,

12   after the two-tab approach was activated, REX experienced a decline in the number of

13   Zillow users viewing its for-sale listings.

14

15

16

17

18    

19

20

21

22   Compl. at ¶ 74 (docket no. 1); *see* Am. Compl. at ¶¶ 90–91 (docket no. 99).  Whether this

23   reduction in views and/or the demise of REX's business was proximately caused by

ORDER - 9

Zillow's implementation of the two-tab design is not an issue raised by REX's motion for partial summary judgment, and this factual question must await trial.  _See_ Minute Order at ¶ 1(a) (docket no. 458).

**Discussion**

**A.     Summary Judgment Standard**

The Court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). A party may move for summary judgment on only a portion of a claim.  _See id._  Rule 56 was amended in 2010 "to make clear at the beginning" that summary judgment may be granted as to "part of a claim."  _See_ Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment.  The 2010 amendments also added the following provision:

> If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case.

Fed. R. Civ. P. 56(g).  Rule 56(g) operates to "'salvage some results' from the time and resources spent in deciding unsuccessful summary-judgment motions."  _Robertson v. Martin_, No. CV 20-4173, 2021 WL 545895, at *1 (C.D. Cal. Jan. 4, 2021) (quoting _Kreg Therapeutics, Inc. v. VitalGo, Inc._, 919 F.3d 405, 415 (7th Cir. 2019)).  The Court analyzes REX's motion under both Rules 56(a) and 56(g) because falsity is "part of a claim" for false advertising under the Lanham Act and a fact that can be established as a matter of law.

1 **B.**   __Lanham Act__

2      To prevail on a false advertising claim under the Lanham Act, a plaintiff must

3 prove the following elements:  (i) the defendant made a false or misleading statement of

4 fact in commercial advertising or promotion about its own or another's goods, services,

5 or commercial activities; (ii) the statement actually deceived or had the tendency to

6 deceive a substantial segment of its audience; (iii) the statement was material, _i.e._, likely

7 to influence a purchasing decision; (iv) the defendant caused the statement at issue to

8 enter interstate commerce; and (v) the plaintiff has been or is likely to be injured as a

9 result of the statement.  _See_ _Southland Sod Farms v. Stover Seed Co._, 108 F.3d 1134,

10 1139 (9th Cir. 1997).[6]

11 **C.**   __"Falsity"__

12      To show the requisite "falsity" for purposes of the first element of a Lanham Act

13 claim, a plaintiff must establish either (a) the statement at issue was literally false on its

14 face or by necessary implication, or (b) the statement was literally true, but likely to

15 mislead or confuse consumers.[7]  _Southland Sod_, 108 F.3d at 1139.  Although "falsity" is

16

---

17 [6] In _Southland Sod_, the Ninth Circuit limited cognizable injuries to the "direct diversion of sales"
18 from the plaintiff to the defendant or "a lessening of the goodwill associated with" the plaintiff's
   products.  108 F.3d 1139.  Roughly 17 years later, however, the Supreme Court rejected the
   Ninth Circuit's bright-line rule that only direct competitors had standing to bring Lanham Act
19 false advertising claims.  _Lexmark Int'l, Inc. v. Static Control Components, Inc._, 572 U.S. 118,
   136 (2014).  Thus, the proposition that a plaintiff must show a diversion of sales from it to the
20 defendant to establish the requisite injury for purposes of a Lanham Act claim cannot be
   considered good law.

21 [7] Zillow contends that REX lacks the requisite "survey or other extrinsic evidence" necessary to
   prevail on a literally-true-but-misleading theory.  _See_ Defs.' Resp. at 21–22 (docket no. 391).
22 Zillow's own records, however, regarding user perceptions of and complaints about the two-tab

23

a question of fact, *Nat'l Prods., Inc. v. Gamber-Johnson LLC*, 699 F. Supp. 2d 1232, 1237 (W.D. Wash. 2010), courts have found a statement literally false as a matter of law in connection with a Lanham Act claim.  *See In-N-Out Burgers v. Smashburger IP Holder LLC*, No. SACV 17-1474, 2019 WL 1431904, at *5–6 (C.D. Cal. Feb. 6, 2019) (granting partial summary judgment and concluding that the slogan "Classic Smash™ Beef build with triple cheese & double the beef in every bite" was false because the related Triple Double burger, which was made with two 2.5-ounce beef patties, did not actually have "double the beef" of the Classic Smash burger, which contained one five-ounce beef patty); *see also CertainTeed Corp. v. Seattle Roof Brokers*, No. C09-563, 2010 WL 2640083, at *5–13 (W.D. Wash. June 28, 2010) (finding three of five challenged statements false as a matter of law, but declining to decide whether the statements were made in interstate commerce for purposes of the Lanham Act).

In evaluating whether a challenged statement is literally false on its face or by necessary implication, the Court must analyze it in "its full context."  *Southland Sod*, 108 F.3d at 1139 (citing *inter alia Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, No. 81 Civ 731, 1982 WL 121559, at *2 (S.D.N.Y. June 9, 1982)[8] ("[I]n determining facial falsity

---

design, might support a finding that the tab labels were likely to mislead or confuse consumers. The Court declines to further address this issue, which is entirely factual and cannot be decided on summary judgment.  As a result, the Court considers only whether the tab labels are literally false.

[8] In *Cuisinarts*, the district court denied a motion for reconsideration concerning a preliminary injunction prohibiting the defendant from using the following scoreboard-style advertisement:

the court must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other.")).  An approach used by a number of courts, but not yet adopted by the Ninth Circuit, is to determine (i) what unambiguous assertion is made by the advertisement at issue, and then (ii) whether the assertion is literally false.  *See* *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002); *see also* *Clorox Co. P.R. ("Clorox P.R.") v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 34 (1st Cir. 2000); *Fortress Secure Sols. LLC v. AlarmSIM LLC*, No. 17-CV-5058, 2019 WL 7816820, at *9 (E.D. Wash. Dec. 5, 2019); *In-N-Out Burgers*, 2019 WL 1431904, at *4.

In *Novartis*, the Third Circuit affirmed the grant of a preliminary injunction,[9] agreeing with the district court that the plaintiff was likely to succeed on the merits of its claim that the defendant's use of the name "Mylanta Night Time Strength" for an over-

---

ROBOT-COUPE:    21
CUISINART:         0

WHEN ALL 21 OF THE THREE-STAR RESTAURANTS IN FRANCE'S MICHELIN GUIDE CHOOSE THE SAME PROFESSIONAL MODEL FOOD PROCESSOR, SOMEBODY KNOWS THE SCORE—SHOULDN'T YOU?

1982 WL 121559, at *1–3.  The *Cuisinarts* Court interpreted the quoted language as indicating, "by necessary implication," that both the plaintiff and the defendant build professional model food processors, and that 100% of French restaurateurs choose the defendant's model over the plaintiff's model.  *Id.* at *1.  This "eye-catching" statement was deemed false because the plaintiff undisputedly did "not market a professional model food processor, confining itself entirely to processors for use in the home."  *Id.* at *2.

[9] Although *Novartis* involved a preliminary injunction rather than summary judgment, the Third Circuit's falsity analysis offers guidance with respect to motions brought under Rule 56.  *See* *Fortress Secure*, 2019 WL 7816820, at *9; *In-N-Out Burgers*, 2019 WL 1431904, at *4; *see also* *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 501 (4th Cir. 2015) (in affirming the district court's grant of summary judgment in favor of the defendants, applying *Novartis*'s two-step approach).

the-counter liquid heartburn medicine that competed with the plaintiff's Maalox products "necessarily implies a false message of special formulation for nighttime relief."  290 F.3d at 583, 589–90, & 599.  The _Novartis_ Court reasoned that the phrase "night time" conveys a different meaning than the terms of degree usually employed to describe a product's strength, _e.g._, regular, extra, or maximum, and it implies that the medicine was formulated for night-time heartburn or that it remedies heartburn at night more effectively than during the day, neither of which were supported by any evidence.  _Id._ at 589–90. The Third Circuit held that, although a plaintiff has the burden to prove falsity, a court may find that "a completely unsubstantiated advertising claim by the defendant is _per se_ false without additional evidence from the plaintiff to that effect."  _Id._ at 590.

In _Clorox P.R._, the First Circuit concluded that the plaintiff, which sells chlorine bleach, had sufficiently stated _inter alia_ a false advertising claim under the Lanham Act. _See_ 228 F.3d at 34–36.  The _Clorox P.R._ Court observed that an assertion of fact may be literally false by necessary implication "when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated."  _Id._ at 35; _see also Aussie Nads U.S. Corp. v. Sivan_, 41 F. App'x 977 (9th Cir. 2002) (citing _Clorox P.R._).  The First Circuit explained that the tag line at issue, "más blanco no se puede" (whiter is not possible), which was juxtaposed against images of people who appeared pleased with results obtained by using the defendant's detergent, could be reasonably interpreted by a factfinder as indicating that the detergent at issue "is equal or superior in whitening ability to a detergent and bleach combination."  228 F.3d at 28 & 35.

Applying the two-step process outlined earlier, the Court must conclude that "Agent listings" and "Other listings" are literally false by necessary implication.[10]  The first inquiry requires the Court to consider Zillow's tab labels together, as opposed to in isolation, along with the context in which they were used.  When the labels are viewed side-by-side, the unambiguous assertion is that one tab includes homes listed for sale by agents and the second tab contains all other listings, _i.e._, homes for sale by their owners or by non-agents.  Zillow attempts to convince the Court that the word "other" means "additional," _see_ Defs.' Resp. at 18 (docket no. 391), but Zillow misapplies the authority on which it relies, namely the online version of the Merriam-Webster Dictionary.  According to this source, the term "other," when used as an adjective, has the following definitions:

> **1 a** : being the one (as of two or more) remaining or not included
> | held on with one hand and waved with the _other_ one
>
> **b** : being the one or ones distinct from that or those first mentioned or implied
> | taller than the _other_ boys
>
> **c** : SECOND
> | every _other_ day
>
> **2** : not the same : DIFFERENT
> | any _other_ color would have been better
> | something _other_ than it seems to be

---

[10] Zillow suggests that the Court "already . . . recognized that Zillow's website, when 'viewed as a whole rather than the websites' individual parts,' is not **even misleading**, precisely because the 'net impression' the 'purchasing public would have' was that the 'Other Listings' tab could include agent listings." Defs.' Resp. at 19 (docket no. 391) (emphasis in original).  For support, Zillow cites the Court's Order, docket no. 80, denying REX's motion for a preliminary injunction with respect to its antitrust and CPA claims.  As indicated in the Court's previous Order, however, REX's Lanham Act claim was not at issue, and the Court made no ruling concerning the likelihood of REX prevailing on its false advertising claim.  _See_ Order at 17 n.10 (docket no. 80) (reproduced at _REX – Real Estate Exch. Inc. v. Zillow Inc._, No. C21-312, 2021 WL 2352043, at *7 n.10 (W.D. Wash. June 9, 2021)).

**3**   : ADDITIONAL
|  sold in the U.S. and 14 *other* countries

**4 a** : recently past
|  the *other* evening

  **b** : FORMER
|  in *other* times

  **5** : disturbingly or threateningly different : ALIEN, EXOTIC

<u>See</u> https://www.merriam-webster.com/dictionary.  Zillow refers to the third explanation

of the word, but that definition does not correlate with the context in which "other" was

used on Zillow's websites and Apps.  The meaning of "additional" might have applied if

the tabs had read "agent listings" and "other **agent** listings," as in Merriam-Webster's

example "the U.S. [a country] and 14 *other* **countries**."  When used, however, in contrast

to "agent listings," the phrase "other listings" can only be understood as indicating those

listings "remaining or not included" in or "distinct" or "different" from agent listings, or

in other words, non-agent listings.

In the context of statutory interpretation, courts have construed "other" in similar

fashion.  <u>See</u> <u>Rynearson v. Motricity, Inc.</u>, 626 F. Supp. 2d 1093 (W.D. Wash. 2009);

<u>United States v. Miami Univ.</u>, 91 F. Supp. 2d 1132 (S.D. Ohio 2000).  In <u>Rynearson</u>, the

question was whether a particular document constituted an "other paper" for purposes of

evaluating the timeliness of a notice of removal.  626 F. Supp. 2d at 1096–97 (quoting 28

U.S.C. § 1446(b) ("a notice of removal may be filed within thirty days after receipt by the

defendant . . . of an amended pleading, motion, order or <u>*other paper*</u> from which it may

first be ascertained that the case is one which is or has become removable" (emphasis

1   added))).  The _Rynearson_ Court listed as examples of "other paper" various items that did

2   not qualify as a pleading, motion, or order, namely discovery documents, briefing, or

3   deposition testimony.  _Id._ at 1097.  In _Miami University_, the statute at issue allowed the

4   Secretary of Education, as remedies for violation of the Family Educational Rights and

5   Privacy Act, to "withhold further payments," "issue a complaint to compel compliance

6   through a cease and desist order," "enter into a compliance agreement," or "_take any_

7   _other action authorized by law_."  91 F. Supp. 2d at 1138 (emphasis in original, quoting

8   20 U.S.C. § 1234c(a)(1)–(4)).  The court in _Miami University_ ruled that "other action

9   authorized by law" included a civil suit for declaratory and injunctive relief, which was

10  not among the remedies specified in § 1234c(a).  _Id._ at 1141 n.6.  In the statutes at issue

11  in _Rynearson_ and _Miami University_, the modifier "other" was employed in the same way

12  it is used on Zillow's "Other listings" tab, to connote items "remaining or not included"

13  in or "distinct" or "different" from those previously enumerated under the "Agent

14  listings" tab.

15       Having determined that, when appearing next to the label "Agent listings," the

16  phrase "Other listings" indicates non-agent listings, the Court turns to the second prong

17  of the falsity analysis.  The parties do not dispute REX's status as a broker and/or agent.

18  This status is a fact against which the veracity of the assertion at issue must be assessed,

19  much like the quantity of beef in _In-N-Out Burgers_, the types of food processors in

20  _Cuisinarts_, the night time efficacy of the medicine in _Novartis_, and the whitening ability

21  of detergent alone in _Clorox P.R_.  And, the result in this matter is the same as in those

22

23

ORDER - 17

earlier cases.  By relegating REX's listings to the "Other listings" tab, Zillow falsely

stated by necessary implication that REX was not (or did not employ) an agent.

Zillow contends that, because it did not, on its websites or Apps, explicitly say

REX was not an agent or label the secondary tab "non-agent listings," Zillow's

statements were not false.  Zillow's focus on what the tab labels did not say, as opposed

to what they did say, is improper; the absence of particular untruths tells us nothing about

the veracity of the factual information that is actually present.  Zillow further asserts that

"facial literal falsity" and "literal falsity by necessary implication" are "incompatible"

theories.  Defs.' Resp. at 16 (docket no. 391).  A plaintiff may, however, pursue

inconsistent claims, _see_ Fed. R. Civ. P. 8(d)(3), and thus, Zillow's accusation that REX is

pursuing conflicting grounds of relief has no persuasive value.  Zillow also mentions a

number of cases, but none of them are analogous or support Zillow's contention that

"Other listings" can be reasonably interpreted to mean "additional" agent listings.[11]

---

[11] Zillow primarily relies on _Monster Energy Co. v. Vital Pharms., Inc._, No. EDCV 18-1882, 2022 WL 1599712 (C.D. Cal. Apr. 19, 2022).  In _Monster_, the plaintiff accused the defendant, a competitor in the energy drink market, of falsely advertising that creatyl-l-leucine, an ingredient of the defendant's product, is a source of creatine.  _Id._ at *4.  The district court denied each side's dispositive motion, concluding that the plaintiff had not shown falsity as matter of law and that the defendant had not established an absence of a factual dispute regarding falsity.  _Id._ at *9–18.  Unlike in the instant case, in which the parties agree on the relevant, underlying fact (_i.e._, REX's status as a broker and/or agent), in _Monster_, the presence or absence of creatine depended on how the term was defined, and the district court concluded that "source of creatine" was not capable of being proven false.  _Id._ at *9–10.  Zillow also cites _LegalZoom.com Inc. v. Rocket Lawyer Inc._, No. CV 12-9942, 2013 WL 12121303 (C.D. Cal. Oct. 17, 2013), _Simpler Consulting, Inc. v. Wall_, No. 05-452, 2008 WL 1710101 (W.D. Pa. Apr. 7, 2008), and _United Indus. Corp. v. Clorox Co._, 140 F.3d 1175 (8th Cir. 1998), in each of which the plaintiff's motion (for summary judgment or a preliminary injunction) was denied, but these cases are

Importantly, what Zillow has not done is identify evidence in the record, or describe evidence that could be adduced at trial, based on which a jury could reasonably find that the tab labels mean something other than agent listings and non-agent listings. To be clear, the Court is not focusing on the burdens of proof at trial, but rather on the standards applicable to a motion for summary judgment. The question before the Court is whether REX, as the moving party, has shown the requisite absence of genuine dispute of material fact. The Court concludes that, despite the voluminous filings to date, no factual question has been raised relating to the meaning of the tab labels.

Indeed, all of the relevant documents, which include the complaints and comments received by Zillow from users, reviewers, and testers of the two-tab design, as well as the summaries of Zillow's own research, support the Court's interpretation of the tab labels. The users and reviewers disparaged the segregation of "agent" or "realtor" listings from "for-sale-by-owner" or FSBO listings, and the remarks of these individuals demonstrate

---

factually distinguishable; none of them concern tab labels or the meaning of the word "other," and the latter two do not involve websites or Apps. Zillow's reference to *CertainTeed* and *In-N-Out Burgers* does not help its position because, in both of those matters, summary judgment on falsity was granted in favor of the plaintiff. The remaining authority mentioned by Zillow, in which summary judgment on a Lanham Act claim was granted in favor of the defendants, bears further discussion. *See Nutrition Distrib. LLC v. PEP Rsch., LLC*, No. 16cv2328, 2019 WL 652391 (S.D. Cal. 2019). In *Nutrition Distribution*, the defendants' webpages described the benefits of their products (certain bodybuilding drugs and synthetic peptides) and contained the warnings "for research purposes only" and "not for human consumption," but did not caution about health risks or anti-doping bans. *Id.* at *6. In essence, the plaintiff's accusation of falsity rested on believing the opposite of the challenged statements, *i.e.*, that the product was not solely for research and was for human consumption. *See id.* (citing *Design*, 789 F.3d at 503). The case now before the Court does not require any similar mental gymnastics, and *Nutrition Distribution* is not on point.

ORDER - 19

that they construed "other" as "non-agent."  One tester articulated confusion ("I don't

know exactly what that [*i.e.*, other] would mean") because the person thought that the

"Other listings" tab would show homes being sold by owners, but then saw a listing that

said "contact agent."  *See* Ex. 38 to Goldfarb Decl. (docket no. 332-37 at 61).  The result

of Zillow's study showed that no participant construed the tab labels in the way that

Zillow now proposes (*i.e.*, agent listings and additional agent listings); roughly two-thirds

(67%) of them thought that "Other listings" meant non-agent listings, and the other third

(four out of twelve) believed that, given the context, "agent" referred to a Zillow agent or

a Zillow-approved agent.  *See* Ex. 37 to Goldfarb Decl. (docket no. 332-36 at 5).

     Zillow's FAQ page did not alleviate the deceptiveness of the tab labels because it

failed to define the acronym (*i.e.*, MLS) that was used to explain what listings were in

each tab, and it did not indicate that an agent need not belong to an MLS.  In sum, REX

has met the burdens imposed on a movant under Rule 56.  The Court concludes that no

triable issue exists concerning the factual assertions made by the tab labels, and that REX

is entitled to judgment as a matter of law with respect to the falsity of the tab labels when

considered in the context of the tab contents and REX's undisputed status as a real estate

broker and/or agent.

**<u>Conclusion</u>**

     For the foregoing reasons, the Court ORDERS:

     (1)    The deferred portion of REX's motion for partial summary judgment,

docket no. 332, is GRANTED.  For purposes of REX's Lanham Act claim (Count II of

the Amended Complaint, docket no. 99), the Court concludes that "falsity" has been established as a matter of law.

(2)     The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 18th day of August, 2023.

Thomas S. Zilly
United States District Judge