THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

REX – REAL ESTATE EXCHANGE, INC.,

     Plaintiff,

v.

ZILLOW, INC., et al.

     Defendants.

Case No. 2:21-cv-00312-TSZ

**REX'S PRETRIAL BRIEF**

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ I

INTRODUCTION ...................................................................................................... 1

PART I (QUESTIONS POSED BY THE COURT REGARDING DR. EVANS) ........... 1

I.       Whether Dr. Evans should be permitted to testify at trial that the Buyer Broker Commission Rule has suppressed competition and resulted in uniform commission rates that are twice as high as competitive rates. ...... 1

II.     Whether Dr. Evans should be permitted to testify at trial that Zillow's compliance with the no-commingling rule resulted in substantial degradation of non-multiple listing service listings on Zillow's platforms. .................................................................................................... 2

III.   Whether Dr. Evans should be permitted to testify at trial that Zillow's compliance with the no-commingling rule forced REX to exit the relevant market. ................................................................................................. 3

IV.   Whether Dr. Evans should be permitted to testify at trial that his calculation of REX's enterprise value is an appropriate measure of damages for REX's false advertising and Consumer Protection Act claims. ................................................................................................... 4

       A.  Introduction ................................................................................... 4

          1.  The Value of a Business Calculated as "Enterprise Value" is an Appropriate Measure of Damages for a Company Driven out of Business by a Lanham Act Violation, even where the company has yet to turn a profit. .............................................. 5

          2.  Evans' Use of the "Comparables Methodology" to Calculate Loss of Enterprise Value is reliable, nonspeculative and supported by case law. ................................................................ 9

          3.  Evans' "Discounted Cash Flow" Analysis Corroborates the Reasonableness of the Comparables Methodology; and, as an alternative calculation of Enterprise Value, it is both reliable and supported by case law. ................................................... 15

          4.  The Enterprise Value Estimates Are Consistent with the Valuations Placed on REX Through Actual, Arms-Length Investments in Rex ............................................................. 16

          5.  The Value of a Business Calculated as "Enterprise Value" is an Appropriate Measure of Damages for a Company Driven out of Business by a Violation of the CPA, even where the company has yet to turn a profit. ........................................... 16

PART II (RESPONSE TO FOUR QUESTIONS POSED BY THE COURT NOT ABOUT DR. EVANS) .................................................................................. 17

REX'S PRETRIAL BRIEF                  i

Case No. 2:21-cv-00312-TSZ

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

I.    Legal Standards Applicable to All Categories ......................... 18

    A.  Any Evidence of REX's Now Dismissed Antitrust Claims .............. 18

    B.  The Buyer Broker Commission Rule ................................. 20

    C.  Any Communications Not Involving Zillow by The National Association of Realtors® or Its Affiliated Multiple Listings Services. ................................................................ 23

    D.  Evidence of prevailing real estate commission rates in the United States or elsewhere .............................................. 25

PART III  (RESPONDING TO AN ARGUMENT ZILLOW SAID IN THE MEET AND CONFER IT WOULD MAKE) ..................................... 26

I.    REX is not required to disaggregate damages for its Lanham Act claim. ................................................................ 26

    A.  The default tab status of Zillow's two-tab display is actionable as a Lanham Act violation, and therefore REX need not disaggregate damages because the default tab is inextricably part of the harm caused by Zillow's two-tab design. ................................. 26

        1.  The default tab status is actionable under the Lanham Act. .. 26

        2.  Because the default tab status is unlawful, REX need not disaggregate the damages. ................................... 29

    B.  Even if default is not actionable under the Lanham Act, it would be impossible to disaggregate damages stemming from lawful and unlawful harm. ............................................... 30

II.   REX is not required to disaggregate damages for its WCPA claim. ....... 32

PART IV (RESPONDING TO ANOTHER ARGUMENT ZILLOW SAID IT WOULD MAKE) ................................................................ 33

I.    REX Should be Allowed to Call Mr. Barton as an Adverse Witness for Live Testimony ...................................................... 33

    i.   Materiality .................................................... 33

    ii.  Commercial Speech ............................................ 34

    iii.  Validation of REX's Business Model ............................ 35

    iv.  Validation of REX's damages .................................. 35

    v.  Rebuttal of Zillow's Business Justification Defense under the WCPA ......... 36

II.  The Apex Doctrine Does Not Protect Barton From Being Compelled to Appear for Trial. ................................................. 37

CERTIFICATE OF SERVICE ........................................... 40

REX'S PRETRIAL BRIEF

ii

Case No. 2:21-cv-00312-TSZ

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REX'S PRETRIAL BRIEF
iii
Case No. 2:21-cv-00312-TSZ

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*3:12-cv-1058*,
2019 WL 1542887 (D. Or. Apr. 9, 2019) ................................................................. 32

*71 Wash.2d* ............................................................................................................... 18

*Alpha GRP, Inc. v. Subaru of Am., Inc.*,
2021 WL 1146029 (C.D. Cal. Feb. 8, 2021) .................................................... 4, 7, 20

*Andreopulos v. Peresteredes*,
95 Wash. 282, 163 P. 770 (1917) ............................................................................ 17

*AT&T*,
708 F.2d 1081 (7th Cir.) ........................................................................................... 30

*Bell v. Boeing Co.*,
No. 20-CV-01716-LK, 2022 WL 1607935 (W.D. Wash. May 20, 2022) ................ 18

*Bowers v. Transamerica Title Ins. Co.*,
100 Wash.2d 581, 675 P.2d 193 (1983) .................................................................. 17

*Cairns v. Idaho Falls Sch. Dist. No. 91*,
No. 4:18-CV-00564-BLW, 2021 WL 4690825 (D. Idaho Oct. 6, 2021) ................. 20

*Champion v. Moda Operandi, Inc.*,
561 F. Supp. 3d 419 (S.D.N.Y. 2021) ..................................................................... 28

*DataQuill Limited v. Kyocera Wireless Corporation*,
No. 01CV2302-B (BLM), 2005 WL 8173292 (S.D. Calif, Oct. 26, 2005) .............. 37

*DSPT Int'l, Inc. v. Nahum*,
624 F.3d 1213 (9th Cir.2010) ..................................................................................... 5

*Edwards v. Wyatt*,
330 Fed.Appx. 342 (3d Cir.2009) ............................................................................ 13

*FTC v. Sperry & Hutchinson Co.*,
405 U.S. 233 ............................................................................................................. 33

*Gibson v. Mayor Council of Wilmington*,
355 F.3d 215 (3d Cir. 2004) .................................................................................... 18

*Global Material Technologies, Inc. v. Dahzeng Metal Fibre Co., Ltd.*,
2018 WL 10321387 (N.D.Ill. March 28, 2018) ........................................................ 7

REX'S PRETRIAL BRIEF

i

Case No. 2:21-cv-00312-TSZ

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

*Hanks v. Clark Cnty.*,
No. 3:22-CV-05359-DGE, 2023 WL 4623977 (W.D. Wash. July 19, 2023) ..................... 21

*Houserman v. Comtech Telecommunications Corp.*,
519 F. Supp. 3d 863 (W.D. Wash. 2021) ........................................................................ 24

*ICTSI Oregon Inc. v. ILWU*,
442 F. Supp. 3d 1329 (D. Or. 2020) ............................................................................... 30

*In re Emerald Casino, Inc.*,
530 B.R. 44 ....................................................................................................................... 14

*In re High-Tech Employee Antitrust Litig.*,
2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) .................................................................. 32

*In re Smartalk Teleservices, Inc. Securities Litigation*,
487 F.Supp.2d 940 (S.D. Ohio 2007) ................................................................................ 6

*In re Tesla, Inc. Sec. Litig.*,
No. 18-CV-04865-EMC, 2022 WL 17582008 (N.D. Cal. Dec. 7, 2022) ........................ 20

*Ind. Ins. Co. v. Gen. Elec. Co.*,
326 F. Supp. 2d 844 (N.D. Ohio 2004) .......................................................................... 19

*Indu Craft, Inc. v. Bank of Baroda*,
47 F.3d 490 (2d Cir. 1995) ..................................................................................... 6, 12, 13

*Inventist, Inc. v. Ninebot, Inc.*,
2023 WL 4235575 (W.D. Wash., June 28, 2023) ........................................................... 19

*Johnson v. Oroweat Foods Co.*,
785 F.2d 503 (4th Cir.1986) ............................................................................................... 6

*Jonasson v. Lutheran Child & Family Svcs.*,
115 F.3d 436 (7th Cir. 1997) ........................................................................................... 19

*Keithly v. Intelius Inc.*,
764 F. Supp. 2d 1257 (W.D. Wash. 2011) ...................................................................... 28

*Klem*,
176 Wash.2d, 295 P.3d 1179 ........................................................................................... 33

*Koho v. Forest Lab'ys, Inc.*,
17 F. Supp. 3d 1109 (W.D. Wash. 2014) ....................................................................... 20

*Lahoti v. Vericheck, Inc.*,
636 F.3d 501 (9th Cir. 2011) ........................................................................................... 21

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

ii

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

*Larsen v. Walton Plywood Co.*,
65 Wash.2d 1, 390 P.2d 677 (1964) ...................................................................... 17

*Lemberg*,
2020 WL 2813177 ............................................................................... 27, 29, 32

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ........................................................................................ 5

*Litton Sys., Inc. v. Honeywell Inc.*,
No. CV 90–4823 MRP, 1996 WL 634213 (C.D. Cal. July 24, 1996) ................................ 31

*Magney v. Lincoln Mut. Sav. Bank*,
34 Wash.App. 45 (Wash. Ct. App. 1983) ............................................................... 33

*Malley–Duff & Assoc. v. Crown Life Ins. Co.*,
734 F.2d 133 (3rd Cir.1984) ............................................................................. 6

*Matrix Group Ltd. v. Rawlings Sporting Goods Co.*,
477 F.3d 583 (8th Cir. 2007) ........................................................................... 13

*MindGames, Inc. v. Western Pub. Co., Inc.*,
218 F.3d 652 (7th Cir.2000) ............................................................................. 6

*National Farmers Organization Inc. v. Associated Milk Producers Inc.*,
850 F.2d 1286 (8th Cir. 1988) ...................................................................... 31, 32

*No Ka Oi Corp. v. National 60 Minute Tune, Inc.*,
71 Wash.App. 844 863 P.2d 79 (1993) .............................................................. 17, 18

*Onyx Pharms., Inc. v. Bayer Corp.*,
863 F. Supp. 2d 894 (N.D. Cal. 2011) ................................................................. 24

*Orozco v. WPV San Jose, LLC*,
36 Cal. App. 5th 375 (2019) ............................................................................. 4

*PerkinElmer Health Sciences, Inc. v. SCR Living LLC*,
2022 WL 3130237 (C.D. Cal. 2022) ............................................................. 7, 15, 16

*Pinn, Inc. v. Apple Inc.*,
No. SA19CV01805DOCJDE, 2021 WL 4775969 (C.D. Cal. Sept. 10, 2021) ...................... 38

*Protectors Ins. Serv., Inc. v. U.S. Fid. & Guar. Co.*,
132 F.3d 612 (10th Cir. 1998) ........................................................................... 6

*Rush v. Blackburn*,
190 Wn. App. 945, 361 P.3d 217 (2015) ............................................................... 33

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

*Schonfeld v. Hilliard,*
218 F.3d 164 (2d Cir 2000) ...................................................................... 13, 14

*Sing v. John L. Scott, Inc.,*
83 Wash.App. 55 920 P.2d 589 (1996) ............................................................ 17

*Skydive Arizona, Inc. v. Quattrocchi,*
673 F.3d 1105 (9th Cir. 2012) .................................................................... 5, 6

*Southland Sod Farms v. Stover Seed Co.,*
108 F.3d 1134 (9th Cir. 1997) ................................................................. 20, 27

*Spray-Rite Service Corp. v. Monsanto Co.,*
684 F.2d 1226 (7th Cir. 1982) ................................................................. 30, 31

*Starz Ent., LLC v. Buena Vista Television, Inc.,*
No. CV 07-1895-VBF (PJWX, 2008 WL 11336466 (C.D. Cal. Oct. 20, 2008)................ 38

*Sumotext Corp. v. Zoove Inc.,*
No. 16-cv-01370, 2020 WL 533006 (N.D. Cal. Feb. 3, 2020) ............................... 31

*Torres Mazatlan Remainder, LLC v. FLRX, Inc.,*
164 Wash.App. 1038 (2011) ........................................................................ 17

*TrafficSchool.com, Inc. v. Edriver Inc.,*
653 F.3d 820 (9th Cir. 2011) ............................................................. 24, 27, 28

*United States v. Tilotta,*
588 F. Supp. 3d 1058 (S.D. Cal. 2022) ......................................................... 19

*Whitcomb v. North Idaho College,*
2023 WL 2599211 (D. Idaho, Mar. 22, 2023) .................................................. 19

**Statutes**

15 U.S.C. § 45(n) ..................................................................................... 33

15 U.S.C. § 1117 .................................................................................... 5, 7

RCW 19.86.020 ...................................................................................... 33

RCW 19.86.021 ...................................................................................... 16

**Rules**

Fed. R. Evid. 401 ................................................................................ 18, 20

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

1 **<u>Regulations</u>**

2 Commission Rule, and the 2020 ............................................................................... 23

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REX'S PRETRIAL BRIEF                             v                    BOIES SCHILLER FLEXNER LLP
                                                                     401 E. Las Olas Blvd, Suite 1200
                                                                     Fort Lauderdale, FL 33301
Case No. 2:21-cv-00312-TSZ                                           (954) 540-6219

## INTRODUCTION

In its August 23, 2023 Minute Order, Dkt. 467, this Court directed the parties to address a number of issues.  The first four issues concern the permissible scope of testimony by Dr. David Evans.  REX responds to the Court's questions in the order in which they were posed by the Court.

## PART I (QUESTIONS POSED BY THE COURT REGARDING DR. EVANS)

**I.  Whether Dr. Evans should be permitted to testify at trial that the Buyer Broker Commission Rule has suppressed competition and resulted in uniform commission rates that are twice as high as competitive rates.**

Because the Court has dismissed the antitrust claims, REX will not seek to have Dr. Evans testify regarding the role of the Buyer Broker Commission Rule in facilitating coordination among real estate agents and brokers and maintaining elevated commission rates.

However, in connection with REX's Lanham Act and WCPA claims, Dr. Evans should be permitted to testify:

• Commission rates in the United States are high compared to other countries;

• A key reason for the high commission rates in the U.S. is the widespread practice that sellers must pay for buyer agents on the Multiple Listing Services;

• The Buyer Broker Commission Rule requires sellers to offer a commission to buyer brokers;

• Buyers use buyer agents in part because they think they are free;

• Because so many people look for and find the homes that they buy online, buyer agents do less and less, and are paid more and more as home prices rise;

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

1

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

• The BBCR facilitates steering and limits the ability of brokers operating in the MLS system to reduce commission rates; and

• Peer-reviewed articles by economists confirm that MLS commission rates in the US are not consistent with competition and are much higher than other countries.

• REX's business model sought to reduce commission rates by operating outside the MLS system and eliminating or at least reducing buyer broker commissions.

This testimony is not only relevant but also crucial to REX's Lanham Act and WCPA claims. The jury cannot understand REX's business model without understanding how the traditional residential real estate model operates and how REX's model differed from that traditional approach.   Nor can the jury understand REX's rapid growth or its appeal to consumers and investors without understanding how REX was able to offer lower rates than even discount brokers such as Redfin.   And the jury cannot understand how relegating REX listings to a secondary tab that almost no one visits affects the public interest for purposes of the WCPA claim without understanding that REX offered consumers an opportunity to save thousands of dollars or more in real estate commission rates and how it was able to do that.

**II.   Whether Dr. Evans should be permitted to testify at trial that Zillow's compliance with the no-commingling rule resulted in substantial degradation of non-multiple listing service listings on Zillow's platforms.**

Now that Court has dismissed the antitrust claims, REX will not seek to have Dr Evans testify regarding Zillow's compliance with the no-commingling rule as part of an illicit agreement with the National Association of Realtors.

However, the dismissal of the antitrust claims does not change REX's evidence regarding proximate cause or damages for either the Lanham Act and WCPA claims. Nor

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

2

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

does it alter what evidence is relevant to Zillow's liability under both claims. [1] In connection with REX's Lanham Act and WCPA claims, Dr. Evans should be permitted to testify regarding the impact that Zillow's implementation of its two-tab display had on REX. Even if the implementation of the two-tab display is not part of an antitrust violation, Zillow's conduct still violates the Lanham Act and the WCPA, and the impact on REX is the same. Not only does Zillow's conduct run afoul of the Lanham Act it also violates the WCPA in a multitude of ways. To give just one example, Zillow entered into contractual arrangements with MLSs whereby it agreed to display MLS listings separately from non-MLS listings to the benefit of MLS participants and the detriment of both REX and the public. Dr. Evans' testimony regarding that conduct is clearly relevant to the public interest prong of the WCPA.

The result of Zillow's implementation of its two-tab display, which violates both the Lanham Act and the WCPA, still lead to a drop of 70-85% in page views of listings on the "Other Listings" tab and a drop of about 50% in submits. The bottom line is that Zillow's shift to a two-tab display and its decision to place REX listings under the "Other Listings" tab and have its web site default to the "Agent Listings" had a devastating impact on REX, by erasing an estimated 60% of REX's closings in 2021 alone and eliminating an estimated 75% of REX's closings in 2022.

**III.   Whether Dr. Evans should be permitted to testify at trial that Zillow's compliance with the no-commingling rule forced REX to exit the relevant market.**

---

[1] REX notes that in its Daubert motion directed at Dr. Evans, Zillow did not challenge Dr. Evans' ability to testify regarding proximate cause or the reason REX went out of business.

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

3

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

Now that the Court has dismissed the antitrust claims, REX will not seek to have Dr. Evans testify regarding Zillow's compliance with the no-commingling rule as part of an illicit agreement with NAR.

However, in connection with REX's Lanham Act and WCPA claims, Dr. Evans should be permitted to testify regarding the impact of Zillow's implementation of its two-tab display on REX.  Even if the implementation is not part of an antitrust violation, the impact on REX is the same.  Not only were REX's listings degraded, but REX was also driven out of business by Zillow's display change.  Dr. Evans testimony that it was Zillow's implementation of the two-tab display that ultimately forced REX to exit the market, is central to REX's evidence of proximate cause and damages.

REX's position is that the same conduct violated the Lanham Act and WCPA as violated the Sherman Act and Washington's antitrust law.  The fact that this Court has granted summary judgment for defendants on the antitrust claims does not alter the fact that Zillow changed its web site display or the impact of that change on REX. It was Zillow's implementation of a two-tab display that caused REX's demise, and Dr. Evans's testimony regarding that impact is a necessary part of REX's proof, and Dr. Evans should be permitted to testify that it was the display change that caused REX to go out of business.

**IV.    Whether Dr. Evans should be permitted to testify at trial that his calculation of REX's enterprise value is an appropriate measure of damages for REX's false advertising and Consumer Protection Act claims.**

**A.    Introduction**

REX was an established business in its seventh year of operation with a track record of steadily increasing sales and revenue and was trending toward profitability until it was driven out of business by Zillow's wrongful conduct.  *Alpha GRP, Inc. v. Subaru of Am., Inc.*, 2021 WL 1146029, at *9 (C.D. Cal. Feb. 8, 2021) (an established business "need

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

4

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

not be presently profitable"); *Orozco v. WPV San Jose*, LLC, 36 Cal. App. 5th 375, 399 (2019) (business is established when it has been in operation).  Dr. Evans has calculated REX's damages as the value of REX's business, a well-established measure of damages for a company forced out of business by a defendant's tortious conduct, and as demonstrated explained below, Dr. Evans' damage analysis is based on reliable evidence and widely used and reliable methods.  Dr. Evans's analysis does not stand on a single approach but is rather rests on three different approaches like a sturdy three-legged stool.

### 1. The Value of a Business Calculated as "Enterprise Value" is an Appropriate Measure of Damages for a Company Driven out of Business by a Lanham Act Violation, even where the company has yet to turn a profit.

REX seeks damages under 15 U.S.C. § 1117, which provides that, when a violation of Section 43(a) has been established, "the plaintiff shall be entitled ..., subject to the principles of equity, to recover ... ***any damages*** sustained by the plaintiff." *Id.* (emphasis added). Consistent with the plain language of the statute, the Supreme Court has stated that a "competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014).

Ninth Circuit precedent is clear that standard tort principles apply in determining damages for claims arising under the Lanham Act. In a case involving false advertising under Section 43(a), *Skydive Arizona, Inc. v. Quattrocchi,* 673 F.3d 1105 (9th Cir. 2012), the court upheld a damage award, stating that under Section 1117 a jury may award "'any damages sustained by the plaintiff' *in the same manner as in tort damages*: the reasonably foreseeable harms caused by the wrong." 673 F.3d at 1112 (emphasis added). *See also DSPT Int'l, Inc. v. Nahum,* 624 F.3d 1213, 1222 (9th Cir.2010) ("DSPT was entitled to 'any

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

5

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

damages' it sustained, which, ***like tort damages,*** are the reasonably foreseeable harms caused by the wrong") (emphasis added). Thus, under the Lanham Act , "many sources can provide the requisite information upon which a reasonable jury may calculate damages" for a violation of Section 1125(a). *Skydive Arizona,* 673 F.3d at 1113.

Unquestionably, destruction of business damages measured by loss of enterprise value is a common and appropriate remedy under tort law. *See, e.g, Protectors Ins. Serv., Inc. v. U.S. Fid. & Guar. Co.*, 132 F.3d 612, 617 (10th Cir. 1998) ("Numerous jurisdictions hold to the view that "when the loss of business is alleged to be caused by the wrongful acts of another, damages are measured by one of two alternative methods: (1) the going concern value; or (2) lost future profits." *Malley–Duff & Assoc. v. Crown Life Ins. Co.,* 734 F.2d 133, 148 (3rd Cir.1984). *See also Johnson v. Oroweat Foods Co*., 785 F.2d 503, 508 (4th Cir.1986) (the courts allow a plaintiff to recover either the present value of lost future earnings or the present market value of the lost business, but not both). The "going concern value" is the price a willing buyer would pay and a willing seller would accept in a free marketplace for the business in question."); *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490 (2d Cir. 1995) (approving jury award in tort and breach of contract action based on expert's calculation of loss of enterprise value*); In re Smartalk Teleservices, Inc. Securities Litigation*, 487 F.Supp.2d 940, 946 (S.D. Ohio 2007) (upholding bankrupt debtor's measure of damages caused by accounting malpractice even though plaintiff was not profitable and its impacted division was a new business:  the expert opinion on damages "is based on [plaintiff's] enterprise value before and after PwC's alleged actions. The Trustee does not make a simple lost profits damages claim.")

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

6

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

Indeed, loss of enterprise value is an appropriate measure of damages ***even where the plaintiff's business has never turned a profit.*** *See MindGames, Inc. v. Western Pub. Co., Inc.,* 218 F.3d 652, 658 (7th Cir.2000). ("If Arriva's argument is accepted then there never is any recourse to a start-up biotechnology company for a competitor's tortious interference. Like in this case, a large competitor could act anti-competitively with impunity to destroy a start-up, thereby undermining innovation and invention. This is the antithesis of the American system of capitalism."); *Alpha GRP, Inc. v. Subaru of Am., Inc*., 2021 WL 1146029, at *9 (C.D. Cal. Feb. 8, 2021) ("Subaru's contention that Plaintiff is incapable of proving damages because it was not profitable also fails. If Subaru's rule were accepted, innovative and thriving businesses that have not yet turned a profit, including businesses like Uber for example, would be denied any relief against wrongdoers who damaged them…. But to the extent that ***the value of Plaintiff's business*** can be measured by using reliable evidence and methods that account for future profits, losses, and costs, the Court sees no reason why such a method should be restricted) (emphasis added). For example, in *PerkinElmer Health Sciences, Inc. v. SCR Living LLC,* 2022 WL 3130237 (C.D. Cal. 2022), the court refused to exclude expert testimony on enterprise value and "evidence of damages arising from a lowered valuation" despite the company never experiencing any profit from the venture (and had yet to obtain the necessary licensure to qualify to earn profit). In so holding the court noted that even a claim of lost profits—which is held to a stricter standard of proof than loss of enterprise value—of an "unestablished business may be admitted where their nature and occurrence can be shown by evidence of reasonable reliability." *Id.* at *5 (emphasis added).

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

1      Thus, it is clear that a company driven out of business by a violation of the Lanham

2  Act is entitled to seek the value of the business as damages, which is within the plain

3  meaning of "any damages" under Section 1117. *Cf. Global Material Technologies, Inc. v.*

4  *Dahzeng Metal Fibre Co., Ltd.*, 2018 WL 10321387, *5 (N.D.Ill. March 28, 2018) (Where

5  the Illinois Trade Secret Act allowed recovery for "any loss," "calculating the enterprise

6  value is a useful way to calculate actual loss.")  This principle is embodied in this court's

7  proposed Jury Instruction No. 18:  "If your verdict is for plaintiff on either its first claim for

8  false advertising in violation of the Lanham Act or its second claim for violation of the CPA

9  or both, you may award actual damages proximately caused by the false advertising and/or

10  the violation of the CPA, including any lost profits that plaintiff would have earned but for

11  defendant's false advertising and/or violation of the CPA ***or any losses that plaintiff***

12  ***suffered from being forced out of business***. (Court's Jury Instructions, REDLINE

13  DISCUSSION DRAFT, Aug. 29, 2023.)[2]

14      Consistent with the case law, Evans estimated REX's damages by calculating the

15  loss of its enterprise value. (Evans' Rep. at ¶ 486.)  Evans used both the "Comparables

16  Methodology" and a modified version of the "Discounted Cash Flow Methodology," the

17  two main methods on which practitioners and academicians rely for determining enterprise

18  value. (Evans' Rpt. at ¶ 499 - 500.).  His calculations under both methodologies are

19  consistent with REX valuations based on contemporaneous, actual, arms-length investments

20  in REX. (Evans Rpt. at ¶¶ 538-541)  As discussed below, his calculations are also consistent

21  with and well supported by case law.

---

[2] REX has invoked lost profits to help demonstrate that REX is entitled to the enterprise value of the company because the enterprise value is the discounted value of future profits, which, of course, are lost when a company is driven out of business.

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

8

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

2. **Evans' Use of the "Comparables Methodology" to Calculate Loss of Enterprise Value is reliable, nonspeculative and supported by case law.**

Dr. Evans determined the value of REX using the comparables method.  He calculated that value by multiplying REX's projected gross profit for the following year by the ratio of the Enterprise Value to the Gross Profit of comparable companies. This is a standard valuation method endorsed both in the academic literature cited by Dr. Evans, *see* Evans Rpt. at ¶¶500-511, and by the capital markets, according to REX's capital markets expert, David Loucks, who calls it the Comparable Company Analysis ("CCA"), *see* **Ex. 36** Loucks Rpt. at pp.3-7. Mr. Loucks has been involved in at least 250 private transactions over the last 25 years, including mergers, securities offerings, private equity investments and other capital financings.

The comparable company analysis can be done using various metrics.  It is common to use gross profits as the relevant metric when valuing a company that is not yet generating a profit.  *See* Evans Rpt. at ¶¶505-509.  Dr. Evans concluded that gross profit was the appropriate metric to use, and Mr. Loucks agreed, stating: "In my opinion and based on my years of experience valuing start-up companies, a CCA using the gross profit metric was the most reliable and practical approach to valuing REX.  Gross profit is the amount available to pay operating expenses and reinvest in the business and, therefore, is a good indicator of financial health, growth, and resources available for the company to scale up." See **Ex. 1** to the Declaration of Carl E. Goldfarb, Loucks Rpt. at p. 13.

With gross profit as the metric, the comparable company approach typically uses the projected gross profit for the coming year.  Evans Rpt. at ¶511. In calculating REX's anticipated gross profits, Dr. Evans calculated himself the anticipated number of REX closings, and his calculation was more conservative than REX's projections, and accounted

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

9

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

for the economic downturn.  *Id.* at ¶¶514-517.  Dr. Evans relied on REX's estimates of its expected revenues and costs of goods sold, and thereby gross profits, for the given level of closings that he forecast. Dr. Evans found that REX's estimates were reasonable and reliable because they were consistent with REX's historical trends in REX business segments with a track record and were supported by detailed business plans for new business segments.

REX's projected profits per closing comes not just from the commissions on real estate transactions, but also from revenue for providing ancillary services such as escrow and title insurance, home loans, and home and auto insurance. Interestingly, Zillow's business model for Zillow Homes, Zillow's ibuying business using salaried Zillow employees as agents and brokers, was strikingly similar to REX's business model.  Like REX, Zillow ████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████ ZG_00282695 at '670; '705. The level of gross profit per closing that Dr. Evans used was consistent with the historical performance of Zillow Homes.  Like REX, Zillow hoped that Zillow Homes, which was not profitable on an operating profit basis, would turn a profit through economies of scale and sale of ancillary services such as title insurance, escrow services and mortgage brokerage services.  *Id.* at '709.

In deciding which companies to choose as comparables, Dr. Evans looked to the capital markets for guidance.  During 2021, REX engaged Bank of America Securities (BofA) and Wells Fargo (Wells) to serve as its investment bankers for a possible public offering through a SPAC or IPO.  Altimar, the SPAC that issued a Letter of Intent for the acquisition of REX in March 2021, hired JP Morgan (JPM) to advise it.  In analyzing the value of REX, BofA, Wells, and JPM used about two dozen comparable companies.  Of

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

10

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

those companies, Dr. Evans chose to use the digital real estate platforms as comparables because their business was the most similar to REX's. *Id.* at ¶ 518. Thus, Dr. Evans used as comparables companies that three of the most sophisticated investment banks in the world used in valuing REX. Those digital real estate platform companies were also the most predictive of future market conditions for real estate following the Federal Reserve's increase in interest rates, which drove up mortgage rates. All six of those companies are publicly traded and so Dr. Evans was able to calculate the ratio of the enterprise value to their gross profits, using publicly available information. Dr. Evans multiplied REX's projected gross profits by the mean multiple of the enterprise value to the gross profit ratio for the comparable companies because he concluded that was the most reliable approach. *Id.* at ¶¶ 527-529.

Mr. Loucks separately concluded that "Digital Real Estate Platform comps are the most directly comparable companies to REX's core business as an innovative real estate brokerage company," noting that "all the bankers that listed comparable companies included digital real estate related firms on their lists to best represent REX's valuation." **Ex. 1,** Loucks Rpt. at p.14. Mr. Loucks also favored using the median multiple from the comparable companies, stating: "In my opinion, it is appropriate to use the median comparable because the average can be distorted by a high or low figure." *Id.* at p.19.

In determining REX's enterprise value as of November 2022, the month before he submitted his expert report, Dr. Evans subtracted from the valuation the money REX

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

received for selling its title and escrow business and for selling its insurance business, resulting in an enterprise value for REX of $440 million.[3]

In sum, Evans' enterprise valuation using the Comparables Methodology is a market-based approach that (a) considers, as one component of the analysis, REX's gross profit *at a fixed point in time*, just one year into the future, in order to (b) estimate what a willing buyer would be willing to pay for REX in the absence of Zillow's wrongful conduct. It is not, as Defendant Zillow argues, mere speculation about future lost profits.  Caselaw is legion in recognizing the analytical distinction.

The Second Circuit's decision in *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490 (2d Cir. 1995) is directly on point. In *Indu Craft*, the plaintiff asserted tort and breach of contract claims seeking compensatory damages for the complete destruction of its business. At trial, the plaintiff presented two methodologies to compute damages:  1) lost profits, which the plaintiffs' owner estimated to be $2.6 million, and 2) the market value of the destroyed business as a going concern, which plaintiff's expert estimated in a range from $3.3 million to $4.3 million. The jury awarded $3.25 million, which the trial court set aside on post-trial motions.

On appeal the Second Circuit upheld the trial court's conclusion that the proof of lost profits through the owner of the business was "insufficient as a matter of law." 47 F.3d at 494-95. Nonetheless, the appellate court reinstated the damages award, finding that, "[h]ad lost profits evidence not been presented, ***evidence of the lost value of Indu Craft as***

---

[3] Dr. Evans also determined REX's enterprise value at other dates using the Comparables Methodology and the valuation is different at different dates because of the change in the enterprise value to gross profit multiple of the comparable companies as a result of fluctuations in their stock price.

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

12

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

***a going enterprise, standing alone, would have been sufficient to support the jury's award***
***of damages.*** *Id.* at 496 (emphasis added).

    *Indu Craft* is particularly persuasive because the court explained in detail the
expert's methodology, which mirrors the steps in Evans' methodology in this case. First,
Indu Craft's expert used the plaintiff's past earnings to *project* earnings for the year 1987.
In so doing, the expert "assumed earnings growth … based on Indu Craft's historical
earnings growth." 47 F.3d at 495.  Dr. Evans forecast closings based on past closing and
used forecasts of revenue and cost per closing, based in part on REX's historical record.
Second, Indu Craft's expert identified "comparables," which he determined to be "publicly
traded apparel companies." 47 F.3d at 495.  Dr. Evans used comparables selected by
sophisticated investment bankers and restricted the comparables to companies in a similar
line of business as REX.  Third, the Indu Craft expert determined that comparable apparel
companies had multiples of earnings that ranged from 5.2 to 11. Due to Indu Craft's small
size relative to publicly traded comparables, multiples at the low end of the range were used.
47 F.3d at 495; *Cf.* Evans Report at ¶ 524 ("The lowest multiple is Compass, at 1.2, and the
highest is Opendoor, at 9.0. The median multiple, which I use in estimating REX's
enterprise value, is 4.5.")

    This methodology, the Second Circuit held, supported the damage award under
both tort and contract claims, despite the court's finding that plaintiff's proof of "lost
profits" was speculative. Numerous cases are in accord. *See, e.g., Edwards v. Wyatt,* 330
Fed.Appx. 342, 350 (3d Cir.2009) (recognizing a "crucial" difference between seeking "lost
profits" damages and damages arising from the loss of an "income-producing asset with an

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

13

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

ascertainable market value."); *Matrix Group Ltd. v. Rawlings Sporting Goods Co.,* 477 F.3d 583, 593–94 (8th Cir. 2007).

The distinction between the "enterprise value" methodology and "loss profits" analysis is perhaps best illustrated by cases from jurisdictions that followed the so called "new business rule," a bright-line rule precluding recovery of "lost profits" by a company that has no track record of profitability.[4] For example, in *Schonfeld v. Hilliard,* 218 F.3d 164 (2d Cir 2000), the court concluded that under New York's new business rule, the plaintiffs were not entitled to recover lost profits because the profits were "purely hypothetical." *Id.* at 173. The court did not bar the plaintiffs from recovering damages altogether, however, instead distinguishing between "damages for the market value of a lost income-producing asset and lost profits." *Id.* at 175. As the Second Circuit explained,

> The market value of an income-producing asset is inherently less speculative than lost profits because it is determined ***at a single point in time.*** It represents ***what a buyer is willing to pay for the chance to earn the speculative profits***. Therefore, ***it is appropriate to apply these proof requirements more leniently than is the case with proof of lost profits***.

*Id.* at 177 (citing 3 Dobbs Law of Remedies at § 12.2(3)) (emphasis added). *See also, In re Emerald Casino, Inc.,* 530 B.R. 44, 226–28 (N.D. Ill. 2014) *aff'd in part, vacated in part sub nom. In re: Emerald Casino, Inc.,* 867 F.3d 743 (7th Cir. 2017) ("The case law recognizes a distinction between projections of lost profits and evidence of market value. …***Although the market value may be based in part on projections about future income, the two categories 'remain analytically distinct'***" … The fact that the market value

---

[4] The "new business rule" is a minority position. as explained *infra*, Part F, Washington has rejected the traditional new business rule.

1   represents what a willing buyer would pay at a single point in time makes it "inherently less

2   speculative than lost profits," and therefore this evidence does not trigger the logic of the

3   new business rule.) (emphasis added).

4

### 3. Evans' "Discounted Cash Flow" Analysis Corroborates the Reasonableness of the Comparables Methodology; and, as an alternative calculation of Enterprise Value, it is both reliable and supported by case law.

7           As a check on his damage analysis, Dr. Evans determined whether the enterprise

8   value of REX is consistent with a conservative, modified discounted cash flow analysis

9   under which REX would achieve just a 0.8% share of existing home sales by 2031. **Ex. 7**,

10  Evans Rpt. at ¶¶531 to 537, Evans Reply Rpt. n. 181.  He used Redfin's experience as a

11  conservative benchmark noting that Redfin had a 0.8% share of U.S. Homes sales in 2020,

12  16 years after it started operating an online listing site in 2004.  REX launched operations

13  in 2015, and so 2031 would mark 16 years after its founding.  For this discounted cash flow

14  analysis, he assumed REX would grow at a constant rate from 2021 to 2031, a rate sufficient

15  to achieve a 0.8% market share by 2031, and that the number of closings would remain

16  steady in all subsequent years.  *Id.* at ¶533.  For a discount rate, he took the highest cost of

17  capital for any of the six comparable firms he used in his analysis– 12.9% for eXP World

18  Holdings—and then rounded up to 15% as the discount rate.  *Id.* at ¶533.  He also did the

19  same analysis using 20% as the discount rate.  With a 15% discount rate, the net present

20  value of REX's free cash flow as of the start of 2023 is $751 million.  Evans Reply Rpt. n.

21  181.  Dr. Evans' modified DCF analysis not only corroborates the reasonableness of his

22  comparable company analysis, but it also serves as a valid alternative basis for calculation

23  of the loss of enterprise value – i.e., "any damages" under the Lanham Act.

REX'S PRETRIAL BRIEF                                       15

Case No. 2:21-cv-00312-TSZ

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

4. **The Enterprise Value Estimates Are Consistent with the Valuations Placed on REX Through Actual, Arms-Length Investments in Rex**

Dr. Evans further noted that his enterprise value estimates are consistent with the valuations placed on REX through actual, arms-length investments in REX. **Ex. 7**, Evans Rpt. at ¶¶538-541. The last valuation of REX before Zillow implemented its display change was the Series C1 funding round, which closed on August 27, 2020. On that date, REX investors bought 8,790,684 shares of stock in REX at $9 a share, for a total investment of $78,984,963, which equates to an implied valuation at the time of $325,158.60.[5] *Id.* at Table VIII-9 and ¶541. That investment came from sophisticated investors with detailed knowledge of REX and the opportunity to seek any additional information they wanted. They were voting on REX with their pocketbooks because the only way they would get their investment back, let alone make a profit on their investment, was if REX succeeded in the marketplace.

5. **The Value of a Business Calculated as "Enterprise Value" is an Appropriate Measure of Damages for a Company Driven out of Business by a Violation of the CPA, even where the company has yet to turn a profit.**

Under the CPA, REX is entitled "to recover the actual damages sustained" by reason of Zillow's violation of RCW 19.86.021 (the "CPA"). As this court recognized in its proposed jury instructions, the appropriate measurement of damages under the CPA and the Lanham Act is the same. *See* Proposed Jury Instruction No. 18, *supra* ("any lost profits that plaintiff would have earned but for defendant's false advertising and/or violation of the CPA or any losses that plaintiff suffered from being forced out of business.")

---

[5] The implied valuation assumes all outstanding shares should be valued at the same price as the newly issued shares.

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

Washington courts have found that lost profits may be recoverable in a CPA case if appropriately quantified. *See Torres Mazatlan Remainder, LLC v. FLRX, Inc.,*164 Wash.App. 1038 (2011); *Sing v. John L. Scott, Inc.,* 83 Wash.App. 55 920 P.2d 589 (1996), *rev'd on other grounds,* 134 Wash.2d 24, 948 P.2d 816 (1997). *See also Bowers v. Transamerica Title Ins. Co.,* 100 Wash.2d 581, 675 P.2d 193 (1983) (proper measure of damages under CPA was the value of the interest of which plaintiff was deprived).

Significantly, Washington does not follow the "new business rule." As explained in *No Ka Oi Corp. v. National 60 Minute Tune, Inc.,* 71 Wash.App. 844 863 P.2d 79 (1993):

> The Supreme Court modified the new business rule in *Larsen v. Walton Plywood Co.,* 65 Wash.2d 1, 16, 390 P.2d 677 (1964), deciding that **recovery of lost profits is not barred when a reasonable estimation of damages can be made based on an analysis of the profits of identical or similar businesses operating under substantially the same market conditions.** 65 Wash.2d at 17, 390 P.2d 677 . The *Larsen* court specifically held that **expert testimony alone is a sufficient basis for an award of lost profits in the new business context when the expert opinion is supported by tangible evidence with a 'substantial and sufficient factual basis'** rather than by mere 'speculation and hypothetical situations.' 65 Wn.2d at 19. This limitation on the new business rule was consistent with the rationale for the recovery of lost profits generally: When plaintiff provides a reasonable basis for estimating the loss, 'there is nothing in the nature of future profits *per se* which would prevent their allowance.... [E]ach case must be governed by its own facts.' *Andreopulos v. Peresteredes,* 95 Wash. 282, 285, 163 P. 770 (1917).

71 Wash.2d at 849-50; 863 P.2d at 82 (emphasis added). Thus, under Washington law, expert testimony and the comparative approach support an award of lost profits to a business with no history of profitability; *a fortiori,* they support an award of lost enterprise value, where profitability is a component of the expert analysis. *See Schonfeld,* 218, F.3d at 177 ("it is appropriate to apply these proof requirements [for lost enterprise value] more leniently than is the case with proof of lost profits."

## PART II (RESPONSE TO FOUR QUESTIONS POSED BY THE COURT NOT ABOUT DR. EVANS)

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

17

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

This Court has asked the parties to address whether it should admit the following: (1) any evidence of REX's now dismissed antitrust claims; (2) any evidence or testimony regarding the Buyer Broker Commission Rule; (3) any communications not involving Zillow by the National Association of REALTORS® ("NAR") or its affiliated multiple listings services; (4) any evidence of prevailing real estate commission rates in the United States or elsewhere.  REX addresses those questions below.

## I.    Legal Standards Applicable to All Categories

"Rule 401 defines "relevant evidence" in the widest possible terms." 1 *Federal Courtroom Evidence* § 401 (2023). Under Rule 401, evidence is relevant if it has a tendency to make a fact more or less probable than it would be without the evidence.  *See Gibson v. Mayor Council of Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004) ("while Rule 401 gives judges great freedom to admit evidence, [it] diminishes substantially their authority to exclude evidence as irrelevant.").  Evidence is relevant pursuant to Fed. R. Evid. 401 so long as it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *Bell v. Boeing Co.*, No. 20-CV-01716-LK, 2022 WL 1607935, at *1 (W.D. Wash. May 20, 2022) (quoting Fed. R. Evid. 401).  If it would tend to assist the trier of fact in determining facts necessary to its decision resolving the claim or defense, it is relevant." 1 *Federal Courtroom Evidence* § 401 (2023). Nevertheless, "[p]roffered evidence need not relate directly to an element of a claim or defense asserted in the case to be relevant.

### A.    Any Evidence of REX's Now Dismissed Antitrust Claims.

REX will not seek to introduce evidence that it *brought* antitrust claims against Zillow and NAR, that those claims were dismissed or that Zillow agreed or conspired to violate the antitrust laws.  However, to the extent that there is evidence that was relevant to

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

18

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

the antitrust claims and remains relevant to the Lanham Act and WCPA claims, such evidence must be allowed provided it is otherwise admissible. *See Inventist, Inc. v. Ninebot, Inc.* 2023 WL 4235575, at *1 (W.D. Wash., June 28, 2023) ("Evidence should be excluded pursuant to a motion in limine only when it is "inadmissible on all potential grounds.") (quoting *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004)[6]; *Whitcomb v. North Idaho College*, 2023 WL 2599211, at *1 (D. Idaho, Mar. 22, 2023) ("motions in limine may be used to eliminate evidence 'that clearly ought not be presented to the jury because [it] clearly would be inadmissible for any purpose.'") (quoting *Jonasson v. Lutheran Child & Family Svcs.*, 115 F.3d 436, 440 (7th Cir. 1997)).

Importantly, REX claims the same compensatory damages for its Lanham Act and WCPA claims that it sought for the antitrust violations. REX also claims, as it claimed with respect to its antitrust claims, that REX was harmed as a proximate result of Zillow's display change.  Therefore, REX will be relying on the same evidence it would have presented had the Court not granted summary judgment on the antitrust claims to prove proximate causation and damages on the remaining claims. *See, e.g., Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997) (error to exclude expert testimony on proximate cause of damages under Lanham Act); *Alpha GRP, Inc. v. Subaru of Am., Inc.*, No. CV182133MWFMRWX, 2021 WL 1146029 (C.D. Cal. Feb. 8, 2021) (valuation testimony relevant to prove damages).

Similarly, evidence relating to the Segregation Rule, which was part of the antitrust claims, is relevant to REX's Lanham Act and WCPA claims and should be admitted under Fed. R. Evid. 401.  The Segregation Rule is Zillow's acknowledged reason for its

---

[6] *United States v. Tilotta*, 588 F. Supp. 3d 1058, 1060 (S.D. Cal. 2022) (same).

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

19

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

website redesign that concealed REX's listings and drove REX out of business and provides important context for Zillow's conduct.  *See In re Tesla, Inc. Sec. Litig.*, No. 18-CV-04865-EMC, 2022 WL 17582008, at *12 (N.D. Cal. Dec. 7, 2022); *Cairns v. Idaho Falls Sch. Dist. No. 91*, No. 4:18-CV-00564-BLW, 2021 WL 4690825, at *3 (D. Idaho Oct. 6, 2021); *Koho v. Forest Labs, Inc.*, 17 F. Supp. 3d 1109, 1114 (W.D. Wash. 2014) (evidence is relevant to "provide useful background information.").

Moreover, Zillow chose to implement the change even though several of its senior executives characterized the Segregation Rule as ███████████████████████."  *See* ZG_00002661 (332-40). REX recently responded to Zillow's motion in *limine* seeking the exclusion of these statements. As argued in response to the motion in *limine*, this evidence, which was relevant to show that NAR and Zillow had entered into an anticompetitive agreement, is directly relevant to at least four issues relating to REX's Lanham Act claim – state of mind, materiality, proximate cause, and "commercial speech".

By way of further example, REX will present evidence that it was viewed in the residential real estate industry as a "disruptor" because it sought to lower commission rates by operating outside the NAR MLS system. This evidence, which was relevant to the antitrust claims, is also directly relevant to whether the public's interest in alternative real estate commission models was harmed when REX failed as a result of Zillow's wrongful conduct. *See, e.g., Lahoti v. Vericheck, Inc.*, 636 F.3d 501 (9th Cir. 2011) (to prove a violation of the WCPA, the plaintiff must demonstrate an act or practice that affects the public interest).

### B.   The Buyer Broker Commission Rule.

REX will not seek to prove that NAR's Buyer Broker Commission Rule violates the antitrust laws or that Zillow entered into an agreement or conspiracy with NAR or the

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

20

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

NAR-affiliated MLSs to enforce the Buyer Broker Commission Rule.  However, the Buyer Broker Commission Rule is still relevant to other important issues that remain part of the case, including materiality, proximate cause, damages, and Zillow's defense that REX failed to mitigate its damages by co-listing on the MLSs or joining NAR MLSs. *See Hanks v. Clark Cnty.*, No. 3:22-CV-05359-DGE, 2023 WL 4623977, at *3 (W.D. Wash. July 19, 2023) (evidence is relevant that "may corroborate or undermine testimony proffered by the parties.").

With respect to the issues on which REX has the burden, REX proffers that it can show that most MLSs require that brokers and agents make unilateral, non-negotiable offers of compensation when listing properties, as required by the Buyer Broker Commission Rule. But REX was founded on the principle that real estate commissions are too high, and its business model was that commissions could be reduced if sellers of residential real estate were not required to pay buyer-broker commissions. Therefore, REX, which did not offer buyer-broker commissions when it listed its properties, was excluded from the MLSs and dependent on Zillow and, to a much lesser degree, other platforms to market its listings. These facts are essential for the jury to understand why Zillow was REX's most important outlet for marketing its listings (materiality) and how badly REX was harmed when Zillow changed its website to conceal REX's listings (proximate cause and damages).

The Buyer Broker Commission Rule is also key to understanding how and why Zillow designed its two-tab display as it did.  Zillow's major source of revenue, more than $1 billion a year, comes from brokers who pay Zillow for buyer leads.  Those brokers, who are Zillow's paying customers, favor listings that comply with the Buyer Broker Commission Rule because they know they will earn a commission if they close a sale on

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

21

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

one of those leads; and they disliked REX's listings, which did not make a mandatory offer of compensation, because they knew they might not get a commission even if they closed a sale on one of those leads.  Thus, it is no coincidence that Zillow's redesigned web site funneled the attention of site visitors to the "Agent Listings" tab. Indeed, the new design defaulted to those listings, the ones on which Zillow's broker customers, and so Zillow itself, stood to make the most money.

Zillow claims REX failed to mitigate its damages because it could have marketed its listings on Zillow's "Agent Listings" tab if it had joined MLSs or co-listed its properties on the MLSs. But the evidence will show that co-listing would not have prevented REX from being a "casualty" of the display change. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

First, not all MLSs allow co-listing for a nominal fee.  More importantly, the Buyer Broker Commission Rule, which allows buyer brokers to see what commissions the listing broker is offering them, allows brokers and agents to "police" listings to enforce the rule.

In fact, the evidence will show that REX *tried* co-listing on some MLSs but those co-listings attracted brokers and agents who demanded commissions and could also exert leverage through the threat of steering their clients to listings paying traditional commissions. When approached by buyers with brokers, REX's clients usually ended up agreeing to pay buyer-broker commissions. Thus, whereas until the display change, REX represented both buyers and sellers in 43.7% of closed transactions in REX's mature markets, and its sellers paid about a 2% commission, after REX began to co-list more

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

22

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

properties, more and more of its sales involved buyers with brokers and consequently higher total commissions. This worked at odds to REX's "value proposition" and made it harder to market REX's services to potential sellers.  Its ability to land new listings declined and its advertising and related administrative expenses increased, contributing to a death spiral and the closing of the business.

### C. Any Communications Not Involving Zillow by The National Association of Realtors® or Its Affiliated Multiple Listings Services.

REX does not intend to offer any evidence of communications not involving Zillow by the National Association of Realtors consisting of emails, text messages, Slack, or the like. However, in an abundance of caution, REX wishes to make clear it intends to offer the 2015 NAR Handbook on Multiple Listing Policy because it contains the Segregation Rule, as significantly amended in 2014, as well as the related Comingling Rule and the Buyer Broker Commission Rule, and the 2020 NAR Handbook on Multiple Listing Policy containing those rules, which was in effect when Zillow implemented its display change. The Segregation Rule, which Zillow acknowledges was the motivation for the display change, is obviously relevant, as discussed above. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 833 n.8 (9th Cir. 2011) (noting evidence was relevant to defendants' intent to deceive); *Houserman v. Comtech Telecommunications Corp.*, 519 F. Supp. 3d 863, 868 (W.D. Wash. 2021) (admitting documents as "relevant background information" probative of the defendant's "notice and intent"); *Onyx Pharms., Inc. v. Bayer Corp.*, 863 F. Supp. 2d 894, 989, 900 (N.D. Cal. 2011) (evidence of a defendant's motive is relevant).  The Handbook quotes in its text the No-Commingling Rule and the Buyer Broker Commission Rule, which are also relevant for the reasons stated above.

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

23

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

1
2
3
4
5
6
7
8
9
10
11
12
13
14

REX also intends to offer the D.A.N.G.E.R. Report, a report commissioned by NAR in 2014 and that NAR made publicly available, which documents that real estate brokerage fees in some developed countries were then in the range of 1 to 2% and therefore supports REX's position that real estate commissions in the United States are too high.  The D.A.N.G.E.R. Report also predicted trends in the residential real estate industry that would undermine United States commission rates and the traditional 50/50 commission split, including "do it yourself" real estate transactions, the emergence of digital listings platforms, technology-powered brokers offering new business models connecting buyers and sellers without agents, and consumer pressure to reduce commission rates.[7] REX was founded in 2015, about a year after the report was published. Jack Ryan and Lynley Sides, REX's founders, will testify that they read the report and considered its findings in making their decision to proceed with REX.

15
16
17
18
19
20
21
22

The D.A.N.G.E.R. report is also relevant to the materiality of Zillow's false statements, proximate cause, and REX's damages because it corroborates the importance of digital platforms, particularly Zillow, for the marketing of residential real estate during the period of REX's existence.  It is relevant to the WCPA claim because it speaks directly to the public interest in the development of innovative business models in the residential real estate market that would reduce commissions.  That interest was harmed when REX was forced by the display change to shutter its business.

23
24
25
26

Zillow and REX have agreed to the admissibility of NAR's published reports concerning consumer trends in the residential real estate industry.  These reports were relied upon by REX's experts in assessing harm to REX from its listings being mislabeled and

27
28

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

24

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

concealed on Zillow.  They also are relevant to show Zillow's importance as the dominant real estate listings platform and are thus relevant to issues like materiality, proximate causation and damages.

### D. Evidence of prevailing real estate commission rates in the United States or elsewhere.

Evidence of prevailing residential real estate commission rates in the United States and elsewhere remains highly relevant because, again, REX was founded on the principle that real estate commissions in the United States are too high. REX's founders will testify that they came to that conclusion, based not only on their personal opinions, but also based on scholarly works and empirical research that compared residential real estate commission rates in the U.S. to those of other developed countries. The evidence thus corroborates that REX's business model was responsive to a serious economic and social issue. Evidence of the prevailing commission rates is also important because it helps explain why REX, which often charged less than half the total commission rate consumers paid on traditional residential real estate transactions, was growing so quickly, why it attracted private capital, and why it was in a strong position to access the capital markets. For that reason, REX's board and investor presentations which will be offered into evidence, frequently reference prevailing commission rates in order to explain REX's business model and to offer comparative data respecting the extent to which REX was able to close transactions at significantly lower rates.  *See, e.g.,* Exhibit 3 to the Declaration of Carl E. Goldfarb, REX_0482824 (2016 presentation discussing the issue of commission rates in the real estate industry and "sub-optimal" results for customers under the traditional model due to the "conflict between the agent's goals and customer's goals"). The fact that prevailing rates

25

are so high also demonstrates that REX's failure was contrary to the public interest, an element that REX is required to prove in order to prevail on its WCPA claim.

## PART III  (RESPONDING TO AN ARGUMENT ZILLOW SAID IN THE MEET AND CONFER IT WOULD MAKE)

### I.     REX is not required to disaggregate damages for its Lanham Act claim.

Zillow's two-tab design has three "essential features": (i) tab labels, (ii) tab contents, and (iii) tab default status. *See* Summary Judgment Order at 4, Dkt. No. 465. The Court has already found as a matter of law that REX has established the falsity of Zillow's tab labels. *Id.* at 20.

All three design features – including tab default status – operated together and inseparably to deceive consumers. The default setting is a powerful design feature Zillow employed to drive the viewer's attention to the false "Agent Listings" tab. Because the default status is an inseparable element of the two-tab design, REX is not required to allocate damages to the default tab status, independent of the labels and contents of the two tabs. Dkt. 458 at 2 ("Zillow also disregards the principle that an injury can have more than one proximate cause, and it cites no authority for the proposition that REX must allocate fault between intertwined sources of harm, namely the tab labels, the tab contents, and the tab default settings.").

#### A.   The default tab status of Zillow's two-tab display is actionable as a Lanham Act violation, and therefore REX need not disaggregate damages because the default tab is inextricably part of the harm caused by Zillow's two-tab design.

##### 1.   The default tab status is actionable under the Lanham Act.

Lanham Act claims must be analyzed in their full context. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) ("the court must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and

in isolation from each other."). In this case, the full context includes the following design features: the labels, the labels contents, and the default status. The Court has found as a matter of law that the labels, which cannot be understood apart from each other and their contents, were false and a classic Lanham Act violation, But the labels appear in the context of a website that was designed to default to and direct the attention of consumers to MLS listings that were falsely characterized as "Agent Listings." Accordingly, Zillow's contention that the harm caused by the labels should be disaggregated from the harm caused by the website design violates the fundamental precept that the full context defines the violation.

An entire website design can constitute a false or misleading statement in violation of the Lanham Act. *See, e.g., TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011) (an "entire site" violates the Lanham Act, despite containing "nothing inherently misleading," if it can still "mislead" or "give a false impression"). Courts have also held that website design and content work can work *together* to violate the Lanham Act. *See, e.g., TrafficSchool.com*, 653 F.3d at 827 ("several facets" contributed to the "entire site ha[ving] a tendency to deceive") (citation omitted); *Lemberg Law, LLC v. eGeneration Marketing, Inc.*, No. 3:18-CV-570 (CSH), 2020 WL 2813177, at *4, 11 (D. Conn. May 29, 2020) (website "[t]aken as a whole," including website's non-content design choices such as the "font, location, and [] color," had tendency to deceive). That is because a website design can increase the likelihood of customer confusion by enhancing the impact of false statements. It can create the appearance of *endorsement* from a trusted authority; it can use visual distraction so customers stay *unaware* of unfavorable information; it can require additional *effort* from a consumer to access corrective information; it can inculcate a

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

27

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

customer's *familiarity and comfort* with misleading information; and it can influence consumer response by prioritizing *placement* of misleading information.[8]

In this case, the default status is the mechanism that leads consumers to the false tabs and then misleads them in multiple, additional ways:

• *Endorsement.* The default tab status gives customers the impression that Zillow is an authoritative "policy-maker/marketer" endorsing listings shown under "Agent Listings" as a "recommended option." Krishna Rep. at 23. *Cf. TrafficSchool.com*, 653 F.3d at 827 (prefixes in the URLs "ca.dmv.org" and "california.dmv.org" "give a false impression as to the likely [official government DMV] sponsorship of [a] website" that was privately run); *Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419, 439 (S.D.N.Y. 2021) (retailer's use of fashion runway pictures falsely implied that the runway models personally endorsed and recommended clothes).

• *Effort*. The default status discourages customers from viewing "Other listings" by requiring additional "cognitive effort" to click alternative tab. Krishna Dep. at 223:18-224:12; *see also* Krishna Rep. at 22. *Cf. TrafficSchool.com*, 653 F.3d at 828 (corrective information required scrolling to the bottom of webpage); *see also Keithly v. Intelius Inc.*, 764 F. Supp. 2d 1257, 1267 (W.D. Wash. 2011) (corrective information required clicking through several web pages deep into internet sales transaction, in violation of CPA).

• *Lack of awareness*. Zillow customers were often not even aware of the existence of the "Other listings" option due to the visually distracting presentation of "Agent listings." *See* Krishna Rep. at 22. Several customers remarked that the "Other listings" tab was difficult to see – even when promoted to find it via a pop-up window. [ZG_00011984.] *Cf. Lemberg Law, LLC v. eGeneration Marketing Inc.*, No. 3:18-cv-570, 2020 WL 2813177, at *11 (D. Conn. May 29, 2020) (corrective information "not noticeable in that it is printed in white ink against a navy blue background").

• *Placement.* The default tab status gave visually privileged placement to "Agent listings." *See* Krishna Rep. at 23 (Dkt. No. 343-01). *Cf. Lemberg*, 2020 WL 2813177, at *11 (corrective information easy to miss when misleading information was highlighted with enticing design choices, e.g., a "boldly provided" "orange rectangle" and the instructions "Get Help").

• *Familiarity*. The default tab status nudges users to develop a familiarity, comfort, and eventual habit of focusing on the "Agent listings" tab. *See* Dkt. No. 343-01 at 23.

---

[8] Dr. Krishna, REX's marketing expert, discusses the scientific literature discussing all five techniques in her report. Krishna Rep. at 21-24 (Dkt. No. 405-74)

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

28

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

Zillow's default tab status, inextricably intertwined as it is with the display's tab labels and content, is part and parcel of Zillow's Lanham Act violation.  The fact is that anyone who went on Zillow's website was first exposed to a display of listings.  Those listings corresponded only to the MLS sourced listings in the "Agent Listings" tab but the default led consumers to believe that the list included all agent listings. As the Court has recognized, that was false. Because the default enhances, prioritizes and otherwise reinforces the falsity of the tabs and their content, there is no basis for requiring REX to disaggregate the impact of the various components of Zillow's two-tab display and separately quantify the impact of the "nose" or "mouth" or "eyes."

> **2.  Because the default tab status is unlawful, REX need not disaggregate the damages.**

Because REX's damages estimate stems from *inextricable unlawful* sources of harm, REX is not required to disaggregate its damages. The Seventh Circuit has addressed this issue most directly, noting:

"**[A] plaintiff need not disaggregate damages among those acts found to be unlawful.**" *MCI Comm'ns v. AT&T*, 708 F.2d 1081, 1163 (7th Cir.), cert. denied, 464 U.S. 891 (1983) (emphasis added)

Since the Supreme Court has been willing to accept a degree of uncertainty in the calculation of damages, strict proof of what damages have been caused by which acts has not been required. Not requiring strict disaggregation of damages among the various unlawful acts of the defendant serves to prevent a defendant from profiting from his own wrongdoing and makes sense when damages arise from a series of unlawful acts intertwined with one another. *Id.* at 1161 (citations omitted); *see also Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226, 1242-43 (7th Cir. 1982) ("a plaintiff claiming injury caused

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

29

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

by more than one of the defendant's unlawful practices need not prove the amount of damage caused by each illegal practice if the plaintiff shows that disaggregation is impracticable").

### B. Even if default is not actionable under the Lanham Act, it would be impossible to disaggregate damages stemming from lawful and unlawful harm.

If the Court determines the default tab status is not par of the Lanham Act violation, REX is still not required to disaggregate damages. Courts have found that where *lawful* and *unlawful* harm are inextricable, a plaintiff is not required to separate the two. The case *National Farmers Organization Inc. v. Associated Milk Producers Inc.*, 850 F.2d 1286 (8th Cir. 1988) (henceforth "*NFO*"), speaks directly to this point. In *NFO*, the Eighth Circuit found that a milk cooperative's lawful (e.g., mergers and acquisitions of other cooperatives) and unlawful (e.g., coercive supply disruptions) actions were too intertwined to separate:

> An antitrust plaintiff's damage claim is not, as the appellees suggest, rendered speculative or unreasonable merely because it fails to provide for a specific reduction in the event that allegations of certain unlawful conduct are rejected. In other words, if an antitrust plaintiff alleges that the defendant engaged in unlawful acts A, B, C, and D, and acts C and D are later rejected as a basis of liability, it does not automatically follow that the damage award must be reduced. *Rather, if acts A and B support the entire damage award, it must be sustained.*

*Id.* at 1307 (emphasis added); *see also Spray-Rite*, 684 F.2d at 1243 ("We will not deprive Spray-Rite of this recovery merely because the jury may have found that Monsanto combined lawful conduct with unlawful conduct making it impossible to determine which portion of the total damages was caused by the unlawful conduct."); *Sumotext Corp. v. Zoove Inc.*, No. 16-cv-01370, 2020 WL 533006, at *7-8 (N.D. Cal. Feb. 3, 2020) ("Plaintiff is entitled to show that damages cannot be disaggregated across the various [] courses of conduct in the instant case, at which point the burden shifts to the defendant") (citing *Litton*

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

30

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

*Sys., Inc. v. Honeywell Inc.*, No. CV 90–4823 MRP, 1996 WL 634213, at *2 (C.D. Cal. July 24, 1996) (admitting damages expert).

Courts in this circuit have followed the Eighth Circuit's holding in *NFO*. *See ICTSI Oregon Inc. v. ILWU*, No. 3:12-cv-1058, 2019 WL 1542887, at *5 (D. Or. Apr. 9, 2019) ("If the jury finds that both lawful and unlawful conduct occurred *and the consequences were not separable*, then disaggregation would be unnecessary.") (emphasis added); *In re High-Tech Employee Antitrust Litig.*, 2014 WL 1351040, at *18 (N.D. Cal. Apr. 4, 2014) ("[damages] model will not be excluded for failure to segregate out any effects of unchallenged conduct" because damages models need not "segregate out effects of every possible factor, including legal conduct, that could impact the dependent variable").

Here, Zillow's default tab display was inseparable in its effect from the tab labels and contents. As REX's marketing expert testified, it would be "complete conjecture" to attempt to disaggregate the impact of impact of the labels from the default.  Krishna Dep. at 68:17-69:12. Notably, while Zillow did testing of its two-tab display with various labels, none of those tests indicated a different impact with different labels. Nor did the tests attempt to disaggregate any separate impact of the default status.

Website design violations of the Lanham Act often work in this way that makes disaggregation impossible: the effect of a false statement is amplified by its display. *See Lemberg*, 2020 WL 2813177, at *4, 11 (text's "font, location, and [] color" increase its ability to deceive). Rarely can these elements be parsed in a damages analysis. Where such elements are "so tightly intertwined as to make it difficult to determine which portion of the damages claimed were caused by the unlawful conduct," *NFO*, 850 F.2d at 1307, disaggregation is not required. *See also* ECF No. 458, at 2 ("an injury can have more than

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

one proximate cause, and [Zillow] cites no authority for the proposition that REX must allocate fault between intertwined sources of harm").

## II.     REX is not required to disaggregate damages for its WCPA claim.

The Washington Consumer Protection Act bars conduct that is "unfair" as well as "deceptive." *See* RCW 19.86.020. As this Court noted in denying Zillow's motion for summary judgment on REX's CPA claim: "A trade practice may be considered 'unfair' without being 'deceptive' or involving 'false' advertising. *See Rush v. Blackburn*, 190 Wn. App. 945, 963, 361 P.3d 217 (2015)." Dkt. No. 458 at 2.

In addition to arguing that the tab labels are false, among other arguments, REX contends that Zillow's decision not to display REX's listings on the default page was "unfair" to both consumers and REX. The record contains voluminous evidence of the impact of the display change on viewers, ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███ ████████████████████████████████████ ██████████████████████████████████ Because the default setting is an integral part of the web site design that caused that impact, the default setting is clearly actionable under the WCPA. *See Rush*, 190 Wash.App. at 963 ("Current federal law suggests that a 'practice is unfair [if it] causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits.' Federal Trade Commission Act of 1914, 15 U.S.C. § 45(n) (quoted in *Klem*, 176 Wash.2d at 787, 295 P.3d 1179)"); *Magney v. Lincoln Mut. Sav. Bank*, 34 Wash.App. 45, 57 (Wash. Ct. App. 1983) ("In determining whether something is unfair, the court may look to see. . . whether it causes substantial

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

32

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

injury to consumers (or competitors or other businessmen") (quoting *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244, n. 5 (1972)).

Because the default setting, along with the inextricably intertwined false labels, violates the WCPA, there is no legal necessity that REX's damage analysis parse the impact of the various components of Zillow's two-tab display.  In any event, as demonstrated above, because the causes are so intertwined, harm cannot be disaggregated.

### PART IV (RESPONDING TO ANOTHER ARGUMENT ZILLOW SAID IT WOULD MAKE)

### I.  REX Should be Allowed to Call Mr. Barton as an Adverse Witness for Live Testimony

Zillow has notified REX that it will resist REX's request that Richard Barton, its CEO, appear as an adverse witness at trial.  REX is further informed that Zillow's position is that REX should be required to rely solely on Mr. Barton's deposition, which was taken by REX's counsel on May 16, 2023, subject to the Court's limit of 3 hours. REX submits that Mr. Barton has relevant evidence that it is entitled to present to the jury and that there is no legal reason why Mr. Barton who works in Seattle should not appear.[9] As set forth below, Mr. Barton has relevant testimony on at least the following 4 issues in this case: materiality, whether Zillow's website is "commercial speech," the viability of REX's business model and REX's damages. Additionally, while REX contests that Zillow's claimed business justification is a defense to REX's WCPA claim, Mr. Barton has knowledge of facts which would be relevant to that defense if it is an issue for the jury.

i.   Materiality

---

[9] Zillow has represented it will accept service of a subpoena for Mr. Barton, but presumably only if the Court orders that REX may call him to testify.

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

1    Zillow employs at least two slogans to burnish its public image: it "turns on the

2    lights for consumers" and it serves as consumers' "North Star" in their search for a new

3    home. Mr. Barton testified with respect to the work of one of Zillow's executives in pursuit

4    of the elimination of the Segregation Rule:

5

6

7

8

9

10   Barton Dep. Tr. at 72:4-17, Exhibit _ to the Declaration of Carl. E Goldfarb.

11       Mr. Barton understands and articulates well the importance of transparency and

12   inclusivity when it comes to the presentation of real estate listings on its digital platform.

13   The jury needs to hear his articulation as the co-founder, CEO, and public face of Zillow to

14   fully appreciate the importance of the change to the website display that concealed REX's

15   listings, and how detrimental that change was to the public as well as to REX.

16       ii.    Commercial Speech

17       Zillow likes to portray itself as serving consumers first but Zillow is a public

18   company and its paramount allegiance is to its shareholders who want Zillow to earn a

19   profit. According to Zillow's public SEC filings, Zillow earns substantial revenue, in excess

20   of $1 billion, from participants in the real estate industry to whom it sells advertising on its

21   search results display page though its Premier Agent Program. *See* Zillow Group Inc., 2020

22   Form 10-K at p. 12; Zillow Group Inc., 2019 form 10-K at p. 7. Mr. Barton, who signs off

23   on Zillow's 10Ks, will confirm that Zillow earns substantial revenue from advertising on its

24   website both before and after the re-design. Barton Dep. Tr. at 120:3-7. None of Zillow's

25   other witnesses had direct responsibility for Zillow's Premier Agent Program.

26

27

28

REX'S PRETRIAL BRIEF                    34            BOIES SCHILLER FLEXNER LLP
                                                      401 E. Las Olas Blvd, Suite 1200
                                                      Fort Lauderdale, FL 33301
Case No. 2:21-cv-00312-TSZ                            (954) 540-6219

iii.     Validation of REX's Business Model

      Zillow began exploring ibuying in 2017, began Zillow Offers in 2019 and. then, in early 2021 launched Zillow Homes, a brokerage which Zillow used to market the homes that it bought and sought to resell for its own account. ZG_00282695 at '696 (Dkt. No. 405-60).   What Zillow discovered in short order was that its margins were insufficient for it to make a profit in part ███████████████████████████ Consequently, Zillow began exploring ways to sell the homes it bought ███████████████ ████████ the very problem REX sought to overcome in its own business model. ZG_00282695 at '699-700. Zillow also began brokering mortgages, offering real estate settlement services and began exploring other ancillary service offerings like moving assistance and insurance. ZG_00282695 at '703-705. Though Zillow was losing money through ibuying and Zillow Homes, it hoped to turn a profit through economies of scale and reduced costs as it ramped up those lines of business. REX, too, sought to earn revenue from offering such services and was having success in doing so until its listings were degraded and concealed on Zillow's website and its business plan also called for reduced costs through economies of scale.  Mr. Barton, as CEO, was ultimately responsible for Zillow's decisions to explore commission reduction measures and the offerings of ancillary services. The jury should hear Mr. Barton's testimony relating to why Zillow made these decisions. Zillow's other witnesses were not integrally involved in Zillow's ibuying business and Zillow Homes, which is part of the reason REX sought to depose Mr. Barton, and accordingly, are not in a position to testify regarding those programs.

iv.     Validation of REX's damages

      Until REX was forced out of business, its financial trajectory was not unlike Zillow's.  Zillow never made a profit before it went public and, in fact, in the fifteen years

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

35

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

or so that it has been around, it has only made a small profit in two years. Barton Dep. Tr. at 42:11-2. Like REX, it went through several financing rounds before it went public. Barton Dep. Tr. at 41:4-42:1. According to publicly available sources, Zillow raised about $87 million in its Series A, Series B and Series C rounds and had a pre-public valuation of $320 million even though it was unprofitable. In mid-July 2011 it went public and raised $539 million in the capital markets. Barton Dep. Tr. at 30:18-20; 44:20-24. It seems highly unlikely that had Zillow been forced out of business in early 2011 that it would have taken the view that it had no value.  Zillow casts a jaundiced eye on REX's damages based on REX's enterprise value at or about the time of the display change or the shuttering of its business. The jury should hear from Mr. Barton that REX was in much the same position as Zillow before Zillow went public when REX became a "casualty" of the display change. No other Zillow witness is in a position to testify about these topics.

> v.   Rebuttal of Zillow's Business Justification Defense under the WCPA.

Zillow contends that its decision to implement its two-tab display was intended to help consumers. Barton Dep. Tr. at 104:10-22; 105:5-12; 113:7-19. Mr. Barton claims that Zillow re-designed its website solely for the purpose of improving listings quality for the benefit of the consumer. But Zillow is a public company and it earns most of its revenue from the real estate industry by selling advertising, software and technology to industry participants. Barton Dep. Tr. at 74:10-15.  It also spent many millions of dollars redesigning its website and it went live with its new website at the same time it launched Zillow Homes, its brokerage associated with its ibuying program. These facts, which undermine Zillow's business rationale for the website redesign, are most comprehensively in Mr. Barton's knowledge than anyone else at Zillow. Consequently, REX should be allowed to question

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

36

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

Mr. Barton as an adverse witness to rebut Zillow's contention as to why it changed its display and to allow the jury to assess Zillow's true motivation.

## II.     The Apex Doctrine Does Not Protect Barton From Being Compelled to Appear for Trial.

The Apex doctrine shields high-ranking corporate officers from attendance and testimony at depositions, not trials.   *See DataQuill Limited v. Kyocera Wireless Corporation,* No. 01CV2302-B (BLM), 2005 WL 8173292 (S.D. Calif, Oct. 26, 2005). Therefore, the Apex doctrine is inapplicable to Barton as a trial witness.

However, if the Court chooses to exercise its discretion to entertain Zillow's claim that Barton is entitled to special consideration because of his status as CEO, the Court should weigh his status against the unique, non-repetitive knowledge of the facts in issue as summarized above. *See, Starz Ent., LLC v. Buena Vista Television, Inc*., No. CV 07-1895-VBF (PJWX, 2008 WL 11336466, at *8 (C.D. Cal. Oct. 20, 2008).[10]  Indeed, Barton made a point at his deposition of his unique perspective as CEO when asked whether he agreed with Errol Samuelson, one of Zillow's most important witnesses in this matter, that the Segregation Rule constrains Zillow's business:

████████████████████████

██████████████████████████████

███████████████████████████████

██████████████████████████████

██████████

███████████████

---

[10] *Pinn, Inc. v. Apple Inc*., No. SA19CV01805DOCJDE, 2021 WL 4775969, at *3 (C.D. Cal. Sept. 10, 2021), is not on point because there the party seeking trial testimony had not even sought to depose the witness in question.

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219



Barton Dep. Tr. at 79:16-25; 80:1-9.  (emphasis added)

REX agrees with Mr. Barton that no one at Zillow has his perspective on matters relating to this lawsuit. As both the founder of Zillow and its current CEO, he is uniquely positioned to testify regarding the full scope of Zillow's commitment to transparency, the relationship of the display change to Zillow's obligations to its shareholders, the importance of Zillow's website to Zillow's commercial success, Zillow's efforts to achieve profitability in its ibuying business, and Zillow's financial trajectory.  His testimony on these matters is highly relevant to contested issues in this case.  Therefore, he should not be protected from testifying.

Finally, REX anticipates that Zillow will argue that REX should be required to rely on its brief deposition of Mr. Barton, rather than requiring him to make a physical appearance at the trial.  But counsel was unable to complete her entire examination of Mr. Barton and, in any event, Mr. Barton has knowledge of facts relating to issues not anticipated at the time of his deposition such as Zillow's business justification defense. Finally, given Mr. Barton's obvious commitment to full transparency, the jury should be given an opportunity to view his demeanor and hear his live testimony in order to evaluate

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

38

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

important issues like Zillow's state of mind, the materiality of Zillow's deceptive conduct, and whether the impact of Zillow's website redesign was injurious to the public interest.

Respectfully submitted,

Dated: September 1, 2023          **BOIES SCHILLER FLEXNER LLP**

By:*/s/ Carl E. Goldfarb*
  Carl E. Goldfarb (Admitted *Pro Hac Vice*)
  BOIES SCHILLER FLEXNER LLP
  401 East Las Olas Blvd., Suite 1200
  Fort Lauderdale, FL 33301
  Telephone: (954) 356-0011
  Facsimile:  (954) 356-0022
  cgoldfarb@bsfllp.com

  Ursula Ungaro
  Stephen N. Zack
  BOIES SCHILLER FLEXNER LLP
  100 SE 2nd Street, Suite 2800
  Miami, FL  33131
  Telephone: (305) 539-8400
  Facsimile:  (305) 539-1307
  uungaro@bsfllp.com
  szack@bsfllp.com

  James Denvir
  BOIES SCHILLER FLEXNER LLP
  1401 New York Ave, NW
  Washington, D.C, 20005
  Telephone: (202) 237-2727
  Facsimile:  (202) 237-6131
  jdenvir@bsfllp.com

  David Boies
  BOIES SCHILLER FLEXNER LLP
  333 Main Street
  Armonk, NY  10504
  Telephone: (914) 749-8200
  Facsimile:  (914) 749-8300
  dboies@bsfllp.com

*Attorneys for Plaintiff*

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

39

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 2, 2023, I served foregoing document to be filed in this Court's CM/ECF system, which will send notification of such filing to the counsel of record.


By: */s/ Carl E. Goldfarb*
                      Carl E. Goldfarb, Esq.

REX'S PRETRIAL BRIEF

Case No. 2:21-cv-00312-TSZ

40

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
(954) 540-6219