THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

REX - REAL ESTATE EXCHANGE, INC.,
a Delaware corporation,

Plaintiff,

v.

ZILLOW, INC., et al.,

Defendants.

Case No. 2:21-CV-00312-TSZ

ZILLOW DEFENDANTS' TRIAL BRIEF

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

# TABLE OF CONTENTS

**Page(s)**

**I.    Introduction** ................................................................................................**1**

**II.   Argument** ...................................................................................................**2**

    A.    Evidence and testimony concerning the Buyer Broker Commission Rule ("BBCR") and alleged supracompetitive commission rates is generally inadmissible. ................................................................................... 2

        1.    The parties agree Evans should be precluded from testifying that the BBCR has suppressed competition. ........................................................ 2

        2.    Evans should be precluded from testifying that the BBCR resulted in uniform commission rates that are twice as high as competitive rates because those opinions are irrelevant to REX's remaining non-antitrust claims. ........................................................................................ 3

    B.    Dr. Evans' opinions on topics (2), (3) and (4) of the Minute Order should be excluded. ............................................................................................. 4

    C.    Remaining issues the Court has directed the parties to address ........................ 13

        1.    The Court should exclude evidence of REX's now dismissed antitrust claims. ........................................................................................ 13

        2.    The Court should limit evidence or testimony regarding the BBCR to only what is necessary to explain REX's business model and how buyer agent commissions work ............................................................ 13

        3.    Communications not involving Zillow by the National Association of REALTORS® or its affiliated multiple listings services is inadmissible. ............................................................................................... 14

        4.    The Court should exclude evidence of prevailing real estate commissions in the US or elsewhere .................................................... 14

    D.    New issues that have arisen since the parties' Joint Pretrial Order .................. 15

        1.    None of Zillow's conduct qualifies under the "unfairness" prong of the WCPA, and thus REX's claim should be rejected as a matter of law... 15

        2.    Live trial testimony from Zillow CEO Richard Barton is unnecessary. 19

        3.    Teresa Thomas needs to testify out of order during the first week of trial. ...................................................................................... 20

**III.  Conclusion** ............................................................................................**20**

TRIAL BRIEF:
2:21-CV-00312-TSZ

i

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpert v. Nationstar Mortg. LLC*,
    No. C15-1164 RAJ, 2019 WL 1200541 (W.D. Wash. Mar. 14, 2019)...............................19

*Apple, Inc .v. Samsung Elecs. Co.*,
    No. 11-CV-01846-LHK, 2012 WL 2571332 (N.D. Cal. June 30, 2012)...........................10

*Arista Networks v. Cisco Sys.*,
    No. 16-cv-00923-BLF, 2018 U.S. Dist. LEXIS 228820 (N.D. Cal. June 2,
    2018)...............................................................................................................................12

*Blewett v. Abbot Lab'ys*,
    86 Wn. App. 782 (1997).................................................................................................17

*Cascade Yarns, Inc. v. Knitting Fever, Inc.*
    No. C10-861, 2015 WL 3407882 (W.D. Wash. May 27, 2015) ...................................10, 12

*City of Vernon v. S. Cal. Edison Co.*,
    955 F.2d 1361 (9th Cir. 1992).......................................................................................11, 12

*Elsayed Mukhtar v. Cal. State Univ., Hayward*,
    299 F.3d 1053 (9th Cir. 2002) (other aspect amended, 319 F.3d 1073) .............................12

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)..........................................................................................19

*Gray v. Amazon.com, Inc.*,
    No. 2:22-cv-800-BJR, 2023 WL 1068513 (W.D. Wash. Jan. 27, 2023) .............................19

*Hood v. Cline*,
    35 Wn.2d 192 (1949) .....................................................................................................18

*Infusion Res., Inc. v. Minimed, Inc.*,
    351 F.3d 688 (5th Cir. 2003)..........................................................................................10, 13

*Klem v. Wash. Mut. Bank*,
    176 Wn.2d 771 (2013) ...................................................................................................17

*Lexmark Int'l., Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .......................................................................................................10

*Newman v. Google LLC*,
    No. 20-cv-04011-LHK, 2021 WL 2633423 (N.D. Cal. June 25, 2021) ...............................8

TRIAL BRIEF:
2:21-CV-00312-TSZ

ii

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

*Randy's Ring & Pinion Serv. Inc. v. Eaton Corp.*,
  No. C09-637Z, 2009 WL 10727790 (W.D. Wash. Nov. 16, 2009) (Zilly, J.) ....................17

*Rush v. Blackburn*,
  190 Wn. App. 945 (2015)..........................................................................................................16

*Smale v. Cellco P'ship*,
  547 F. Supp. 2d 1181 (W.D. Wash. 2008) ..........................................................................16

*TrafficSchool.com, Inc. v. Edriver Inc.*,
  653 F.3d 820 (9th Cir. 2011)............................................................................................7, 10

*United States v. Arenal*,
  768 F.2d 263 (8th Cir. 1985)..................................................................................................12

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) ..................................................................................................................17

*United States v. Hitt*,
  981 F.2d 422 (9th Cir. 1992)..................................................................................................13

*Verdian Credit Union v. Eddie Bauer, LLC*,
  295 F. Supp. 3d 1140 (W.D. Wash. 2017) ..........................................................................18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TRIAL BRIEF:
  2:21-CV-00312-TSZ

iii

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1    **I.      INTRODUCTION**[1]

2          Following its summary judgment ruling on REX's antitrust claims, the Court granted

3    Zillow's *Daubert* motion to exclude Dr. Evans' opinions (the "*Daubert* Motion") on harm to

4    competition from the No-Comingling Rule[2] as irrelevant to the remaining claims.   *See*

5    August 23, 2023 Minute Order, ECF 467, at 1 ("Minute Order").   The Court deferred to the

6    Pretrial Conference consideration of whether Evans should be permitted to testify that:

7          1.      the Buyer Broker Commission Rule has suppressed competition and resulted in

8                  uniform commission rates that are twice as high as competitive rates;

9          2.      Zillow's compliance with the no-commingling rule resulted in substantial

10                 degradation of non-multiple listing service listings on Zillow's platforms;

11         3.      Zillow's compliance with the no-commingling rule forced REX to exit the

12                 relevant market; and

13         4.      his calculation of REX's enterprise value is an appropriate measure of damages

14                 for REX's false advertising and Consumer Protection Act claims.

15   *Id*.  Evans should be precluded from offering testimony on each of these subjects because any

16   such opinions would be either irrelevant or unreliable and inconsistent with the law.  It would

17   also be highly prejudicial to Zillow.

18         The Court in its Minute Order also asks whether the following categories of evidence are

19   admissible:

20         1.      Any evidence of REX's now-dismissed antitrust claims;

21         2.      Any evidence or testimony regarding the Buyer Broker Commission Rule;

22         3.      Any communications not involving Zillow by the National Association of

23                 REALTORS® or its affiliated multiple listings services; and

24

25   _____

[1] Exhibits filed alongside the parties summary judgment and *Daubert* briefing are cited by reference to
26   their docket numbers.  New exhibits are attached to the concurrently filed Declaration of Erica Fruiterman
     and are likewise cited as "Ex."

27   [2] All references to the "no-commingling rule" have the same meaning as noted in Zillow's opening
     motion to exclude certain opinions of Dr. Evans.  ECF 357, at 1 n.2.

28   REPLY ISO MOTION TO EXCLUDE
     CERTAIN OPINIONS OF DAVID S.
     EVANS:                                            1
     2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

4.      Any evidence of prevailing real estate commission rates in the United States or elsewhere.

Minute Order at 2.  Again, none of this evidence is admissible at trial because it is no longer relevant and it would be highly prejudicial.

Although not addressed in the Minute Order, Zillow also asks the Court for the following relief regarding issues that have arisen since the Parties' Joint Status Report, ECF 466, which are critical to the parties' to properly prepare for trial:

1.      A finding that Zillow's conduct is not unfair under the WCPA as a matter of law;

2.      A protective order ruling that Rich Barton is not required to testify live at trial; and

3.      An order granting Zillow's request to permit Teresa Thomas to testify on or before September 21, 2023.

## II.      ARGUMENT

### A.      Evidence concerning the Buyer Broker Commission Rule ("BBCR") and alleged supracompetitive commission rates is inadmissible.

The Minute Order asks whether Evans should be permitted to testify that the BBCR has suppressed competition and resulted in uniform commission rates that are twice as high as competitive rates.  Any such testimony by Evans should be excluded, to match the slimmed-down nature of the case.

#### 1.      The parties agree Evans should be precluded from testifying that the BBCR has suppressed competition.

On August 29, 2023, the parties met pursuant to Local Rule 16(k).  At that conference, the parties previewed their positions on the questions presented by the Court's Minute Order. Zillow understands that the parties are in agreement that Evans should be precluded from testifying that the BBCR has suppressed competition as that opinion is relevant only to REX's antitrust claims, which have been dismissed.

TRIAL BRIEF:
2:21-CV-00312-TSZ

2

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1
2
3
4

     **2.**   <u>Evans should be precluded from testifying that the BBCR resulted in uniform commission rates that are twice as high as competitive rates because those opinions are irrelevant to REX's remaining non-antitrust claims.</u>

5
6
7

Evans' opinions concerning the BBCR as the cause of allegedly supracompetitive commission rates should similarly be excluded because they are irrelevant to the conduct at issue in this case: Zillow's website changes and the labeling of the tabs.

8
9
10
11
12
13
14
15

Evans should not be permitted to testify about the competitive impact of a rule completely unrelated to Zillow's conduct at issue in the case. ECF 345-13, at ¶¶ 24-32, 82-223. His opinions regarding commission rates have nothing to do with Zillow's website changes or the labeling of the tabs, and the Court has already ruled that harm to competition (which Evans purported to measure based on differences in commission rates) was not established. ECF 461, at 30 n.19. Now that the Court has granted summary judgment on REX's federal and state antitrust claims, Evans' opinion concerning the BBCR's purported role in maintaining high commissions is entirely irrelevant.

16
17
18
19
20
21
22
23
24
25
26
27

During the Rule 16(k) conference, REX informed Zillow that it intends to argue that the BBCR and uniform, high commission rates are relevant to explaining Zillow's motivation for its decision to switch to IDX feeds and adopting the two-tab design. But there is no evidence to support REX's baseless assertion that Zillow made these changes in order to protect high commission rates. *See* ECF 461, at 27 ("REX has provided no evidence, such as relevant communications between Zillow and any MLS, tending to show that Zillow was not engaging in permissible competitive behavior"). Nor is there any basis for REX to claim, as it did in the Local Rule 16(k) conference, that evidence of high commissions is independently relevant to whether the alleged conduct affected the public interest under the WCPA. That argument is simply a backdoor attempt to inject into the trial a portion of Evans' testimony that this Court already has excluded—that the alleged conduct in this case "raises commission rates." ECF 345-13, Section I.C.5.

28

TRIAL BRIEF:
2:21-CV-00312-TSZ

3

1    Worse, there is significant prejudice that would flow from the admission of these

2  irrelevant opinions.  Fed. R. Evid. 403.  By characterizing the BBCR as leading to higher

3  commission rates, there is potential for the jury to view REX as a victim of wholly unrelated

4  and irrelevant acts yet seek to place the blame on Zillow.  And because the BBCR is a model

5  rule promulgated by the National Association of Realtors ("NAR") years before Zillow was an

6  MLS member, the only entity with the personal knowledge to defend is no longer a party to the

7  case.

8    **B.**    **Dr. Evans' opinions on topics (2), (3) and (4) of the Minute Order should**

9         **be excluded.**

10    Evans' opinions regarding the following topics in the Court's Minute Order should be

11  excluded because they are either irrelevant or unreliable, and are highly prejudicial: (2) Zillow's

12  compliance with the no-commingling rule resulted in substantial degradation of non-multiple

13  listing service listings on Zillow's platforms; (3) Zillow's compliance with the no-commingling

14  rule forced REX to exit the relevant market; and (4) his calculation of REX's enterprise value is

15  an appropriate measure of damages for REX's false advertising and Consumer Protection Act

16  claims.

17    Each of these opinions are predicated on the now-dismissed antitrust claims and should

18  be excluded.  Evans' opinions regarding the alleged degradation of non-MLS listings are based

19  on the separation and non-default status of REX's listings—neither of which are relevant to false

20  advertising or actionable under the WCPA.  Similarly, because Evans' opinion that REX was

21  forced to exit the market was premised on the degradation of REX's listings, that opinion also

22  is both irrelevant and prejudicial.  Finally, because Evans' calculation of REX's enterprise value

23  as damages is merely a proxy for REX being forced out of the market, that too must be excluded

24  as it is the manifestation of the defects above and does not provide the jury any tools to calculate

25  damages for the remaining limited conduct alleged in this case.

26

27

28

TRIAL BRIEF:
  2:21-CV-00312-TSZ

4

**(2) Evans should be precluded from offering the opinion that Zillow's compliance with the no-commingling rule resulted in substantial degradation of non-multiple listing service listings on Zillow's platforms.**

Section I.C.3. of Evans' report summarizes his opinion that "NAR's Segregation Rule and Zillow's Enforcement of It Resulted in the Substantial Degradation of Non-MLS Listing on Zillow's Sites." ECF 345-13, ¶¶ 33-41.  The basis for his opinion—an agreement between NAR and Zillow to enforce the Segregation Rule—was rejected by the Court.  ECF 461, at 30.  And his opinion that the implementation of the no-commingling rule degraded non-MLS listings, including REX listings, is not relevant to the remaining claims.

Neither REX's Lanham Act or WCPA "deceptive prong" claims are predicated on the degradation of non-MLS listings due to their separation and placement on the secondary tab. Instead, those claims are based on alleged harm to REX resulting from consumer confusion as a result of false representations or deceptive acts or practices by Zillow through its tab labels. Evans does not address that at all.[3]

Evans' opinions rest entirely on what he calls the *degraded visibility* of REX listings, which results from the segregation of listings on Zillow's websites—a result of a now-rejected agreement between Zillow and NAR.  His opinions are based on the alleged impact of Zillow's implementation of the no-commingling rule on the visibility of REX's listings, and the fact that fewer people navigate to the secondary tab.  Evans repeatedly opines that REX's damages result from a reduction of views of REX's listings because of their placement on the secondary, non-default tab, resulting from the alleged conspiracy:

- "Zillow's enforcement of NAR's Segregation Rule substantially degraded non-MLS listings, and thereby *dramatically reduced the views* these listings received from potential home buyers."  ECF 345-13, ¶ 38 (emphasis added).

- "Zillow's display change *put REX's listings in a secondary tab*, which required consumers to take an additional step to see a separate list of houses which they

---

[3] As further discussed in the briefing of newly arisen issues below, Evans' damages opinions are inadmissible with respect to REX's newly minted "unfair prong" claim because that claim cannot make actionable Zillow's creation of the two-tab display.  *See infra* Section D.1.

could not readily compare to those in the primary tab, which was the default tab. Consumers had to review each group separately."  ECF 345-13, ¶ 409 (emphasis added).

Critically, Evans' report discloses no opinion on whether, and if so how, REX was harmed by consumer confusion or deception flowing from the tab labels.   In fact, Evans mentions the labels only a handful of times in the combined 519 pages of his reports.  *See* ECF 345-13, ¶¶ 228, 261; ECF 345-22, ¶¶ 35, 54.  Where Evans does mention the labels, his focus remains on degraded visibility, and no mention is made of falsity, deception, or unfairness, let alone damages flowing therefrom.  For example:

> Beginning in January 2021 Zillow began enforcing the Segregation Rule by eliminating all non-MLS listing from the main tab that consumers went to and putting those listings in a secondary tab labelled "Other listings". Zillow recognized that this design was cumbersome for consumers, degraded their experience, and would result in a massive drop of views of homes downgraded to the Other Tab. Yet Zillow chose to adopt and enforce the Segregation Rule.

345-13, ¶ 228.  Similarly, in Evans' recounting of customer complaints about the two tabs, the focus is again on degraded visibility and the difficulty of having to toggle back and forth between the two tabs to discover results:

- "To enforce the Segregation Rule, Zillow presented visitors with two tabs both of which showed the number of listings in that tab.  The first tab is labelled 'Agent listings' and contains only MLS listings. The second tab is labelled 'Other listings' and contains only non-MLS listings. Zillow placed REX listings in the 'Other listings' tab. Zillow also placed homes for sale by owner and homes in foreclosure on the 'Other listings' tab."  ECF 345-13, ¶ 261.

- "According to Zillow the two tabs 'means more work' for the consumer.

    o   More cognitive effort to **discover, understand**, and **use** two categories of results.

    o   Customers must now **predict or remember** where a listing type might show up . . .

    o   More difficult for shoppers to feel they've **'seen everything' or catch up on what's new.**" ECF 345-13, ¶ 262 (emphasis in original).

- "Zillow observed that, 'The 'Other' tab is **not immediately discoverable** as the buyer mental model is to browse a singular list rather than seek out multiple lists when looking for homes. In its critical review of the result of the segregation of

listings into the two tabs Zillow highlighted a customer who commented, The average person looking for a new home won't see your FSBO listing unless they toggle to the 'other listings' section. **This is ridiculous** and makes listing FSBO much more challenging for people to see your house. One more way to push people to list with agent." ECF 345-13, ¶ 263 (emphasis in original).

Evans' focus on the decline in FSBO listings alone reveals why his testimony should be excluded. Evans relies on Zillow data that found an 80% decrease in views of FSBO listings after Zillow's implementation of the two-tab design. ECF 345-13, ¶ 265. Evans uses this 80% decrease in FSBO views as a proxy for the harm to REX. *See, e.g.*, *id.* ¶ 39 ("Zillow['s] . . . internal studies found that the enforcement of the rule reduced consumer page views of FSBO listings by 80 percent. NAR's Segregation Rule therefore largely blocked non-MLS listings, including REX and FSBO, *from visibility* on the only material listing aggregator, Zillow, that was available to them, and on by far the largest aggregator.") (emphasis added).[4] ***But there is nothing false or deceptive about putting FSBO listings—which undisputedly are non-agent listings—on a tab with a label that the Court has found to mean "non-agent listings."*** *See* ECF 465, at 16 ("the phrase 'other listings' can only be understood as indicating those listings 'remaining or not included' in or 'distinct' or 'different' from agent listings, or in other words, non-agent listings."). Thus, the decline in FSBO views that Evans claims inferentially supports the decline in its own views, cannot have been caused by the tab labels.

At the Local Rule 16(k) conference, REX indicated that it would advocate for a broader view, where false advertising can be evaluated not just on the challenged statements—the labels on Zillow's website—but the two-tab design as a whole. According to REX, it is entitled to claim damages resulting from the two-tab design as a whole under the Ninth Circuit's decision in *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011). Not so. In that case, the plaintiff was permitted to proceed on the website as a whole because the district court had made a finding that ***the website as a whole amounted to a false statement*** (or series of false statements) that confused consumers. *Id.* at 829. But that is not the case here. REX is not

---

[4] REX's briefing repeatedly makes the same point. ECF 402, at 7 ("By that time viewings of FSBO listings and, ***by inference REX listings***, had declined 70-85%, and, as a result, REX was having difficulty selling listed homes and attracting new listings.") (emphasis added).

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1  entitled to bootstrap other design elements to its claim based on Zillow's labels just because they

2  are part of the same two-tab design.  *See Newman v. Google LLC*, No. 20-cv-04011-LHK, 2021

3  WL 2633423, at *12 (N.D. Cal. June 25, 2021) (rejecting claim where identified "harms flow

4  from the fact that Defendants have limited [users'] access" to plaintiff's materials, not the

5  "allegedly false statements" about those materials).

6      **(3) Evans should be precluded from offering the opinion that Zillow's compliance**

7  **with the no-commingling rule forced REX to exit the relevant market.**

8      Evans's opinion that REX exited the market flow from the same irrelevant and

9  prejudicial opinions discussed above.

10      Evans claims REX was forced from the relevant market because REX homes "***would not***

11  ***be listed on the primary tab***" and "***would get far less visibility . . . on the secondary tab.***"  ECF

12  345-13, ¶ 410.  As a result, REX listings had fewer page views and fewer closings and "[t]he

13  Segregation Event forced REX to close down."  *Id.* ¶ 425. Thus, according to Evans, it was the

14  reduced visibility of its listings, and not a result of confusion from labels that caused REX to

15  exit the market.

16      The regression analysis in Evans' report confirms that he overlooks the false nature of

17  the tab labels, and thus should be excluded.  Evans uses a regression to estimate the impact of

18  the "Segregation Event" on the number of sales REX closed.  Evans claims that this "measure[s]

19  the combined effect of the decline in sellers, buyers, and the feedback effects between them."

20  ECF 345-13, ¶ 50.  Evans first purports to measure the decline in page views of REX listings

21  from the segregation event.  ECF 345-13, ¶¶ 50, 413-416.  He then estimates that the segregation

22  event caused a 60 percent decline in REX's home closures in 2021, and that this decline would

23  have increased to 75 percent in 2022, "wiping out the preponderance of REX's home closures

24  and revenues."  ECF 345-13, ¶¶ 50, 423.  Missing from Evans' regression is any factor that

25  would allow him or anyone else to determine the impact, if any, the false labels had on REX's

26  exit from the market.[5]

27

28  [5] Nor is there any basis to admit lay evidence at trial.  REX's initial disclosures said that it would provide
a calculation of its Lanham Act and similar state law claims via expert opinion, not lay testimony:

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

**(4) Evans' calculation of REX's enterprise value should be excluded as it is not an appropriate measure of damages for REX's false advertising and Consumer Protection Act claims.**

Evans' enterprise valuation of $444 Million as of November 2022 should be excluded for multiple reasons.  First, as the Court is well aware, the sum total of Evans' analysis of whether enterprise value is an appropriate measure of damages for REX's Lanham Act and WCPA claims is in the following footnote:

> This section reports REX's damages estimates under REX's antitrust claims, whether under federal or state law. My understanding that REX claims, and intends to prove at trial that Zillows' two-tab display violated the Lnham Act and the analogous state consumer protection act, in which case the damages estimates reported in this section equal REX's damage estimates under these claims as well.

ECF 345-13, ¶ 485.1 n.473.

Aside from not disclosing any methodology for calculating damages arising from REX's Lanham Act and WCPA claims, which should be the end of the story, Evans should be precluded

---

> Computation of Damages . . . REX's damages on its federal and state antitrust claims and its Lanham Act claim and similar state law claim consist of loss [sic] profits and/or the value of REX's business . . . REX cannot calculate now either its lost profits or the value of REX's business or the injury to its reputation because those determinations depend on expert opinion and report(s), which REX has not received. REX will provide a more specific damage figure in its expert damages report(s)."

ECF 352-29, at 8.  But even were the Court to consider lay testimony, Lynley Sides, one of REX"s co-founders and its 30(b)(6) corporate representative on the topic 'the alleged harm caused to REX by virtue of the names or labels used on on Zillow's two-tab display." Testified that REX had not quantified the contribution of the name vs. the two-tab design because it was impossible to do so, and that it was the "combined" effect that led REX to go out of business.  ECF 345-9, 219:5-12; 220:15-20; Ex. 1, at 4.  The Court noted at the Summary Judgment hearing that "… at some prior time, Sides did not have enough – at her deposition enough data. I don't think the door is entirely closed there."  Ex. 3, 23:17-19.  However, when that testimony is considered along with the contents of the notes to which Ms. Sides referred in her deposition, it is clear that there is no basis to permit any trial evidence on this issue.  Exhibit 5 to Ms. Sides' deposition is a set of notes Ms. Sides compiled in preparation for her 30(b)(6) deposition.  Under the deposition topic, "the alleged harm caused to REX by virtue of the names or labels used on Zillow's two-tab display (i.e. "Agent Listing" and "Other Listing") and any analysis or quantification thereof," the document notes "Same as above, impossible to quantify contribution of the name vs the 2-tab."  Ex. 1, at 4.  Ms. Sides consulted with eight former REX employees to gather this information, including REX's data science team.  Ex. 1, at 2.

TRIAL BRIEF:
2:21-CV-00312-TSZ

9

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

from offering any estimate of REX's enterprise value as a method of damages because it flows from the same reliability/prejudice defects noted above.

A damages expert's opinion must follow the alleged wrongful conduct to be admissible. *Infusion Res., Inc. v. Minimed, Inc.*, 351 F.3d 688, 695-96 (5th Cir. 2003) (affirming exclusion of amended damages report where plaintiff did no more than "repackage" an antitrust damages report to assert "that essentially the same damages [] flowed from the remaining non-antitrust claims"); *Apple, Inc .v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *6 (N.D. Cal. June 30, 2012). Evans' damages opinions are inconsistent with 15 U.S.C. § 1117(a), which provides that a plaintiff may recover damages only if the claimed injury is to "a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014). But none of the damages quantified in Evans' report are proximately caused by the labels on the tabs of Zillow's website.[6] The Lanham Act further requires that damages be compensatory and not punitive. *See TrafficSchool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820, 831 (9th Cir. 2011); *Cascade Yarns, Inc. v. Knitting Fever, Inc.* No. C10-861, 2015 WL 3407882, at *6-7 (W.D. Wash. May 27, 2015). Evans' methodology and his failure to allocate do not comply with that requirement.[7]

REX bears the burden of proving "the link between the injury suffered and the [alleged] *illegal* practices" and proffering sufficient evidence so that a jury could reasonably estimate without speculation the amount of damages attributable to the unlawful conduct. *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371-73 (9th Cir. 1992) (affirming lower court exclusion of expert damages study where expert "insist[ed] that all of [defendant's] acts contributed to the damage figure" and where many of those acts were found to be proper) (emphasis added) (citing

---

[6] It is apparent that any change in the tab labeling would have zero impact on Evans' damages theory and calculation. That is a sure sign that such damages are not "proximately caused by the defendant's misrepresentations," as the law requires.

[7] This is not to say that Zillow claims there could be no injury resulting from the labels should the jury conclude they constitute false advertising or deception, or that there cannot be multiple causes of harm. But the theoretical possibility of harm resulting from the tab labels does not negate REX's obligation to estimate damages based only on the harm from the alleged conduct, as opposed to alleged harms arising from some other non-liability factor.

TRIAL BRIEF:
2:21-CV-00312-TSZ

10

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1133 (7th Cir. 1983) (remanding for new trial on damages where plaintiffs' "lost profits study does not establish any variation in the outcome depending on which acts of AT&T were held to be legal and which illegal")). Because Evans has not done so here, his enterprise valuation must be excluded.  Indeed, REX acknowledged as much in its opposition to Zillow's *Daubert* Motion:

> Dr. Evans is offering an opinion on REX's damage for its Lanham Act claim only if the jury finds that the two-tab display both violated the Lanham Act and forced REX to shutter its business. . . . He is not offering an opinion on REX's damages if the jury finds a violation of the Lanham Act that did not cause REX to go out of business. . . . For instance, ***he is not offering an opinion on damages if the jury finds that the only Lanham Act violation was the label on the "Other Listings" tab***.

ECF 394, at 11 & n.10 (emphasis added).

While Courts in the Ninth Circuit have on occasion admitted flawed damages studies that fail to separate the effects of various acts, they have done so only where there was a likelihood that record evidence existed that would allow the jury to allocate between acts in a nonspeculative manner.  *See City of Vernon*, 955 F.2d at 1371-73 (reviewing cases).  Thus, where the Ninth Circuit believed that damages evidence could be filled in by testimony at trial, because the "data already existed even though it had not yet been placed in the proposed damage report," the plaintiff was given the opportunity to repair the report, with the knowledge that if the repair was not sufficient the lower court could grant a directed verdict or a judgment notwithstanding the verdict.  *Id.* (citing *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1513 (9th Cir. 1985)).  But that is not the case here.

There is no indication that any data exists that measures the impact of the labels as opposed to the two-tab design or would allow an allocation to the tab labels from the claimed damages arising from REX's exit from the market.  Because Evans provides no basis to quantify such damages, or to apportion them to only the challenged conduct, that renders such evidence entirely unreliable.  *See City of Vernon*, 955 F.2d at 1372 (refusing to allow damages study to go to jury where plaintiff's expert said plaintiff would not or could not correct the flawed report

TRIAL BRIEF:
  2:21-CV-00312-TSZ

11

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

to segregate losses between legal and illegal acts); *cf. Cascade Yarns Inc. v. Knitting Fever Inc.*, No. C10-861 RSM, 2015 WL 3407882, at  *7 (W.D. Wash. 2015) (refusing to allow Lanham Act claim to go to jury where plaintiff "failed to provide any evidentiary basis—through expert testimony or otherwise—from which the jury could have linked [plaintiff's] losses" to the allegedly false statement).[8]  It would also seriously prejudice Zillow and could result in an award of wholly speculative relief.  Federal Rule of Evidence 403 provides that an expert opinion may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Here, Dr. Evans should not be permitted to put an alleged $444 million lost enterprise value number before the jury, lending it an "aura of authority," when he has utterly failed to link that number to the only conduct that allegedly can be found illegal in this case, the tab labels.  *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063-64 (9th Cir. 2002) (other aspect amended, 319 F.3d 1073) (recognizing the "the aura of authority experts often exude, which can lead juries to give more weight to their testimony"); *United States v. Arenal*, 768 F.2d 263, 270 (8th Cir. 1985) (finding the admission of evidence prejudicial because of the "aura of expertise").[9]

---

[8] Although the Court in *Arista Networks v. Cisco Sys.*, No. 16-cv-00923-BLF, 2018 U.S. Dist. LEXIS 228820, at *35 (N.D. Cal. June 2, 2018), admitted the expert damages opinions despite the fact that it failed to apportion damages, it was on the basis of the plaintiff's representations that it would proffer other evidence to support apportionment of damages. *Id.* at *35.  But that is not the scenario here, where REX has not identified any fact evidence to measure the harm arising from the alleged false statements.

[9] Finally, under *Daubert*, REX bears the burden of showing that enterprise value is a legally acceptable method of calculating damages under the Lanham Act and WCPA.  REX has not come forward with any authority in support of the claim that enterprise value is acceptable as a lost profits or CPA measure of damages.  Evans does not calculate lost profit damages, Opp. 11, and REX has provided no authority that he may substitute his "lost enterprise value" calculation for a missing lost-profits analysis.  *See Infusion Res., Inc. v. Minimed, Inc.*, 351 F.3d 688, 695–696 (5th Cir. 2003); Mot. 8.  REX should be required to meet its burden under *Daubert* and identify the legal authority that permits Evans to testify that his enterprise value calculation is an appropriate measure of damages for REX's Lanham Act and CPA claims.

TRIAL BRIEF:
2:21-CV-00312-TSZ

12

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

**C.**     **Remaining issues the Court has directed the parties to address**

   **1.**     The Court should exclude evidence of REX's now dismissed antitrust claims.

At the Local Rule 16(k) conference, both parties agreed that evidence that REX had brought antitrust claims—and that the Court has dismissed them—is inadmissible. This agreement tracks the parties' prior understanding that evidence about other litigation should not come before the jury. The parties also agree that, at a minimum, evidence going to REX's now-dismissed theory of a conspiracy between NAR and Zillow is inappropriate.

Despite the parties' agreement, the Court should ensure that REX does not open the floodgates to evidence underlying dismissed claims. REX represented during the Local Rule 16(k) conference that the connection between the BBCR and allegedly high commissions remain an important part of their case. These facts are inapposite to deciding whether and to what extent Zillow's website design changes harmed REX. Rule 402 thus precludes admitting this evidence.

Even if there were marginal relevance to the collateral issue of REX's business model and what REX was aiming to "disrupt," the waste of time and severe danger of confusing the issues warrants exclusion under Rule 403. *See United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992) (When evidence "is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury."). The evidence falls under the rubric of the very antitrust-related opinions that the Court has already excluded. *See, also, supra* at Section A.2

   **2.**     The Court should limit evidence or testimony regarding the BBCR to only what is necessary to explain REX's business model and how buyer agent commissions work

At the Rule 16(k) conference, the Parties discussed REX's need to explain its business model to the jury, the basics of a real estate transaction, including buyer agent commission, and the fact that REX's commission rates were intended to be lower. By way of example, Evans' report contains this neutral description: "Under the Buyer Broker Commission Rule, buyer

TRIAL BRIEF:
2:21-CV-00312-TSZ                                              13

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1   agents are compensated by the listing broker from the seller commission."  ECF 345-13, ¶ 27.

2   Zillow agrees that REX should be permitted to introduce these non-inflammatory facts to the

3   jury.  In contrast, the opinions in the remainder of the same paragraph are irrelevant and

4   prejudicial: "Buyers generally get a buyer agent who buyers perceive as having no cost to them.

5   The buyer agents are a monopoly gateway between home sellers and home buyers…"  *Id.*  Any

6   evidence related to a so-called conspiracy is irrelevant and prejudicial, and therefore should be

7   excluded for the reasons noted above.

8            **3.**     Communications not involving Zillow by the National Association of

9                       REALTORS® or its affiliated multiple listings services is inadmissible.

10     In negotiating the proposed joint pretrial order, REX has now agreed to withdraw most

11   proposed exhibits produced by NAR, a step that Zillow appreciates.  But to be clear, there is no

12   basis to introduce NAR or MLS communications that do not involve Zillow.  Such

13   communications were relevant only to proving an antitrust conspiracy and harm to

14   competition—elements of claims the Court has dismissed with prejudice.  Nothing that NAR or

15   MLSs say among themselves are admissible to show anything related to Zillow's website design

16   changes, the labelling of the tab, or the effect either may have had on REX.  There are no

17   witnesses to lay the foundation for, or testify about the content of, these documents at trial.  With

18   no conceivable basis to admit these materials and every reason to believe they would waste time

19   at trial, the Court should rule this evidence inadmissible.

20            **4.**     The Court should exclude evidence of prevailing real estate

21                       commissions in the US or elsewhere

22     For the reasons noted in the discussion concerning Evans, above, evidence and opinions

23   concerning "uniform," or "prevailing" commission rates in the U.S. and elsewhere are wholly

24   irrelevant to REX's Lanham Act and WCPA claims.  *See, e.g.*, ECF 345-13, ¶¶ 32, 140, 176.

25   Evans' report underscores how intertwined this evidence is with REX's now dismissed antitrust

26   claims, and for that reason it should be excluded.  For example, Evans alleged:

27

> NAR, MLSs, and the local associations engaged in brazen price fixing of commissions

28

> from the early part of the 20th century until the early 1970s. This history led to a series

TRIAL BRIEF:
2:21-CV-00312-TSZ

14

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

> of continuing practices in the industry that have made commission rates largely uniform within local markets and across diverse local markets in the US. The high commission rates became customary within local markets and real estate agents who tried to deviate from them have been subject to retribution by other real estate agents.

ECF 345-13, ¶ 24.  Such assertions relate to a conspiracy that REX alleged was integral to its antitrust claims.  But the antitrust claims are no longer part of REX's case.

While Zillow recognizes that REX may wish to explain its efforts to compete with existing real estate commissions in the U.S., it can do so without characterizing such commission rates as "high, uniform, [or] customary." *Id.*, ¶ 32.  For example, REX may offer evidence that the "average commission rate for residential real estate brokerage sales of existing homes" is 5%, and explain that REX's business model envisioned reducing that rate further. *Id.* ¶ 29.  But, for example, it should not be permitted to offer evidence that the average commission rate "is twice as high as the commission rate in similar developed countries with well-functioning housing markets." *Id.*  REX has no need to introduce the concept of "well-functioning housing markets" much less the details about prevailing commission rates in those ex-US markets. *Id.* It is not relevant to the remaining claims., and for the same reasons outlined above, it is highly prejudicial.

### D.   New issues that have arisen since the parties' Joint Pretrial Order

#### 1.   None of Zillow's conduct qualifies under the "unfairness" prong of the WCPA, and thus REX's claim should be rejected as a matter of law.

In this Court's summary judgment rulings, it found that "REX has pleaded both the 'unfair' and 'deceptive' prongs of a CPA violation." ECF 458, at 2; *see also* ECF 465, at 2 n.1.  Although REX pleaded a violation based on the "unfair" prong, REX's focus throughout this case has been on the "deceptive prong," which led this Court to observe that REX would need to come forward with its theory of unfairness "in the trial briefs." Ex 2., 106:12-23.  REX has now gestured—without elaboration—that its theory is that "Zillow's decision not to display REX's listings on the default page was 'unfair' to both consumers and REX." ECF 473, at 5.  Now that REX has made clear its intention to pursue a separate "unfairness" theory

TRIAL BRIEF:
  2:21-CV-00312-TSZ

15

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

premised on not being on the default tab of Zillow's redesigned listings display, it is clear any such theory is prohibited as a matter of law under the WCPA, and there is no basis for REX to present such a theory to the jury. *Smale v. Cellco P'ship*, 547 F. Supp. 2d 1181, 1188 (W.D. Wash. 2008) ("When there is no dispute about what the defendant did, the court may determine as a matter of law whether a practice is unfair or deceptive."); *Rush v. Blackburn*, 190 Wn. App. 945, 963 (2015) ("Whether undisputed conduct is unfair or deceptive is a question of law, not a question of fact.").

The scope of liability under the WCPA unfairness prong cannot encompass the two-tab design for two reasons: (1) Zillow's decisions to unilaterally create the two-tab design and to place REX on the secondary tab is conduct that is not reached by the Washington Consumer Protection Act; and (2) the two-tab design does not substantially harm consumers, let alone REX.

The purpose of the WCPA and its broad definition of unfairness is to ensure that the statute can address a broad range of acts and practices that can harm consumers. The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. Because its purpose is "to protect the public and foster fair and honest competition," RCW 19.86.920, the CPA does not exist merely for the purpose of benefiting an individual plaintiff. Rather, the statute's purpose is to offer broad protection to the citizens of Washington from unfair or deceptive acts or practices. RCW 19.86.920. This statute, however, cannot be so broad to abrogate existing law. To hold as "unfair" Zillow's unilateral decision to create the two-tab design and its unilateral decision to place REX's listings on the secondary tab, would mean that Zillow was ***required to deal with REX on REX's preferred terms***. But such a ruling would conflict with a bedrock principle under Washington law, where it has been clear, for nearly a century, that the "law does not compel a man to have business relations with another." *Powell v. Graham*, 183 Wn. 452, 458 (1935).

Further, the Washington Legislature directs that the purpose of the Washington Consumer Protection Act "is to complement the body of federal law governing restraints of

16

trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition." RCW 19.86.920. "It is the intent of the legislature that, in construing this act, the courts be guided by the final decisions of the federal courts and final orders of the federal trade commission interpreting various federal statutes dealing with the same or similar matters. . . ." *Id.*; *see also Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787 (2013). "In directing courts to be 'guided by' federal law, the Legislature presumably intended to minimize conflict between the enforcement of state and federal antitrust laws and to avoid subjecting Washington businesses to divergent regulatory approaches to the same conduct. Any departure from federal law, therefore, must be for a reason rooted in our own statutes or case law and not in the general policy arguments that [a] court would weigh if the issue came before [it] as a matter of first impression." *Blewett v. Abbot Lab'ys*, 86 Wn. App. 782, 787 (1997).

Federal competition law permits a business's unilateral refusal to deal. *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) ("In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."); *Randy's Ring & Pinion Serv. Inc. v. Eaton Corp.*, No. C09-637Z, 2009 WL 10727790, at *7 (W.D. Wash. Nov. 16, 2009) ("The Supreme Court has indicated that the Sherman Act generally does not restrict the 'long recognized right' to choose the parties with which to deal[.]") (Zilly, J.); *accord Powell*, 183 Wn. at 458 ("The law does not compel a man to have business relations with another."); *State ex rel. Hamilton v. Standard Oil Co. of Cal.*, 190 Wn. 496, 499 (1937) ("It is established that a trader may buy from whom he pleases and sell to whom he pleases and, if he refuses to sell, his reason for doing so is not material"); *Hood v. Cline*, 35 Wn.2d 192, 206 (1949) ("A person may not be put into a contractual relationship with another with whom he has refused to deal"). With this guidance, "unfairness" under the WCPA cannot be construed to encompass Zillow's unilateral development of a two-tab design and unilateral decision to place REX listings on a secondary tab. Such an interpretation would turn Washington and federal law upside down and create a limitless "unfair" prong that would

17

capture any business decision that another business simply didn't like. Zillow was well within its rights to unilaterally choose not to deal with REX altogether, and so it cannot be deemed to have engaged in an "unfair" act where it chose to deal with REX in a way REX does not prefer.

This threshold issue—seeking to require Zillow to deal with REX on its preferred terms—should dispense with REX's so-called unfairness claim. But REX's unfairness claim also fails because the two-tab design harms neither consumers nor REX. REX cannot show that the two-tab design "causes or is likely to cause substantial injury," which "consumers cannot avoid." *Verdian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1161 (W.D. Wash. 2017) (quoting *Merriman v. Am. Guar. & Liab. Ins. Co.*, 198 Wn. App. 594, 628 (2017)). REX has not—and cannot—show that Zillow's "decision not to display REX's listings on the default page" meets this standard with respect to consumers. ECF 473, at 5.

REX cannot make that showing with respect to consumers. There is no evidence indicating that ***consumers***—the buyers that look for listings on Zillow's website—would be injured, let alone substantially injured, by the placement of REX's listings on the secondary tab. To the contrary, as this Court has already recognized, "the present record" at most "shows only harm to REX itself" as a result of the "challenged restraint." ECF 461, at 30 n.19. In so concluding, this Court rejected any claim of "harm to competition," ECF 461, at 30 n.19, meaning that consumers would not be harmed in the form of "reduced output, increased prices, or decreased quality." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020). That finding alone is dispositive of REX's unfairness claim with respect to consumer harm.

Even if REX could claim some injury to consumers (and it cannot), the claim ignores the ability of consumers to choose to visit Zillow or to list a property on Zillow. In "determining whether consumers' injuries' were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *Alpert v. Nationstar Mortg. LLC*, No. C15-1164 RAJ, 2019 WL 1200541, at *6–7 (W.D. Wash. Mar. 14, 2019); *Gray v. Amazon.com, Inc.*, No. 2:22-cv-800-BJR, 2023 WL 1068513, at *7 (W.D. Wash. Jan. 27, 2023) (An "injury is reasonably avoidable if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward

TRIAL BRIEF:
2:21-CV-00312-TSZ

18

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1   mitigating the injury after the fact.") (citation omitted).  Consumers could avoid any impact from

2   the two-tab design by (1) choosing not to use Zillow, or choosing other websites such as Redfin,

3   Realtor.com, or REX.com; or (2) clicking on the second tab.[10]  *See Alpert*, 2019 WL 1200541,

4   at *6-7.  Because of this freedom of choice, there is no unfairness to which consumers and REX

5   were subjected.

6        As a matter of law, none of Zillow's conduct constitutes unfair conduct under the WCPA.

7   REX should therefore be precluded from advancing an unfair prong claim.

## 2.   Live trial testimony from Zillow CEO Richard Barton is unnecessary.

9        During the Local Civil Rule 16(k) conference, counsel for REX confirmed that it may

10  call Zillow's CEO Richard Barton to provide live testimony during trial.  REX sought, and was

11  permitted, to depose Mr. Barton on the basis that this was at that time an antitrust case, and REX

12  alleged Mr. Barton had relevant testimony on that issue.  ECF 300, at 2 n.1.  This Court's

13  dismissal of the antitrust claims and related issues, however, obviates REX's need for Mr.

14  Barton's testimony.

15       With respect the issues that actually remain for trial—Zillow's two-tab display and its

16  design—Mr. Barton testified repeatedly that he did not have personal knowledge that might

17  assist the jury.  He made clear he lacks knowledge about the particulars of the development of

18  the two-tab display, the reasons behind it, or how it functioned.  *See, e.g.*, Ex. 4, 69:11-70:5,

19  85:5-86:5, 92:7-93:24, 94:8-95:5.  There thus is no good reason to require him to provide live

20  testimony in this case.

21       Indeed, the topics REX has identified about which Mr. Barton would be asked to

22  testify—topics REX provided to Zillow for the first time on September 1, 2023—underscore

23  that his live testimony is wholly unnecessary.  Those topics include, in REX's words: "Zillow's

24  commitment to transparency,  the importance of transparency to consumers,  Zillow's sources

25  of revenue and evolving business lines,  Zillow's financial history and trajectory, Zillow's

26  financial relationship to real estate industry participants."  *See* Joint Proposed Pretrial Order.  To

27

28  ------

[10] Similarly, REX had the ability to choose whether or not to use Zillow and whether to co-list in order to appear on Tab 1.  Zillow is not an essential facility, and neither consumers nor REX are required to use it.

TRIAL BRIEF:
2:21-CV-00312-TSZ                                    19

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1   the extent REX believes Mr. Barton has non-duplicative testimony regarding these basic

2   background topics as his expected testimony, it may rely on Mr. Barton's deposition transcript

3   (for which it has already offered deposition designations that are being filed with the Court

4   today)[11] or the testimony of other witnesses such as Mr. Errol Samuelson, who will appear live.

5      Mr. Barton's deposition transcript is easily available to REX for use at trial and,

6   therefore, its attempt to haul Zillow's CEO in for live testimony otherwise is harassment.

7   Neither the parties, this Court, nor the jury have the luxury of time to present and listen to

8   duplicative testimony.

9                     **3.**   <u>Teresa Thomas needs to testify out of order during the first week of</u>

10                            <u>trial.</u>

11      Teresa Thomas, a Zillow employee called affirmatively in Zillow's case-in-chief and

12   included on REX's lists as a witness it may call, will be unavailable to testify after September

13   21st due to prior travel plans from September 22nd through the end of trial.  For this reason,

14   Zillow initially inquired during the Rule 16(k) conference whether REX would consent to

15   allowing witnesses to testify out of order if necessary.  REX's counsel indicated that they did

16   not anticipate a problem with accommodating Zillow's request.  Zillow's counsel followed up

17   with an email formally requesting REX's agreement that Ms. Thomas could testify out of order

18   on either September 20th or 21st, but REX's counsel have not yet confirmed in writing their

19   willingness to agree.  Zillow asks the Court to permit Ms. Thomas to testify on September 19th,

20   20th, or 21st.  *See* Fed. R. Evid. 611(a) (granting the court substantial discretion to control the

21   mode and order of witnesses to seek truth).

22   **III.   CONCLUSION**

23      Zillow Defendants respectfully request the Court preclude Dr. Evans and REX from

24   testifying on the topics identified in the Court's Minute Order, and that the Court further order

25   that:

26   _____

27   [11] Ex. 4, 70:6-14 and 71:24-72:17 (Zillow's commitment to transparency); *id.*, 72:18-73:2 (the importance of transparency to consumers); *id.*, 72:23-73:12 (Zillow's sources of revenue and evolving business lines); *id.*, 39:21-40:13 and 45:3-25 (Zillow's financial history and trajectory); *id.*, 73:10-12 and

28   74:6-15 (Zillow's financial relationship to real estate industry participants).

(1) Zillow's conduct is not unfair under the WCPA as a matter of law;

(2) Rich Barton is not required to testify live at trial; and

(3) Teresa Thomas is permitted to testify on or before September 21, 2023.

Dated: September 1, 2023.

By:     */s/ Aravind Swaminathan*

ORRICK, HERRINGTON & SUTCLIFFE LLP
Aravind Swaminathan (WSBA No. 33883)
aswaminathan@orrick.com
Aaron P. Brecher (WABA No. 47212)
abrecher@orrick.com
401 Union Street, Suite 3300
Seattle, WA 98101
Telephone:  206-839-4300
Facsimile:  206-839-4301

Laura Najemy (Admitted *Pro Hac Vice*)
lnajemy@orrick.com
222 Berkeley Street
Suite 2000
Boston, MA 02116
Telephone: 617-880-1800

Jesse Beringer (Admitted *Pro Hac Vice*)
jberinger@orrick.com
1152 15tg Street, N.W.
Washington, DC 20005
Telephone: 202-339-8671

DECHERT LLP
John "Jay" Jurata, Jr. (Admitted *Pro Hac Vice*)
Jay.Jurata@dechert.com
Erica Fruiterman (Admitted *Pro Hac Vice*)
Erica.Fruiterman@dechert.com
1900 K Street, N.W.
Washington, DC  20006
Telephone:  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

Russell P. Cohen (Admitted *Pro Hac Vice*)
Russ.Cohen@dechert.com
One Bush Street, Suite 1600
San Francisco, CA 94104

TRIAL BRIEF:
2:21-CV-00312-TSZ

21

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300

1

Telephone:  415-262-4506

2

***Attorneys for Defendants Zillow, Inc., Zillow Group,***
***Inc., Zillow Homes, Inc., Zillow Listing Services,***
***Inc., and Trulia, LLC***

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TRIAL BRIEF:
2:21-CV-00312-TSZ

22

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street,, Suite 3300
Seattle, Washington  98101
+1 206 839 4300