THE HONORABLE THOMAS S. ZILLY

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| REX - REAL ESTATE EXCHANGE, INC., | Case No. 2:21-CV-00312-TSZ |
| Plaintiff, | ZILLOW'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW |
| v. | |
| ZILLOW GROUP INC., | |
| Defendant. | |

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................... 1

II.    LEGAL STANDARD ............................................................................................ 1

III.   ARGUMENT ........................................................................................................ 1

       A.  REX's Lanham Act claim must fail. ............................................................ 1

               1.   The default status and two-tab display do not constitute false statements. .... 2

               2.   The challenged conduct does not constitute commercial advertisement or promotion. ............................................................................. 4

               3.   The challenged statements are not deceptive. ............................................. 7

               4.   Any deception would not be material. ........................................................ 8

               5.   The challenged statements did not proximately cause REX's injury .......... 10

       B.  REX's WCPA claim must fail. ................................................................... 12

               1.   There is no unfair or deceptive act or practice. ........................................ 12

               2.   The challenged acts or practices did not occur in trade or commerce. ....... 15

               3.   The challenged acts or practices do not affect the public interest. ............. 16

               4.   The challenged acts or practices do not cause REX's harm. .................... 16

               5.   The challenged acts or practices are reasonable in relation to Zillow's business. ........................................................................ 17

       C.  REX's is not entitled to damages on either of its claims. ........................... 18

               1.   Lanham Act. ........................................................................................... 18

               2.   WCPA. ................................................................................................... 22

               3.   REX is entitled only to post-mitigation damages. ...................................... 23

IV.    CONCLUSION ................................................................................................... 23

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

i

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Allergan USA Inc. v. Imprimis Pharms., Inc.*,
   No. 17-cv-1551, 2019 WL 12661090 (C.D. Cal. May 16, 2019) ........................................20

5

*Alpert v. Nationstar Mortg. LLC*,
   No. 15-cv-1164, 2019 WL 1200541 (W.D. Wash. Mar. 14, 2019) ....................................14

6

*Anderson v. City of Hermosa Beach*,
   621 F.3d 1051 (9th Cir. 2010)..............................................................................................4

7

8

*Ariix, LLC v. NutriSearch Corp.*,
   985 F.3d 1107 (9th Cir. 2021)....................................................................................3, 4, 5, 6

9

*Blewett v. Abbot Lab'ys*,
   86 Wn. App. 782, 938 P.2d 842 (1997) ...............................................................................15

10

11

*Boeing Co. v. Sierracin Corp.*,
   108 Wn.2d 38, 738 P.2d 665 (1987) ...........................................................................17, 18

12

*Browne v. Avvo Inc.*,
   525 F. Supp. 2d 1249 (W.D. Wash. 2007) ..........................................................................15

13

14

*Cascade Yarns, Inc. v. Knitting Fever, Inc.*,
   No. 10-cv-00681, 2015 WL 3407882 (W.D. Wash. May 27, 2015)........................19, 20, 21

15

*City of Vernon v. S. Cal. Edison Co.*,
   955 F.2d 1361 (9th Cir. 1992).............................................................................................20

16

17

*Clorox Co. v. Reckitt Benckiser Grp. PLC*,
   398 F. Supp. 3d 623 (N.D. Cal. 2019) .................................................................................9

18

*Dees v. County of San Diego*,
   960 F.3d 1147 (9th Cir. 2020)...............................................................................................1

19

20

*Delashaw v. Seattle Times Co.*,
   No. 18-cv-0537, 2018 WL 4027078 (W.D. Wash. Aug. 23, 2018) ....................................15

21

*Dex Media W., Inc. v. City of Seattle*,
   696 F.3d 952 (9th Cir. 2012)..............................................................................................5, 6

22

23

*Edge v. City of Everett*,
   929 F.3d 657 (9th Cir. 2019)................................................................................................4

24

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
   69 F.4th 665 (9th Cir. 2023)................................................................................................3

25

26

*F.C. Bloxom Co. v. Fireman's Fund Ins. Co.*,
   No. 10-cv-1603, 2012 WL 5992286 (W.D. Wash. Nov. 30, 2012) ....................................22

27

28

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

ii

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

*Fid. Mortg. Corp. v. Seattle Times Co.*,
    131 Wn. App. 462, 128 P.3d 621 (2005) ...............................................................15, 22

*ForSaleByOwner.com Corp. v. Zinnemann*,
    347 F. Supp. 2d 868 (E.D. Cal. 2004) ...........................................................................5

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)........................................................................................13

*Grasshopper House, LLC v. Clean & Sober Media, LLC*,
    No. 19-56072, 2021 WL 3702243 (9th Cir. Aug. 20, 2021)................................................21

*Gray v. Amazon.com, Inc.*,
    No. 22-cv-800, 2023 WL 1068513 (W.D. Wash. Jan. 27, 2023)........................................14

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co*,
    105 Wn.2d 778, 719 P.2d 531 (1986) .......................................................................12, 16

*Harper House, Inc. v. Thomas Nelson, Inc.*,
    889 F.2d 197 (9th Cir. 1989)........................................................................................10

*IMDb.com Inc. v. Becerra*,
    962 F.3d 1111 (9th Cir. 2020).....................................................................................4, 6

*Indoor Billboard/Wash, Inc. v. Integra Telecom of Wash., Inc.*,
    162 Wn.2d 59, 170 P.3d 10 (2007) ...............................................................................16

*Johnson & Johnson Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*,
    960 F.2d 294 (2d Cir. 1992) ..........................................................................................7

*Klem v. Wash. Mut. Bank*,
    176 Wn.2d 771, 295 P.3d 1179 (2013) ...........................................................................13

*Krechman v. County of Riverside*,
    723 F.3d 1104 (9th Cir. 2013)........................................................................................1

*Kremermen v. Open Source Steel, LLC*,
    No. 17-cv-0953, 2018 WL 5785441 (W.D. Wash. Nov. 5, 2018) ......................................22

*Lemberg Law, LLC v. eGeneration Marketing, Inc.*,
    No. 3:18-cv-0570, 2020 WL 2813177 (D. Conn. May 29, 2020)........................................4

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .........................................................................................10, 19, 21

*MCI Commc'ns Corp. v. Am. Tel & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983)........................................................................................21

*MindGames, Inc. v. W. Publ'g Co.*,
    218 F.3d 652 (7th Cir. 2000).........................................................................................21

*Mut. Pharm. Co. v. IVAX Pharms., Inc.*,
    459 F. Supp. 2d 925 (C.D. Cal. 2006)............................................................................3

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

iii

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

*Newman v. Google LLC*,
No. 20-cv-04011, 2021 WL 2633423 (N.D. Cal. June 25, 2021) .........................3, 6, 11, 19

*Optimum Techs, Inc. v. Home Depot USA, Inc.*,
No. 04-cv-02360, 2005 WL 3307508 (N.D. Ga. Dec. 5, 2005) ............................................5

*Panag v. Farmers Ins. Co. of Wash.*,
166 Wn.2d 27, 204 P.3d 885 (2009) ................................................................................12

*Polar Bear Prods., Inc. v. Timex Corp.*,
384 F.3d 700 (9th Cir. 2004) ..........................................................................................21

*Powell v. Graham*,
183 Wash. 452, 48 P.2d 952 (1935) .................................................................................15

*Prager Univ. v. Google LLC*,
951 F.3d 991 (9th Cir. 2020) .........................................................................................4, 6

*Schnall v. AT&T Wireless Servs., Inc.*,
171 Wn.2d 260, 259 P.3d 129 (2011) ..............................................................................16

*Southland Sod Farms v. Stover Seed Co.*,
108 F.3d 1134 (9th Cir. 1997) ...........................................................................2, 7, 9, 10

*Stiegler v. Saldat*,
No. 14-cv-1309-TSZ, 2015 WL 13686087 (W.D. Wash. Oct. 23, 2015).........................16

*Thornell v. Seattle Serv. Bureau, Inc.*,
184 Wn.2d 793, 363 P.3d 587 (2015) ..............................................................................15

*TrafficSchool.com, Inc. v. Edriver Inc.*,
653 F.3d 820 (9th Cir. 2011) ..............................................................................3, 19, 20

*Travis v. Wash. Horse Breeders Ass'n*,
111 Wn.2d 396, 759 P.2d 418 (1988) .........................................................................12, 17

*United States v. Colgate & Co.*,
250 U.S. 300 (1919) .......................................................................................................15

*Universal Life Church Monastery Storehouse v. Am. Marriage Ministries*,
No. 19-cv-0301, 2022 WL 2317439 (W.D. Wash. June 28, 2022)......................................19

*VBS Distrib., Inc. v. Nutrivita Lab'ys, Inc.*,
811 F. App'x 1005 (9th Cir. 2020)...................................................................................10

*Veridian Credit Union v. Eddie Bauer, LLC*,
295 F. Supp. 3d 1140 (W.D. Wash. 2017) .......................................................................13

*Vrdolyak v. Avvo, Inc.*,
206 F. Supp. 3d 1384 (N.D. Ill. 2016) ..............................................................................5

*William H. Morris Co. v. Grp. W, Inc.*,
66 F.3d 255 (9th Cir. 1995)..............................................................................................7

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

iv

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

*Wolfe v. Logan*,
     No. 2:22-cv-06463, 2023 WL 2239062 (C.D. Cal. Jan. 25, 2023) .......................................5

*Young v. Toyota Motor Sales, U.S.A.*,
     196 Wn.2d 310, 472 P.3d 990 (2020) ...............................................................................12

*Zunum Aero, Inc. v. Boeing Co.*,
     No. 21-cv-0896, 2022 WL 2116678 (W.D. Wash. June 13, 2022)....................................16

**Statutes**

15 U.S.C. § 1117(a).............................................................................................................19

15 U.S.C. § 1125(a)(1)(B)....................................................................................................4

15 U.S.C. § 1125 ..................................................................................................................1

RCW 19.86............................................................................................................................17

RCW 19.86.010......................................................................................................................15

RCW 19.86.020.................................................................................................................1, 14

RCW 19.86.093......................................................................................................................16

RCW 19.86.920..............................................................................................................12, 17

**Other Authorities**

Federal Rule of Civil Procedure 50(a) ..............................................................................1, 21

*McCarthy on Trademarks and Unfair Competition* (5th ed.) .................................................20

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

v

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

I.   **INTRODUCTION**

This Court is familiar with the background facts.  REX maintains that the way Zillow organizes and labels real estate listings on its website constitutes false advertising under the Lanham Act and represents an unfair or deceptive practice under the Washington Consumer Protection Act ("WCPA").  But the evidence REX promised would come at trial has not materialized, and the evidence introduced at trial falls short of what is required for multiple elements of these claims.  Accordingly, REX's claims should not be put to a jury, and the Court should enter judgment in Zillow's favor as a matter of law under Federal Rule of Civil Procedure 50(a).

II.  **LEGAL STANDARD**

Judgment as a matter of law is permissible if "there is no legally sufficient basis for a reasonable jury to find for [the nonmoving] party on that issue." *Krechman v. County of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013).  The Court must "view the evidence in the light most favorable to the nonmoving party … and draw all reasonable inferences in the party's favor." *Dees v. County of San Diego*, 960 F.3d 1147, 1151 (9th Cir. 2020).

III. **ARGUMENT**

There are two claims for damages left in this case:  (1) a false advertising claim under the Lanham Act, 15 U.S.C. § 1125; and (2) an unfair or deceptive act or practice claim under the WCPA, RCW 19.86.020.  Neither should reach the jury.  First, REX has failed to offer evidence from which a reasonable jury could find that Zillow violated either the Lanham Act (§ III.A) or the WCPA (§ III.B).  Second, even assuming REX has established liability on either of these claims, which it has not, REX has not presented sufficient evidence of damages with respect to either claim.  § III.C.

A.   **REX's Lanham Act claim must fail.**

The elements of a Lanham Act false advertising claim are not in dispute: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

1

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

1    purchasing decision; (4) the defendant caused its false statement to enter interstate commerce;

2    and (5) the plaintiff has been or is likely to be injured as a result of the false statement."

3    *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

4         REX must identify particular ***statements*** made by Zillow and then show that each

5    statement satisfies each of the elements of the Lanham Act.  Through summary judgment,

6    REX had identified the tab labels as the statements it was challenging.  Dkt. 465, 4-5, 20.  In a

7    late-breaking attempt to expand its case, REX indicated its intention to sweep in additional

8    aspects of Zillow's website, claiming that the entire two-tab design, including the tabs

9    themselves, the colors, and "the default setting," is also "***part*** of the alleged violation."  Dkt.

10   498, 6.  This Court should not permit this expansion of REX's claim—indeed, this Court's

11   draft instructions correctly have focused only on the labels.[1]  That aside, ***no*** variant of REX's

12   claim should reach the jury.  As the chart below summarizes, a reasonable jury could not find

13   that REX has met the elements marked with an X, which we take in turn below.

14

15

|  | False Statement | Commercial Advertisement | Deception | Materiality | Commerce | Causation |
|---|---|---|---|---|---|---|
| Tab Labels |  | X | X | X |  | X |
| Default Status | X | X | X | X |  | X |
| Two-Tab Display | X | X | X | X |  | X |

20         **1.    The default status and two-tab display do not constitute false statements.**

21         The Lanham Act reaches only "false statement[s] of fact by the defendant."  *Southland*,

22   108 F.3d at 1139.  Here, the Court has determined that the tab labels are literally false.  Dkt.

23   465, 4-5, 20.[2]  But it never has addressed whether the default status or two-tab display as a

24   whole are false statements of fact.

25

26   [1] *See* Instruction No. 14A (focusing on tab labels); Instruction No. 14C ("Plaintiff bears the burden of proving … that … (2) the tab labels at issue were a proximate cause of any such injury.").

27   [2] Zillow preserves its argument that the tab labels should not have been found literally false as a matter of law.

28

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

2

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

1    REX cannot establish that either is such a statement.  Put simply, an actionable

2    statement makes a "specific and measurable claim, capable of being proved false or of being

3    reasonably interpreted as a statement of objective fact."  *Ariix, LLC v. NutriSearch Corp.*, 985

4    F.3d 1107, 1121 (9th Cir. 2021).  The non-communicative aspects of Zillow's display—that

5    merely divide listings and default one tab over the other—do not make any such claim.

6    Indeed, design decisions that "limit [users'] access" to materials are distinct from any "false

7    statement."  *Newman v. Google LLC*, No. 20-cv-04011, 2021 WL 2633423, at *12 (N.D. Cal.

8    June 25, 2021).

9    REX has not offered evidence proving otherwise.  REX's marketing expert offers that,

10   in her view, the default status ***might*** imply "these are the listings that I see and these are all the

11   listings that I need to see."  Ex. D, 18:13-23 (Krishna).  That expert's say-so is not concrete

12   evidence showing that the statement "implies" a "factual assertion."  *Enigma Software Grp.*

13   *USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665, 672 (9th Cir. 2023); *cf. Mut. Pharm. Co. v.*

14   *IVAX Pharms., Inc.*, 459 F. Supp. 2d 925, 939-42 (C.D. Cal. 2006) (existence of a statement

15   supported by "market surveys demonstrating that the relevant consumer group … consider[s]

16   use of th[e] particular marketing mechanism as implicitly informing them" about the product

17   in the way the plaintiff claimed).  Moreover, even if the default status and two-tab display

18   made such a statement, the notion that "these are the listings that I need to see" merely reflects

19   Zillow's judgment about which listings to first display to its users.  *See* Ex. C, 91:21-92:2

20   (Thomas) ("We want our customers, by default, to have what they consider the most

21   actionable listings.");  TX35, ZG_00001170.  At best, this kind of statement conveys an

22   ***opinion*** of a website owner, not an actionable ***statement*** of fact that could be true or false.  *See*

23   *Ariix*, 985 F.3d at 1121-22.

24   REX's cases showing that "an entire website design can constitute a false or

25   misleading statement in violation of the Lanham Act" are not to the contrary.  Dkt. 498, 6.  In

26   *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011), for example, the website

27   as a whole did imply an objective statement of fact—namely, that the "DMV.org was affiliated

28

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

3

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

with a government agency"—based on "several" communicative aspects of the website.  *Id.* at 827-28.  So too in *Lemberg Law, LLC v. eGeneration Marketing, Inc.*, No. 3:18-cv-0570, 2020 WL 2813177, at *4, *11 (D. Conn. May 29, 2020), where the website implied to consumers that "they are dealing with a law firm."  Here, by contrast, the default status and two-tab display make no factual representation on their own.

### 2. The challenged conduct does not constitute commercial advertisement or promotion.

The Lanham Act reaches only false statements made in "commercial advertisement or promotion."  *Ariix*, 985 F.3d at 1114; *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020); 15 U.S.C. § 1125(a)(1)(B).  As relevant here, the Ninth Circuit defines "commercial advertising or promotion" to require "(1) commercial speech … (3) for the purpose of influencing consumers to buy defendant's goods or services."  *Ariix*, 985 F.3d at 1115.  REX cannot satisfy either requirement.

### a. There is no commercial speech.

*Not Speech*.  As an initial matter, neither the default status nor the two-tab display constitutes speech.  Not "everything that communicates an idea counts as 'speech.'"  *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058 (9th Cir. 2010).  While "pure speech" clearly counts, "conduct intending to express an idea" amounts to speech "only if it is 'sufficiently imbued with elements of communication,'" which means there must be both an "intent to convey a particularized message" and a "likelihood … that the message w[ill] be understood by those who view [] it."  *Id.*; *see Edge v. City of Everett*, 929 F.3d 657, 668 (9th Cir. 2019).  There is no evidence that Zillow intended to convey any particularized message with the default status or two-tab display or that the consumers who viewed these features took away any particular message.  At most, Dr. Krishna speculates about what the display might communicate, Ex. D, 18:13-22 (Krishna), but that is not evidence, just guesswork.  It is not surprising that REX lacks evidence on this point:  These aspects of Zillow's website are akin to product placement, and "product placement is not commercial speech" precisely because "[i]t is difficult to see how merely displaying products on a store shelf qualifies as speech."

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

4

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

1   *Optimum Techs, Inc. v. Home Depot USA, Inc.*, No. 04-cv-02360, 2005 WL 3307508, at *6

2   (N.D. Ga. Dec. 5, 2005).[3]   Accordingly, any claim with respect to the default status or two-tab

3   display as a whole must fail.

4   ***Not Commercial Speech***.   In addition, the labels, default status, and two-tab display are

5   not ***commercial*** speech.   The "starting point" for whether speech constitutes "commercial

6   speech" is "speech that does no more than propose a commercial transaction."   *Ariix*, 985 F.3d

7   at 1115; *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020) (same).   The tab

8   labels, default status, and two-tab display do nothing to propose any commercial transaction.

9   Rather, they were designed to help consumers locate information regarding real estate listings

10  on Zillow's website.   Ex. C, 58:1-59:18 (Thomas).

11          Indeed, even if Zillow's broader database were considered, it still does not propose any

12  commercial transaction.   Rather, Zillow is an "online database of information" that provides

13  "free, publicly available" information that is "not transactional."   *IMDb.com*, 962 F.3d at 1122;

14  *ForSaleByOwner.com Corp. v. Zinnemann*, 347 F. Supp. 2d 868, 876 (E.D. Cal. 2004); *see*

15  *Ariix*, 985 F.3d at 1115 (an online guide to nutritional supplements "does not appear to

16  propose a commercial transaction").   Just as in *ForSaleByOwner.com*, Zillow generally

17  "provide[s] information in the form of real estate listings," and nothing in the challenged

18  display "propose[s] or encourage[s] a direct sales transaction between itself and a prospective

19  real estate purchaser."   347 F. Supp. 2d at 876.   To that end, Zillow's "listings are simply a

20  computerized version" of the very sort of "directories and newspapers" that have long been

21  held not to "constitute commercial speech."   *Vrdolyak v. Avvo, Inc.*, 206 F. Supp. 3d 1384,

22  1388-89 (N.D. Ill. 2016) (quoting *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 962 (9th

23  Cir. 2012)).

24          Because the display on Zillow's website plainly does not "propose a commercial

25

26  [3] REX cannot rely on this communicative aspect of the display to render the default status and
two-tab display as a whole expressive.   Where "actions [are] expressive only because'" the

27  speaker "'accompanied [its] conduct with speech explaining it,' it is not inherently expressive
conduct."   *Wolfe v. Logan*, No. 2:22-cv-06463, 2023 WL 2239062, at *3 (C.D. Cal. Jan. 25,

28  2023).

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW                      5
2:21-CV-00312-TSZ

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington 98101
+1 206 839 4300

transaction," there is no need to analyze the speech further. *IMDb.com*, 962 F.3d at 1122 ("Because IMDb's public profiles do not 'propose a commercial transaction,' we need not reach the *Bolger* factors."); *see Dex Media*, 696 F.3d at 959 (same). But even if this Court considers the *Bolger* factors ("[1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation," *Ariix*, 985 F.3d at 1115-16), there is not sufficient evidence to meet them. The tab labels, default status, and two-tab display are in no way traditional advertisements, and they do not refer to any specific product. That is enough to render them non-commercial under the *Bolger* factors. *See IMDb.com*, 962 F.3d at 1122; *Dex Media W*, 696 F.3d at 960 ("economic motive in itself is insufficient to characterize a publication as commercial"). Further, to the extent Zillow had an economic motivation to redesign its display, it was to have the best listings content that would drive consumers to use its website. Ex. C, 61:11-62:24, 108:23-109:15 (Thomas); Ex. E, 10:4-11, 19:21-20:8, 28:15-19, 36:12-21 (Samuelson); *Ariix*, 985 F.3d at 1116-17; *Dex Media*, 696 F.3d at 960.

### b. The challenged statements were not for the purpose of influencing consumers to buy defendant's goods or services.

Even if the challenged aspects of Zillow's website constitute "commercial speech," only "promotional" speech is actionable, and not all "commercial speech is promotional." *Prager*, 951 F.3d at 1000. In particular, the commercial speech must also be "for the purpose of influencing consumers to buy defendant's goods or services." *Ariix*, 985 F.3d at 1115; *Prager*, 951 F.3d at 1000.

REX has not developed evidence that any aspect of Zillow's two-tab display—the labels, the default, or the display as a whole—was meant to influence consumers to buy *defendant's* goods or services. Nothing shows that the reason the display, the default, and the labels were chosen was to promote any of Zillow's own listings. To the contrary, the challenged statements were "made to explain a user tool" and thus are "not for a promotional purpose to 'penetrate the relevant market' of the viewing public." *Prager*, 951 F.3d at 999-1000; *see also Newman*, 2021 WL 2633423, at *11-12. The record makes clear that the

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ                    6                    ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington 98101
+1 206 839 4300

display, default, and labels were chosen to help users find the listings that mattered to them, regardless where they came from.  Ex. C, 58:1-59:4, 67:5-14, 68:12-69:2 (Thomas); Ex. E 42:2-14, 58:2-5 (Samuelson); TX993, ZG_00018958; TX1176, ZG_00543992; TX 1031, ZG_00360544.  In this way, the reason Zillow adopted the display that it did—from the structure to the labels—is that it would create the best user experience possible to help consumers navigate the website given the new rules Zillow was required to comply with.  Ex. C, 69:3-21, 70:18-72:15, 81:1-6 (Thomas).  The tabs (and their labels) were just like any other search tool that existed on Zillow's website: it allowed users to identify property listings in which they may be interested.  Ex. C, 72:16-77:6 (Thomas); *see* Ex. C, 58:14-24 (Thomas).  Accordingly, they do not constitute commercial advertisements.

### 3.        The challenged statements are not deceptive.

The Court has concluded that REX is entitled to a presumption of deception with respect to the tab labels.  But the presumption does not apply to any other aspect of the display. And so, "proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical."  *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995).  The plaintiff must demonstrate that "a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement." *Id.* (quoting *Johnson & Johnson Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297-98 (2d Cir. 1992)).  Given this demand for rigor, "[r]eactions of the public are typically tested through the use of consumer surveys."  *Southland*, 108 F.3d at 1140.

There is no evidence that a substantial part of Zillow's audience was deceived by the default status or two-tab display.  It is undisputed that REX's marketing expert performed no survey to determine user confusion, Ex. D, 39:21-40:8 (Krishna), let alone a survey "to understand whether consumers were aware of or discovered the tabs," Ex. D, 39:18-20 (Krishna), so REX cannot establish deception that way.  Nor can REX rely on its expert's generalized research about default effects, because it is undisputed that REX's expert did not

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

7

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

1   consult research relating to the default effect in the context of home buying.  Ex. D, 46:12-15

2   (Krishna).  REX simply has no *evidence* from which it can claim that consumers were

3   deceived by the non-label aspects of Zillow's website.  Indeed, the extrinsic evidence in the

4   record shows the opposite, because "people were discovering the toggle."  Ex. C, 81:7-16

5   (Thomas); Ex. C, 137:23-138:7 (Thomas); TX993, ZG_00018958 ("There were no issues with

6   the discoverability of the toggle and Beth's were easily able to navigate between the two

7   listings categories."); TX1176, ZG_00543990; TX44, ZG_00011982; *see* TX35,

8   ZG_00001168; TX1031, ZG_00360550.  And of course they were:  The second tab was

9   located right next to the primary tab, and both tabs were always available on the website.

10   TX873; Ex. D, 49:22-24 (Krishna); Ex. C, 72:8-15, 115:25-116:7 (Thomas).  Zillow also

11   implemented a variety of methods to ensure that users were aware of the different tabs.  Ex. C,

12   94:8-95:6 (Thomas); TX424, ¶¶ 23-25.

13          Zillow also notes that it has offered evidence to rebut the presumption of deception.

14   Zillow implemented a variety of methods to explain what was found within each tab.  Ex. C,

15   94:8-95:6 (Thomas); TX 424, ¶¶ 23-25.  Indeed, consumers would not be deceived about

16   whether REX's listings were non-agent listings because those listings clearly conveyed they

17   came from agents.  *See* TX44, ZG_00011985; TX35, ZG_00001219.  REX has no additional

18   evidence from which to show the labels were deceptive.  REX's marketing expert did not do

19   any survey of her own, Ex. D, 39:21-40:8 (Krishna), and she conceded she has no "empirical

20   evidence showing whether any consumers who use Zillow's website were confused or misled

21   by the labels," Ex. D, 40:5-14 (Krishna).  REX's expert further conceded that the Zillow study

22   that expert relied on, and that this Court emphasized in granting REX's motion with respect to

23   falsity, *see* Ex. D, 53:24-54:10 (Krishna); Dkt. 465, 20, is not "sufficient to be reliable"

24   because it only involved twelve people, Ex. D, 53:24-54:10 (Krishna).

25                  **4.      Any deception would not be material.**

26          REX also has failed to offer evidence from which the jury could find that the deception

27   is material, in that it is "'likely to influence the purchasing decision' of consumers."

28

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ                                          8                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                                                        401 Union Street, Site 3300
                                                                                        Seattle, Washington  98101
                                                                                        +1 206 839 4300

1   *Southland*, 108 F.3d at 1139.  Because this inquiry is focused on how consumers would

2   actually react to a deceptive statement, materiality is "'typically' proven through consumer

3   surveys, which provide direct evidence of a statement's impact."  *Clorox Co. v. Reckitt*

4   *Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644 (N.D. Cal. 2019).

5        ***Tab Labels***.  REX must show that consumers assuming REX listings to be non-agent

6   listings would influence their decision whether to pursue, and ultimately purchase, those

7   listings.  REX's marketing expert cannot have a view on materiality, because she did not do a

8   survey showing how consumers reacted to the label "Other listings."  Ex. D, 40:2-4 (Krishna);

9   Ex. D, 41:5-9 (Krishna).  Indeed, she did not look at actual purchasing behavior at all.  Ex. D,

10   41:10-12 (Krishna).

11        Moreover, the evidence in the record indicates that consumers' purchasing decisions

12   would not be influenced by the fact that a listing came from a non-agent.  Consumers focus on

13   the qualities of the house—features like square footage, location, and number of bathrooms—

14   as opposed to who was selling it.  TX1176, ZG_00543992 ("It is important to note that Beth's

15   are more focused on whether or not the home meets their needs rather tha[n] who is selling

16   it."); TX993, ZG_00018958 (same); TX44, ZG_00001220 ("From a buyer standpoint, why

17   should I care who's selling it?").  Motivated buyers would look for homes in many places,

18   including the second tab, Ex .C, 70:8-17, 96:17-97:9 (Thomas), but also the other channels

19   where REX advertised its properties, Ex. A, 113:25-114:18 (Sides).  In other words, if REX

20   had a property that otherwise matched a consumer's interest, they would not walk away simply

21   because they thought it might be from a non-agent.

22        ***Default Status and Two-Tab Display.***  For similar reasons, REX also cannot show that

23   these features of Zillow's display impacted purchasing behavior.  REX's marketing expert did

24   not develop any evidence establishing that consumers were less likely to click on the non-

25   default tab.  *See supra* § III.A.3.  And she acknowledged that, unlike in other contexts where a

26   default status is employed, the decision whether to click the second tab is "more easily

27   reversed."  Ex. D, 50:5-20 (Krishna).  There is every indication that motivated buyers would

28

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

9

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

1   look for, and locate, REX listings on the second tab, and toggle between the two tabs.  *See*

2   *supra* § III.A.3.

3   **5.    The challenged statements did not proximately cause REX's injury.**

4   Finally, REX must show that it "has been or is likely to be injured *as a result of the*

5   *false statement*" it challenges.  *Southland*, 108 F.3d at 1139 (emphasis added); *Harper House,*

6   *Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989) ("[A]ctual evidence of some

7   injury *resulting from the deception* is an essential element of the plaintiff's case.").  The

8   injury must "flow[] directly from the deception wrought by the defendant's advertising; and

9   that occurs when deception of consumers causes them to withhold trade from the plaintiff."

10  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133-34 (2014).

11  Judgment as a matter of law is appropriate when the plaintiff "fails to present any evidence of

12  injury resulting from defendants' deception."  *VBS Distrib., Inc. v. Nutrivita Lab'ys, Inc.*, 811

13  F. App'x 1005, 1007 (9th Cir. 2020).

14  REX has not even attempted to show injury flowing directly from the alleged deception

15  caused by the distinct aspects of the two-tab display.  REX's marketing expert did not separate

16  out the injury caused by different elements of the website.  Ex. D, 34:20-35:1 (Krishna).

17  REX's economic expert likewise explained that he did not analyze the effect that the distinct

18  aspects of the display had on REX; he instead analyzed them only altogether, Ex. B, 157:9-

19  158:2 (Evans), which left an absence of evidence establishing that the only real statements at

20  issue here—the tab labels—caused REX's harm.  Indeed, REX's own fact witnesses did not

21  offer any testimony supporting the notion that the labels, in particular, caused them harm.

22  Moreover, the fact that there was an impact on for-sale-by-owner listings—listings that

23  properly would be labeled as "Other listings"—shows it is not the labels that had this impact.

24  Ex. B, 160:19-162:15 (Evans).  Accordingly, unless REX establishes that liability is properly

25  based on every aspect of Zillow's display, which it cannot for the reasons explained above,

26  then it cannot establish causation with respect to any of them.  *See VBS*, 811 F. App'x at 1007

27  (where evidence "refers collectively to various allegedly false statements" that evidence "falls

28

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

10

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

well short of the quantum of evidence" that is "adequate … for a reasonable jury to conclude

that Plaintiffs suffered actual injury as a result of Defendants' advertisements"); *Newman*,

2021 WL 2633423, at *12 (rejecting claim where identified "harms flow from the fact that

Defendants have limited [users'] access" to plaintiff's materials, not the "allegedly false

statements" about those materials).

More fundamentally, the evidence also reflects that ***none*** of Zillow's actions were the

proximate cause of REX's injury.  REX has pointed generally to views and closings dropping

after Zillow changed its website.  But as REX's CEO explained, there is a "difference between

correlation and causation," and what "you really want to find, if things are going wrong, is

causation." Ex. B, 30:12-16 (Ryan).  A drop in views on the websites does not necessarily

imply a drop in closings.  And a drop in closings may not be attributable to the display change

at all.  To that end, REX simply has no evidence from which it can attribute REX's harms to

Zillow's conduct, as opposed to any of the other headwinds REX has admitted it was facing at

that time.  Dkt. 478-2, 169:02-170:14 (Drath) (REX's demise was the product of a complex

array of factors, and in "no shape, way, or form" could Zillow's website change be thought to

be the sole cause.).  These included:

- Underperformance predating Zillow's website change.  Dkt. 478-2, 36:3-37:5 (Drath); Ex. A, 147:2-25 (Sides); *see* Ex. A, 125:22-25, 126:12-127:7, 130:13-22 (Sides) (REX's listing quantity and lead conversion decreased in 2020); TX569, REX_0000149.

- Mismanagement.  Dkt. 478-2, 165:4-20, 167:11-25, 169:2-18 (Drath).

- Consequences of bypassing the MLS system.  Dkt. 478-5, 61:24-62:12 (Felice); TX49; TX50.

- Impact of COVID-19.  Ex. A, 132:15-134:3, 136:14-138:10 (Sides); Ex. B, 155:5-156:13 (Evans).

- Overexpansion in anticipation of an early end to COVID-19.  Ex. A, 135:15-20, 144:15-19 (Sides); Ex. A, 184:2-19 (Ryan); TX710.

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

11

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

- Investors' independent decisions not to fund REX.  Ex. B, 23:14-29:6 (Ryan); Dkt. 478-2, 47:03-47:17 (Drath).

- Collapse of the SPAC IPO market.  Ex. A, 144:23-145:2 (Sides).

Ultimately, REX could not deliver on the business model it promised, with almost half of REX's transactions involving a non-REX buy-side agent, Ex. A, 116:4-19 (Sides), and users giving REX poor marks where it was unable to get buyers for its listings, Ex. A, 123:14-16, 125:15-18 (Sides).  In short, given all of these other sources of REX's harm, REX cannot claim that its injury would not have happened in the absence of Zillow's conduct.

### B.    REX's WCPA claim must fail.

To prevail on its WCPA claim, REX must prove "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Young v. Toyota Motor Sales, U.S.A.*, 196 Wn.2d 310, 316, 472 P.3d 990 (2020).  In addition, there can be no liability where the challenged "acts or practices … are reasonable in relation to the development and preservation of business."  RCW 19.86.920; *see Travis v. Wash. Horse Breeders Ass'n*, 111 Wn.2d 396, 408, 759 P.2d 418 (1988).

REX has purported to challenge multiple acts or practices associated with Zillow's redesigned website. These acts or practices do not satisfy the elements marked with an X.

| | Deceptive or Unfair | Trade or Commerce | Public Interest | Injury | Causation |
|---|---|---|---|---|---|
| Tab Labels | X | X | X | | X |
| Default Status | X | X | X | | X |
| Two-Tab Display | X | X | X | | X |

### 1.    There is no unfair or deceptive act or practice.

#### a.    Deceptive.

To show deception, there must be "'a representation, omission or practice that is likely to mislead' a reasonable consumer."  *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 50, 204 P.3d 885 (2009).  That practice must have the "capacity to deceive a substantial portion of

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

12

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

1   the public." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co*, 105 Wn.2d 778,

2   785, 719 P.2d 531 (1986).

3        For all the reasons explained above, REX does not have sufficient evidence from

4   which a jury could conclude that the acts or practices challenged here would have the capacity

5   to deceive a substantial portion of the public. *See supra* § III.A.3.

6        **b.**    **Unfair.**

7        An act or practice is unfair if it "causes or is likely to cause substantial injury to

8   consumers which is not reasonably avoidable by consumers themselves and not outweighed by

9   countervailing benefits." *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787, 295 P.3d 1179

10   (2013); *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1161-62 (W.D.

11   Wash. 2017).  None of the asserted acts or practices meet that standard.

12        ***Substantial Injury To Consumers.***  There is no evidence that consumers are injured by

13   the labeling or placement of REX's listings.  REX's theory of consumer harm is that

14   consumers would be injured if they could not access REX listings because REX would allow

15   consumers to pay lower commissions.  But as this Court already recognized on summary

16   judgment, the record at most could show "***harm to REX***" and there was no "harm to

17   competition" in the form of "reduced output, increased prices, or decreased quality."  Dkt. 461,

18   30 n.19 (emphasis added); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020).  That

19   should resolve the matter.

20        In any event, REX has not overcome this fatal flaw by producing evidence of consumer

21   injury at trial.  To the extent REX might have been able to offer savings on commissions by

22   bypassing the MLS, the evidence reflects that those savings evaporated after accounting for

23   REX being less effective at promoting its listings.  Ex. A, 119:22-121:25 (Sides); Dkt. 478-5,

24   106:24-110:23 (Felice) Ex. B, 150:15-151:25 (Evans); *see* TX49; TX50.  Still more, despite

25   what REX claimed, REX regularly failed to offer commission savings in the first place.  Buyer

26   commissions were still paid nearly 50% of the time.  Ex. A, 173:6-174:4 (Ryan); Ex. A, 116:4-

27   19 (Sides).  Ultimately, even if consumers could not access REX, there were plenty of other

28

13

1    discount brokers in the market, Ex. A, 75:15-76:7 (Sides); Ex. E, 88:14-25 (Samuelson).  In

2    short, REX has not established injury to consumers that flowed from the challenged acts or

3    practices.

4        ***Consumers Cannot Avoid.***  Even if REX could establish injury to consumers (and it

5    cannot), consumers would have been able to avoid that harm.  In "determining whether

6    consumers' injuries were reasonably avoidable, courts look to whether the consumers had a

7    free and informed choice."  *Alpert v. Nationstar Mortg. LLC*, No. 15-cv-1164, 2019 WL

8    1200541, at *6-7 (W.D. Wash. Mar. 14, 2019).  An "injury is reasonably avoidable if

9    consumers have reason to anticipate the impending harm and the means to avoid it, or if

10   consumers are aware of, and are reasonably capable of pursuing, potential avenues toward

11   mitigating the injury after the fact."  *Gray v. Amazon.com, Inc.*, No. 22-cv-800, 2023 WL

12   1068513, at *7 (W.D. Wash. Jan. 27, 2023).  To the extent consumers wanted additional

13   options, they were "free, at any time, to choose" to investigate the second tab and/or search for

14   listings on any of the other websites that carried additional listings.  *See Alpert*, 2019 WL

15   1200541, at * 7.  Indeed, there is no dispute that consumers can, and do, consult other sources

16   for housing listings, which is precisely why Zillow sought to ensure it always had as many

17   listings as possible.  Ex. E, 16:18-25 (Samuelson); Ex. C, 139:22-140:10 (Thomas); *see also*

18   Ex. C, 141:15-23 (Thomas); Ex. E, 182:12-183:11 (Erdem).  Serious buyers would take "the

19   trouble of going to this non-default view and finding homes."  Ex. C, 96:18-97:9 (Thomas).

20   REX's listings could be found there, or on any of the other, multiple channels REX listings

21   appeared.  Ex. A, 113:25-114:18 (Sides); Dkt. 478-5, 72:16-25 (Felice) (admitting that the

22   "Zillow change didn't prevent REX from using other channels").

23       ***Is Not Outweighed By Countervailing Benefits.***  Finally, whatever limited harm

24   consumers faced from REX's listings being on the second tab would be outweighed by the

25   benefits those consumers received by virtue of Zillow switching to the IDX feeds.  That

26   allowed Zillow to give consumers more listings, of higher quality, and faster.  Ex. C, 109:5-15

27   (Thomas).  Going forward, Zillow also would be able to innovate more by virtue of the

28

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

14

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

security the IDX agreements supplied.  Ex. E, 26:1-22 (Samuelson).  In this way, the "overall experience" for consumers "was better."  Ex. C, 108:23-109:15 (Thomas); *see* Ex. C, 98:13-21 (Thomas).[4]

### 2.   The challenged acts or practices did not occur in trade or commerce.

The WCPA reaches only "unfair or deceptive acts or practices in the conduct of any trade or commerce."  RCW 19.86.020; *see* RCW 19.86.010.

Zillow's two-tab display does not occur "in trade or commerce."  That part of Zillow's website serves to "collect[] data" and "provide" it "to consumers free of charge."  *Browne v. Avvo Inc.*, 525 F. Supp. 2d 1249, 1254 (W.D. Wash. 2007).  In other words, it is "an information clearinghouse" and Zillow's "publication of information" is not "trade or commerce" and "cannot form the basis of a CPA claim."  *Id.*; *see Fid. Mortg. Corp. v. Seattle Times Co.*, 131 Wn. App. 462, 468, 128 P.3d 621 (2005) ("[T]he quarterly rate chart is not paid advertising.  It is a news article, and as such it is not published 'in the conduct of any trade or commerce.'"); *Delashaw v. Seattle Times Co.*, No. 18-cv-0537, 2018 WL 4027078, at * 15 (W.D. Wash. Aug. 23, 2018) (similar).  Under Washington law, the publication of information—for example, providing an informational database or publishing news articles—does not take place in trade or commerce unless the information provider "accept[s] payment for the inclusion" on its "website."  *Browne*, 525 F. Supp. 2d at 1254.  Those categories of acts and practices thus do not fall within "the scope of the acts and practices the CPA is designed to prevent."  *Thornell v. Seattle Serv. Bureau, Inc.*, 184 Wn.2d 793, 800, 363 P.3d 587 (2015).

---

[4] Zillow also maintains this Court should not find that Zillow's conduct was unfair because that would create a conflict between the WCPA and state and federal antitrust law.  In applying the WCPA, courts are instructed to "minimize conflict" with "state and federal antitrust laws" so as "to avoid subjecting Washington businesses to divergent regulatory approaches to the same conduct."  *Blewett v. Abbot Lab'ys*, 86 Wn. App. 782, 788, 938 P.2d 842 (1997).  It is well-established that a party is not required to do business with another.  *See Powell v. Graham*, 183 Wash. 452, 458, 48 P.2d 952 (1935); *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).  There is no "reason rooted in [Washington] statutes or case law" that supports reading the unfairness prong to conflict with that fundamental principle of antitrust law.  *Blewett*, 86 Wn. App. at 788.

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ                                      15            ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                                              401 Union Street, Site 3300
                                                                              Seattle, Washington  98101
                                                                              +1 206 839 4300

### 3.   The challenged acts or practices do not affect the public interest.

REX must also establish that the challenged acts or practices affected the public interest.  As relevant here, "a claimant may establish that the act or practice is injurious to the public interest because it … (3)(a) injured other persons; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons."  RCW 19.86.093; *Zunum Aero, Inc. v. Boeing Co.*, No. 21-cv-0896, 2022 WL 2116678, at *11 (W.D. Wash. June 13, 2022).  Importantly, there must be a "likelihood that additional plaintiffs have been or will be injured in exactly the same fashion" as the plaintiff to "transform a 'factual pattern from a private dispute to one that affects the public interest.'"  *Zunum*, 2022 WL 2116678, at *12 (quoting *Hangman Ridge*, 105 Wn.2d at 790).  Where no "person will be injured by" the defendant by "the same or similar conduct," there is not sufficient "public interest impact."  *Stiegler v. Saldat*, No. 14-cv-1309-TSZ, 2015 WL 13686087, at *3 (W.D. Wash. Oct. 23, 2015).

REX has not established that other persons were injured in the same way it was.  REX's claimed injury is that, even though it is an agent, its listings were placed on the non-default, "Other listings" tab as opposed to the "Agent listings" tab.  Dkt. 99, ¶¶ 170-72.  But REX contends it has satisfied this element because Zillow deprived "consumers" of the "opportunity to save thousands of dollars or more in real estate commission rates."  Dkt. 481, 2; *see also* Dkt. 481, 24, 26; Dkt. 99, ¶¶ 173-75.  As explained above, the evidence does not reflect that consumers were harmed in this way.  *See supra* § III.B.1.b.  But even if it did, that would not suffice to show an effect on the public interest because the harm consumers may face from REX "reducing competition" is "far from 'exactly the same' as the fashion" in which Zillow supposedly harmed REX.  *Zunum*, 2022 WL 2116678, at *12.

### 4.   The challenged acts or practices do not cause REX's harm.

The Washington Supreme Court has embraced the causation standard set out in WPI 15.01, such that a "plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury."  *Indoor Billboard/Wash, Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 83, 170 P.3d 10 (2007); *Schnall v. AT&T*

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

16

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

1   *Wireless Servs., Inc.*, 171 Wn.2d 260, 278, 259 P.3d 129 (2011) (same).  For all the reasons

2   explained above, REX has not offered evidence establishing that the challenged acts or

3   practices—the labels, two-tab display, or default status—caused REX's injury.  *See supra*

4   § III.A.5.  Moreover, the evidence reflects that REX would have suffered injury even if the

5   challenged acts or practices here—the labels, two-tab display, or default status—did not take

6   place.  *See supra* § III.A.5.

   **5.      The challenged acts or practices are reasonable in relation to
            Zillow's business.**

8        Even if REX otherwise could establish the elements of its WCPA claim, there can be

9   no liability where the challenged "acts or practices … are reasonable in relation to the

10  development and preservation of business."  RCW 19.86.920; *see Travis*, 111 Wn.2d at 408-

11  09.  This consideration reflects "that businesses need some latitude within which to conduct

12  their trade."  *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 54, 738 P.2d 665 (1987).  "Where

13  conduct is motivated by legitimate business concerns, there can be no violation of RCW

14  19.86."  *Id.*

15       Here, Zillow has offered evidence from which a jury would be compelled to conclude

16  that Zillow's actions throughout the website redesign process were motivated by legitimate

17  business concerns.  Zillow's adoption of the two-tab display was motivated by Zillow's desire

18  to obtain access to the IDX listings feed, which was necessary for Zillow to stay competitive

19  with other listings data aggregators.  Ex. E, 19:3-20:24 (Samuelson); Ex. C, 67:5-14, 141:15-

20  23 (Thomas).  In particular, when consumers thought that other listings data aggregators had

21  more or timelier listings, that could result in them opting to use that data aggregator instead of

22  Zillow.  Ex. E, 19:3-20:24, 27:19-28:19 (Samuelson); Ex. C, 141:14-23 (Thomas).  Accepting

23  those higher quality listings came with the trade-off that it would have to redesign its website,

24  but Zillow believed that it would be better for its business and consumers to do so. Ex. E,

25  33:10-17 (Samuelson); Ex. C, 108:23-109:15 (Thomas).[5]

26

27  [5] REX has suggested (citing nothing) that Zillow's decision to "change its web design" must be
    analyzed in a vacuum, without consideration that it was necessary to gain "access to the IDX

28

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ                                    17            ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                                       401 Union Street, Site 3300
                                                                       Seattle, Washington  98101
                                                                          +1 206 839 4300

1    Zillow's choice of design—the use of tabs, choice of labels, and decision to make

2    MLS-affiliated listings the default—likewise reflected that Zillow was motivated by legitimate

3    business concerns.  Zillow engaged in an extensive process to develop the most user-friendly

4    display that it could, given the constraints that came along with accepting the better listings

5    data.  Ex. C, 72:8-78:2, 83:5-20 (Thomas).  It considered many other ways to separate the data,

6    and numerous alternative labels, before settling on the design that gave rise to this suit.  Ex. C,

7    72:8-78:2 (Thomas).  And it determined that the display should default to the tab with the most

8    actionable listings, because those were the listings that were most valuable to consumers.  Ex.

9    C, 91:13-92:2 (Thomas).

10    Ultimately, the record also reflects that REX's core complaint—Zillow's inclusion of

11    REX's listings on the non-default tab with the label "Other listings"—reflected Zillow's need

12    to engage in a careful balancing act.  Zillow had to keep its redesign process confidential until

13    just before launch, Ex. E, 38:13-39:3 (Samuelson), which limited the ability to do more

14    testing, Ex. C, 78:12-20 (Thomas).  By the time the issue of REX's inclusion on Zillow's

15    website arose, it was too late for Zillow to redesign its website to accommodate the previously

16    unexpected possibility of agent listings appearing on a non-MLS tab.  Ex. E, 47:3-50:22

17    (Samuelson); Ex. C, 89:5-17 (Thomas).  But Zillow concluded that including REX on its

18    website was better—for consumers, for Zillow, and for REX—than omitting them entirely.

19    Ex. E, 48:1-50:22 (Samuelson).

20    In short, at each step of the way, Zillow acted reasonably to advance its business

21    interests, and this Court should preclude liability under the WCPA.

22    **C.      REX's is not entitled to damages on either of its claims.**

23    Even if REX establishes liability on its claims, it still is not entitled to damages.

24    **1.      Lanham Act.**

25    REX may recover "any damages sustained by the plaintiff," so long as the injury

26

27    feeds."  Dkt. 516, 3.  But the question is whether the display change was "motivated by
      legitimate business concerns," *Boeing*, 108 Wn.2d at 54, and there can be no doubt that the

28    benefits of IDX feeds supplied that motivation.

1    plaintiff claims is "proximately caused by the defendant's misrepresentations." *Lexmark*, 572

2    U.S. at 140.  The damages must flow from the "deception wrought by the defendant's

3    advertising" and "that occurs when deception of consumers causes them to withhold trade

4    from the plaintiff." *Lexmark*, 572 U.S. at 133.  Indeed, under the Lanham Act, the plaintiff

5    must offer evidence from which the jury could find "damages were attributable to" the

6    actionable statement and not "any number of economic or other causes." *Cascade Yarns, Inc.*

7    *v. Knitting Fever, Inc.*, No. 10-cv-00681, 2015 WL 3407882, at *7 (W.D. Wash. May 27,

8    2015); *Newman*, 2021 WL 2633423, at *12 (disregarding "injuries" that do not "flow[] from

9    [the] allegedly false statements").  This requirement must be strictly followed, as Congress has

10   dictated that any "sum" awarded "shall constitute compensation and not a penalty."  15 U.S.C.

11   § 1117(a).  Where there is no "way to determine with any degree of certainty what award

12   would be compensatory," a claim **for damages** under the Lanham Act should not go to the

13   jury. *TrafficSchool.com*, 653 F.3d at 831; *Cascade Yarns*, 2015 WL 3407882, at *7

14   ("[A]ppropriate to preclude … Lanham Act claim from going to the jury" where "any award

15   would constitute an impermissible penalty rather than compensation[.]").  REX has not offered

16   cognizable damages here for multiple reasons.

17     **First**, if the Court concludes, as it should, that REX's Lanham Act claim is properly

18   limited to the only statements that appear in the two-tab display—the labels—then REX has no

19   non-speculative evidence to establish damages attributable to those statements.  REX's expert

20   on the matter concededly has "not" offered an "opinion on damages if the jury finds that the

21   only Lanham Act violation was the label." Dkt. 394, 11 n.10; *see id.* 11 (damages opinion

22   relevant only if "the jury finds that the two-tab display both violated the Lanham Act and

23   forced REX to shutter its business.").  REX's damages expert confirmed at trial that his

24   damages calculation "analyzed the display change in its entirety." Ex. B, 156:17-158:2

25   (Evans).  Accordingly, there is **no basis** for permitting the jury to award damages on a Lanham

26   Act claim predicated on the tab labels.  *See Universal Life Church Monastery Storehouse v.*

27   *Am. Marriage Ministries*, No. 19-cv-0301, 2022 WL 2317439, at *4 (W.D. Wash. June 28,

28

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

19

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

2022) (not permitting Lanham Act claim to go to the jury "to the extent" the plaintiff "seeks monetary damages"); *Cascade Yarns*, 2015 WL 3407882, at *7 (party "failed to provide any evidentiary basis—through expert testimony or otherwise—from which the jury could have linked" the claimed losses to the statement); *Allergan USA Inc. v. Imprimis Pharms., Inc.*, No. 17-cv-1551, 2019 WL 12661090, at *1 (C.D. Cal. May 16, 2019).[6]

This also follows Zillow's argument that Dr. Evans' testimony on this point should be excluded altogether.  Zillow moved to exclude his opinion as irrelevant to the issue of damages for the non-antitrust claims because "none of the harm discussed in Evans' report is tied to what the tabs on Zillow's website were labeled."  Dkt. 341, § IV.B; *see also City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371-73 (9th Cir. 1992).  Zillow has renewed that objection through pre-trial proceedings, Ex. F, 32:15-24 (Sept. 8, 2023), and at trial, Ex. B, 60:22-61:3 (Evans).  This Court has yet to rule.  Dkt. 491; Ex. F, 35:8-36:4 (Sept. 8, 2023).

REX has previously resisted the argument that damages must be attributable to the challenged conduct because "Courts have found that where lawful and unlawful harm are inextricable, a plaintiff is not required to separate the two."  Dkt. 482, 30-31; Dkt. 498, 7-9.  But none of the cases REX cites are from the Lanham Act context, where there is special need to ensure that the damages awarded are compensatory.  *See TrafficSchool.com*, 653 F.3d at 831.  REX has made no attempt to square this line of cases with that fundamental requirement under the Lanham Act.[7]

**_Second_**, REX's damages analysis is further flawed because its expert did not calculate anything that remotely resembles a traditional lost profits calculation.  *McCarthy on Trademarks and Unfair Competition* § 27:43 (5th ed.).  Instead, he calculates the entire value

---

[6] Likewise, the fact that its expert examined the display in its entirety means that he failed to isolate the damages attributable to the impact of the default.
[7] Moreover, REX has not established that it was impossible to establish the impact that each distinct aspect of the two-tab display had on consumers.  REX's marketing expert could have used consumer surveys to assess the relative impact on consumers' purchasing decisions of each aspect of the display.  But she did not.  REX's damages expert likewise did not endeavor to do that, and instead relied on a "natural experiment" that never could answer the actual question posed by REX's Lanham Act claim—i.e., what harm was caused by the labels of the tabs.  Ex. B, 157:1-158:2 (Evans).  To be clear, that REX declined to do an analysis does not mean that it would have been impossible to do so.

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

20

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

1    of REX's business, Ex. B, 98:2-99:13 (Evans), without even attempting to account for how

2    REX's entire loss of business value could have resulted from the false advertising it claims.

3    But REX should be limited to those "losses" that "flow[] directly from the deception wrought

4    by defendant's advertising," where the "deception of consumers causes them to withhold

5    trade." *Lexmark*, 572 U.S. at 133-34.  There is simply no basis for concluding that the entirety

6    of REX's business value could have resulted from deception causing consumers to withhold

7    trade from REX.  It is too "speculative" to say that Zillow's conduct was the "cause of

8    [REX's] business failure."  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 710 (9th

9    Cir. 2004) (holding that judgment as matter of law was appropriate on the issue after observing

10   that "a start-up company should not be permitted to obtain pie-in-the-sky damages upon

11   allegations that it was snuffed out before it could begin to operate … capitalizing … present

12   value sought as damages." (quoting *MindGames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 658 (7th

13   Cir. 2000)).

14           Indeed, the record reflects that many of the reasons REX's business failed (and the

15   value of its business was reduced) had nothing to do with consumers withholding trade from

16   REX as a result of Zillow's deception, *see supra* § III.A.5.  REX's expert failed to account for

17   the lost value attributable to these causes having nothing to do with Zillow's display change.

18   *See* Ex. B, 164:21-165:3 (Evans).  For this reason, too, REX's damages calculation is fatally

19   flawed.  *See Cascade*, 2015 WL 3407882, at *7 ("The jury would have no way to find that

20   [plaintiff's] damages were attributable to the [challenged conduct] and not to … any number of

21   economic or other causes."); *cf. MCI Commc'ns Corp. v. Am. Tel & Tel. Co.*, 708 F.2d 1081,

22   1062 (7th Cir. 1983) ("When a plaintiff improperly attributes all losses to a defendant's illegal

23   acts, despite the presence of significant other factors, the evidence does not permit a jury to

24   make a reasonable and principled estimate of the amount of damages.").  In like

25   circumstances, where an expert "discount[s] competing causal factors without an adequate

26   basis" for doing so, courts have "excluded" such testimony and kept the issue of damages from

27   the jury under Rule 50.  *Grasshopper House, LLC v. Clean & Sober Media, LLC*, No. 19-

28

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

21

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300

1   56072, 2021 WL 3702243, at *1-2 (9th Cir. Aug. 20, 2021).

2     **Third**, and relatedly, the methodology of REX's expert in calculating REX's value was

3   flawed.  His valuation methodologies relied on REX's financial projections, Ex. B, 131:7-19,

4   133:13-135:2 (Evans), which the record makes clear were unreliable.  Dkt. 478-2, 26:08-26:14

5   (Drath) ("The company had missed its targets on … virtually every driver of revenue."); Dkt.

6   478-2, 30:09-30:13, 38:10-38:17 (Drath); Ex. B, 13:24-14:4, 16:24-17:25, 25:7-29:7 (Ryan).

7   It was "blatantly obvious" that REX "would not hit the numbers."  Dkt. 478-2, 32:17-33:03

8   (Drath).  And yet, REX's expert used them to arrive at his damages calculation anyway.

9   REX's damages expert's reliance on fundamentally unreliable forecasts dooms the resulting

10   damages analysis.[8]

11     Accordingly, REX cannot get actual damages and at most can get nominal damages.

12      **2.**  **WCPA.**

13     REX's claim for damages under the WCPA fares no better.  The WCPA, like the

14   Lanham Act, requires that damages be "attributable to the defendant's wrongful conduct."

15   *Fid. Mortg.*, 131 Wn. App. at 471; *see Kremermen v. Open Source Steel, LLC*, No. 17-cv-

16   0953, 2018 WL 5785441, at *19 (W.D. Wash. Nov. 5, 2018).  And here, too, the jury award

17   must be "supported by the evidence" and not just "speculation or guesswork."  *F.C. Bloxom*

18   *Co. v. Fireman's Fund Ins. Co.*, No. 10-cv-1603, 2012 WL 5992286, at *1 (W.D. Wash. Nov.

19   30, 2012).  REX has not supported its damages claim here.  REX's expert's concession that he

20   calculated damages only for the display as a whole stands in the way of awarding REX

21   damages as to the labels ***and*** default status.  *See supra* § III.C.1.  If the entire display is the

22   deceptive act or practice, REX's expert failed to explain how that practice caused REX to lose

23   its full enterprise value—a calculation that is flawed in any event.  *See supra* § III.C.1.

24

25   ───────────────

26   [8] The methodology of REX's damages expert was further flawed.  He also relied on comparables
    that were not remotely analogous to REX, Ex. B, 142:15-143:8, 153:13- 154:10 (Evans).

27   Moreover, to the extent REX's expert claims that valuations from investors establish REX's
    value, that helps Zillow's case.  Investors indicated that REX retained value many months after

28   Zillow's website change, Ex. E, 161:10-162:3 (Kennelly), proving that—at least from the
    market's perspective—the website change did not destroy REX's business.

### 3. REX is entitled only to post-mitigation damages.

The evidence reflects that REX could have solved its problems—and mitigated its damages—by co-listing with or joining MLSs, because that would have meant that REX listings would have been featured on the default tab with the label "Agent listings." *See* TX51 ("Joining the MLS would mean that we're back on the main tab on Zillow and Trulia."); TX53, REX_0255318 ("Solved the Zillow issue by partnering with MLS agents in some markets and joining non-NAR MLS's in others to get around the NAR -imposed change."). Indeed, REX could, and often did, solve its issues by "co-listing" with the MLS. Ex. A, 174:9-16 (Ryan); Ex. A, 107:6-23 (Sides); Ex. A, 117:11-18 (Sides). Indeed, "co-listing helped to get more eyeballs on [REX] listings," and "it did help … to get [its] listings sold." Ex. A, 107:17-22 (Sides). In fact, the evidence shows that the performance of homes REX co-listed on the MLS did better than those not listed on the MLS, even before the change in Zillow's website. Ex. A, 118:2-121:18 (Sides); TX49. Co-listing was at least as effective an option after Zillow changed its website. *See* TX50; *compare* TX49 (period covering 03/24/2019-02/28/2021), *with* TX50 (period covering 1/1/2021-6/29/2021). In short, REX could have avoided much of the harm it claims it suffered here. The record further reflects that "[t]he cost to" REX to do so "was relatively low" at just "$100 to $300 per co-list." Ex. A, 109:19-21 (Sides). Because co-listing would have remedied entirely the harm about which REX complains, REX is at most entitled to $100 to $300 per each of the listings it had to co-list.

## IV. CONCLUSION

This Court should enter judgment for Zillow on both of REX's claims.

1    Dated:  September 27, 2023                By:    */s/ Aravind Swaminathan*

2                                             ORRICK, HERRINGTON & SUTCLIFFE LLP
                                              Aravind Swaminathan (WSBA No. 33883)
3                                             aswaminathan@orrick.com
                                              Nicole Tadano (WSBA No. 40531)
4                                             ntadano@orrick.com
                                              Aaron P. Brecher (WABA No. 47212)
5                                             abrecher@orrick.com
                                              401 Union Street, Suite 3300
6                                             Seattle, WA  98101
                                              Telephone:  206-839-4300
7                                             Facsimile:  206-839-4301

8                                             Laura Najemy (Admitted *Pro Hac Vice*)
                                              lnajemy@orrick.com
9                                             222 Berkeley Street
                                              Suite 2000
10                                            Boston, MA 02116
                                              Telephone: 617-880-1800
11
                                              Paul Stancil (Admitted *Pro Hac Vice*)
12                                            pstancil@orrick.com
                                              609 Main Street
13                                            40th Floor
                                              Houston, TX 77002
14                                            Telephone:  713-658-6446

15                                            Jesse Beringer (Admitted *Pro Hac Vice*)
                                              jberinger@orrick.com
16                                            1152 15tg Street, N.W.
                                              Washington, DC 20005
17                                            Telephone: 202-339-8671

18                                            DECHERT LLP
                                              John "Jay" Jurata, Jr. (Admitted *Pro Hac Vice*)
19                                            jay.jurata@dechert.com
                                              Erica Fruiterman (Admitted *Pro Hac Vice*)
20                                            erica.fruiterman@dechert.com
                                              1900 K Street, N.W.
21                                            Washington, DC  20006
                                              Telephone:  202-261-3440
22
                                              Russell P. Cohen (Admitted *Pro Hac Vice*)
23                                            russ.cohen@dechert.com
                                              One Bush Street, Suite 1600
24                                            San Francisco, CA 94104
                                              Telephone:  415-262-4506
25
                                              ***Attorneys for Defendant Zillow Group, Inc.***
26

27

28

ZILLOW'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW
2:21-CV-00312-TSZ

24

ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Site 3300
Seattle, Washington  98101
+1 206 839 4300